**Commonwealth of Massachusetts**
**NORFOLK SUPERIOR COURT**
Case Summary
Civil Docket

## NOCV2004-02106
### Cashman v International business Machines Corporation et al

| | | | | |
|---|---|---|---|---|
| **File Date** | 12/10/2004 | **Status** | Disposed: transfered to other court (dtrans) | |
| **Status Date** | 02/16/2005 | **Session** | A - Civil A | |
| **Origin** | 1 | **Case Type** | A01 - Services, labor, materials | |
| **Lead Case** | | **Track** | F | |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Service** | 03/10/2005 | **Answer** | 05/09/2005 | **Rule12/19/20** | 05/09/2005 | |
| **Rule 15** | 05/09/2005 | **Discovery** | 10/06/2005 | **Rule 56** | 11/05/2005 | |
| **Final PTC** | 12/05/2005 | **Disposition** | 02/03/2006 | **Jury Trial** | Yes | |

### PARTIES

**Plaintiff**
Thomas Cashman
Active 12/10/2004

**Private Counsel 556934**
Kathleen E Cross
Hanify & King
One Beacon Street
Boston, MA 02108
Phone: 617-423-0400
Fax: 617-423-0498
Active 12/10/2004 Notify

**Defendant**
International business Machines Corporation
Served: 01/19/2005
Served (answr pending) 02/02/2005

**Private Counsel 348220**
Joan Ackerstein
Jackson Lewis LLP
1 Beacon Street
Suite 3300
Boston, MA 02108
Phone: 617-367-0025
Fax: 617-367-2155
Active 02/16/2005 Notify

**Defendant**
Steven A Mills
Served: 01/19/2005
Served (answr pending) 02/02/2005

*** See Attorney Information Above ***

**Defendant**
Charles ILL
Served: 01/17/2005
Served (answr pending) 02/02/2005

*** See Attorney Information Above ***

**Commonwealth of Massachusetts**
**NORFOLK SUPERIOR COURT**
**Case Summary**
**Civil Docket**

## NOCV2004-02106
### Cashman v International business Machines Corporation et al

| **Defendant**<br>John R Joyce<br>Served: 01/19/2005<br>Served (answr pending) 02/02/2005 | *** See Attorney Information Above *** |
|---|---|
| **Defendant**<br>Gregory  Enriquez<br>Served: 01/19/2005<br>Served (answr pending) 02/02/2005 | *** See Attorney Information Above *** |

**ENTRIES**

| Date | Paper | Text |
|---|---|---|
| 12/10/2004 | 1.0 | Complaint entry fee $280 plff jury claim |
| 12/10/2004 | | Origin 1, Type A01, Track F. |
| 12/10/2004 | 2.0 | Civil action cover sheet filed |
| 12/10/2004 | | fast track notice sent to plff attorney |
| 12/17/2004 | | ONE TRIAL review by Clerk, Case is to remain in the Superior Court |
| 01/10/2005 | 3.0 | Amended Complaint of Thomas Cashman |
| 01/13/2005 | 4.0 | Plaintiff Thomas Cashman's MOTION for appointment of special process server . |
| 01/14/2005 | | MOTION (P#4.0) ALLOWED.  Counsel to submit proof that out of state process servers have authority in their respective jurisdiction.<br>(Isaac Borenstein,  Associate Justice) dated January 14, 2005 Notices mailed January 14, 2005 |
| 01/18/2005 | 5.0 | Amended complaint of Thomas Cashman(rec'd1/14/05) |
| 02/02/2005 | 6.0 | Plff's Proof of Authority of out of state process servers:SERVICE RETURNED:in hand to  Charles ILL(Defendant)-served on Jan. 17,2005 |
| 02/02/2005 | | Plff's proof of service of authority of out of state process server SERVICE RETURNED: in hand to Sandi Garvin accepting for Steven A Mills(Defendant)-served on Jan19,2005 |
| 02/02/2005 | | Plffs' Proof of authority of out of state process serversSERVICE RETURNED:in hand to Sandi Garvin accepting for  John R Joyce(Defendant)-served on Jan. 19,2005 |
| 02/02/2005 | 7.0 | SERVICE RETURNED: inhand to Gregory Enriquez(Defendant)sr. VP World Wide Sales U.S.Operations -served on Jan.19.2005 |
| 02/02/2005 | 8.0 | SERVICE RETURNED (summons): Charles ILL, service made on January 17, 2005 (in hand)served on Jan19,.2005 |
| 02/02/2005 | 9.0 | SERVICE RETURNED:  in hand to Yvette Conception process specialist accepting for International business Machines Corporation(Defendant)-served 1/19/05 |
| 02/02/2005 | 10.0 | SERVICE RETURNED (summons): in hand to Sandi Garvin accepting for Steven A Mills, service made on January 19, 2005 |

MAS-20041213
levisdeb

Case 1:05-cv-10306-RWZ    Document 4    Filed 02/28/2005    Page 3 of 23

Commonwealth of Massachusetts
NORFOLK SUPERIOR COURT
Case Summary
Civil Docket

02/16/2005
02:38 PM

## NOCV2004-02106
## Cashman v International business Machines Corporation et al

| Date | Paper | Text |
|------|-------|------|
| 02/02/2005 | 11.0 | SERVICE RETURNED (summons): in hand to Sandi Garvin accepting for John R Joyce, service made on January 19, 2005 |
| 02/08/2005 | 12.0 | Notice of Motion for additional time for response (fax)(rec'd2/7/05) |
| 02/08/2005 | 13.0 | Original of p#12.0 Notice of motion for additional time for response |
| 02/16/2005 | 14.0 | Case REMOVED this date to US District Court of Massachusetts - Notice of Removal |

EVENTS

A TRUE COPY

Attest:

Deputy Assistant Clerk

2/16/05

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                  TRIAL COURT OF THE COMMONWEALTH
                             SUPERIOR COURT DEPARTMENT
                             CIVIL ACTION NO.

| | |
|---|---|
| THOMAS CASHMAN, ) <br> ) <br>　　　　Plaintiff, ) <br> ) <br>　　vs. ) <br> ) <br> INTERNATIONAL BUSINESS ) <br> MACHINES CORPORATION, ) <br> STEVEN A. MILLS, CHARLES ILL, ) <br> JOHN R. JOYCE, and ) <br> GREGORY ENRIQUEZ, ) <br> ) <br>　　　　Defendants. ) | **04  02106** |

## COMPLAINT AND JURY DEMAND

The plaintiff, Thomas Cashman ("Mr. Cashman"), asserts claims arising from his employment by International Business Machines, Corp. ("IBM") and the actions and omissions of various of its officers and senior managers based on IBM's failure to pay Mr. Cashman compensation that he earned pursuant to the terms of his compensation plan and subsequent retaliation for Mr. Cashman's pursuit of an internal grievance.

### JURISDICTION

1.    Jurisdiction is appropriate pursuant to the Massachusetts Long-Arm Statute, Mass. Gen. Laws, ch. 223A, §3.

2.    The Massachusetts Wage Act, G.L. ch. 149, §§148, provides, in pertinent part that, "[t]he president and treasurer of a corporation and any officers or agents having

the management of such corporation shall be deemed to be the employers of the

employees of the corporation within the meaning of this section."

## VENUE

3.     Venue is appropriate pursuant to Mass. Gen. Laws, ch. 223, §1.

## FACTS COMMON TO ALL COUNTS

4.     The plaintiff, Thomas Cashman, resides at 375 Westfield Street, Dedham,

Massachusetts, Norfolk County, where he also maintains a home office.

5.     Mr. Cashman was an employee of IBM continuously since February 3,

1997 and until he left IBM on November 30, 2004, at which time he held the position of a

WWW Business Unit Executive, E-business on Demand Automation, IBM Software

Group.  Other positions held by Mr. Cashman at IBM which are relevant to the claims

brought herein include Director of EMEA Financial Sales with Tivoli Global Financial

Services;  Tivoli Sales Manager, Business Unit Executive; Director, Financial Vertical,

Tivoli Systems, Inc.; Director, Performance, Availability, Configuration and Operations

Solutions, Tivoli Systems – Americas.

6.     The defendant, IBM, is a New York corporation and maintains a principal

place of business at 1133 Westchester Avenue, White Plains, New York ("IBM

Headquarters").  IBM is a foreign corporation registered with the Secretary of State of the

Commonwealth of Massachusetts and regularly conducts and solicits business in

Massachusetts.  Notably, it has a division in Cambridge, Massachusetts known as Lotus

Development Corporation.  IBM maintains or has maintained offices in the

Commonwealth of Massachusetts, including offices in Boston, Cambridge and Waltham,

Massachusetts.

7.     The defendant, Charles Ill, was a senior executive at IBM, on information and belief holding, the position of Vice President of Americas Software, at all times relevant to this action. Mr. Ill was the direct line supervisor for Mr. Cashman's direct supervisor, Gregory Enriquez. On or about February 5, 2002, Mr. Cashman filed an Open Door grievance with Mr. Ill respecting IBM's failure to pay his 2001 commissions earned and due and payable pursuant to the 2001 50/50 SWG Sales Plan. Mr. Cashman initiated and received many communications involving Mr. Ill from Mr. Cashman's home office in Massachusetts directly related to the claims central to this action. On information and belief, Mr. Ill is now a sales executive with BEA Systems, Inc., located in San Jose, California. Mr. Ill is an employer of plaintiff as defined by Mass. Gen. Laws, ch. 149 § 148.

8.     The defendant, Steven A. Mills, is Senior Vice President & Group Executive, a position he has held since July of 2000. According to IBM, Mr. Mills is responsible for shaping IBM's overall software strategy and directing its software business. Mr. Mills is responsible for approving the structure of yearly sales plans, and approved the structure of the 2001 50/50 SWG Sales Plan. Mr. Mills maintains an office at IBM headquarters in New York. Upon information and belief, Mr. Mills travels regularly to IBM's offices in Massachusetts, to carryout his duties regarding IBM software. Mr. Mills was in the direct chain of command managing and controlling software sales and commission decisions for IBM, including those complained of by Mr. Cashman in this action. Mr. Mills is an employer of plaintiff as defined by Mass. Gen. Laws, ch. 149 § 148.

3

9.    The defendant, John R. Joyce, at all times relevant to this complaint was a Senior Vice President and Chief Financial Officer of IBM, a position he had held since 1999. Mr. Joyce was responsible for all financial and business development activities of IBM, including those taking place in Massachusetts and including compensation of its employees. Upon information and belief, IBM's Finance and Planning sector, headed by Mr. Joyce, was complicitous in the decision to cut Mr. Cashman's commissions. Mr. Joyce was an employer of plaintiff as defined by Mass. Gen. Laws, ch. 149 § 148.

10.    The defendant, Gregory Enriquez, was the Americas Sales Vice President of Tivoli IBM Software group at all times relevant to this action and was the direct-line supervisor for Mr. Cashman. Mr. Enriquez maintained an office at IBM Americas Software Group Headquarters during his tenure of Vice President. Mr. Enriquez regularly contacted Mr. Cashman by telephone and email at Mr. Cashman's Dedham, Massachusetts home office regarding IBM's business in Massachusetts, and, more precisely the claims raised in this lawsuit. In or about January 2002, Mr. Enriquez telephoned Mr. Cashman at Mr. Cashman's home office in Dedham, Massachusetts and notified him that his 2001 earned and due and payable commissions would be reduced. At all times relevant to this action, Mr. Enriquez was an employer of plaintiff as defined by Mass. Gen. Laws, ch. 149, §148. On information and belief, Mr. Enriquez is currently employed as the Senior Vice President-Worldwide Sales for Stratus Technologies, 111 Powdermill Road, Maynard, Massachusetts 01754.

4

## FACTS COMMON TO ALL COUNTS

### Tivoli IBM Software Group – EMEA

11.    After achieving over 400% of his sales quota at IBM for 1997, Mr. Cashman was asked to take a three-year international assignment with EMEA (a division of IBM, which is an acronym for Europe, Middle East and Africa) that involved being relocated to the Netherlands. IBM directed a dedicated team to sell to substantial institutional targets, largely located in Europe, where IBM determined significant growth opportunities existed for its Tivoli products. Mr. Cashman was appointed to this position because of his demonstrated skill in managing sales involving large, institutional customers of IBM and his ability to close these deals.

12.    Mr. Cashman accepted this position and the substantial burden of relocating to the Netherlands in large part due to the professional and financial opportunities represented to him by IBM.

13.    Mr. Cashman's title was Director of EMEA Financial Sales with Tivoli Global Financial Services. His management team initially included five veteran sales managers. Mr. Cashman's direct line of supervision was up through the IBM Tivoli EMEA organization.

14.    IBM expressly directed Mr. Cashman to develop large, profitable transactions for the company. The team focused on sales to large institutions, principally comprising European banks and insurance companies. The sales structure and revenue targets for this team, as represented by the 1999 Sales Compensation Plan, were aggressive – more so than most similarly situated Tivoli sales teams responsible for other IBM geographical territories.

5

15.    Mr. Cashman's EMEA team each received an individual 1999 Sales

Compensation plan modeled on that previously employed by Tivoli, which became very

highly leveraged when a salesperson exceeded his or her sales goals by large amounts. A

true and accurate copy of Mr. Cashman's plan for 1999 is attached as Exhibit A.

16.    Mr. Cashman worked with Bruno Teuber, IBM Tivoli's Vice President of

Sales for EMEA, to design fair sales account responsibilities for each member of Mr.

Cashman's team, as well as bonus incentives for the team, to provide true challenges and

avoid "windfall" profits to any individual member of the team. The resulting distribution

of accounts was particularly challenging to the team because the success of each

salesperson, as well as the team, depended on sales a relatively small number of targeted

customers.

17.    Over the course of his tenure in this position, Mr. Cashman personally

recruited to the team three of the five IBM sales managers and an additional five business

consultants with significant ties to the targeted business communities and demonstrated

sales ability. In order to recruit this sales talent, Mr. Cashman touted the substantial

financial incentives represented by the IBM compensation scheme if the team could

produce outstanding sales performance.

18.    By fall of 1999, despite the aggressive goals set by IBM, Mr. Cashman's

EMEA sales team performed exceptionally, just as IBM had asked, and was well on its

way to exceeding individual and team quotas for the year. As a result of the team's

success, IBM was realizing significant revenue.

19.    At this time, Mr. Teuber contacted Mr. Cashman informing him that IBM

intended to elevate individual and team quotas so that year-end commissions and other

quota-based compensation would be reduced significantly. Mr. Cashman refused to change his team's compensation plans as he believed it would undermine his effectiveness as a manager and leader. He requested Mr. Teuber to reconsider.

20.    Mr. Teuber's next conversation with Mr. Cashman consisted of his informing Mr. Cashman that his compensation plan would be changed to eliminate commissions that Mr. Cashman had earned and that were due and payable. When Mr. Cashman asked whether he had any recourse to appeal the decision, Mr. Teuber told him that he could "go back to America" if he did not accept the reduction.

21.    As Mr. Cashman had rearranged his entire life so that he could be stationed in the Netherlands for three years, he had little option but to stay until he could make other arrangements. Mr. Cashman did begin immediate discussions with his "dotted line" manager back in New York to return to a position with IBM in the United States.

22.    Mr. Teuber initiated a two-fold reduction in the commissions compensation that IBM was obligated to pay Mr. Cashman's team. Rather than reduce quotas, IBM/EMEA resolved to pay the individuals on the team 50% of the commissions compensation they earned on large transactions, rather than the 100% due per their sales compensation plans. To reduce Mr. Cashman's commission compensation, which was based on team sales, rather than the leveraged overachievement commissions compensation articulated by his compensation plan, IBM paid him a lesser percentage for every dollar that his team sold above 186% of its quota for the year.

23.    Based on his sales quota of $28 million contained in his 1999 Sales Compensation Plan, and his actual sales for the year of $103.4 million, Mr. Cashman

would have earned approximately $1,582,200 in base salary and commissions for the year. Instead, with IBM/EMEA's end-of-the-year changes to his sales plan, his earnings were cut to $845,100, which cost Mr. Cashman at least $737,100 in earned commissions.

Tivoli IBM Software Group Sales – Massachusetts

24.    In February of 2000, Mr. Cashman returned to the United States to rebuild the Tivoli Finance Vertical Team, which sold mostly to banking, insurance and brokerage institutions. Mr. Cashman faced significant challenges in this new position.

25.    The first hurdle faced by Mr. Cashman in making his team successful was significant turnover in the software industry that was occurring at the time he took the reigns. The opportunities available in the computer software industry at the zenith of the dot com expansion to make significant sums of money attracted many good salespeople away from IBM in the 1999-2000 period.

26.    The Tivoli product line had also suffered recent setbacks that led to customer dissatisfaction, including, significantly, IBM's sale of Tivoli's customer help desk, which had been portrayed as the core of Tivoli's management strategy for sales to large institutional customers. As a result, when Mr. Cashman returned to lead this team, many customers who had made significant Tivoli purchases in the preceding few years, had yet to deploy the systems (a problem known in the industry as "shelfware"). These frustrated customers required substantial attention from Mr. Cashman and his team merely to digest their prior purchases and integrate Tivoli products into their businesses.

27.    Despite the constant turnover and existing customer unrest, Mr. Cashman's team was one of the only two sales teams on a regional level to achieve its sales quota.

8

28.     In 2001, IBM took action to bring the Tivoli sector of its business (which was wholly owned by IBM since approximately 1996), including the sales operation, in line with the other IBM software divisions. For sales, this meant that Tivoli's field sales personnel was compensated for the first time pursuant to the IBM SWG [software group] Sales Plans. The one that applied to Mr. Cashman and his team, which were "direct, field sales personnel" was entitled the "50/50 SWG Sales Plan." A true and accurate copy of the 50/50 SWG Sales Plan for 2001 ("Sales Plan") is attached hereto as Exhibit B.

29.     Essentially, the Sales Plan provided three sources of compensation for sales personnel to which it applied. Fifty per cent of a salesperson's compensation was considered base pay, or fixed portion of compensation that was to be paid semi-monthly. The other 50% of the "On Target Earnings" ("OTE") (total compensation available if salesperson achieved 100% of his or her quota) was divided between commissions and bonus-type opportunities. A final component of Total Cash Compensation (as defined by IBM) under the Sales Plan included any monies earned for "overachievement", sales in excess of 100% of an individual's or team's quota, which were generally paid out at a higher percentage of sales as the overachievement sales grew.

30.     IBM's software group ("SWG") made an express and concerted effort in 2001 to embrace and excite the Tivoli Americas Sales force of which Mr. Cashman's team was a prominent part. As is evident in the SWG management guidelines and communications from upper-tier SWG executives, IBM understood that it was suffering from attrition of its sales force and needed to stop this loss by providing aggressive

commission opportunities for its salespeople to compete with financial incentives offered by competitors the marketplace.

31.    On the cover of the IBM document that was provided to all sales staff by IBM to set out the benefits of the 50/50 SWG plan, "industry consultants" are quoted as saying, "your plan 'has some of the most aggressive rewards for overachievement in the industry.'"

32.    On the inside cover of the Sales Plan, in a message from Dan Lautenbach, Vice President, Worldwide Software Sales for IBM, he encourages, "[t]he software sales incentive plan recognizes the unique opportunities our sales force can identify and close this year. It is characterized by extremely high payout rates for business you close in excess of your assigned full year quota. And, because your sales plan is based on a self-funding model, *there are no caps to your earnings: the more you sell, the more revenue and incremental profit for IBM: and the more earnings for you.*" Emphasis supplied.

33.    The Sales Plan also included a listing of principles that guide the "Software Sales Incentive Plan," including, that "[t]he plan should be competitive with the software industry marketplace,' and "[t]he plan should be consistent with industry practice in key areas of uncapped earnings, earnings at first sale, and attractive upside opportunity."

34.    With respect to managers, IBM recognized in the Sales Plan that "[t]he plan should motivate Technical Support and Sales Management in a manner consistent with the team they support."

35.    The Sales Plan is replete with statements from IBM further emphasizing the "sky's-the-limit" approach to an individual salesperson's earnings for 2001. For

example Mr. Cashman and his team were promised, "[w]e have great expectations for a fantastic sales year with unlimited possibilities for you. There's no limit to your 2001 sales incentive opportunity;" "Your earnings for performance above quota continue to be uncapped in 2001;" "As soon as you start overachieving your full-year quota, the plan provides significant leverage to reward your performance. And, your earnings for attainment above 100% are uncapped." "You want to earn as much money as you can. We want that too, because when you win, IBM wins." Exhibit B.

36.    IBM also expressly recognized that its own gain was directly related to the overachievement of its salespeople. The Sales Plan states, "Revenue drives value for IBM. That's why the revenue measure is the largest portion of the incentive plan for most job roles. Double-digit revenue growth is one of our core business objectives, and we're making sure the Sales Incentive Plan pays you for helping achieve this goal." *Id.*

37.    For second-line sales managers like Mr. Cashman, his performance over 100% of his quota was even more highly rewarded in that the Sales Plan provided, "sales managers have accelerators that are greater than those for sales employees." In other words, the more sales revenue generated by a second line manager's team, the greater the percentage he or she would earn in commissions.

38.    In the example provided on page 6 of the Sales Plan, IBM specifically notes that when a manager generates revenue through his team that is above 120% of his full year quota, he or she earns commissions compensation at 12 times the rate for attainment compensation, which is "uncapped." (Sales Plan, p. 5).

39.    IBM's message of unbounded earnings potential for sales personnel who over achieve was echoed in all communications to Mr. Cashman concerning quotas, sales

11

plans and territories. Steven Mills, then the Senior Vice President and Group Executive for IBM SWG, wrote to hundreds of his sales managers on January 4, 2001 by email (including Mr. Cashman at his Massachusetts office) to preview the year's message. He stated, "we have put in significant effort to insure that quota's are reasonable and that we are delivering a sales plan that will provide a big payoff for those who can drive growth. Paying for growth is the key idea. Giving people the opportunity for significant financial reward is part of the excitement of winning."

40.    IBM repeatedly reinforced that IBM wanted to retain its sales force by providing financial incentives. At E-business University in 2001, a sales rally held at the beginning of every calendar year to excite the sales force, Steven Mills acknowledged, "We lost some good people. We cannot afford to have that happen in the year 2001. So we're going to focus our time, our effort, our energy into everything that goes into having a high performance sales team that is excited about selling for this organization, that's committed to this organization and who wants to be here a year from now."

41.    Mr. Mills also stated in his January 4, 2001 email, "[g]iven what happened to us in 2000, we MUST instill confidence that IBM SWG will be the software company to be a part of in 2001. The key to our success this year will be to retain our reps . . . How we treat our sales force this year and their growing commitment to our common goals will be key to driving the growth of IBM software."

42.    Mr. Mills recognized that financial success was at the heart of IBM's sales and retention plan. He said in his E-University speech, "That's what this year's sales plan is all about. It's about making money. It's about leverage . . . It's about a plan and a quota when combine[d] that causes you to put every last bit of effort into making this the

most successful financial year in your lives . . . The sales plan and the quotas together are all about how you're going to want to be here a year from now . . . you're going to want to be here because this is the best place to sell, with the best sales plan, with a tremendous opportunity for leverage."

43.     Nowhere in any of the sales plan materials that Mr. Cashman received or had access to was there any mention of a subjective judgment regarding a manager's level of involvement in a sales transaction in order for the revenue generated to be counted as part of a sales manager's quota.

44.     In February of 2001, Mr. Cashman was provided his target account list by an IBM account analyst. Mr. Cashman received his individual quota letter and compensation plan from John Dunderdale, the outgoing Vice President of Sales for Tivoli Americas in early March of 2001. True and accurate copies of both are attached hereto as Exhibit C. Mr. Cashman's quota was $35.5 million in sales.

45.     Despite Mr. Cashman taking on additional responsibilities as IBM's Director of Performance, Availability, Configuration and Operations products for the Americas in August of 2001, Mr. Cashman and his Financial Vertical team attained nearly $70 million in sales for 2001, which, in accordance with the Sales Plan should been used to figure Mr. Cashman's Total Cash Compensation for 2001.

46.     However, in January of 2002, Mr. Enriquez, the IBM executive to which Mr. Cashman reported directly, called Mr. Cashman at his home office in Dedham, Massachusetts and indicated that IBM did not intend to pay him the commission compensation that he had earned and that was due and payable.

13

47.    Directly thereafter, at the IBM 2002 E-Business University sales rally, Mr. Enriquez approached Mr. Cashman, again confirming that his compensation would be reduced for 2001, and warning Mr. Cashman that he could not speak about the impending reductions with anyone.

48.    Shortly thereafter, Mr. Cashman learned that IBM's financial commission specialist responsible for tracking Mr. Cashman's sales was told by Mr. Enriquez to reduce the sales attributable to Mr. Cashman so that his resulting commission compensation, already earned and due and payable, would be cut. On Mr. Enriquez' order, Mr. Cashman's attainment earnings were reduced to approximately $57 million, thereby resulting in a loss in commission compensation of approximately $375,000.00.

49.    Despite IBM's backdoor attempts to reduce compensation to Mr. Cashman and other sales staff retrospectively and in contravention of the Sales Plan, IBM, through Mr. Mills, promised its salespeople at the January 2002 E-Business rally that its commitments from the prior year would be honored and that the sales staff should keep on selling.

<u>Grievance Process</u>

50.    For many years, IBM had a published internal grievance procedure known as the "Open Door Policy," which claimed to have been available to IBM employees who did not believe that they had been treated appropriately.

51.    Mr. Cashman discussed initiating an Open-Door grievance with his Human Resources representative, Michael Schade, but expressed some reservation about possible negative ramifications to his IBM career long-term if he filed a complaint. Mr. Schade assured him that IBM would not tolerate any form of reprisal. Mr. Cashman

14

began the Open-Door process by filing a grievance on February 5, 2002 with Charles Ill, the Vice President of Americas Software for IBM at the time and a superior to Mr. Enriquez.

52.    Mr. Ill followed neither the processes nor the timeline outlined by the published Open-Door materials. While he did restore a small portion of Mr. Cashman's attained sales months after the grievance was filed, the lion's share of the sales that had been de-credited were not restored.

53.    On June 12, 2002, Mr. Cashman filed an appeal of Mr. Ill's determination. Despite Mr. Cashman's best efforts to track the appeal, it took until November of 2002 before Mr. Cashman was merely told verbally that his appeal was denied.

54.    After Mr. Cashman complained in 2002 about the reduction in his 2001 compensation, he was removed from IBM's Executive Resource list by Mr. Enriquez, who also refused to give him the highest rating on his performance evaluation for 2001, despite that another IBM Executive did give him the highest rating for the same period. Mr. Enriquez had confirmed for Mr. Cashman that his name appeared on that list in August of 2001. As a result, Mr. Cashman has not been considered for an Executive Management position. Mr. Enriquez also made negative comments about Mr. Cashman to his subsequent manager and others at IBM after Mr. Cashman refused to accept cuts to his compensation and initiated the internal grievance procedure.

55.    Since filing the Open-Door grievance, IBM has also consistently passed Mr. Cashman over for advancement, taken away his management responsibilities, and assigned him to positions that were not commensurate with his experience.

## COUNT I
### (Breach of Contract -- IBM)

56.    The plaintiff repeats and realleges all averments in paragraphs 1 through 55 as if fully set forth herein.

57.    IBM had a contract with Mr. Cashman for 1999 that dictated how his compensation would be paid for services rendered as an employee of IBM.

58.    Mr. Cashman performed all of his obligations pursuant to that contract.

59.    IBM breached that contract by failing to pay Mr. Cashman as required by the terms of the contract.

60.    As a result, Mr. Cashman has been damaged.

## COUNT II
### (Unjust Enrichment/Quantum Meruit -- IBM)

61.    The plaintiff repeats and realleges all averments in paragraphs 1 through 60 as if fully set forth herein

62.    Mr. Cashman rendered valuable services to IBM in 1999;

63.    IBM accepted Mr. Cashman's services and used, enjoyed, and profited by them;

64.    IBM should reasonably have expected that it would have to pay Mr. Cashman his full compensation for the services he rendered;

65.    Mr. Cashman reasonably expected to be paid full compensation for the services he rendered.

66.    IBM was unjustly enriched by receiving the benefit of Mr. Cashman's services while refusing to pay his full compensation.

## COUNT III
### (Breach of Contract -- IBM)

67.    The plaintiff repeats and realleges all averments in paragraphs 1 through 66 as if fully set forth herein.

68.    IBM had a contract with Mr. Cashman for 2001 that dictated how his compensation would be paid for services rendered as an employee of IBM.

69.    Mr. Cashman performed all of his obligations pursuant to that contract.

70.    IBM breached that contract by failing to pay Mr. Cashman as required by the terms of the contract.

71.    As a result, Mr. Cashman has been damaged.

## COUNT IV
### (Unjust Enrichment/Quantum Meruit – IBM)

72.    The plaintiff repeats and realleges all averments in paragraphs 1 through 71 as if fully set forth herein.

73.    Mr. Cashman rendered valuable services to IBM in 2001.

74.    IBM accepted Mr. Cashman's services and used, enjoyed, and profited by them.

75.    IBM should reasonably have expected that it would have to pay Mr. Cashman his full compensation for the services he rendered.

76.    Mr. Cashman reasonably expected to be paid full compensation for the services he rendered.

77.    IBM was unjustly enriched by receiving the benefit of Mr. Cashman's services while refusing to pay his full compensation.

## COUNT V

### (Violations of Mass. Gen. Laws ch. 149, §§ 148, 148A, 150 – IBM, Ill, Mills, Joyce and Enriquez)

78.     The plaintiff repeats and realleges all averments in paragraphs 1 through 77 as if fully set forth herein.

79.     Mr. Cashman earned compensation pursuant to IBM's 2001 SWG 50/50 Sales Plan, which remains unpaid despite verbal and written demands.

80.     The unpaid compensation is covered by G.L. c. 149, § 148.

81.     IBM is an employer within the meaning of G.L. c. 149, § 148.

82.     Mssrs. Ill, Mills, Joyce and Enriquez are or were for relevant times officers or agents of IBM within the meaning of G.L. c. 149, § 148.

83.     Defendants failed to pay Mr. Cashman his compensation which had become due and payable at the close of 2001, even after he requested payment of the sums due both verbally and in writing and followed IBM's published "Open-Door" grievance procedure.

84.     As more fully described above, in violation of Mass. Gen. Laws, ch. 149, §148A, Mr. Cashman suffered retaliation by the Defendants for taking action to recover his compensation including but not limited to being removed from IBM's Executive Resource List.

85.     Mr. Cashman has suffered harm as a result of the Defendants' conduct, in violation of M.G.L. ch. 149, §§148, 148A and 150.

## COUNT VI
### (Interference with Advantageous Business Relations – Enriquez)

86.    The plaintiff repeats and realleges all averments in paragraphs 1 through 85 as if fully set forth herein.

87.    Mr. Cashman's name had been added to the list from which IBM appointed executives internally("Executive Resource List") in 2001. A prerequisite for such an appointment was that an employee's name appear on this list.

88.    Mr. Enriquez was aware that Mr. Cashman's name was on the Executive Resource List and that to remain on the list Mr. Cashman's performance rating needed to remain at the highest level.

89.    In 2001, Mr. Cashman exceeded his team sales quota by nearly 100% and was rated at the highest level by Thomas Wroblewski, an IBM sales executive to which Mr. Cashman answered.

90.    In 2002, after Mr. Cashman protested the refiguring of his sales such that his commissions would be improperly reduced, and his commencement of an Open-Door grievance, Mr. Enriquez willfully, intentionally and with malice refused to give Mr. Cashman the highest rating for his 2001 performance so that he could not remain on the Executive Resource List and proceeded to spread false rumors and degrading comments about Mr. Cashman to other executives at IBM to damage his ability to succeed at the company.

91.    Mr. Enriquez's decision with respect to Mr. Cashman's performance was unlawfully calculated to cause Mr. Cashman damage and loss.

92.    As a result of Mr. Enriquez's actions, Mr. Cashman has suffered damage and loss.

WHEREFORE, the plaintiff, Thomas Cashman requests this court to:

1.   Enter judgment for Thomas Cashman against defendants on all counts of the Complaint;

2.   Award damages to Thomas Cashman in an amount determined by the court;

3.   Award treble damages, interest, costs, and attorneys' fees to Thomas Cashman pursuant to Count V of the Complaint, and,

4.   Award such other relief as this Court deems just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL COUNTS SO TRIABLE.**

THOMAS CASHMAN
By his attorneys,

Charles R. Bennett, Jr., BBO #037380
Kathleen E. Cross, BBO #556934
Sharon H. Patton, BBO #634780

HANIFY & KING
Professional Corporation
One Beacon Street
Boston, MA  02108
(617) 423-0400

DATED: December 8, 2004

406935

A TRUE COPY
Attest: _Mary E. Kenny_
Deputy Assistant Clerk
2/16/05



**PRIVATE & CONFIDENTIAL**

12 May 1999

Mr T Cashman
Keizersgracht 361 D
1016 EJ
Amsterdam

Dear Tom

**RE: COMPENSATION REVIEW**

I have recently spent some time reviewing your compensation and I have
great pleasure in confirming that your base salary will increase to £60,000,
also your on target commissions will increase to £80,000 with effect from 1
January 1999.   All your other existing terms and conditions of employment
remain unchanged.

May I take this opportunity to thank you personally for your continued
support and contribution both to the function and the Tivoli organisation as a
whole.

Kind regards

Yours sincerely

Steve Standring
**Director, Verticals**

CC:   Personnel File
      Payroll

Tivoli Systems (UK) Ltd.
Sefton Park
Bells Hill
Stoke Poges
Bucks
SL2 4HD

Tel: 01753 896896
Fax: 01753 896899

Registered in England. No. 3129044
Registered Office: Factory House,
16-20 Ely Place, London, EC1N 6SN



**Letter from the desk of Dan Lautenbach...**
**VP, Worldwide Software Sales**

You should be very excited about the unique software sales incentive plan that covers our sales representatives and sales managers for 2001. It's better than both the 2000 and 1999 plans. Compensation consultants who specialize in the software industry tell us it is really pushing the edge when it comes to rewarding overachievement. And, I think you have a superb opportunity to perform at an above-quota level this year.

This booklet explains the basic principles that guided design of the new plan, and provides information to help you understand how the plan works ... for you and for IBM.

The most important thing to understand is your importance to IBM's software business. Your plan is custom-designed to reflect the reality of the software industry, our competitors, and customer requirements for IBM's outstanding offerings.

The software sales incentive plan recognizes the unique opportunities our sales force can identify and close this year. It is characterized by extremely high payout rates for business you close in excess of your assigned full year quota.

And, because your sales plan is based on a self-funding model, there are no caps to your earnings: the more you sell, the more revenue and incremental profit for IBM; and the more earnings for you.

I encourage you to read this important booklet. I believe you will be convinced that you are in the right place, at the right time, in our company.

I know I can count on each of you for a fast start and focused sales efforts throughout the year. Our collective efforts can assure a great year for the company, and for each of us.

Thanks for your efforts so far, and best wishes for a healthy and happy 2001.


Dan

# *The Software Group Sales Incentive Plan Principles:*

A set of basic principles guide development of your Software Sales Incentive Plan. The design point for 2001: a plan that motivates you to overachieve assigned targets; a plan that compensates you for outstanding performance; and a plan that attracts and retains top sales talent by delivering competitive compensation.

I. *The plan should reinforce IBM's software business strategy*

II. *The plan should be simple to understand and communicate*

III. *The plan should be competitive with the software industry marketplace*

IV. *The plan should be consistent with industry practice in key areas of uncapped earnings, earnings at first sale, and attractive upside opportunity*

V. *The plan should motivate Technical Support and Sales Management in a manner consistent with the team they support*

VI. *The plan should be tested against the prior year's plan and the current year's expectations*

VII. *The plan should address unique country environments*

**Table of Contents**

Important Changes for 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4
Framework and Terminology  . . . . . . . . . . . . . . . . . . . . . . . . . . . .5
Performance Measures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
How Payout Rates Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
Sales Plan Example . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8
Glossary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

Please visit your new Sales Incentives site on the intranet. We'll soon be adding lots of useful content that helps you focus on big payout opportunities, and easily calculate your earnings.

*w3.ibm.com/software/sales/saletool.nsf/salestools/sales+incentives*



# Your 2001 Software Sales Incentive Plan

**Easy to understand. Easy to love.**

You talked. We listened. The result: new and improved features for the 2001 Software Sales Incentive Plan. We have great expectations for a fantastic sales year with unlimited possibilities for you. There's no limit to your 2001 sales incentive opportunity.

This booklet will help you understand how your Sales Incentive Plan works, how your performance is measured, how to calculate earnings, and how much money you can make.

## Important Changes for 2001

Your performance is important, and the new plan emphasizes greater pay-for higher levels of performance.

## You get paid more from the first sale

The 2001 payout table pays 1% of your target incentive for every 1% attainment when you are at or below 100% of quota for PCO1. In 2000, the payout rate was just 0.5% when you were below 80% of quota. Changing to 1% for attainment at or below 100% attainment of quota reduces the complexity of the plan and makes it easier for you to estimate your pay.

## You get paid for attainment against full-year quota

You will be paid based on attainment against your full-year quota instead of attainment against a year-to-date quota. This change eliminates the concept of "seasonal" or quarterly skews. The full-year pay methodology encourages driving business earlier in the year because the accelerators apply when you exceed 100% of your full-year quota. Because quarterly results are still very important to IBM, your manager will be able to use PCO3 challenges to focus on quarterly initiatives.

## You get paid at higher payout rates above 100% of full-year quota

As in 2000, you have an accelerator for attainment above your quota; however, this year, the accelerator will apply when you achieve your full-year quota, as opposed to when you've reached your year-to-date quota. Your earnings for performance above quota continue to be uncapped in 2001.

## Calculation of your incentive payments is easy under the 2001 Plan

The year-to-date method used in 2000 created complexities because of fluctuations in performance during the year, and was a major cause of debit balances — situations in which sales reps owed IBM money.

## Sales Matter – You Matter

No one needs to tell you that you are the front line at IBM. Our success depends on you and your ability to sell products and services to our customers. It's straightforward: no sales, no customers, no growth, no IBM. Your sales success creates value for our shareholders and for you. The 2001 Sales Incentive Plan encourages you to drive sales.

**4**

## The 2001 Software Sales Incentive Plan Framework and Terminology

(See Software Sales Incentive Plan Glossary on page 10 for definitions).



## Pay Mix for Software Sales Plans

Pay Mix is the ratio of your Base Salary to your Target Incentive. A higher proportion of your pay on Target Incentive means more pay is at risk, with greater upside earnings potential. Pay Mix varies by job role and geography.

|  | SAM | Pillar | Partner | Technical |
|---|---|---|---|---|
| Americas | 60/40 | 60/40 | 60/40 and 70/30 | 75/25 |
| Asia Pacific | 60/40 | 50/50 | 60/40 and 70/30 | 75/25 |
| Japan | 60/40 | 60/40 | 60/40 and 70/30 | 90/10 |
| EMEA | 60/40 | 50/50 | 60/40 and 70/30 | 75/25 |
| Europe North | 50/50 | 50/50 | 60/40 and 70/30 | 75/25 |

## PCO Weightings for Software Sales Plans

Your Target Incentive has two components or Personal Contribution Objectives (PCOs). The split between PCO1 (Revenue) and PCO3 (Challenges) is generally 80/20. You earn eighty percent of your Target Incentive amount when you reach 100% of your full-year revenue quota.

## Payout Tables for Software Sales Plans

Sales employees around the world say they don't always understand how to calculate sales incentive payments. There are three payout rates that apply to your PCO1 performance measurement.

The payout rate when you are at or below 100% attainment of your full-year quota: For every 1% attainment against your full-year quota, you earn 1% of your PCO1 Target Incentive. At 100% quota achievement, you receive 100% of your Target Incentive for PCO1.

Higher payout rates apply when you are above 100% attainment of your full-year quota: As soon as you start overachieving your full-year quota, the plan provides significant leverage to reward your performance. And, your earnings for attainment above 100% are uncapped.

## Incentive Payments Based on Your Performance: How Payout Rates Work

There are two easy-to-understand techniques you can use to calculate your pay: Payout Rate per $1,000 of revenue attainment, and Payout Rate per 1% attainment of your full-year quota. The same incentive payment amount is calculated by these two methods.

*Illustration: Your full year quota is $5M, and your Target Incentive (PCO1) is $40,000*
*Pay Rate per 1% Attainment of Full Year Quota Method*

|  | 0%-100% of Full Year Quota | 100%-125% of Full Year Quota | Above 125% of Full Year Quota |
|---|---|---|---|
| 1% of Full Year Quota Earns | $400 | $1,600 | $2,400 |
| 100% of Full Year Quota Earns | $400 × 100% = $40,000 |  |  |
| 125% of Full Year Quota Earns |  | $400 × 100% = $40K $1,600 × 25% = $40K = $80,000 |  |
| 150% of Full Year Quota Earns |  |  | $400 × 100% = $40K $1,600 × 25% = $40K $2,400 × 25% = $60K = $140,000 |

*Calculation of the payout rate per 1% of Full Year Quota attainment*
- *Payout Rate for the 0% to 100% zone:* Divide the PCO1 Target Incentive by 100. In the above example $40,000 divided by 100 equals $400 for each 1% of attainment.
- *Payout Rate for the 100% to 125% zone:* Multiple the 0% to 100% payout rate by 4 to get $1,600.
- *Payout Rate for the Above 125% zone:* Multiple the 0% to 100% payout rate by 6 to get $2,400.

*Illustration: Your full year quota is $5M, and your Target Incentive (PCO1) is $40,000*
*Pay Rate per $1,000 of Revenue Attainment Method*



*Calculation of the payout rate per $1,000 of revenue attainment*
- *Payout Rate for the 0% to 100% zone:* Divide the PCO1 Target Incentive by Full Year Quota. In the above example $40,000 divided by $5,000,000 equals $8 for each $1,000 of revenue.
- *Payout Rate for the 100% to 125% zone:* Multiple the 0% to 100% payout rate by 4 to get $32 for each $1,000 of revenue.
- *Payout Rate for the Above 125% zone:* Multiple the 0% to 100% payout rate by 6 to get $48 for each $1,000 of revenue.



## Example for a Software Account Manager

Your 2001 Compensation Plan is designed to help you achieve financial success, as you contribute to the growth of IBM's software revenues. You're wondering, "How much will I make for closing a deal?" The following example illustrates how the value of many deals adds up in your full-year, quarterly or monthly sales incentive earnings. The key ingredients for the example are: How much did you sell? What is your full-year revenue quota (PCO1)? What is your full-year PCO1 Target Incentive pay?

*Disclaimer: This example is provided for illustration purposes only. Actual sales incentive payments will be different than the numbers displayed here. In cases of conflict between what is shown in this booklet and local documentation, local plan documentation prevails.*

## Quota and Territory Management

Successful growth is the result of focusing resources and attention in a disciplined manner over an extended period of time. Sales enablement programs, solution selling training, marketing activities, and sales collateral help you identify opportunities and take actions that can maximize your effectiveness. You are well positioned for 2001. As an active participant in the software industry, and as a Software Account Manager in IBM's Software Group, you can really make a positive contribution to customers. You can sell leadership products and solutions — and with the 2001 sales plan, you have the opportunity for outstanding professional and financial success.

## Comparison of Your Plan to the Industry

Consultant studies indicate the design of your plan is consistent with the plans used by sales professionals throughout the software industry. What's more important ... Your opportunity to earn really big money due to above quota performance is greater, because your overachievement payout rates are significantly higher than industry practice.

| In this zone -> | 0% - 100% of Full Year Quota | 100% - 125% of Full Year Quota | Above 125% of Full Year Quota |
|---|---|---|---|
| For each $1000 of revenue, You earn: | 1✕ | 4✕ | 6✕ no earnings cap |

*Note: 1X is calculated based on your Full Year Quota and PCO1 Target Incentive Pay.*
*Note: Accelerators may also be expressed in terms of percentages: 1% of PCO1 Target Incentive is paid for each 1% of Full Year Quota attainment between 0% and 100% of Full Year Quota; 4% is paid for attainment between 100% and 125%; 6% is paid for attainment above 125% of Full Year Quota.*

## Software Account Manager Illustration

(Note: your quota, territory management, and earnings details will differ from this illustration)

You are assigned an $8,500,000 full-year revenue quota, and two territory challenges; and you are eligible for local and worldwide sales contests. Your sales plan has the following characteristics: a "60/40" Base/Incentive Pay Mix; an "80/20" PCO1/PCO3 Incentive Split; a "50/50" Worldwide/Local Manager PCO3 Split; and you have the opportunity to earn very substantial additional pay for quota overachievement.

Compensation is based on your Base Pay, an On-Target Earnings level that reflects IBM's practice of paying sales professionals at a higher rate than other employees who are not on a sales plan, and your sales performance as a percentage of your full-year revenue quota. Attainment of assigned territory objectives, and achievement against available contest targets add to your earnings. Your earnings are easily calculated, and increase dramatically as soon as you start to overachieve your full-year revenue target.

## Example: Base Pay: $65,600; On Target Earnings: $108,800; Full Year Quota = $8.5M

|  | Mar | Jun | Sep | Dec |
|---|---|---|---|---|
| Revenue Attained | $1.9M | $4.25M | $9.8M | $13.3M |
| % of Full Year Quota | 22% | 50% | 115% | 156% |
| Base Pay | $16,400 | $32,800 | $49,200 | $65,600 |
| Incentive Pay - PCO1 | $7,782 | $17,408 | $56,115 | $135,373 |
| Incentive Pay - PCO3 | $3,200 | $3,200 | $3,200 | $9,400 |
| Compensation | $27,382 | $53,408 | $108,515 | $210,373 |
| Annual Incentive Pay "at target performance" |  |  |  | $43,520 |
| Incentive Pay Split: PCO1/PCO3 |  |  |  | 80/20 |
| PCO3 Split: Local/Worldwide |  |  |  | 50/50 |
| Annual Quota Incentive at 100% of PCO1 |  |  |  | $34,816 |
| Funding of PCO3 Annual Challenges (uncapped) |  |  |  | $8,704 |

| PCO3 Territory Challenges Assigned (Make/Miss) | Challenge A: Install Linux pilot at XYZ Bank |
|---|---|
| Each $2200 value | Challenge B: Replace Oracle & Microsoft at ABC Factory |
| PCO3 Challenges Available as Contests | Fast Start, Winback, others as announced |
| Quota Zone | Revenue Performance Pay (PCO1): Pay per $1,000 revenue |
| $0 - $8.5M | $4.10 per $1,000 |
| $8.5M - $10.625M | $16.38 per $1,000 |
| $10.625M+ | $24.58 per $1,000 |

### Scenario #1: Year-to-Date Earnings After 3 months

$1.9M sales (22% FY Quota), Challenge A accomplished, $1000 Contest prize won

Base Salary = $5,467 / month × 3 months = $16,400

Incentive Pay = $1.9M / $1000 × $4.10 / $1,000 revenue = $7,782

Challenge A Payment = $2,200, Contests = $1,000

Total Year-to-Date Compensation = $27,382

### Scenario #2: Year-to-Date Earnings After 6 months

$4.25M sales (50% FY Quota), Challenge A accomplished, $1,000 Contest prize won

Base Salary = $5,467 / month × 6 months = $32,800

Incentive Pay = $4.25M / $1,000 × $4.10 / $1,000 revenue = $17,408

Challenge A Payment = $2,200, Contests = $1,000

Total Year-to-Date Compensation = $53,408

### Scenario #3: Year-to-Date Earnings After 9 months

$9.8M sales (115% FY Quota), Challenge A accomplished, $1000 Contest prize won

Base Salary = $5,467 / month × 9 months = $49,200

Incentive Pay = $56,115

$8.5M / $1,000 × $4.10 / $1,000 revenue = $34,816

$1.3M / $1,000 × $16.38 / $1,000 revenue = $21,299

Challenge A Payment = $2,200, Contests = $1,000

Total Year-to-Date Compensation = $108,515

### Scenario #4: Year-to-Date Earnings After 12 months

$13.3M sales (156% FY Quota), Challenges A & B accomplished, $1,000 & $4,000 Contest prizes won

Base Salary = $5,467 / month × 12 months = $65,600

Incentive Pay = $135,373

$8.500M / $1,000 × $4.10 / $1,000 revenue = $34,816

$2.125M / $1,000 × $16.38 / $1,000 revenue = $34,816

$2.675M / $1,000 × $24.58 / $1,000 revenue = $65,741

Challenge A Payment = $2,200, Challenge B Payment = $2,200, Contests = $1,000 and $4,000

Total Year-to-Date Compensation = $210,373



# 2001 Software Sales Incentive Plan Glossary

As you review the definitions in this section, it's helpful to understand how the elements of your pay work together. Keep in mind that the On-Target Earnings diagram does not contain all elements of your total cash compensation, such as awards or other cash payments.

**Attainment:** Measurement of your cumulative actual sales against your full-year quota.

**Base Salary:** This is the fixed portion of your pay for each pay period.

**Manager (eligibility for accelerators) Rules:** To be eligible for manager accelerators, a manager must have sales reps reporting to him/her (based on the organization chart), and/or sales responsibility and provide business direction to a sales team. The manager is the person who typically sets Personal Contribution Objectives for this sales team, determines Personal Business Commitments (PBCs) for the team, and is responsible for the team's personnel records. The sales manager's quota should equal the sum of the quotas of the sales force reporting to him/her.

**•First Line Manager:** To be considered a first line manager for purposes of qualifying for First Line Manager payout rates, the person must have functional responsibility for a minimum of three sales reps based on the definition above. The second line manager is responsible for ensuring the correct plan assignment at the time the manager is put on the plan. Once the manager is assigned to the First Line Manager payout rates, changes will not be made during the year due to fluctuations in onboard rep headcount or the existence of temporarily open territories.

**•Second Line Manager:** To be considered a second line manager for the purposes of qualifying for Second Line Manager payout rates, the person must have responsibility for a minimum of two sales managers based on the definition above. The VP is responsible for ensuring the correct plan assignment at the time the second line manager is put on the plan. Once the manager is assigned to the Second Line Manager payout rates, changes will not be made during the year due to fluctuations in onboard rep headcount or the existence of temporarily open territories.

**On-Target Earnings (OTE):** Your On-Target Earnings is the sum of your Base Salary plus your Target Incentive. Your Target Incentive is your pay for



achieving 100% of your Personal Contribution Objectives (PCOs).

**Pay Accelerator:** An increased incentive rate that is earned for every dollar sold above quota.

**Pay Mix:** The ratio of your Base Salary to your Target Incentive at 100% of full-year attainment. For example, a 60/40 plan means that 60% of your On-Target Earnings is Base Salary and 40% is Target Incentive.

**PCO1:** This is the Personal Contribution Objective for revenue.

**PCO2:** This is the Personal Contribution Objective for profit. This element is included in your incentive plan only when profit can be measured.

**PCO3:** This is the Personal Contribution Objective for individual and global challenges.

**PCO Weighting:** The percentage of your full-year Target Incentive that is tied to each Personal Contribution Objective (PCO). Your PCO Weighting is determined by your job role.

**Reference Salary:** What your salary would be if you were taken off incentive.

**Salary Equivalent:** Term used by the U.S. and Canada for Reference Salary.

**Target Incentive:** Your sales incentive opportunity for achievement of 100% of your PCO elements.

# 2001 Sales Planning Calendar

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | | | | | |





© International Business Machines Corporation 2001

IBM Corporation
Route 100
Somers , NY 10589

Printed in the United States of America
January, 2001
All Rights Reserved

IBM and the IBM logo are trademarks of International
Business Machines Corporation in the US, other
countries, or both.


Printed on recycled paper containing 10% recovered
post-consumer fiber.

# EMPLOYEE QUOTA LETTER:

## EMPLOYEE DETAILS:

| | |
|---|---|
| Employee Name: | Tom Cashman |
| Employee Serial: | 427563 |
| Employee Manager: | Dunderdale |
| Organization: | FINANCIAL |

## PLAN DETAILS:

| | |
|---|---|
| Plan Type: | SM |
| Job Role: | Tivoli Sales Manager - BUE |
| Plan Effective Date: | 1/1/2001 |
| Territory: | FINANCIAL |
| Date on Quota: | 1/1/2001 |
| Your Pay Mix as a % of On-Target Earnings: | 50/50 |
| Your On-Target Earnings are: | $269,999 |
| Your Target Incentive Pay at 100% Attainment is:<br>  PCO1: 80%<br>  PCO3: 20% | $108,000<br>$ 27,000 |

| Component | Weight | Target | Start Date – End Date | Bonus Opp for 100% Attainment (USD) |
|---|---|---|---|---|
| PCO1: Revenue | 100% | $35,500,000 | 1/1/2001 - 12/31/2001 | $108,000 |
| Component* | Criteria | Challenge Opportunity | Start Date – End Date | |
| PCO3A: | SWG Bounty Challenge | http://w3.software.ibm.com/americas/awards/1QBounty.html | 1/1/01 - 3/31/01 | |
| PCO3B: | SWG Bounty Challenge | http://w3.software.ibm.com/americas/awards/1QBounty.html | 1/1/01 - 3/31/01 | |

*PCO3 Criteria will be communicated to the field at the beginning of each quarter.

**Right to Modify or Cancel:** *While IBM's intent is to pay employees covered by this program according to its provisions, this program does not constitute a promise by IBM to make any distributions under it. IBM reserves the right to adjust the program terms or to cancel or otherwise modify the program at any time during the program period, or up until actual payment has been made under the program. Modification or cancellation may be applicable to all persons covered by the program, or to any subset as defined by management. Even though you may be given progress reports regarding plan achievement during the year, no one becomes entitled to any payment in advance of his or her receipt of the payment. Bonus opportunity which includes salary in the calculation reflects the salary in effect the date this letter is sent. However, actual bonus payments will be made based on the salary in effect the date the bonus is earned. The current payment amount appearing on an employee's assessment form will net against any debit balance in the employee's commission account.*

## 2001 Tivoli Systems Individual Compensation Plan: Territory Definition
(To be used for new territories or changes to existing territories)

## 1. Territory Identification

| Name | Tom Cashman |
|---|---|
| Serial Number | 427563 |
| Region | Finance |
| Date Territory Definition Created | 02/21/01 |
| Territory Effective Period | 01/01/01-12/31/01 |

This Territory definition cancels and replaces any prior Territory definitions for the above mentioned effective period.

## 2. Territory Detail

Territory detail **must** contain specific territory information, including Product, Geography (region, city, state and/or zip) and/or Named Accounts (if applicable). (**Note: Area Code is not an acceptable parameter**)

Example of Acceptable Territory Definition: New York, zip codes 10509, 10512, and 10539

Example of Unacceptable Territory Definition: Southern New York, Westchester County

Product:

Geography: United States

Named Accounts: AFLAC, Amsouth, Astoria Financial, Bank Austria, Cantor Fitzgerald,

Credit Lyonnas, Diawa Securities, Dresdner Bank, nEmigrant Savings, Fuji Bank & Trust,

Greenpoint Financial, Industrial Bank of Japan, Lazard Freres, Neuberger and Berman,

Nikko Securities, Nomura Securities, Rosenthal Group, SG Cowen Securities, SIAC,

Standard & Poors, Sumitomo Bank, Swiss Reinsurance, Warburg Pincus

Assurant (American Bankers) , Branch Bank & Trust, Capitola One Financial, Colonial Bank,

Crawford & Co, Fannie Mae, First Maryland Bancorp, Freddie Mac, Geico, IBM Credit Corp (NC),

ING, Jefferson Pilot, National Council on Comp., NC Farm Bureau Mutual, Northern Trust

Employee Signature                    Date

Manager Signature                     Date

| |
|---|
| Retirement, Region Financial, Royal & Sun Alliance, Sallie Mae, Southern Farm Bureau, |
| SunTrust, Synovus (Vital Processing Service), T Rowe Price, Total Systems, Union Labor Life, Union |
| Planters, United Guaranty, First Tennessee |
| Chase Manhattan (JP Morgan), Alliance Capitol Management, Brown Brothers |
| CIT Group, Credit Suisse First Boston (Pershing), HSBC, Lehman Brothers, MBNA, |
| Moody's, Paine Webber, Reuters, Scudder |
| Bank of Tokyo, Barclay's Bank, CIBC Worldmarkets, Deutsche Bank, |
| Donaldson Lufkin & Jen., Dow Jones, GE Capital, Instinet, Mass Financial Services , |
| National Discount Brokers, Putnam,  Risk Enterprise Mgmt, Sovereign Bancorp, |
| UBS AG, UJB Summit Bancorp, Vanguard, |
| Bank of America,  Compass Bank, First Union, Southtrust, Wachovia |
| American ExpressTSSTM,Bank of New York, Bear Stearns, Depository Trust,Dime Bancorp, Fidelity, |
| Fleet Boston, Goldman Sachs, Lend Lease, Merrill Lynch, Morgan Stanley Dean Witter, NASDAQ |
| State Street, TD Waterhouse, Citicorp (Citibank, Travellers, Solomon Smith Barney, Primerica), |
| Aid Assoc. for Lutherans, Allstate Insurance, American Family, AmerUs Group, American Century |
| Auto Club Insurance, Auto Owners Insurance, Blue Cross of Minn., Chicago Board of Options, |
| Chicago Board of Trade, Chicago Mercantile Exchange, CNAInsurance, Farm Bureau Insurance (MI) |
| Federated Mutual, Firstar, Jackson National Life, Michigan Mutual Insurance (Amerisure), Minnesota |
| Mutual Insurance, Ohio Savings, Principal Life Insurance, Reliastar , St Paul Companies, |
| State Farm Mutual Auto, US Bank,  Wausua Insurance ,American Express, American General |
| Ameritrade, Banc One Corp, Charter One Bank, Conseco, Fifth Third Bancorp, Charles Schwab |
| Fortis Benefits Ins., Great American Ins.,Household International, Huntington Bancshares, Keycorp, |
| Mellon Bank, Mutual of Omaha Ins., National City Corp., Nationwide, Northern Trust Corp., |
| Ohio Casualty Ins., PMA Group, PNC Bank, Progressive Casualty Ins., Provident Mutual Life, |
| Western and Southern Life Ins., Westfield Ins. Co., CalFed (Golden State Bank), ETrade, USAA |
| Aegon, AG Edwards , AON, Beta Systems, Comerica, Cuna Mutual Ins., Farmers Group |
| Discover Card, Edward Jones, First Data, Kemper Companies, LaSalle National Corp., |
| Lincoln Financial Corp., M&I Data (Metavante), MasterCard, Mercantile Bancorp, Mortgage Guaranty |
| Northwestern Mutual Life, RW Baird , TransUnion LLC, Van Kampen Funds, Zurich Ins. |
| Firemans Fund, First Security Service, Franklin Templeton, Oppenheimer Funds, Union Bank of CA, |
| Providian Financial, Visa International, Washington Mutual, Wells Fargo |
| |

| CIVIL ACTION COVER SHEET | DOCKET NO.(S) 04 02106 | Trial Court of Massachusetts Superior Court Department County: Nor R/A |
|---|---|---|

**PLAINTIFF(S)**
Thomas Cashman

**DEFENDANT(S)**
Steven Mills, Charles Ill, Internat'l Bus. Mach., John Joyce & Gregory Enriquez

**ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE**
Kathleen Cross, Hanify & King    (617)423-0900
One Beacon St., Boston 02108
Board of Bar Overseers number: 556934

**ATTORNEY (if known)**

OB 2

### Origin code and track designation

Place an x in one box only:
- [x] 1. F01 Original Complaint
- [ ] 2. F02 Removal to Sup.Ct. C.231,s.104 (Before trial) (F)
- [ ] 3. F03 Retransfer to Sup.Ct. C.231,s.102C (X)
- [ ] 4. F04 District Court Appeal c.231, s. 97 &104 (After trial) (X)
- [ ] 5. F05 Reactivated after rescript; relief from judgment/Order (Mass.R.Civ.P. 60) (X)
- [ ] 6. E10 Summary Process Appeal (X)

### TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| A01 | Contract / Wage | (F) | (x) Yes    ( ) No |

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS
(Attach additional sheets as necessary)

A. Documented medical expenses to date:
   1. Total hospital expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ . . . . . . . .
   2. Total Doctor expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ . . . . . . . .
   3. Total chiropractic expenses . . . . . . . . . . . . . . . . . . . . . . . . . . $ . . . . . . . .
   4. Total physical therapy expenses . . . . . . . . . . . . . . . . . . . . . . . $ . . . . . . . .
   5. Total other expenses (describe) . . . . . . . . . . . . . . . . . . . . . . . $ . . . . . . . .
   Subtotal $ . . . . . . . .

B. Documented lost wages and compensation to date . . . . . . . . . . . . . $ . . . . . . . .
C. Documented property damages to date . . . . . . . . . . . . . . . . . . . . . $ . . . . . . . .
D. Reasonably anticipated future medical and hospital expenses . . . . . $ . . . . . . . .
E. Reasonably anticipated lost wages . . . . . . . . . . . . . . . . . . . . . . . $ . . . . . . . .
F. Other documented items of damages (describe)
   $ . . . . . . . .

G. Brief description of plaintiff's injury, including nature and extent of injury (describe)

$ . . . . . . . .
TOTAL $ . . . . . . . . . .

*RECEIVED & FILED CLERK OF THE COURTS NORFOLK COUNTY*

### CONTRACT CLAIMS
(Attach additional sheets as necessary)

Provide a detailed description of claim(s):
Defendants breached contract by failing to pay plaintiff amounts required thereby.

TOTAL $ . . . . . . . . . . .

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record _____ 680#65/335    DATE: 12/10/4

AOTC-6 mtc005-11/99
A.O.S.C. 1-2000

*3.0*

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                          TRIAL COURT OF THE COMMONWEALTH
                                      SUPERIOR COURT DEPARTMENT
                                      CIVIL ACTION NO. *04- 2106*

|  |  |
|---|---|
| THOMAS CASHMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| INTERNATIONAL BUSINESS | ) |
| MACHINES CORPORATION, | ) |
| STEVEN A. MILLS, CHARLES ILL, | ) |
| JOHN R. JOYCE, and | ) |
| GREGORY ENRIQUEZ, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## FIRST AMENDED COMPLAINT AND JURY DEMAND

The plaintiff, Thomas Cashman ("Mr. Cashman"), asserts claims arising from his

employment by International Business Machines, Corp. ("IBM") and the actions and

omissions of various of its officers and senior managers based on IBM's failure to pay

Mr. Cashman compensation that he earned pursuant to the terms of his compensation

plan and subsequent retaliation for Mr. Cashman's pursuit of an internal grievance.

### JURISDICTION

1.      Jurisdiction is appropriate pursuant to the Massachusetts Long-Arm

Statute, Mass. Gen. Laws, ch. 223A, §3.

2.      The Massachusetts Wage Act, G.L. ch. 149, §§148, provides, in pertinent

part that, "[t]he president and treasurer of a corporation and any officers or agents having

the management of such corporation shall be deemed to be the employers of the

employees of the corporation within the meaning of this section."

**VENUE**

3.      Venue is appropriate pursuant to Mass. Gen. Laws, ch. 223, §1.

**FACTS COMMON TO ALL COUNTS**

4.      The plaintiff, Thomas Cashman, resides at 375 Westfield Street, Dedham,

Massachusetts, Norfolk County, where he also maintains a home office.

5.      Mr. Cashman was an employee of IBM continuously since February 3,

1997 and until he left IBM on November 30, 2004, at which time he held the position of a

WWW Business Unit Executive, E-business on Demand Automation, IBM Software

Group.  Other positions held by Mr. Cashman at IBM which are relevant to the claims

brought herein include Director of EMEA Financial Sales with Tivoli Global Financial

Services;  Tivoli Sales Manager, Business Unit Executive; Director, Financial Vertical,

Tivoli Systems, Inc.; Director, Performance, Availability, Configuration and Operations

Solutions, Tivoli Systems – Americas.

6.      The defendant, IBM, is a New York corporation and maintains a principal

place of business at 1133 Westchester Avenue, White Plains, New York ("IBM

Headquarters").  IBM is a foreign corporation registered with the Secretary of State of the

Commonwealth of Massachusetts and regularly conducts and solicits business in

Massachusetts.  Notably, it has a division in Cambridge, Massachusetts known as Lotus

Development Corporation.  IBM maintains or has maintained offices in the

Commonwealth of Massachusetts, including offices in Boston, Cambridge and Waltham,

Massachusetts.

2

7.      The defendant, Charles Ill, was a senior executive at IBM, on information and belief holding, the position of Vice President of Americas Software, at all times relevant to this action. Mr. Ill was the direct line supervisor for Mr. Cashman's direct supervisor, Gregory Enriquez. On or about February 5, 2002, Mr. Cashman filed an Open Door grievance with Mr. Ill respecting IBM's failure to pay his 2001 commissions earned and due and payable pursuant to the 2001 50/50 SWG Sales Plan. Mr. Cashman initiated and received many communications involving Mr. Ill from Mr. Cashman's home office in Massachusetts directly related to the claims central to this action. On information and belief, Mr. Ill is now a sales executive with BEA Systems, Inc., located in San Jose, California. Mr. Ill is an employer of plaintiff as defined by Mass. Gen. Laws, ch. 149 § 148.

8.      The defendant, Steven A. Mills, is Senior Vice President & Group Executive, a position he has held since July of 2000. According to IBM, Mr. Mills is responsible for shaping IBM's overall software strategy and directing its software business. Mr. Mills is responsible for approving the structure of yearly sales plans, and approved the structure of the 2001 50/50 SWG Sales Plan. Mr. Mills maintains an office at IBM headquarters in New York. Upon information and belief, Mr. Mills travels regularly to IBM's offices in Massachusetts, to carryout his duties regarding IBM software. Mr. Mills was in the direct chain of command managing and controlling software sales and commission decisions for IBM, including those complained of by Mr. Cashman in this action. Mr. Mills is an employer of plaintiff as defined by Mass. Gen. Laws, ch. 149 § 148.

3

9.    The defendant, John R. Joyce, at all times relevant to this complaint was a Senior Vice President and Chief Financial Officer of IBM, a position he had held since 1999. Mr. Joyce was responsible for all financial and business development activities of IBM, including those taking place in Massachusetts and including compensation of its employees. Upon information and belief, IBM's Finance and Planning sector, headed by Mr. Joyce, was complicitous in the decision to cut Mr. Cashman's commissions. Mr. Joyce was an employer of plaintiff as defined by Mass. Gen. Laws, ch. 149 § 148.

10.    The defendant, Gregory Enriquez, was the Americas Sales Vice President of Tivoli IBM Software group at all times relevant to this action and was the direct-line supervisor for Mr. Cashman. Mr. Enriquez maintained an office at IBM Americas Software Group Headquarters during his tenure of Vice President. Mr. Enriquez regularly contacted Mr. Cashman by telephone and email at Mr. Cashman's Dedham, Massachusetts home office regarding IBM's business in Massachusetts, and, more precisely the claims raised in this lawsuit. In or about January 2002, Mr. Enriquez telephoned Mr. Cashman at Mr. Cashman's home office in Dedham, Massachusetts and notified him that his 2001 earned and due and payable commissions would be reduced. At all times relevant to this action, Mr. Enriquez was an employer of plaintiff as defined by Mass. Gen. Laws, ch. 149, §148. On information and belief, Mr. Enriquez is currently employed as the Senior Vice President-Worldwide Sales for Stratus Technologies, 111 Powdermill Road, Maynard, Massachusetts 01754.

4

## FACTS COMMON TO ALL COUNTS

### Tivoli IBM Software Group – EMEA

11.    After achieving over 400% of his sales quota at IBM for 1997, Mr.
Cashman was asked to take a three-year international assignment with EMEA (a division
of IBM, which is an acronym for Europe, Middle East and Africa) that involved being
relocated to the Netherlands. IBM directed a dedicated team to sell to substantial
institutional targets, largely located in Europe, where IBM determined significant growth
opportunities existed for its Tivoli products. Mr. Cashman was appointed to this position
because of his demonstrated skill in managing sales involving large, institutional
customers of IBM and his ability to close these deals.

12.    Mr. Cashman accepted this position and the substantial burden of
relocating to the Netherlands in large part due to the professional and financial
opportunities represented to him by IBM.

13.    Mr. Cashman's title was Director of EMEA Financial Sales with Tivoli
Global Financial Services. His management team initially included five veteran sales
managers. Mr. Cashman's direct line of supervision was up through the IBM Tivoli
EMEA organization.

14.    IBM expressly directed Mr. Cashman to develop large, profitable
transactions for the company. The team focused on sales to large institutions, principally
comprising European banks and insurance companies. The sales structure and revenue
targets for this team, as represented by the 1999 Sales Compensation Plan, were
aggressive – more so than most similarly situated Tivoli sales teams responsible for other
IBM geographical territories.

5

15.    Mr. Cashman's EMEA team each received an individual 1999 Sales Compensation plan modeled on that previously employed by Tivoli, which became very highly leveraged when a salesperson exceeded his or her sales goals by large amounts. A true and accurate copy of Mr. Cashman's plan for 1999 is attached as Exhibit A.

16.    Mr. Cashman worked with Bruno Teuber, IBM Tivoli's Vice President of Sales for EMEA, to design fair sales account responsibilities for each member of Mr. Cashman's team, as well as bonus incentives for the team, to provide true challenges and avoid "windfall" profits to any individual member of the team. The resulting distribution of accounts was particularly challenging to the team because the success of each salesperson, as well as the team, depended on sales a relatively small number of targeted customers.

17.    Over the course of his tenure in this position, Mr. Cashman personally recruited to the team three of the five IBM sales managers and an additional five business consultants with significant ties to the targeted business communities and demonstrated sales ability. In order to recruit this sales talent, Mr. Cashman touted the substantial financial incentives represented by the IBM compensation scheme if the team could produce outstanding sales performance.

18.    By fall of 1999, despite the aggressive goals set by IBM, Mr. Cashman's EMEA sales team performed exceptionally, just as IBM had asked, and was well on its way to exceeding individual and team quotas for the year. As a result of the team's success, IBM was realizing significant revenue.

19.    At this time, Mr. Teuber contacted Mr. Cashman informing him that IBM intended to elevate individual and team quotas so that year-end commissions and other

quota-based compensation would be reduced significantly. Mr. Cashman refused to change his team's compensation plans as he believed it would undermine his effectiveness as a manager and leader. He requested Mr. Teuber to reconsider.

20.    Mr. Teuber's next conversation with Mr. Cashman consisted of his informing Mr. Cashman that his compensation plan would be changed to eliminate commissions that Mr. Cashman had earned and that were due and payable. When Mr. Cashman asked whether he had any recourse to appeal the decision, Mr. Teuber told him that he could "go back to America" if he did not accept the reduction.

21.    As Mr. Cashman had rearranged his entire life so that he could be stationed in the Netherlands for three years, he had little option but to stay until he could make other arrangements. Mr. Cashman did begin immediate discussions with his "dotted line" manager back in New York to return to a position with IBM in the United States.

22.    Mr. Teuber initiated a two-fold reduction in the commissions compensation that IBM was obligated to pay Mr. Cashman's team. Rather than reduce quotas, IBM/EMEA resolved to pay the individuals on the team 50% of the commissions compensation they earned on large transactions, rather than the 100% due per their sales compensation plans. To reduce Mr. Cashman's commission compensation, which was based on team sales, rather than the leveraged overachievement commissions compensation articulated by his compensation plan, IBM paid him a lesser percentage for every dollar that his team sold above 186% of its quota for the year.

23.    Based on his sales quota of $28 million contained in his 1999 Sales Compensation Plan, and his actual sales for the year of $103.4 million, Mr. Cashman

28.    In 2001, IBM took action to bring the Tivoli sector of its business (which was wholly owned by IBM since approximately 1996), including the sales operation, in line with the other IBM software divisions. For sales, this meant that Tivoli's field sales personnel was compensated for the first time pursuant to the IBM SWG [software group] Sales Plans. The one that applied to Mr. Cashman and his team, which were "direct, field sales personnel" was entitled the "50/50 SWG Sales Plan." A true and accurate copy of the 50/50 SWG Sales Plan for 2001 ("Sales Plan") is attached hereto as Exhibit B.

29.    Essentially, the Sales Plan provided three sources of compensation for sales personnel to which it applied. Fifty per cent of a salesperson's compensation was considered base pay, or fixed portion of compensation that was to be paid semi-monthly. The other 50% of the "On Target Earnings" ("OTE") (total compensation available if salesperson achieved 100% of his or her quota) was divided between commissions and bonus-type opportunities. A final component of Total Cash Compensation (as defined by IBM) under the Sales Plan included any monies earned for "overachievement", sales in excess of 100% of an individual's or team's quota, which were generally paid out at a higher percentage of sales as the overachievement sales grew.

30.    IBM's software group ("SWG") made an express and concerted effort in 2001 to embrace and excite the Tivoli Americas Sales force of which Mr. Cashman's team was a prominent part. As is evident in the SWG management guidelines and communications from upper-tier SWG executives, IBM understood that it was suffering from attrition of its sales force and needed to stop this loss by providing aggressive

commission opportunities for its salespeople to compete with financial incentives offered by competitors the marketplace.

31.    On the cover of the IBM document that was provided to all sales staff by IBM to set out the benefits of the 50/50 SWG plan, "industry consultants" are quoted as saying, "your plan 'has some of the most aggressive rewards for overachievement in the industry.'"

32.    On the inside cover of the Sales Plan, in a message from Dan Lautenbach, Vice President, Worldwide Software Sales for IBM, he encourages, "[t]he software sales incentive plan recognizes the unique opportunities our sales force can identify and close this year. It is characterized by extremely high payout rates for business you close in excess of your assigned full year quota. And, because your sales plan is based on a self-funding model, *there are no caps to your earnings: the more you sell, the more revenue and incremental profit for IBM: and the more earnings for you.*" Emphasis supplied.

33.    The Sales Plan also included a listing of principles that guide the "Software Sales Incentive Plan," including, that "[t]he plan should be competitive with the software industry marketplace,' and "[t]he plan should be consistent with industry practice in key areas of uncapped earnings, earnings at first sale, and attractive upside opportunity."

34.    With respect to managers, IBM recognized in the Sales Plan that "[t]he plan should motivate Technical Support and Sales Management in a manner consistent with the team they support."

35.    The Sales Plan is replete with statements from IBM further emphasizing the "sky's-the-limit" approach to an individual salesperson's earnings for 2001. For

example Mr. Cashman and his team were promised, "[w]e have great expectations for a fantastic sales year with unlimited possibilities for you. There's no limit to your 2001 sales incentive opportunity;" "Your earnings for performance above quota continue to be uncapped in 2001;" "As soon as you start overachieving your full-year quota, the plan provides significant leverage to reward your performance. And, your earnings for attainment above 100% are uncapped." "You want to earn as much money as you can. We want that too, because when you win, IBM wins." Exhibit B.

36.    IBM also expressly recognized that its own gain was directly related to the overachievement of its salespeople. The Sales Plan states, "Revenue drives value for IBM. That's why the revenue measure is the largest portion of the incentive plan for most job roles. Double-digit revenue growth is one of our core business objectives, and we're making sure the Sales Incentive Plan pays you for helping achieve this goal." *Id.*

37.    For second-line sales managers like Mr. Cashman, his performance over 100% of his quota was even more highly rewarded in that the Sales Plan provided, "sales managers have accelerators that are greater than those for sales employees." In other words, the more sales revenue generated by a second line manager's team, the greater the percentage he or she would earn in commissions.

38.    In the example provided on page 6 of the Sales Plan, IBM specifically notes that when a manager generates revenue through his team that is above 120% of his full year quota, he or she earns commissions compensation at 12 times the rate for attainment compensation, which is "uncapped." (Sales Plan, p. 5).

39.    IBM's message of unbounded earnings potential for sales personnel who over achieve was echoed in all communications to Mr. Cashman concerning quotas, sales

plans and territories. Steven Mills, then the Senior Vice President and Group Executive for IBM SWG, wrote to hundreds of his sales managers on January 4, 2001 by email (including Mr. Cashman at his Massachusetts office) to preview the year's message. He stated, "we have put in significant effort to insure that quota's are reasonable and that we are delivering a sales plan that will provide a big payoff for those who can drive growth. Paying for growth is the key idea. Giving people the opportunity for significant financial reward is part of the excitement of winning."

40.    IBM repeatedly reinforced that IBM wanted to retain its sales force by providing financial incentives. At E-business University in 2001, a sales rally held at the beginning of every calendar year to excite the sales force, Steven Mills acknowledged, "We lost some good people. We cannot afford to have that happen in the year 2001. So we're going to focus our time, our effort, our energy into everything that goes into having a high performance sales team that is excited about selling for this organization, that's committed to this organization and who wants to be here a year from now."

41.    Mr. Mills also stated in his January 4, 2001 email, "[g]iven what happened to us in 2000, we MUST instill confidence that IBM SWG will be the software company to be a part of in 2001. The key to our success this year will be to retain our reps . . . How we treat our sales force this year and their growing commitment to our common goals will be key to driving the growth of IBM software."

42.    Mr. Mills recognized that financial success was at the heart of IBM's sales and retention plan. He said in his E-University speech, "That's what this year's sales plan is all about. It's about making money. It's about leverage . . . It's about a plan and a quota when combine[d] that causes you to put every last bit of effort into making this the

most successful financial year in your lives . . . The sales plan and the quotas together are all about how you're going to want to be here a year from now . . . you're going to want to be here because this is the best place to sell, with the best sales plan, with a tremendous opportunity for leverage."

43.     Nowhere in any of the sales plan materials that Mr. Cashman received or had access to was there any mention of a subjective judgment regarding a manager's level of involvement in a sales transaction in order for the revenue generated to be counted as part of a sales manager's quota.

44.     In February of 2001, Mr. Cashman was provided his target account list by an IBM account analyst. Mr. Cashman received his individual quota letter and compensation plan from John Dunderdale, the outgoing Vice President of Sales for Tivoli Americas in early March of 2001. True and accurate copies of both are attached hereto as Exhibit C. Mr. Cashman's quota was $35.5 million in sales.

45.     Despite Mr. Cashman taking on additional responsibilities as IBM's Director of Performance, Availability, Configuration and Operations products for the Americas in August of 2001, Mr. Cashman and his Financial Vertical team attained nearly $70 million in sales for 2001, which, in accordance with the Sales Plan should been used to figure Mr. Cashman's Total Cash Compensation for 2001.

46.     However, in January of 2002, Mr. Enriquez, the IBM executive to which Mr. Cashman reported directly, called Mr. Cashman at his home office in Dedham, Massachusetts and indicated that IBM did not intend to pay him the commission compensation that he had earned and that was due and payable.

13

47.     Directly thereafter, at the IBM 2002 E-Business University sales rally, Mr. Enriquez approached Mr. Cashman, again confirming that his compensation would be reduced for 2001, and warning Mr. Cashman that he could not speak about the impending reductions with anyone.

48.     Shortly thereafter, Mr. Cashman learned that IBM's financial commission specialist responsible for tracking Mr. Cashman's sales was told by Mr. Enriquez to reduce the sales attributable to Mr. Cashman so that his resulting commission compensation, already earned and due and payable, would be cut. On Mr. Enriquez' order, Mr. Cashman's attainment earnings were reduced to approximately $57 million, thereby resulting in a loss in commission compensation of approximately $375,000.00.

49.     Despite IBM's backdoor attempts to reduce compensation to Mr. Cashman and other sales staff retrospectively and in contravention of the Sales Plan, IBM, through Mr. Mills, promised its salespeople at the January 2002 E-Business rally that its commitments from the prior year would be honored and that the sales staff should keep on selling.

Grievance Process

50.     For many years, IBM had a published internal grievance procedure known as the "Open Door Policy," which claimed to have been available to IBM employees who did not believe that they had been treated appropriately.

51.     Mr. Cashman discussed initiating an Open-Door grievance with his Human Resources representative, Michael Schade, but expressed some reservation about possible negative ramifications to his IBM career long-term if he filed a complaint. Mr. Schade assured him that IBM would not tolerate any form of reprisal. Mr. Cashman

14

began the Open-Door process by filing a grievance on February 5, 2002 with Charles Ill, the Vice President of Americas Software for IBM at the time and a superior to Mr. Enriquez.

52.    Mr. Ill followed neither the processes nor the timeline outlined by the published Open-Door materials. While he did restore a small portion of Mr. Cashman's attained sales months after the grievance was filed, the lion's share of the sales that had been de-credited were not restored.

53.    On June 12, 2002, Mr. Cashman filed an appeal of Mr. Ill's determination. Despite Mr. Cashman's best efforts to track the appeal, it took until November of 2002 before Mr. Cashman was merely told verbally that his appeal was denied.

54.    After Mr. Cashman complained in 2002 about the reduction in his 2001 compensation, he was removed from IBM's Executive Resource list by Mr. Enriquez, who also refused to give him the highest rating on his performance evaluation for 2001, despite that another IBM Executive did give him the highest rating for the same period. Mr. Enriquez had confirmed for Mr. Cashman that his name appeared on that list in August of 2001. As a result, Mr. Cashman has not been considered for an Executive Management position. Mr. Enriquez also made negative comments about Mr. Cashman to his subsequent manager and others at IBM after Mr. Cashman refused to accept cuts to his compensation and initiated the internal grievance procedure.

55.    Since filing the Open-Door grievance, IBM has also consistently passed Mr. Cashman over for advancement, taken away his management responsibilities, and assigned him to positions that were not commensurate with his experience.

## COUNT I
### (Breach of Contract -- IBM)

56.    The plaintiff repeats and realleges all averments in paragraphs 1 through 55 as if fully set forth herein.

57.    IBM had a contract with Mr. Cashman for 1999 that dictated how his compensation would be paid for services rendered as an employee of IBM.

58.    Mr. Cashman performed all of his obligations pursuant to that contract.

59.    IBM breached that contract by failing to pay Mr. Cashman as required by the terms of the contract.

60.    As a result, Mr. Cashman has been damaged.

## COUNT II
### (Unjust Enrichment/Quantum Meruit -- IBM)

61.    The plaintiff repeats and realleges all averments in paragraphs 1 through 60 as if fully set forth herein

62.    Mr. Cashman rendered valuable services to IBM in 1999;

63.    IBM accepted Mr. Cashman's services and used, enjoyed, and profited by them;

64.    IBM should reasonably have expected that it would have to pay Mr. Cashman his full compensation for the services he rendered;

65.    Mr. Cashman reasonably expected to be paid full compensation for the services he rendered.

66.    IBM was unjustly enriched by receiving the benefit of Mr. Cashman's services while refusing to pay his full compensation.

**COUNT III**
**(Breach of Contract -- IBM)**

67.    The plaintiff repeats and realleges all averments in paragraphs 1 through 66 as if fully set forth herein.

68.    IBM had a contract with Mr. Cashman for 2001 that dictated how his compensation would be paid for services rendered as an employee of IBM.

69.    Mr. Cashman performed all of his obligations pursuant to that contract.

70.    IBM breached that contract by failing to pay Mr. Cashman as required by the terms of the contract.

71.    As a result, Mr. Cashman has been damaged.

**COUNT IV**
**(Unjust Enrichment/Quantum Meruit – IBM)**

72.    The plaintiff repeats and realleges all averments in paragraphs 1 through 71 as if fully set forth herein.

73.    Mr. Cashman rendered valuable services to IBM in 2001.

74.    IBM accepted Mr. Cashman's services and used, enjoyed, and profited by them.

75.    IBM should reasonably have expected that it would have to pay Mr. Cashman his full compensation for the services he rendered.

76.    Mr. Cashman reasonably expected to be paid full compensation for the services he rendered.

77.    IBM was unjustly enriched by receiving the benefit of Mr. Cashman's services while refusing to pay his full compensation.

## COUNT V

### (Violations of Mass. Gen. Laws ch. 149, §§ 148, 148A, 150 – IBM, Ill, Mills, Joyce and Enriquez)

78.    The plaintiff repeats and realleges all averments in paragraphs 1 through 77 as if fully set forth herein.

79.    Mr. Cashman earned compensation pursuant to IBM's 2001 SWG 50/50 Sales Plan, which remains unpaid despite verbal and written demands.

80.    The unpaid compensation is covered by G.L. c. 149, § 148.

81.    IBM is an employer within the meaning of G.L. c. 149, § 148.

82.    Mssrs. Ill, Mills, Joyce and Enriquez are or were for relevant times officers or agents of IBM within the meaning of G.L. c. 149, § 148.

83.    Defendants failed to pay Mr. Cashman his compensation which had become due and payable at the close of 2001, even after he requested payment of the sums due both verbally and in writing and followed IBM's published "Open-Door" grievance procedure.

84.    As more fully described above, in violation of Mass. Gen. Laws, ch. 149, §148A, Mr. Cashman suffered retaliation by the Defendants for taking action to recover his compensation including but not limited to being removed from IBM's Executive Resource List.

85.    Mr. Cashman has suffered harm as a result of the Defendants' conduct, in violation of M.G.L. ch. 149, §§148, 148A and 150.  Mr. Cashman has applied to and received authorization from the Office of the Attorney General, Commonwealth of Massachusetts, Fair Labor and Business Practices Division, to prosecute this claim.

18

## COUNT VI
### (Interference with Advantageous Business Relations – Enriquez)

86.    The plaintiff repeats and realleges all averments in paragraphs 1 through 85 as if fully set forth herein.

87.    Mr. Cashman's name had been added to the list from which IBM appointed executives internally("Executive Resource List") in 2001. A prerequisite for such an appointment was that an employee's name appear on this list.

88.    Mr. Enriquez was aware that Mr. Cashman's name was on the Executive Resource List and that to remain on the list Mr. Cashman's performance rating needed to remain at the highest level.

89.    In 2001, Mr. Cashman exceeded his team sales quota by nearly 100% and was rated at the highest level by Thomas Wroblewski, an IBM sales executive to which Mr. Cashman answered.

90.    In 2002, after Mr. Cashman protested the refiguring of his sales such that his commissions would be improperly reduced, and his commencement of an Open-Door grievance, Mr. Enriquez willfully, intentionally and with malice refused to give Mr. Cashman the highest rating for his 2001 performance so that he could not remain on the Executive Resource List and proceeded to spread false rumors and degrading comments about Mr. Cashman to other executives at IBM to damage his ability to succeed at the company.

91.    Mr. Enriquez's decision with respect to Mr. Cashman's performance was unlawfully calculated to cause Mr. Cashman damage and loss.

92.    As a result of Mr. Enriquez's actions, Mr. Cashman has suffered damage and loss.

WHEREFORE, the plaintiff, Thomas Cashman requests this court to:

1.   Enter judgment for Thomas Cashman against defendants on all counts of the Complaint;

2.   Award damages to Thomas Cashman in an amount determined by the court;

3.   Award treble damages, interest, costs, and attorneys' fees to Thomas Cashman pursuant to Count V of the Complaint, and,

4.   Award such other relief as this Court deems just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL COUNTS SO TRIABLE.**

THOMAS CASHMAN
By his attorneys,

Charles R. Bennett, Jr., BBO #037380
Kathleen E. Cross, BBO #556934
Sharon H. Patton, BBO #634780

HANIFY & KING
Professional Corporation
One Beacon Street
Boston, MA  02108
(617) 423-0400

DATED: January 7, 2005

406935

**A TRUE COPY**
Attest: _Mary E. Kenney_
Deputy Assistant Clerk
2/16/05

4.0

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                          TRIAL COURT OF THE COMMONWEALTH
                                     SUPERIOR COURT DEPARTMENT
                                     CIVIL ACTION NO. 04-02106

---

THOMAS CASHMAN,                      )
                                     )
                Plaintiff,           )
                                     )
        vs.                          )
                                     )
INTERNATIONAL BUSINESS               )
MACHINES CORPORATION,                )
STEVEN A. MILLS, CHARLES ILL,        )
JOHN R. JOYCE, and                   )
GREGORY ENRIQUEZ,                    )
                                     )                    **RECEIVED & FILED**
                Defendants.          )                    **CLERK OF THE COURTS**
                                     )                    NORFOLK COUNTY
                                                          1-13-05

**PLAINTIFF'S MOTION FOR SPECIAL PROCESS SERVER**

        Plaintiff Thomas R. Cashman ("Cashman") hereby moves this Court, pursuant to

Mass. R. Civ. P. 4(c), for the appointment of Dewsnap & Associates at P.O. Box 4538,

Boston, MA 02101 as special process server for defendants located in Massachusetts in

this matter. Plaintiff states that the appointment of Dewsnap & Associates will facilitate

the service of process in this matter. Plaintiff represents to the Court that Dewsnap &

Associates is not a party to this action and its process servers are not less than eighteen

(18) years of age.

        In addition, Cashman respectfully moves this Court, pursuant to Mass. R. Civ. P.

4(e) for the appointment of Paul Verille, State Marshall, at 1856 Summer Street,

Stamford, CT 06905 as special process server for defendants located in Connecticut in

this matter. Plaintiff states that the appointment of Paul Verille will facilitate the service

of process in this matter. Plaintiff represents to the Court that Paul Verille is not a party to this action and is not less than eighteen (18) years of age.

Finally, Cashman respectfully moves this Court, pursuant to Mass. R. Civ. P. 4(e) for the appointment of LegalEase, at 139 Fulton Street, Suite 1013, New York, NY 10038 as special process server for defendants located in New York in this matter. Plaintiff states that LegalEase will facilitate the service of process in this matter. Plaintiff represents to the Court that LegalEase is not a party to this action and its process servers are not less than eighteen (18) years of age.

Respectfully submitted,

THOMAS R. CASHMAN

By his attorneys,

Charles R. Bennett, Jr. (BBO#037380)
Kathleen E. Cross (BBO#556934)
Sharon H. Patton (BBO#634780)
HANIFY & KING, P.C.
One Beacon Street, 21st floor
Boston, MA  02108
(617) 423-0400

DATED: January 11 , 2005

**A TRUE COPY**

Attest: _Mary E. Kenney_
Deputy Assistant Clerk
2/16/05

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

TRIAL COURT OF THE COMMONWEALTH
SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. 2004-02106-A

---

THOMAS CASHMAN,               )
                              )
              Plaintiff,      )
                              )
        vs.                   )
                              )
INTERNATIONAL BUSINESS        )
MACHINES CORPORATION,         )
STEVEN A. MILLS, CHARLES ILL, )
JOHN R. JOYCE, and            )
GREGORY ENRIQUEZ,             )
                              )
              Defendants.     )
                              )

---

## FIRST AMENDED COMPLAINT AND JURY DEMAND

The plaintiff, Thomas Cashman ("Mr. Cashman"), asserts claims arising from his

employment by International Business Machines, Corp. ("IBM") and the actions and

omissions of various of its officers and senior managers based on IBM's failure to pay

Mr. Cashman compensation that he earned pursuant to the terms of his compensation

plan and subsequent retaliation for Mr. Cashman's pursuit of an internal grievance.

### JURISDICTION

1.    Jurisdiction is appropriate pursuant to the Massachusetts Long-Arm

Statute, Mass. Gen. Laws, ch. 223A, §3.

2.    The Massachusetts Wage Act, G.L. ch. 149, §§148, provides, in pertinent

part that, "[t]he president and treasurer of a corporation and any officers or agents having

the management of such corporation shall be deemed to be the employers of the

employees of the corporation within the meaning of this section."

### VENUE

3.      Venue is appropriate pursuant to Mass. Gen. Laws, ch. 223, §1.

### FACTS COMMON TO ALL COUNTS

4.      The plaintiff, Thomas Cashman, resides at 375 Westfield Street, Dedham,

Massachusetts, Norfolk County, where he also maintains a home office.

5.      Mr. Cashman was an employee of IBM continuously since February 3,

1997 and until he left IBM on November 30, 2004, at which time he held the position of a

WWW Business Unit Executive, E-business on Demand Automation, IBM Software

Group.  Other positions held by Mr. Cashman at IBM which are relevant to the claims

brought herein include Director of EMEA Financial Sales with Tivoli Global Financial

Services;  Tivoli Sales Manager, Business Unit Executive; Director, Financial Vertical,

Tivoli Systems, Inc.; Director, Performance, Availability, Configuration and Operations

Solutions, Tivoli Systems – Americas.

6.      The defendant, IBM, is a New York corporation and maintains a principal

place of business at 1133 Westchester Avenue, White Plains, New York ("IBM

Headquarters").  IBM is a foreign corporation registered with the Secretary of State of the

Commonwealth of Massachusetts and regularly conducts and solicits business in

Massachusetts.  Notably, it has a division in Cambridge, Massachusetts known as Lotus

Development Corporation.  IBM maintains or has maintained offices in the

Commonwealth of Massachusetts, including offices in Boston, Cambridge and Waltham,

Massachusetts.

2

7.     The defendant, Charles Ill, was a senior executive at IBM, on information and belief holding, the position of Vice President of Americas Software, at all times relevant to this action. Mr. Ill was the direct line supervisor for Mr. Cashman's direct supervisor, Gregory Enriquez. On or about February 5, 2002, Mr. Cashman filed an Open Door grievance with Mr. Ill respecting IBM's failure to pay his 2001 commissions earned and due and payable pursuant to the 2001 50/50 SWG Sales Plan. Mr. Cashman initiated and received many communications involving Mr. Ill from Mr. Cashman's home office in Massachusetts directly related to the claims central to this action. On information and belief, Mr. Ill is now a sales executive with BEA Systems, Inc., located in San Jose, California. Mr. Ill is an employer of plaintiff as defined by Mass. Gen. Laws, ch. 149 § 148.

8.     The defendant, Steven A. Mills, is Senior Vice President & Group Executive, a position he has held since July of 2000. According to IBM, Mr. Mills is responsible for shaping IBM's overall software strategy and directing its software business. Mr. Mills is responsible for approving the structure of yearly sales plans, and approved the structure of the 2001 50/50 SWG Sales Plan. Mr. Mills maintains an office at IBM headquarters in New York. Upon information and belief, Mr. Mills travels regularly to IBM's offices in Massachusetts, to carryout his duties regarding IBM software. Mr. Mills was in the direct chain of command managing and controlling software sales and commission decisions for IBM, including those complained of by Mr. Cashman in this action. Mr. Mills is an employer of plaintiff as defined by Mass. Gen. Laws, ch. 149 § 148.

3

9.     The defendant, John R. Joyce, at all times relevant to this complaint was a Senior Vice President and Chief Financial Officer of IBM, a position he had held since 1999. Mr. Joyce was responsible for all financial and business development activities of IBM, including those taking place in Massachusetts and including compensation of its employees. Upon information and belief, IBM's Finance and Planning sector, headed by Mr. Joyce, was complicitous in the decision to cut Mr. Cashman's commissions. Mr. Joyce was an employer of plaintiff as defined by Mass. Gen. Laws, ch. 149 § 148.

10.     The defendant, Gregory Enriquez, was the Americas Sales Vice President of Tivoli IBM Software group at all times relevant to this action and was the direct-line supervisor for Mr. Cashman. Mr. Enriquez maintained an office at IBM Americas Software Group Headquarters during his tenure of Vice President. Mr. Enriquez regularly contacted Mr. Cashman by telephone and email at Mr. Cashman's Dedham, Massachusetts home office regarding IBM's business in Massachusetts, and, more precisely the claims raised in this lawsuit. In or about January 2002, Mr. Enriquez telephoned Mr. Cashman at Mr. Cashman's home office in Dedham, Massachusetts and notified him that his 2001 earned and due and payable commissions would be reduced. At all times relevant to this action, Mr. Enriquez was an employer of plaintiff as defined by Mass. Gen. Laws, ch. 149, §148. On information and belief, Mr. Enriquez is currently employed as the Senior Vice President-Worldwide Sales for Stratus Technologies, 111 Powdermill Road, Maynard, Massachusetts 01754.

4

## FACTS COMMON TO ALL COUNTS

### Tivoli IBM Software Group – EMEA

11.    After achieving over 400% of his sales quota at IBM for 1997, Mr.

Cashman was asked to take a three-year international assignment with EMEA (a division

of IBM, which is an acronym for Europe, Middle East and Africa) that involved being

relocated to the Netherlands. IBM directed a dedicated team to sell to substantial

institutional targets, largely located in Europe, where IBM determined significant growth

opportunities existed for its Tivoli products. Mr. Cashman was appointed to this position

because of his demonstrated skill in managing sales involving large, institutional

customers of IBM and his ability to close these deals.

12.    Mr. Cashman accepted this position and the substantial burden of

relocating to the Netherlands in large part due to the professional and financial

opportunities represented to him by IBM.

13.    Mr. Cashman's title was Director of EMEA Financial Sales with Tivoli

Global Financial Services. His management team initially included five veteran sales

managers. Mr. Cashman's direct line of supervision was up through the IBM Tivoli

EMEA organization.

14.    IBM expressly directed Mr. Cashman to develop large, profitable

transactions for the company. The team focused on sales to large institutions, principally

comprising European banks and insurance companies. The sales structure and revenue

targets for this team, as represented by the 1999 Sales Compensation Plan, were

aggressive – more so than most similarly situated Tivoli sales teams responsible for other

IBM geographical territories.

5

15.    Mr. Cashman's EMEA team each received an individual 1999 Sales Compensation plan modeled on that previously employed by Tivoli, which became very highly leveraged when a salesperson exceeded his or her sales goals by large amounts. A true and accurate copy of Mr. Cashman's plan for 1999 is attached as Exhibit A.

16.    Mr. Cashman worked with Bruno Teuber, IBM Tivoli's Vice President of Sales for EMEA, to design fair sales account responsibilities for each member of Mr. Cashman's team, as well as bonus incentives for the team, to provide true challenges and avoid "windfall" profits to any individual member of the team. The resulting distribution of accounts was particularly challenging to the team because the success of each salesperson, as well as the team, depended on sales a relatively small number of targeted customers.

17.    Over the course of his tenure in this position, Mr. Cashman personally recruited to the team three of the five IBM sales managers and an additional five business consultants with significant ties to the targeted business communities and demonstrated sales ability. In order to recruit this sales talent, Mr. Cashman touted the substantial financial incentives represented by the IBM compensation scheme if the team could produce outstanding sales performance.

18.    By fall of 1999, despite the aggressive goals set by IBM, Mr. Cashman's EMEA sales team performed exceptionally, just as IBM had asked, and was well on its way to exceeding individual and team quotas for the year. As a result of the team's success, IBM was realizing significant revenue.

19.    At this time, Mr. Teuber contacted Mr. Cashman informing him that IBM intended to elevate individual and team quotas so that year-end commissions and other

quota-based compensation would be reduced significantly. Mr. Cashman refused to change his team's compensation plans as he believed it would undermine his effectiveness as a manager and leader. He requested Mr. Teuber to reconsider.

20.    Mr. Teuber's next conversation with Mr. Cashman consisted of his informing Mr. Cashman that his compensation plan would be changed to eliminate commissions that Mr. Cashman had earned and that were due and payable. When Mr. Cashman asked whether he had any recourse to appeal the decision, Mr. Teuber told him that he could "go back to America" if he did not accept the reduction.

21.    As Mr. Cashman had rearranged his entire life so that he could be stationed in the Netherlands for three years, he had little option but to stay until he could make other arrangements. Mr. Cashman did begin immediate discussions with his "dotted line" manager back in New York to return to a position with IBM in the United States.

22.    Mr. Teuber initiated a two-fold reduction in the commissions compensation that IBM was obligated to pay Mr. Cashman's team. Rather than reduce quotas, IBM/EMEA resolved to pay the individuals on the team 50% of the commissions compensation they earned on large transactions, rather than the 100% due per their sales compensation plans. To reduce Mr. Cashman's commission compensation, which was based on team sales, rather than the leveraged overachievement commissions compensation articulated by his compensation plan, IBM paid him a lesser percentage for every dollar that his team sold above 186% of its quota for the year.

23.    Based on his sales quota of $28 million contained in his 1999 Sales Compensation Plan, and his actual sales for the year of $103.4 million, Mr. Cashman

7

would have earned approximately $1,582,200 in base salary and commissions for the year. Instead, with IBM/EMEA's end-of-the-year changes to his sales plan, his earnings were cut to $845,100, which cost Mr. Cashman at least $737,100 in earned commissions.

### Tivoli IBM Software Group Sales – Massachusetts

24.    In February of 2000, Mr. Cashman returned to the United States to rebuild the Tivoli Finance Vertical Team, which sold mostly to banking, insurance and brokerage institutions. Mr. Cashman faced significant challenges in this new position.

25.    The first hurdle faced by Mr. Cashman in making his team successful was significant turnover in the software industry that was occurring at the time he took the reigns. The opportunities available in the computer software industry at the zenith of the dot com expansion to make significant sums of money attracted many good salespeople away from IBM in the 1999-2000 period.

26.    The Tivoli product line had also suffered recent setbacks that led to customer dissatisfaction, including, significantly, IBM's sale of Tivoli's customer help desk, which had been portrayed as the core of Tivoli's management strategy for sales to large institutional customers. As a result, when Mr. Cashman returned to lead this team, many customers who had made significant Tivoli purchases in the preceding few years, had yet to deploy the systems (a problem known in the industry as "shelfware"). These frustrated customers required substantial attention from Mr. Cashman and his team merely to digest their prior purchases and integrate Tivoli products into their businesses.

27.    Despite the constant turnover and existing customer unrest, Mr. Cashman's team was one of the only two sales teams on a regional level to achieve its sales quota.

8

28.    In 2001, IBM took action to bring the Tivoli sector of its business (which

was wholly owned by IBM since approximately 1996), including the sales operation, in

line with the other IBM software divisions.  For sales, this meant that Tivoli's field sales

personnel was compensated for the first time pursuant to the IBM SWG [software group]

Sales Plans.  The one that applied to Mr. Cashman and his team, which were  "direct,

field sales personnel" was entitled the "50/50 SWG Sales Plan."  A true and accurate

copy of the 50/50 SWG Sales Plan for 2001 ("Sales Plan") is attached hereto as Exhibit

B.

29.    Essentially, the Sales Plan provided three sources of compensation for

sales personnel to which it applied.  Fifty per cent of a salesperson's compensation was

considered base pay, or fixed portion of compensation that was to be paid semi-monthly.

The other 50% of the "On Target Earnings" ("OTE") (total compensation available if

salesperson achieved 100% of his or her quota) was divided between commissions and

bonus-type opportunities. A final component of Total Cash Compensation (as defined by

IBM) under the Sales Plan included any monies earned for "overachievement", sales in

excess of 100% of an individual's or team's quota, which were generally paid out at a

higher percentage of sales as the overachievement sales grew.

30.    IBM's software group ("SWG") made an express and concerted effort in

2001 to embrace and excite the Tivoli Americas Sales force of which Mr. Cashman's

team was a prominent part.  As is evident in the SWG management guidelines and

communications from upper-tier SWG executives, IBM understood that it was suffering

from attrition of its sales force and needed to stop this loss by providing aggressive

9

commission opportunities for its salespeople to compete with financial incentives offered by competitors the marketplace.

31.    On the cover of the IBM document that was provided to all sales staff by IBM to set out the benefits of the 50/50 SWG plan, "industry consultants" are quoted as saying, "your plan 'has some of the most aggressive rewards for overachievement in the industry.'"

32.    On the inside cover of the Sales Plan, in a message from Dan Lautenbach, Vice President, Worldwide Software Sales for IBM, he encourages, "[t]he software sales incentive plan recognizes the unique opportunities our sales force can identify and close this year. It is characterized by extremely high payout rates for business you close in excess of your assigned full year quota. And, because your sales plan is based on a self-funding model, *there are no caps to your earnings: the more you sell, the more revenue and incremental profit for IBM: and the more earnings for you*." Emphasis supplied.

33.    The Sales Plan also included a listing of principles that guide the "Software Sales Incentive Plan," including, that "[t]he plan should be competitive with the software industry marketplace,' and "[t]he plan should be consistent with industry practice in key areas of uncapped earnings, earnings at first sale, and attractive upside opportunity."

34.    With respect to managers, IBM recognized in the Sales Plan that "[t]he plan should motivate Technical Support and Sales Management in a manner consistent with the team they support."

35.    The Sales Plan is replete with statements from IBM further emphasizing the "sky's-the-limit" approach to an individual salesperson's earnings for 2001. For

10

example Mr. Cashman and his team were promised, "[w]e have great expectations for a fantastic sales year with unlimited possibilities for you. There's no limit to your 2001 sales incentive opportunity;" "Your earnings for performance above quota continue to be uncapped in 2001;" "As soon as you start overachieving your full-year quota, the plan provides significant leverage to reward your performance. And, your earnings for attainment above 100% are uncapped." "You want to earn as much money as you can. We want that too, because when you win, IBM wins." Exhibit B.

36.    IBM also expressly recognized that its own gain was directly related to the overachievement of its salespeople. The Sales Plan states, "Revenue drives value for IBM. That's why the revenue measure is the largest portion of the incentive plan for most job roles. Double-digit revenue growth is one of our core business objectives, and we're making sure the Sales Incentive Plan pays you for helping achieve this goal." *Id.*

37.    For second-line sales managers like Mr. Cashman, his performance over 100% of his quota was even more highly rewarded in that the Sales Plan provided, "sales managers have accelerators that are greater than those for sales employees." In other words, the more sales revenue generated by a second line manager's team, the greater the percentage he or she would earn in commissions.

38.    In the example provided on page 6 of the Sales Plan, IBM specifically notes that when a manager generates revenue through his team that is above 120% of his full year quota, he or she earns commissions compensation at 12 times the rate for attainment compensation, which is "uncapped." (Sales Plan, p. 5).

39.    IBM's message of unbounded earnings potential for sales personnel who over achieve was echoed in all communications to Mr. Cashman concerning quotas, sales

plans and territories. Steven Mills, then the Senior Vice President and Group Executive for IBM SWG, wrote to hundreds of his sales managers on January 4, 2001 by email (including Mr. Cashman at his Massachusetts office) to preview the year's message. He stated, "we have put in significant effort to insure that quota's are reasonable and that we are delivering a sales plan that will provide a big payoff for those who can drive growth. Paying for growth is the key idea. Giving people the opportunity for significant financial reward is part of the excitement of winning."

40.     IBM repeatedly reinforced that IBM wanted to retain its sales force by providing financial incentives. At E-business University in 2001, a sales rally held at the beginning of every calendar year to excite the sales force, Steven Mills acknowledged, "We lost some good people. We cannot afford to have that happen in the year 2001. So we're going to focus our time, our effort, our energy into everything that goes into having a high performance sales team that is excited about selling for this organization, that's committed to this organization and who wants to be here a year from now."

41.     Mr. Mills also stated in his January 4, 2001 email, "[g]iven what happened to us in 2000, we MUST instill confidence that IBM SWG will be the software company to be a part of in 2001. The key to our success this year will be to retain our reps . . . How we treat our sales force this year and their growing commitment to our common goals will be key to driving the growth of IBM software."

42.     Mr. Mills recognized that financial success was at the heart of IBM's sales and retention plan. He said in his E-University speech, "That's what this year's sales plan is all about. It's about making money. It's about leverage . . . It's about a plan and a quota when combine[d] that causes you to put every last bit of effort into making this the

most successful financial year in your lives . . . The sales plan and the quotas together are all about how you're going to want to be here a year from now . . . you're going to want to be here because this is the best place to sell, with the best sales plan, with a tremendous opportunity for leverage."

43.    Nowhere in any of the sales plan materials that Mr. Cashman received or had access to was there any mention of a subjective judgment regarding a manager's level of involvement in a sales transaction in order for the revenue generated to be counted as part of a sales manager's quota.

44.    In February of 2001, Mr. Cashman was provided his target account list by an IBM account analyst. Mr. Cashman received his individual quota letter and compensation plan from John Dunderdale, the outgoing Vice President of Sales for Tivoli Americas in early March of 2001. True and accurate copies of both are attached hereto as Exhibit C. Mr. Cashman's quota was $35.5 million in sales.

45.    Despite Mr. Cashman taking on additional responsibilities as IBM's Director of Performance, Availability, Configuration and Operations products for the Americas in August of 2001, Mr. Cashman and his Financial Vertical team attained nearly $70 million in sales for 2001, which, in accordance with the Sales Plan should been used to figure Mr. Cashman's Total Cash Compensation for 2001.

46.    However, in January of 2002, Mr. Enriquez, the IBM executive to which Mr. Cashman reported directly, called Mr. Cashman at his home office in Dedham, Massachusetts and indicated that IBM did not intend to pay him the commission compensation that he had earned and that was due and payable.

47.    Directly thereafter, at the IBM 2002 E-Business University sales rally, Mr. Enriquez approached Mr. Cashman, again confirming that his compensation would be reduced for 2001, and warning Mr. Cashman that he could not speak about the impending reductions with anyone.

48.    Shortly thereafter, Mr. Cashman learned that IBM's financial commission specialist responsible for tracking Mr. Cashman's sales was told by Mr. Enriquez to reduce the sales attributable to Mr. Cashman so that his resulting commission compensation, already earned and due and payable, would be cut.  On Mr. Enriquez' order, Mr. Cashman's attainment earnings were reduced to approximately $57 million, thereby resulting in a loss in commission compensation of approximately $375,000.00.

49.    Despite IBM's backdoor attempts to reduce compensation to Mr. Cashman and other sales staff retrospectively and in contravention of the Sales Plan, IBM, through Mr. Mills, promised its salespeople at the January 2002 E-Business rally that its commitments from the prior year would be honored and that the sales staff should keep on selling.

Grievance Process

50.    For many years, IBM had a published internal grievance procedure known as the "Open Door Policy," which claimed to have been available to IBM employees who did not believe that they had been treated appropriately.

51.    Mr. Cashman discussed initiating an Open-Door grievance with his Human Resources representative, Michael Schade, but expressed some reservation about possible negative ramifications to his IBM career long-term if he filed a complaint.  Mr. Schade assured him that IBM would not tolerate any form of reprisal.  Mr. Cashman

14

began the Open-Door process by filing a grievance on February 5, 2002 with Charles Ill, the Vice President of Americas Software for IBM at the time and a superior to Mr. Enriquez.

52.    Mr. Ill followed neither the processes nor the timeline outlined by the published Open-Door materials. While he did restore a small portion of Mr. Cashman's attained sales months after the grievance was filed, the lion's share of the sales that had been de-credited were not restored.

53.    On June 12, 2002, Mr. Cashman filed an appeal of Mr. Ill's determination. Despite Mr. Cashman's best efforts to track the appeal, it took until November of 2002 before Mr. Cashman was merely told verbally that his appeal was denied.

54.    After Mr. Cashman complained in 2002 about the reduction in his 2001 compensation, he was removed from IBM's Executive Resource list by Mr. Enriquez, who also refused to give him the highest rating on his performance evaluation for 2001, despite that another IBM Executive did give him the highest rating for the same period. Mr. Enriquez had confirmed for Mr. Cashman that his name appeared on that list in August of 2001. As a result, Mr. Cashman has not been considered for an Executive Management position. Mr. Enriquez also made negative comments about Mr. Cashman to his subsequent manager and others at IBM after Mr. Cashman refused to accept cuts to his compensation and initiated the internal grievance procedure.

55.    Since filing the Open-Door grievance, IBM has also consistently passed Mr. Cashman over for advancement, taken away his management responsibilities, and assigned him to positions that were not commensurate with his experience.

## COUNT I
## (Breach of Contract -- IBM)

56.    The plaintiff repeats and realleges all averments in paragraphs 1 through 55 as if fully set forth herein.

57.    IBM had a contract with Mr. Cashman for 1999 that dictated how his compensation would be paid for services rendered as an employee of IBM.

58.    Mr. Cashman performed all of his obligations pursuant to that contract.

59.    IBM breached that contract by failing to pay Mr. Cashman as required by the terms of the contract.

60.    As a result, Mr. Cashman has been damaged.

## COUNT II
## (Unjust Enrichment/Quantum Meruit -- IBM)

61.    The plaintiff repeats and realleges all averments in paragraphs 1 through 60 as if fully set forth herein

62.    Mr. Cashman rendered valuable services to IBM in 1999;

63.    IBM accepted Mr. Cashman's services and used, enjoyed, and profited by them;

64.    IBM should reasonably have expected that it would have to pay Mr. Cashman his full compensation for the services he rendered;

65.    Mr. Cashman reasonably expected to be paid full compensation for the services he rendered.

66.    IBM was unjustly enriched by receiving the benefit of Mr. Cashman's services while refusing to pay his full compensation.

## COUNT III
### (Breach of Contract -- IBM)

67.    The plaintiff repeats and realleges all averments in paragraphs 1 through 66 as if fully set forth herein.

68.    IBM had a contract with Mr. Cashman for 2001 that dictated how his compensation would be paid for services rendered as an employee of IBM.

69.    Mr. Cashman performed all of his obligations pursuant to that contract.

70.    IBM breached that contract by failing to pay Mr. Cashman as required by the terms of the contract.

71.    As a result, Mr. Cashman has been damaged.

## COUNT IV
### (Unjust Enrichment/Quantum Meruit – IBM)

72.    The plaintiff repeats and realleges all averments in paragraphs 1 through 71 as if fully set forth herein.

73.    Mr. Cashman rendered valuable services to IBM in 2001.

74.    IBM accepted Mr. Cashman's services and used, enjoyed, and profited by them.

75.    IBM should reasonably have expected that it would have to pay Mr. Cashman his full compensation for the services he rendered.

76.    Mr. Cashman reasonably expected to be paid full compensation for the services he rendered.

77.    IBM was unjustly enriched by receiving the benefit of Mr. Cashman's services while refusing to pay his full compensation.

## COUNT V

### (Violations of Mass. Gen. Laws ch. 149, §§ 148, 148A, 150 – IBM, Ill, Mills, Joyce and Enriquez)

78.     The plaintiff repeats and realleges all averments in paragraphs 1 through 77 as if fully set forth herein.

79.     Mr. Cashman earned compensation pursuant to IBM's 2001 SWG 50/50 Sales Plan, which remains unpaid despite verbal and written demands.

80.     The unpaid compensation is covered by G.L. c. 149, § 148.

81.     IBM is an employer within the meaning of G.L. c. 149, § 148.

82.     Mssrs. Ill, Mills, Joyce and Enriquez are or were for relevant times officers or agents of IBM within the meaning of G.L. c. 149, § 148.

83.     Defendants failed to pay Mr. Cashman his compensation which had become due and payable at the close of 2001, even after he requested payment of the sums due both verbally and in writing and followed IBM's published "Open-Door" grievance procedure.

84.     As more fully described above, in violation of Mass. Gen. Laws, ch. 149, §148A, Mr. Cashman suffered retaliation by the Defendants for taking action to recover his compensation including but not limited to being removed from IBM's Executive Resource List.

85.     Mr. Cashman has suffered harm as a result of the Defendants' conduct, in violation of M.G.L. ch. 149, §§148, 148A and 150. Mr. Cashman has applied to and received authorization from the Office of the Attorney General, Commonwealth of Massachusetts, Fair Labor and Business Practices Division, to prosecute this claim.

18

## COUNT VI
### (Interference with Advantageous Business Relations – Enriquez)

86.     The plaintiff repeats and realleges all averments in paragraphs 1 through 85 as if fully set forth herein.

87.     Mr. Cashman's name had been added to the list from which IBM appointed executives internally("Executive Resource List") in 2001.  A prerequisite for such an appointment was that an employee's name appear on this list.

88.     Mr. Enriquez was aware that Mr. Cashman's name was on the Executive Resource List and that to remain on the list Mr. Cashman's performance rating needed to remain at the highest level.

89.     In 2001, Mr. Cashman exceeded his team sales quota by nearly 100% and was rated at the highest level by Thomas Wroblewski, an IBM sales executive to which Mr. Cashman answered.

90.     In 2002, after Mr. Cashman protested the refiguring of his sales such that his commissions would be improperly reduced, and his commencement of an Open-Door grievance, Mr. Enriquez willfully, intentionally and with malice refused to give Mr. Cashman the highest rating for his 2001 performance so that he could not remain on the Executive Resource List and proceeded to spread false rumors and degrading comments about Mr. Cashman to other executives at IBM to damage his ability to succeed at the company.

91.     Mr. Enriquez's decision with respect to Mr. Cashman's performance was unlawfully calculated to cause Mr. Cashman damage and loss.

92.     As a result of Mr. Enriquez's actions, Mr. Cashman has suffered damage and loss.

WHEREFORE, the plaintiff, Thomas Cashman requests this court to:

1.    Enter judgment for Thomas Cashman against defendants on all counts of the Complaint;

2.    Award damages to Thomas Cashman in an amount determined by the court;

3.    Award treble damages, interest, costs, and attorneys' fees to Thomas Cashman pursuant to Count V of the Complaint, and,

4.    Award such other relief as this Court deems just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL COUNTS SO TRIABLE.**

                                        THOMAS CASHMAN
                                        By his attorneys,


                                        _Kathleen E Cross_
                                        Charles R. Bennett, Jr., BBO #037380
                                        Kathleen E. Cross, BBO #556934
                                        Sharon H. Patton, BBO #634780

                                        HANIFY & KING
                                        Professional Corporation
                                        One Beacon Street
                                        Boston, MA  02108
                                        (617) 423-0400

DATED: January 7, 2005

406935

                                        A TRUE COPY
                                        Attest: _Mary E. Kinney_
                                        Deputy Assistant Clerk    2/16/05

20



**PRIVATE & CONFIDENTIAL**


12 May 1999


Mr T Cashman
Keizersgracht 361 D
1016 EJ
Amsterdam


Dear Tom

**RE: COMPENSATION REVIEW**

I have recently spent some time reviewing your compensation and I have great pleasure in confirming that your base salary will increase to £60,000, also your on target commissions will increase to £80,000 with effect from 1 January 1999.  All your other existing terms and conditions of employment remain unchanged.

May I take this opportunity to thank you personally for your continued support and contribution both to the function and the Tivoli organisation as a whole.

Kind regards

Yours sincerely

Steve Standring
**Director, Verticals**

Tivoli Systems (UK) Ltd.
Sefton Park
Bells Hill
Stoke Poges
Bucks
SL2 4HD

CC:   Personnel File
Payroll

Tel: 01753 896896
Fax: 01753 896899

Registered in England. No. 3128044
Registered Office: Pudney House
16-20 Ely Place, London, EC1N 6SN

# Welcome to the fabulous world of your 2001 Software Sales Incentive Plan

*Information you must have if you have a software sales quota . . .*
This is the place to learn about the new improved incentive plan that recognizes your high value to the IBM Software Group.



*According to industry consultants ...*
Your plan "has some of the most aggressive rewards for overachievement in the industry"

A few minutes of reading will help you understand how to calculate your earnings under the 2001 sales plan, and why IBM Software is the place to be in 2001.



**Letter from the desk of Dan Lautenbach...**
**VP, Worldwide Software Sales**

You should be very excited about the unique software sales incentive plan that covers our sales representatives and sales managers for 2001. It's better than both the 2000 and 1999 plans. Compensation consultants who specialize in the software industry tell us it is really pushing the edge when it comes to rewarding overachievement. And, I think you have a superb opportunity to perform at an above-quota level this year.

This booklet explains the basic principles that guided design of the new plan, and provides information to help you understand how the plan works ... for you and for IBM.

The most important thing to understand is your importance to IBM's software business. Your plan is custom-designed to reflect the reality of the software industry, our competitors, and customer requirements for IBM's outstanding offerings.

The software sales incentive plan recognizes the unique opportunities our sales force can identify and close this year. It is characterized by extremely high payout rates for business you close in excess of your assigned full year quota.

And, because your sales plan is based on a self-funding model, there are no caps to your earnings: the more you sell, the more revenue and incremental profit for IBM; and the more earnings for you.

I encourage you to read this important booklet. I believe you will be convinced that you are in the right place, at the right time, in our company.

I know I can count on each of you for a fast start and focused sales efforts throughout the year. Our collective efforts can assure a great year for the company, and for each of us.

Thanks for your efforts so far, and best wishes for a healthy and happy 2001.


Dan

# The Software Group Sales Incentive Plan Principles:

A set of basic principles guide development of your Software Sales Incentive Plan. The design point for 2001: a plan that motivates you to overachieve assigned targets; a plan that compensates you for outstanding performance; and a plan that attracts and retains top sales talent by delivering competitive compensation.

I.   *The plan should reinforce IBM's software business strategy*

II.  *The plan should be simple to understand and communicate*

III. *The plan should be competitive with the software industry marketplace*

IV.  *The plan should be consistent with industry practice in key areas of uncapped earnings, earnings at first sale, and attractive upside opportunity*

V.   *The plan should motivate Technical Support and Sales Management in a manner consistent with the team they support*

VI.  *The plan should be tested against the prior year's plan and the current year's expectations*

VII. *The plan should address unique country environments*

### Table of Contents

Important Changes for 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . .4
Framework and Terminology . . . . . . . . . . . . . . . . . . . . . . . . . .5
Performance Measures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
How Payout Rates Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
Sales Plan Example . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8
Glossary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

Please visit your new Sales Incentives site on the intranet. We'll soon be adding lots of useful content that helps you focus on big payout opportunities, and easily calculate your earnings.

*w3.ibm.com/software/sales/saletool.nsf/salestools/sales+incentives*

**3**



*Your 2001 Software Sales Incentive Plan*

**Easy to understand. Easy to love.**

You talked. We listened. The result: new and improved features for the 2001 Software Sales Incentive Plan. We have great expectations for a fantastic sales year with unlimited possibilities for you. There's no limit to your 2001 sales incentive opportunity.

This booklet will help you understand how your Sales Incentive Plan works, how your performance is measured, how to calculate earnings, and how much money you can make.

## Important Changes for 2001

Your performance is important, and the new plan emphasizes greater pay for higher levels of performance.

## You get paid more from the first sale

The 2001 payout table pays 1% of your target incentive for every 1% attainment when you are at or below 100% of quota for PCO L. In 2000, the payout rate was just 0.5% when you were below 80% of quota. Changing to 1% for attainment at or below 100% attainment of quota reduces the complexity of the plan and makes it easier for you to estimate your pay.

## You get paid for attainment against full-year quota

You will be paid based on attainment against your full-year quota instead of attainment against a year-to-date quota. This change eliminates the concept of "seasonal" or quarterly skews. The full-year pay methodology encourages driving business earlier in the year because the accelerators apply when you exceed 100% of your full-year quota. Because quarterly results are still very important to IBM, your manager will be able to use PCO3 challenges to focus on quarterly initiatives.

## You get paid at higher payout rates above 100% of full-year quota

As in 2000, you have an accelerator for attainment above your quota; however, this year, the accelerator will apply when you achieve your full-year quota, as opposed to when you've reached your year-to-date quota. Your earnings for performance above quota continue to be uncapped in 2001.

## Calculation of your incentive payments is easy under the 2001 Plan

The year-to-date method used in 2000 created complexities because of fluctuations in performance during the year, and was a major cause of debit balances -- situations in which sales reps owed IBM money.

## Sales Matter -- You Matter

No one needs to tell you that you are the front line at IBM. Our success depends on you and your ability to sell products and services to our customers. It's straightforward: no sales, no customers, no growth, no IBM. Your sales success creates value for our shareholders and for you. The 2001 Sales Incentive Plan encourages you to drive sales.

# The 2001 Software Sales Incentive Plan Framework and Terminology
(See Software Sales Incentive Plan Glossary on page 10 for definitions).



## Pay Mix for Software Sales Plans

Pay Mix is the ratio of your Base Salary to your Target Incentive. A higher proportion of your pay on Target Incentive means more pay is at risk, with greater upside earnings potential. Pay Mix varies by job role and geography.

|  | SAM | Pillar | Partner | Technical |
|---|---|---|---|---|
| Americas | 60/40 | 60/40 | 60/40 and 70/30 | 75/25 |
| Asia Pacific | 60/40 | 50/50 | 60/40 and 70/30 | 75/25 |
| Japan | 60/40 | 60/40 | 60/40 and 70/30 | 90/10 |
| EMEA | 60/40 | 50/50 | 60/40 and 70/30 | 75/25 |
| Europe North | 50/50 | 50/50 | 60/40 and 70/30 | 75/25 |

## PCO Weightings for Software Sales Plans

Your Target Incentive has two components or Personal Contribution Objectives (PCOs). The split between PCO1 (Revenue) and PCO3 (Challenges) is generally 80/20. You earn eighty percent of your Target Incentive amount when you reach 100% of your full-year revenue quota.

## Payout Tables for Software Sales Plans

Sales employees around the world say they don't always understand how to calculate sales incentive payments. There are three payout rates that apply to your PCO1 performance measurement.

The payout rate when you are at or below 100% attainment of your full-year quota: For every 1% attainment against your full-year quota, you earn 1% of your PCO1 Target Incentive. At 100% quota achievement, you receive 100% of your Target Incentive for PCO1.

Higher payout rates apply when you are above 100% attainment of your full-year quota: As soon as you start overachieving your full-year quota, the plan provides significant leverage to reward your performance. And, your earnings for attainment above 100% are uncapped.



## Payout Table for Software Sales Representatives:

| Quota Zone | 0% - 100% | 100% - 125% | Above 125% |
|---|---|---|---|
| Payout Rate | 1% | 4% | 6% |

## Payout Table for Software Sales Managers:

In recognition of their large quotas and added responsibilities, sales managers have accelerators that are greater than those for sales employees.

| Quota Zone | 0% - 100% | 100% - 120% | Above 120% |
|---|---|---|---|
| FLM Payout Rate | 1% | 5% | 7.5% |
| SLM Payout Rate | 1% | 8% | 12% |

FLM = First Line Manager; SLM = Second Line Manager

Note: Not all employees with "manager" titles are considered managers for purposes of this plan. See the Glossary for eligibility rules for manager accelerators.

## More About the Plan

You can learn more about how you get paid by viewing the Sales Plan Example on pages 8 and 9. It illustrates how to estimate the payout of an individual transaction, and how to estimate total earnings.

## Performance Measures Used to State Personal Contribution Objectives

You want to earn as much money as you can. We want that too, because when you win, IBM wins. Sounds simple enough, so how do we get there? One of our goals is to make sure you get paid for doing what matters most to our business. The 2001 Sales Incentive Plan consists of Personal Contribution Objectives (PCOs) for your specific job role. Personal Contribution Objectives are defined as follows:

### • PCO1: It's All About Revenue

Revenue drives value for IBM. That's why the revenue measure is the largest portion of the incentive plan for most job roles. Double-digit revenue growth is one of our core business objectives, and we're making sure the Sales Incentive Plan pays you for helping achieve this goal.

### • PCO3: Challenges Beyond the Numbers

Making financial goals is key to our success, but it doesn't end there. We want to reward you for focusing on specific sales-related activities: closing high-profit transactions, moving into "white space" or using alternative sales channels to name a few. A portion of your Target Incentive is tied to individual and global challenges.

- *Individual Challenges:* Your managers know your opportunities best. That's why your first and second line managers will set challenges specifically for you.
- *Global Challenges:* Part of your incentive will be based on your achievement against global challenges, set by the Worldwide Software Sales Leader.

## 2001 Sales Incentive Plan for the Software Technical Sales Support Role

Pay Mix, the ratio of your Base Salary to your Target Incentive, is 75/25. Your PCO weightings align with the sales force you support, and your payout table will be the same as that of the sales force. In cases where team quotas are assigned, your individual payments will be made based on management assessment of your contribution.

## Incentive Payments Based on Your Performance: How Payout Rates Work

There are two easy-to-understand techniques you can use to calculate your pay: Payout Rate per $1,000 of revenue attainment, and Payout Rate per 1% attainment of your full-year quota. The same incentive payment amount is calculated by these two methods.

*Illustration: Your full year quota is $5M, and your Target Incentive (PCO1) is $40,000*
*Pay Rate per 1% Attainment of Full Year Quota Method*

|  | 0%-100% of Full Year Quota | 100%-125% of Full Year Quota | Above 125% of Full Year Quota |
|---|---|---|---|
| 1% of Full Year Quota Earns | $400 | $1,600 | $2,400 |
| 100% of Full Year Quota Earns | $400 x 100% = $40,000 | | |
| 125% of Full Year Quota Earns | | $400 x 100% = $1,600 x 25% = $40K | |
| 100% of Full Year Quota Earns | | | $400 x 100% = $40K $1,600 x 25% = $40K $2,400 x 25% = $60K $140,000 |

*Calculation of the payout rate per 1% of Full Year Quota attainment*
- *Payout Rate for the 0% to 100% zone:* Divide the PCO1 Target Incentive by 100. In the above example $40,000 divided by 100 equals $400 for each 1% of attainment.
- *Payout Rate for the 100% to 125% zone:* Multiple the 0% to 100% payout rate by 4 to get $1,600.
- *Payout Rate for the Above 125% zone:* Multiple the 0% to 100% payout rate by 6 to get $2,400.

*Illustration: Your full year quota is $5M, and your Target Incentive (PCO1) is $40,000*
*Pay Rate per $1,000 of Revenue Attainment Method*



*Calculation of the payout rate per $1,000 of revenue attainment*
- *Payout Rate for the 0% to 100% zone:* Divide the PCO1 Target Incentive by Full Year Quota. In the above example $40,000 divided by $5,000,000 equals $8 for each $1,000 of revenue.
- *Payout Rate for the 100% to 125% zone:* Multiple the 0% to 100% payout rate by 4 to get $32 for each $1,000 of revenue.
- *Payout Rate for the Above 125% zone:* Multiple the 0% to 100% payout rate by 6 to get $48 for each $1,000 of revenue.



## Example for a Software Account Manager

Your 2001 Compensation Plan is designed to help you achieve financial success, as you contribute to the growth of IBM's software revenues. You're wondering, "How much will I make for closing a deal?" The following example illustrates how the value of many deals adds up in your full-year, quarterly or monthly sales incentive earnings. The key ingredients for the example are: How much did you sell? What is your full-year revenue quota (PCO1)? What is your full-year PCO1 Target Incentive pay?

*Disclaimer: This example is provided for illustration purposes only. Actual sales incentive payments will be different than the numbers displayed here. In cases of conflict between what is shown in this booklet and local documentation, local plan documentation prevails.*

## Quota and Territory Management

Successful growth is the result of focusing resources and attention in a disciplined manner over an extended period of time. Sales enablement programs, solution selling training, marketing activities, and sales collateral help you identify opportunities and take actions that can maximize your effectiveness. You are well positioned for 2001. As an active participant in the software industry, and as a Software Account Manager in IBM's Software Group, you can really make a positive contribution to customers. You can sell leadership products and solutions -- and with the 2001 sales plan, you have the opportunity for outstanding professional and financial success.

## Comparison of Your Plan to the Industry

Consultant studies indicate the design of your plan is consistent with the plans used by sales professionals throughout the software industry. What's more important ... Your opportunity to earn really big money due to above quota performance is greater, because your overachievement payout rates are significantly higher than industry practice.

| In this zone -> | 0% - 100% of Full Year Quota | 100% - 125% of Full Year Quota | Above 125% of Full Year Quota |
|---|---|---|---|
| For each $1000 of revenue, You earn: | 1X | 4X | 6X no earnings cap |

*Note: 1X is calculated based on your Full Year Quota and PCO1 Target Incentive Pay.*

*Note: Accelerators may also be expressed in terms of percentages: 1% of PCO1 Target Incentive is paid for each 1% of Full Year Quota attainment between 0% and 100% of Full Year Quota; 4% is paid for attainment between 100% and 125%; 6% is paid for attainment above 125% of Full Year Quota.*

## Software Account Manager Illustration

(Note: your quota, territory management, and earnings details will differ from this illustration)

You are assigned an $8,500,000 full-year revenue quota, and two territory challenges; and you are eligible for local and worldwide sales contests. Your sales plan has the following characteristics: a "60/40" Base/Incentive Pay Mix; an "80/20" PCO1/PCO3 Incentive Split; a "50/50" Worldwide/Local Manager PCO3 Split; and you have the opportunity to earn very substantial additional pay for quota overachievement.

Compensation is based on your Base Pay, an On-Target Earnings level that reflects IBM's practice of paying sales professionals at a higher rate than other employees who are not on a sales plan, and your sales performance as a percentage of your full-year revenue quota. Attainment of assigned territory objectives, and achievement against available contest targets add to your earnings. Your earnings are easily calculated, and increase dramatically as soon as you start to overachieve your full-year revenue target.

**Example: Base Pay: $65,600; On Target Earnings: $108,800; Full Year Quota = $8.5M**

|  | Mar | Jun | Sep | Dec |
|---|---|---|---|---|
| Revenue Attained | $1.9M | $4.25M | $9.8M | $13.3M |
| % of Full Year Quota | 22% | 50% | 115% | 156% |
| Base Pay | $16,400 | $32,800 | $49,200 | $65,600 |
| Incentive Pay - PCO1 | $7,782 | $17,408 | $56,115 | $135,373 |
| Incentive Pay - PCO3 | $3,200 | $3,200 | $3,200 | $9,400 |
| Compensation | $27,382 | $53,408 | $108,515 | $210,373 |
| Annual Incentive Pay "at target performance" |  |  |  | $43,520 |
| Incentive Pay Split: PCO1/PCO3 |  |  |  | 80/20 |
| PCO3 Split: Local/Worldwide |  |  |  | 50/50 |
| Annual Quota Incentive at 100% of PCO1 |  |  |  | $34,816 |
| Funding of PCO3 Annual Challenges (uncapped) |  |  |  | $8,704 |
| PCO3 Territory Challenges Assigned (Make/Miss) | Challenge A: Install Linux pilot at XYZ Bank | | | |
| Each $2200 value | Challenge B: Replace Oracle & Microsoft at ABC Factory | | | |
| PCO3 Challenges Available as Contests | Fast Start, Winback, others as announced | | | |
| Quota Zone | Revenue Performance Pay (PCO1): Pay per $1,000 revenue | | | |
| $0 - $8.5M | $4.10 per $1,000 | | | |
| $8.5M - $10.625M | $16.38 per $1,000 | | | |
| $10.625M+ | $24.58 per $1,000 | | | |

## Scenario #1: Year-to-Date Earnings After 3 months

$1.9M sales (22% FY Quota), Challenge A accomplished, $1000 Contest prize won

| Base Salary = $5,467 / month × 3 months = $16,400 |
|---|
| Incentive Pay = $1.9M / $1000 × $4.10 / $1,000 revenue = $7,782 |
| Challenge A Payment = $2,200, Contests = $1,000 |
| Total Year-to-Date Compensation = $27,382 |

## Scenario #2: Year-to-Date Earnings After 6 months

$4.25M sales (50% FY Quota), Challenge A accomplished, $1,000 Contest prize won

| Base Salary = $5,467 / month × 6 months = $32,800 |
|---|
| Incentive Pay = $4.25M / $1,000 × $4.10 / $1,000 revenue = $17,408 |
| Challenge A Payment = $2,200, Contests = $1,000 |
| Total Year-to-Date Compensation = $53,408 |

## Scenario #3: Year-to-Date Earnings After 9 months

$9.8M sales (115% FY Quota), Challenge A accomplished, $1000 Contest prize won

| Base Salary = $5,467 / month × 9 months = $49,200 |
|---|
| Incentive Pay = $56,115 |
| $8.5M / $1,000 × $4.10 / $1,000 revenue = $34,816 |
| $1.3M / $1,000 × $16.38 / $1,000 revenue = $21,299 |
| Challenge A Payment = $2,200, Contests = $1,000 |
| Total Year-to-Date Compensation = $108,515 |

## Scenario #4: Year-to-Date Earnings After 12 months

$13.3M sales (156% FY Quota), Challenges A & B accomplished, $1,000 & $4,000 Contest prizes won

| Base Salary = $5,467 / month × 12 months = $65,600 |
|---|
| Incentive Pay = $135,373 |
| $8.500M / $1,000 × $4.10 / $1,000 revenue = $34,816 |
| $2.125M / $1,000 × $16.38 / $1,000 revenue = $34,816 |
| $2.675M / $1,000 × $24.58 / $1,000 revenue = $65,741 |
| Challenge A Payment = $2,200, Challenge B Payment = $2,200, Contests = $1,000 and $4,000 |
| Total Year-to-Date Compensation = $210,373 |



# 2001 Software Sales Incentive Plan Glossary

As you review the definitions in this section, it's helpful to understand how the elements of your pay work together. Keep in mind that the On-Target Earnings diagram does not contain all elements of your total cash compensation, such as awards or other cash payments.

**Attainment:** Measurement of your cumulative actual sales against your full-year quota.

**Base Salary:** This is the fixed portion of your pay for each pay period.

**Manager (eligibility for accelerators) Rules:** To be eligible for manager accelerators, a manager must have sales reps reporting to him/her (based on the organization chart), and/or sales responsibility and provide business direction to a sales team. The manager is the person who typically sets Personal Contribution Objectives for this sales team, determines Personal Business Commitments (PBCs) for the team, and is responsible for the team's personnel records. The sales manager's quota should equal the sum of the quotas of the sales force reporting to him/her.

•**First Line Manager:** To be considered a first line manager for purposes of qualifying for First Line Manager payout rates, the person must have functional responsibility for a minimum of three sales reps based on the definition above. The second line manager is responsible for ensuring the correct plan assignment at the time the manager is put on the plan. Once the manager is assigned to the First Line Manager payout rates, changes will not be made during the year due to fluctuations in onboard rep headcount or the existence of temporarily open territories.

•**Second Line Manager:** To be considered a second line manager for the purposes of qualifying for Second Line Manager payout rates, the person must have responsibility for a minimum of two sales managers based on the definition above. The VP is responsible for ensuring the correct plan assignment at the time the second line manager is put on the plan. Once the manager is assigned to the Second Line Manager payout rates, changes will not be made during the year due to fluctuations in onboard rep headcount or the existence of temporarily open territories.

**On-Target Earnings (OTE):** Your On-Target Earnings is the sum of your Base Salary plus your Target Incentive. Your Target Incentive is your pay for



achieving 100% of your Personal Contribution Objectives (PCOs).

**Pay Accelerator:** An increased incentive rate that is earned for every dollar sold above quota.

**Pay Mix:** The ratio of your Base Salary to your Target Incentive at 100% of full-year attainment. For example, a 60/40 plan means that 60% of your On-Target Earnings is Base Salary and 40% is Target Incentive.

**PCO1:** This is the Personal Contribution Objective for revenue.

**PCO2:** This is the Personal Contribution Objective for profit. This element is included in your incentive plan only when profit can be measured.

**PCO3:** This is the Personal Contribution Objective for individual and global challenges.

**PCO Weighting:** The percentage of your full-year Target Incentive that is tied to each Personal Contribution Objective (PCO). Your PCO Weighting is determined by your job role.

**Reference Salary:** What your salary would be if you were taken off incentive.

**Salary Equivalent:** Term used by the U.S. and Canada for Reference Salary.

**Target Incentive:** Your sales incentive opportunity for achievement of 100% of your PCO elements.

# 2001 Sales Planning Calendar

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
|  | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 |  |  |  |  |  |

SUNDAY    MONDAY    TUESDAY    WEDNESDAY    THURSDAY    FRIDAY    SATURDAY





© International Business Machines Corporation 2001

IBM Corporation
Route 100
Somers , NY 10589

Printed in the United States of America
January, 2001
All Rights Reserved

IBM and the IBM logo are trademarks of International
Business Machines Corporation in the US, other
countries, or both.


Printed on recycled paper containing 10% recovered
post-consumer fiber.

# EMPLOYEE QUOTA LETTER:

## EMPLOYEE DETAILS:

| Employee Name: | Tom Cashman |
|---|---|
| Employee Serial: | 427563 |
| Employee Manager: | Dunderdale |
| Organization: | FINANCIAL |

## PLAN DETAILS:

| Plan Type: | SM |
|---|---|
| Job Role: | Tivoli Sales Manager - BUE |
| Plan Effective Date: | 1/1/2001 |
| Territory: | FINANCIAL |
| Date on Quota: | 1/1/2001 |
| Your Pay Mix as a % of On-Target Earnings: | 50/50 |
| Your On-Target Earnings are: | $269,999 |
| Your Target Incentive Pay at 100% Attainment is:<br>  PCO1: 80%<br>  PCO3: 20% | $408,000<br>$ 27,000 |

| Component | Weight | Target | Start Date – End Date | Bonus Opp for 100% Attainment (USD) |
|---|---|---|---|---|
| PCO1: Revenue | 100% | $35,500,000 | 1/1/2001 - 12/31/2001 | $108,000 |
| Component* | Criteria | Challenge Opportunity | Start Date – End Date | |
| PCO3A: | SWG Bounty Challenge | http://w3.software.ibm.com/americas/awards/1QBounty.html | 1/1/01 - 3/31/01 | |
| PCO3B: | SWG Bounty Challenge | http://w3.software.ibm.com/americas/awards/1QBounty.html | 1/1/01 - 3/31/01 | |

*PCO3 Criteria will be communicated to the field at the beginning of each quarter.

*Right to Modify or Cancel: While IBM's intent is to pay employees covered by this program according to its provisions, this program does not constitute a promise by IBM to make any distributions under it. IBM reserves the right to adjust the program terms or to cancel or otherwise modify the program at any time during the program period, or up until actual payment has been made under the program. Modification or cancellation may be applicable to all persons covered by the program, or to any subset as defined by management. Even though you may be given progress reports regarding plan achievement during the year, no one becomes entitled to any payment in advance of his or her receipt of the payment. Bonus opportunity which includes salary in the calculation reflects the salary in effect the date this letter is sent. However, actual bonus payments will be made based on the salary in effect the date the bonus is earned. The current payment amount appearing on an employee's assessment form will net against any debit balance in the employee's commission account.*

## 2001 Tivoli Systems Individual Compensation Plan: Territory Definition
(To be used for new territories or changes to existing territories)

## 1. Territory Identification

| Name | Tom Cashman |
|---|---|
| Serial Number | 427563 |
| Region | Finance |
| Date Territory Definition Created | 02/21/01 |
| Territory Effective Period | 01/01/01-12/31/01 |

This Territory definition cancels and replaces any prior Territory definitions for the above mentioned effective period.

## 2. Territory Detail

Territory detail **must** contain specific territory information, including Product, Geography (region, city, state and/or zip) and/or Named Accounts (if applicable). **(Note: Area Code is not an acceptable parameter)**
Example of Acceptable Territory Definition:  New York, zip codes 10509, 10512, and 10539
Example of Unacceptable Territory Definition:  Southern New York, Westchester County

Product:

Geography: United States

Named Accounts: AFLAC, Amsouth, Astoria Financial, Bank Austria, Cantor Fitzgerald,

 Credit Lyonnas, Diawa Securities, Dresdner Bank, nEmigrant Savings, Fuji Bank & Trust,

Greenpoint Financial, Industrial Bank of Japan, Lazard Freres, Neuberger and Berman,

Nikko Securities, Nomura Securities, Rosenthal Group, SG Cowen Securities, SIAC,

Standard & Poors, Sumitomo Bank, Swiss Reinsurance, Warburg Pincus

Assurant (American Bankers) , Branch Bank & Trust, Capitola One Financial, Colonial Bank,

Crawford & Co, Fannie Mae, First Maryland Bancorp, Freddie Mac, Geico, IBM Credit Corp (NC),

ING, Jefferson Pilot, National Council on Comp., NC Farm Bureau Mutual, Northern Trust

Employee Signature                    Date

Manager Signature                    Date

| |
|---|
| Retirement, Region Financial, Royal & Sun Alliance, Sallie Mae, Southern Farm Bureau, |
| SunTrust, Synovus (Vital Processing Service), T Rowe Price, Total Systems, Union Labor Life, Union Planters, United Guaranty, First Tennessee |
| Chase Manhattan (JP Morgan), Alliance Capitol Management, Brown Brothers |
| CIT Group, Credit Suisse First Boston (Pershing), HSBC, Lehman Brothers, MBNA, |
| Moody's, Paine Webber, Reuters, Scudder |
| Bank of Tokyo, Barclay's Bank, CIBC Worldmarkets, Deutsche Bank, |
| Donaldson Lufkin & Jen., Dow Jones, GE Capital, Instinet, Mass Financial Services , |
| National Discount Brokers, Putnam,  Risk Enterprise Mgmt, Sovereign Bancorp, |
| UBS AG, UJB Summit Bancorp, Vanguard, |
| Bank of America,  Compass Bank, First Union, Southtrust, Wachovia |
| American ExpressTSSTM,Bank of New York, Bear Stearns, Depository Trust,Dime Bancorp, Fidelity, |
| Fleet Boston, Goldman Sachs, Lend Lease, Merrill Lynch, Morgan Stanley Dean Witter, NASDAQ |
| State Street, TD Waterhouse, Citicorp (Citibank, Travellers, Solomon Smith Barney, Primerica), |
| Aid Assoc. for Lutherans, Allstate Insurance, American Family, AmerUs Group, American Century |
| Auto Club Insurance, Auto Owners Insurance, Blue Cross of Minn., Chicago Board of Options, |
| Chicago Board of Trade, Chicago Mercantile Exchange, CNAInsurance, Farm Bureau Insurance (MI) |
| Federated Mutual, Firstar, Jackson National Life, Michigan Mutual Insurance (Amerisure), Minnesota Mutual Insurance, Ohio Savings, Principal Life Insurance, Reliastar , St Paul Companies, |
| State Farm Mutual Auto, US Bank,  Wausua Insurance ,American Express, American General |
| Ameritrade, Banc One Corp, Charter One Bank, Conseco, Fifth Third Bancorp, Charles Schwab |
| Fortis Benefits Ins., Great American Ins.,Household International, Huntington Bancshares, Keycorp, |
| Mellon Bank, Mutual of Omaha Ins., National City Corp., Nationwide, Northern Trust Corp., |
| Ohio Casualty Ins., PMA Group, PNC Bank, Progressive Casualty Ins., Provident Mutual Life, |
| Western and Southern Life Ins., Westfield Ins. Co., CalFed (Golden State Bank), ETrade, USAA |
| Aegon, AG Edwards , AON, Beta Systems, Comerica, Cuna Mutual Ins., Farmers Group |
| Discover Card, Edward Jones, First Data, Kemper Companies, LaSalle National Corp., |
| Lincoln Financial Corp., M&I Data (Metavante), MasterCard, Mercantile Bancorp, Mortgage Guaranty |
| Northwestern Mutual Life, RW Baird ,  TransUnion LLC, Van Kampen Funds, Zurich Ins. |
| Firemans Fund, First Security Service, Franklin Templeton, Oppenheimer Funds, Union Bank of CA, |
| Providian Financial, Visa International, Washington Mutual, Wells Fargo |
| |

Employee Signature          Date

Manager Signature          Date

RECEIVED & FILED
CLERK OF THE COURTS
NORFOLK COUNTY

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

TRIAL COURT OF THE COMMONWEALTH
SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. 04-02106

THOMAS CASHMAN,                          )
                                         )
                Plaintiff,               )
                                         )
        vs.                              )
                                         )
INTERNATIONAL BUSINESS                   )
MACHINES CORPORATION,                    )
STEVEN A. MILLS, CHARLES ILL,            )
JOHN R. JOYCE, and                       )
GREGORY ENRIQUEZ,                        )
                                         )
                Defendants.              )

## PLAINTIFF'S PROOF OF AUTHORITY OF
## OUT OF STATE PROCESS SERVERS

Now comes the plaintiff, Thomas Cashman ("Cashman") and, as required by this

Court's Order dated January 14, 2005, hereby submits proof that the following process

servers, located in New York and Connecticut, have authority to serve process in their

respective jurisdictions.

Process is properly served in Connecticut by State Marshal. Conn. Gen. Stat. §

52-50 states, in pertinent part, that "(a) All process shall be directed to a state marshal, a

constable or other proper officer authorized by statute, or, subject to the provisions of

subsection (b) of this section, to an indifferent person." Attached as Exhibit A hereto is a

business card and attestation signed by Paul L. Verille, State Marshal for the State of

Connecticut, attesting to service of process in hand upon defendant Charles Ill.

In New York, Civil Practice Law and Rules ("CPLR") Rule 2103 governs service

of papers. Subdivision (a) provides "Except where otherwise prescribed by law or order

of court, papers may be served by any person not a party of the age of eighteen years or

over." Attached as Exhibit B hereto are two (2) affidavits signed by Caswell Bryan

indicating that he is a licensed process server in the State of New York, is not a party to

the above-captioned action, and is over the age of eighteen. The affidavits indicate that

Mr. Bryan served process upon John R. Joyce and Steven A. Mills, respectively.

Respectfully submitted,

THOMAS CASHMAN

By his attorneys,

Charles R. Bennett, Jr. (BBO#037380)
Kathleen E. Cross (BBO#556934)
Sharon H. Patton (BBO#634780)
HANIFY & KING, P.C.
One Beacon Street, 21st floor
Boston, MA 02108
(617) 423-0400

DATED: February 1, 2005

A TRUE COPY
Attest: Mary C. Kenney
Deputy Assistant Clerk
2/16/05



# STATE OF CONNECTICUT

## Paul L. Verille, State Marshal
1856 Summer Street/Stamford/Connecticut/06905

Cellular: (203) 249-0540

Over 30 Years in Law Enforcement

Telephone: (203) 327-0816

Facsimile: (203) 348-3221

STATE OF CONNECTICUT )
) ss: *Stamford*        *January 17, 2005*
COUNTY OF FAIRFIELD )

Then and there by virtue hereof, I made service of the within foregoing original: *Summons, Tracking Order, Complaint and Jury Demand, Exhibit A, B, C, First Amended Complaint and Jury Demand, Exhibit A, Exhibit B, Exhibit C*

Upon the within named defendant: *Charles Ill*
By leaving a true and attested copy ~~IN THE HANDS~~ ~~AT THE USUAL PLACE OF~~ ~~ABODE~~ OF: *Charles Ill 277 Stamford Avenue Stamford, CT on: 1/17/05 after 3 attempts*

The within and foregoing is the original *Summons, Tracking Order, Complaint and Jury Demand, Exhibit A, B, C, First Amended Complaint and Jury Demand, Exhibit A, Exhibit B, Exhibit C*

With my doings hereon endorsed.

PROCESS        30.00
TRAVEL         *See Bill*
COPY           82.00
SERVICE         .20
ENDORSEMENT     .80

ATTEST: *1/17/05*

*Paul L Verille*

PAUL L. VERILLE
STATE MARSHAL
STATE OF CONNECTICUT

COMMONWEALTH OF MASSACHUSETTS
NORFOLK SUPERIOR COURT

CIVIL ACTION NO.
04-02106

THOMAS CASHMAN,

Plaintiff

v.

INTERNATIONAL BUSINESS
MACHINES CORPORATION, STEVEN A.
MILLS,       et al.,

Defendants.

STATE OF NEW YORK}
COUNTY OF NEW YORK  } ss.:

Caswell Bryan, being duly sworn , deposes and says: I am not a  party to this action, am
Over 18 years of age and reside at New York, NY:

I am a process server licensed by the City of New York, authorized to serve process in
the State of New York;

On January 19, 2005 at 9:10 a.m. at 294 Route 100, Somers, NY 10589, I served the
within Summons, Tracking Order, Complaint and Jury Demand, and First Amended
Complaint and Jury Demand on **STEVEN A. MILLS**, Defendant therein named, by
delivering true copies of same to SANDI GARVIN, a person of suitable age and
discretion at the defendant's actual place of business.

On January 19, 2005 I mailed a copy of the above documents to Steven A. Mills at IBM,
294 Route 100, Somers, NY 10589, his actual place of business, by enclosing them in an
envelope, postage prepaid, and depositing it in an official depository under the exclusive
care and custody of the United States Postal Service within New York State. The
envelope bore the legend "Personal and Confidential" and did not indicate on the outside
thereof, by return address or otherwise, that the communication was from an attorney or
concerned an action against the defendant.

I asked Sandi Garvin if Steven A. Mills was in military service in any capacity and
received a negative reply.

The person served is a black female, black hair, 35-45 years old, 5'5"-5'7" in height,
140-150 pounds.

_Caswell Bryan_
Caswell Bryan
Lic. 846846

Sworn to before me this
19th day of January 2005

NOTARY PUBLIC

MAUREEN I. MINTZER
NOTARY PUBLIC·STATE OF NEW YORK
No. 60·4827421
Qualified in Westchester County
My Commission Expires May 31, 2006

LegalEase
Inc.

139 Fulton Street, New York, NY 10038
Tel: 212-393-9070    •    800-393-1277    •    Fax: 212-393-9796

COMMONWEALTH OF MASSACHUSETTS
NORFOLK SUPERIOR COURT

CIVIL ACTION NO.
04-02106

THOMAS CASHMAN,

                    Plaintiff

        v.

INTERNATIONAL BUSINESS
MACHINES CORPORATION, STEVEN A.
MILLS,        et al.,

                    Defendants.

---

STATE OF NEW YORK}
COUNTY OF NEW YORK  } ss.:

Caswell Bryan, being duly sworn , deposes and says: I am not a  party to this action, am
Over 18 years of age and reside at New York, NY:

I am a process server licensed by the City of New York, authorized to serve process in
the State of New York;

On January 19, 2005 at 9:10 a.m. at 294 Route 100, Somers, NY 10589, I served the
within Summons, Tracking Order, Complaint and Jury Demand, and First Amended
Complaint and Jury Demand on **JOHN R. JOYCE**, Defendant therein named, by
delivering true copies of same to SANDI GARVIN, a person of suitable age and
discretion at the defendant's actual place of business.

On January 19, 2005 I mailed a copy of the above documents to John R. Joyce at IBM,
294 Route 100, Somers, NY 10589, his actual place of business, by enclosing them in an
envelope, postage prepaid, and depositing it in an official depository under the exclusive
care and custody of the United States Postal Service within New York State. The
envelope bore the legend "Personal and Confidential" and did not indicate on the outside
thereof, by return address or otherwise, that the communication was from an attorney or
concerned an action against the defendant.

I asked Sandi Garvin if John R. Joyce was in military service in any capacity and
received a negative reply.

The person served is a black female, black hair, 35-45 years old, 5'5"-5'7" in height,
140-150 pounds.

                                        _Caswell Bryan_
                                        Caswell Bryan
                                        Lic. 846846

Sworn to before me this
19th day of January 2005

_____
NOTARY PUBLIC

MAUREEN I. MINTZER
NOTARY PUBLIC-STATE OF NEW YORK
No. 60-4827421
Qualified in Westchester County
My Commission Expires May 31, 2006

**LegalEase**
_Inc._

139 Fulton Street, New York, NY 10038
Tel: 212-393-9070   •   800-393-1277   •   Fax: 212-393-9796

HK | Hanify&King

**SHARON H. PATTON**
Direct Fax: 617-305-0657
Email: shp@hanify.com

February 1, 2005

Civil Clerk's Office
Norfolk Superior Court
650 High Street
Dedham, MA 02026

      RE:    Thomas Cashman
      VS:    International Business Machines Corporation, et al.
      NO:    Norfolk Superior Court, Civil Action No. 04-02106

Dear Sir or Madam:

Enclosed for docketing and filing please find Plaintiff's Proof Of Authority Of Out Of State Process Servers regarding the above-referenced action.

Thank you.

Sincerely,

Sharon H. Patton

Enclosure

*422529*

Professional Corporation    One Beacon Street
Counsellors at Law    Boston, Massachusetts 02108-3107
    Tel: 617-423-0400
    Fax: 617-423-0498
    www.hanify.com

(TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED:-
TORT - MOTOR VEHICLE TORT - CONTRACT -
EQUITABLE RELIEF - OTHER.)

# COMMONWEALTH OF MASSACHUSETTS

**NORFOLK, ss.**

SUPERIOR COURT
CIVIL ACTION

NO. 04-02106

Thomas Cashman ........................................, *Plaintiff(s)*

**v.**

International Business Machines Corporation,
Steven A. Mills, Charles Ill,
John R. Joyce and ........................, *Defendant(s)*
Gregory Enriquez

## SUMMONS

To the above-named Defendant:

You are hereby summoned and required to serve upon Kathleen E. Cross ........,
Hanify & King

plaintiff's attorney, whose address is 1 Beacon St., Boston, MA 02108, an answer to the com-
plaint which is herewith served upon you, within 20 days after service of this summons upon you,
exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. You are also required to file your answer to the com-
plaint in the office of the Clerk of this court at Dedham either before service upon plaintiff's attorney
or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim
any claim which you may have against the plaintiff which arises out of the transaction or occur-
rence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making
such claim in any other action.

BARBARA J. ROUSE, Esquire

WITNESS, SUZANNE V. DELVECCHIO, *Esquire*, at ............Boston............the 18th............

day of ...........January........................, in the year of our Lord two thousand and ....five............................

A TRUE COPY

Attest: *Mary C. Kenney*

Deputy Assistant Clerk

2/16/05

*Walter G. Timilty* Clerk.

**NOTES:**
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption.
If a separate summons is used for each defendant, each should be addressed to the particular defendant.

F-33

(TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED:-
TORT - MOTOR VEHICLE TORT - CONTRACT -
EQUITABLE RELIEF - OTHER.)

# COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
CIVIL ACTION

NO. 04-02106

Thomas Cashman ........................., *Plaintiff(s)*

RECEIVED &
CLERK OF THE COURTS
NORFOLK COUNTY
2/2/05

**v.**

International Business Machines Corporation,
Steven A. Mills, Charles Ill, John R. Joyce
and Gregory Enriquez ................., *Defendant(s)*

## SUMMONS

To the above-named Defendant:

You are hereby summoned and required to serve upon Kathleen E. Cross,
Hanify & King,
plaintiff's attorney, whose address is 1 Beacon St., Boston, MA 02108 an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Dedham either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

~~BARBARA J. ROUSE, Esquire~~

WITNESS, ~~SUZANNE V. DELVECCHIO, *Esquire*~~, at Boston.............the ........18th...........

day of ....January...................., in the year of our Lord two thousand and .....five.........................

A TRUE COPY

Attest: *Mary E. Kenney*

Deputy Assistant Clerk

2/16/05

*Walter F. Timilty* Clerk.

**NOTES:**
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

F-83

(TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED:
TORT - MOTOR VEHICLE TORT - CONTRACT -
EQUITABLE RELIEF - OTHER.)

# COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

9.0

SUPERIOR COURT
CIVIL ACTION

RECEIVED & FILED
CLERK OF THE COURTS
NORFOLK COUNTY
1/2/05

NO. 04-02106

Thomas Cashman
........................................................, *Plaintiff(s)*

**v.**

International Business Machines Corporation,
Steven A. Mills, Charles Ill,
........................................................, *Defendant(s)*
John R. Joyce and Gregory Enriquez

## SUMMONS

To the above-named Defendant:

You are hereby summoned and required to serve upon ...Kathleen.E..Cross..........,
Hanify & King
plaintiff's attorney, whose address is 1.Beacon.St.,.Boston,.MA.02108, an answer to the com-
plaint which is herewith served upon you, within 20 days after service of this summons upon you,
exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint.  You are also required to file your answer to the com-
plaint in the office of the Clerk of this court at Dedham either before service upon plaintiff's attorney
or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim
any claim which you may have against the plaintiff which arises out of the transaction or occur-
rence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making
such claim in any other action.

BARBARA J. ROUSE, Esquire

WITNESS, SUZANNE V. DELVECCHIO, *Esquire*, at .....Boston.........the ...18th...............

day of .....January..................., in the year of our Lord two thousand and ......five........................

A TRUE COPY
Attest: *Mary E. Kenney*          *Walter F. Timilty*          Clerk.
Deputy Assistant Clerk
2/16/05

NOTES:
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption.
   If a separate summons is used for each defendant, each should be addressed to the particular defendant.

F-33

(TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED:-
TORT - MOTOR VEHICLE TORT - CONTRACT -
EQUITABLE RELIEF - OTHER.)

10.()

# COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

RECEIVED & FILED
CLERK OF THE COURTS
NORFOLK COUNTY
2/2/05

SUPERIOR COURT
CIVIL ACTION

NO. 04-02106

Thomas Cashman
......................................................, *Plaintiff(s)*

**v.**

International Business Machines Corporation, Steven A. Mills
Charles Ill, John R. Joyce and Gregory Enriquez ...., *Defendant(s)*

## SUMMONS

To the above-named Defendant:

You are hereby summoned and required to serve upon ............... Kathleen E. Cross ...............,
Hanify & King
plaintiff's attorney, whose address is 1 Beacon St., Boston, MA 02108 an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Dedham either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action. BARBARA J. ROUSE, Esquire

WITNESS, ~~SUZANNE V. DELVECCHIO, Esquire,~~ at ...Boston...........the ...18th...............

day of ...January....................., in the year of our Lord two thousand and ..five...........................

A TRUE COPY
Attest: Mary E. Kenney
Deputy Assistant Clerk
2/11/05

Walter F. Timilty Clerk.

NOTES:
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption.
   If a separate summons is used for each defendant, each should be addressed to the particular defendant.

F-33

(TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED:-
TORT - MOTOR VEHICLE TORT - CONTRACT -
EQUITABLE RELIEF - OTHER.)

## COMMONWEALTH OF MASSACHUSETTS

*11.()*

NORFOLK, ss.

SUPERIOR COURT
CIVIL ACTION

NO. 04-02106

RECEIVED
CLERK OF T ...TS
NORFOLK COUNTY
2/2/cq

Thomas Cashman
........................................., *Plaintiff(s)*

**v.**

International Business Machines Corporation, Steven A. Mills
Charles Ill, John R. Joyce and Gregory Enriquez ........................., *Defendant(s)*

### SUMMONS

To the above-named Defendant:

You are hereby summoned and required to serve upon ............................. Kathleen E. Cross .............................,
Hanify & King
plaintiff's attorney, whose address is 1 Beacon St., Boston, MA 02108 an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Dedham either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action. BARBARA J. ROUSE, Esquire

WITNESS, SUZANNE V. DELVECCHIO, *Esquire*, at ...Boston...........the ...18th...............

day of ...January....................., in the year of our Lord two thousand and ..five...........................

A TRUE COPY
Attest: *Mary O'Kinney*
Deputy Assistant Clerk
2/16/05

*Walter O. Dimitry* Clerk.

NOTES:
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption.
   If a separate summons is used for each defendant, each should be addressed to the particular defendant.

F-33

RECEIVED & FILED
**CLERK OF THE COURTS**
NORFOLK COUNTY

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS.

SUPERIOR COURT DEPARTMENT

THOMAS CASHMAN,
    Plaintiff,

v.

INTERNATIONAL BUSINESS MACHINES
CORPORATION, STEVEN A. MILLS,
CHARLES ILL, JOHN R. JOYCE, and
GREGORY ENRIQUEZ,
    Defendants.

Civil Action No. NOCV 2004-02106-A

## NOTICE OF MOTION FOR ADDITIONAL TIME FOR RESPONSE

This is to notify the Court that Defendants today served on Plaintiff their Motion For

Additional Time To Respond To Plaintiff's Complaint. In their motion, Defendants state that the

complaint is complex and that they are seeking an additional thirty days to respond, to and

including Wednesday, March 9, 2005. The motion will be filed with the Court pursuant to Rule

9A after the response to the motion is received.

Respectfully submitted,

Joan Ackerstein, BBO # 348220
Counsel for Defendants
JACKSON LEWIS LLP
75 Park Plaza, 4th Floor
Boston, Massachusetts 02116
(617) 367-0025

Dated: February 7, 2005

### CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of February, 2005, a copy of the foregoing document was
served upon Plaintiff's Attorney, Kathleen E. Cross, Hanify & King, One Beacon Street, Boston, MA
02108, by hand.

Jackson Lewis LLP

A TRUE COPY
Attest: _____
Deputy Assistant Clerk
2/16/04



Representing Management Exclusively in Workplace Law and Related Litigation

**Jackson Lewis LLP**
75 Park Plaza
Boston, Massachusetts 02116
Tel 617 367-0025
Fax 617 367-2155
www.jacksonlewis.com

| | |
|---|---|
| ATLANTA, GA | LOS ANGELES, CA | SACRAMENTO, CA |
| BOSTON, MA | MIAMI, FL | SAN FRANCISCO, CA |
| CHICAGO, IL | MINNEAPOLIS, MN | SEATTLE, WA |
| DALLAS, TX | MORRISTOWN, NJ | STAMFORD, CT |
| GREENVILLE, SC | NEW YORK, NY | WASHINGTON, DC METRO |
| HARTFORD, CT | ORLANDO, FL | WHITE PLAINS, NY |
| LONG ISLAND, NY | PITTSBURGH, PA | |

February 7, 2005

**BY FACSIMILE & 1ST CLASS MAIL**

Office of the Clerk – Civil
Norfolk Superior Court
650 High Street
Dedham, MA  02026

Re:  ***Cashman v. IBM, et al.***
     ***C.A. No. NOCV-2004-02106-A***

Dear Sir/Madam:

In connection with the above-referenced matter, we enclose for docketing and filing a Notice of Motion For Additional Time For Response.

In receipt of this letter and its enclosure, kindly date stamp the enclosed copy of this letter and return it in the envelope provided.

We appreciate your assistance.

Very truly yours,

JACKSON LEWIS LLP

Joan Ackerstein

JA:cc
Enclosures
cc:   Kathleen E. Cross



**jackson | lewis**

Attorneys at Law

Representing Management Exclusively in Workplace Law and Related Litigation

| Jackson Lewis LLP | ATLANTA, GA | LOS ANGELES, CA | SACRAMENTO, CA |
| 75 Park Plaza | BOSTON, MA | MIAMI, FL | SAN FRANCISCO, CA |
| Boston, MA 02116 | CHICAGO, IL | MINNEAPOLIS, MN | SEATTLE, WA |
| Phone: (617) 367-0025 | DALLAS, TX | MORRISTOWN, NJ | STAMFORD, CT |
| Fax: (617) 367-2155 | GREENVILLE, SC | NEW YORK, NY | WASHINGTON, DC AREA |
| www.jacksonlewis.com | HARTFORD, CT | ORLANDO, FL | WHITE PLAINS, NY |
| | LONG ISLAND, NY | PITTSBURGH, PA | |

# FAX

| | |
|---|---|
| **To:** | |
| **Company:** | Office of the Clerk – Civil |
| | Norfolk Superior Court |
| **Fax:** | 781-326-3871          **Tel #:**   781-326-1600 |
| **From:** | Joan Ackerstein |
| **Sender:** | Carol @ ext. 207 |
| **Subject:** | Cashman v. IBM et al. |
| | CA No. NOCV-2004-02106-A |
| **Date:** | February 7, 2005 |
| **Client/Matter #:** | |
| **Pages:** | *3* , including cover sheet |
| **Original:** | X    Will Follow _____ Will Not Follow |

**MESSAGE:**  Please see what follows.  Thank you.

---

**Please contact Carol @ ext. 207 if there are any problems with this transmission.**

---

**Confidentiality Note:** This facsimile contains privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this facsimile is not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this facsimile is strictly prohibited. If you have received this facsimile in error, please immediately notify us by telephone and return the original facsimile to us at the above address via the U.S. Postal Service. Thank you.

2/8/05
RECEIVED & FILED
**CLERK OF THE COURTS**
NORFOLK COUNTY

13.

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS.                                    SUPERIOR COURT DEPARTMENT

THOMAS CASHMAN,
       Plaintiff,

v.

INTERNATIONAL BUSINESS MACHINES          Civil Action No. NOCV 2004-02106-A
CORPORATION, STEVEN A. MILLS,
CHARLES ILL, JOHN R. JOYCE, and
GREGORY ENRIQUEZ,
       Defendants.

## NOTICE OF MOTION FOR ADDITIONAL TIME FOR RESPONSE

This is to notify the Court that Defendants today served on Plaintiff their Motion For

Additional Time To Respond To Plaintiff's Complaint. In their motion, Defendants state that the

complaint is complex and that they are seeking an additional thirty days to respond, to and

including Wednesday, March 9, 2005. The motion will be filed with the Court pursuant to Rule

9A after the response to the motion is received.

Respectfully submitted,

Joan Ackerstein
Joan Ackerstein, BBO # 348220
Counsel for Defendants
JACKSON LEWIS LLP
75 Park Plaza, 4th Floor
Boston, Massachusetts 02116
(617) 367-0025

Dated:  February 7 , 2005

A TRUE COPY
Attest: Mary P. Kinney
Deputy Assistant Clerk
2/16/05

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of February, 2005, a copy of the foregoing document was
served upon Plaintiff's Attorney, Kathleen E. Cross, Hanify & King, One Beacon Street, Boston, MA
02108, by hand.

Joan Ackerstein
Jackson Lewis LLP

|H.0

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS.                                    SUPERIOR COURT DEPARTMENT

THOMAS CASHMAN,
              Plaintiff,

v.

INTERNATIONAL BUSINESS MACHINES              Civil Action No. NOCV 2004-02106-A
CORPORATION, STEVEN A. MILLS,
CHARLES ILL, JOHN R. JOYCE, and
GREGORY ENRIQUEZ,
              Defendants.

## NOTICE OF FILING OF NOTICE OF REMOVAL

To:    Civil Clerk's Office
       Norfolk County Superior Court
       650 High Street
       Dedham, MA  02026

       PLEASE TAKE NOTICE that a Notice of Removal in the above action from the Superior

Court, Norfolk County, has been duly filed in the U.S. District Court for the District of

Massachusetts.  Attached hereto as Exhibit A is a certified copy of that Notice of Removal.

       This Court is requested to proceed no further unless and until such time as the action may

be remanded by order of said United States District Court.

RECEIVED & FILED
**CLERK OF THE COURTS**
NORFOLK COUNTY
2/17/05

Respectfully submitted,

INTERNATIONAL BUSINESS MACHINES
CORPORATION, STEVEN A. MILLS, CHARLES
ILL, JOHN R. JOYCE, and GREGORY
ENRIQUEZ

By their attorneys,

_Joan Ackerstein_

Joan Ackerstein, BBO # 348220
Heather Stepler, BBO #654269
JACKSON LEWIS LLP
75 Park Plaza, 4th Floor
Boston, Massachusetts  02116
(617) 367-0025

Dated: February 15, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on this 15 day of February, 2005, a copy of the foregoing document was served upon Plaintiff's Attorney, Kathleen E. Cross, Hanify & King, One Beacon Street, Boston, MA 02108, by first-class mail, postage prepaid.

_Joan Ackerstein_

Jackson Lewis LLP

**A TRUE COPY**

Attest: _MDeane Gibbons_

~~Deputy~~ Assistant Clerk

2/16/05

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

FILED
IN CLERKS OFFICE

THOMAS CASHMAN,
Plaintiff,

v.

INTERNATIONAL BUSINESS MACHINES
CORPORATION, STEVEN A. MILLS,
CHARLES ILL, JOHN R. JOYCE, and
GREGORY ENRIQUEZ,
Defendants.

05    10306 RWZ 15 P 3:29

U.S. DISTRICT COURT
DISTRICT OF MASS.

Civil Action

## NOTICE OF REMOVAL

TO THE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF MASSACHUSETTS:

Defendants, International Business Machines Corporation, Steven Mills, Charles Ill, John

R. Joyce, and Gregory Enriquez ("Defendants"), respectfully submit that:

1.    On or about January 17, 2005, one of the Defendants was served with a Summons

and Complaint in a matter entitled <u>Thomas Cashman v. International Business Machines</u>

<u>Corporation, Steven A. Mills, Charles Ill, John R. Joyce, and Gregory Enriquez</u>, Civil Action No.

2004-02106, which was filed in Massachusetts Superior Court, Norfolk County.

2.    This Notice is being filed within thirty (30) days of the receipt by the first

defendant of the Summons and Complaint.  The time for filing this Notice under 28 U.S.C. §

1446(b) has not expired.

3.    The process, pleadings, and orders served upon Defendants to date in this matter,

copies of which are attached hereto as <u>Exhibit A</u>, are as follows:

    a.    Complaint and Jury Demand;

    b.    Summons; and

c. Amended Complaint and Jury Demand.

4. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is diversity of citizenship, the parties being citizens of different states, the amount in controversy exceeds $75,000, exclusive of interest and costs, and no defendant is a citizen of the State in which the action was brought. On information and belief, including the allegations set forth in Paragraph 4 of Plaintiff's Complaint, Plaintiff is, was at the time of the filing of the Complaint, and has been at all intervening times, a resident of the Commonwealth of Massachusetts. Defendant International Business Machines Corporation ("IBM") is, was at the time of the filing of the Complaint, and has been at all intervening times, a corporation which is incorporated in New York and has its principal place of business in New York, and, therefore, is, pursuant to 28 U.S.C. § 1332(c)(1), a citizen of the State of New York. Defendant Mills is, was at the time of the filing of the Complaint, and has been at all intervening times, a citizen of the State of New York. Defendant Joyce is, was at the time of the filing of the Complaint, and has been at all intervening times, a citizen of the State of Connecticut. Defendant Ill is, was at the time of the filing of the Complaint, and has been at all intervening times, a citizen of the State of Connecticut. Defendant Enriquez is, was at the time of the filing of the Complaint, and has been at all intervening times, a citizen of the State of Connecticut. Further, the substantive allegations of Plaintiff's Complaint can fairly be read to indicate that the amount in controversy exceeds $75,000, exclusive of interest and costs. Therefore, there is complete diversity between Plaintiff and the Defendants and the requisite amount in controversy.

5. Accordingly, this action is removable to this Court under 28 U.S.C. § 1441.

6. All defendants consent to this removal.

7.    Promptly after the filing of this Notice, Defendants will give written notice to Plaintiff and will notify the Norfolk Superior Court of this Notice of Removal by filing with the Superior Court a Notice of Filing of Notice of Removal. A copy of that notification, which will be sent to the Norfolk Superior Court, is attached hereto as Exhibit B.

Respectfully submitted,

INTERNATIONAL BUSINESS MACHINES CORPORATION, STEVEN A. MILLS, CHARLES ILL, JOHN R. JOYCE, and GREGORY ENRIQUEZ
By their attorneys,

_Joan Ackerstein_

Joan Ackerstein, BBO # 348220
Heather Stepler, BBO # 654269
JACKSON LEWIS LLP
75 Park Plaza, 4th Floor
Boston, Massachusetts  02116
(617) 367-0025

Dated:  February _15_, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on this _15_ day of February, 2005, a copy of the foregoing document was served upon Plaintiff's Attorney, Kathleen E. Cross, Hanify & King, One Beacon Street, Boston, MA 02108, by first-class mail, postage prepaid.

_Joan Ackerstein_

Jackson Lewis LLP

-3-

# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                    TRIAL COURT OF THE COMMONWEALTH
                               SUPERIOR COURT DEPARTMENT
                               CIVIL ACTION NO.

THOMAS CASHMAN,                    )
                                   )
               Plaintiff,          )
                                   )
        vs.                        )
                                   )
INTERNATIONAL BUSINESS             )
MACHINES CORPORATION,              )
STEVEN A. MILLS, CHARLES ILL,      )
JOHN R. JOYCE, and                 )
GREGORY ENRIQUEZ,                  )
                                   )
               Defendants.         )
                                   )

## COMPLAINT AND JURY DEMAND

The plaintiff, Thomas Cashman ("Mr. Cashman"), asserts claims arising from his

employment by International Business Machines, Corp. ("IBM") and the actions and

omissions of various of its officers and senior managers based on IBM's failure to pay

Mr. Cashman compensation that he earned pursuant to the terms of his compensation

plan and subsequent retaliation for Mr. Cashman's pursuit of an internal grievance.

### JURISDICTION

1.     Jurisdiction is appropriate pursuant to the Massachusetts Long-Arm

Statute, Mass. Gen. Laws, ch. 223A, §3.

2.     The Massachusetts Wage Act, G.L. ch. 149, §§148, provides, in pertinent

part that, "[t]he president and treasurer of a corporation and any officers or agents having

the management of such corporation shall be deemed to be the employers of the employees of the corporation within the meaning of this section."

**VENUE**

3.     Venue is appropriate pursuant to Mass. Gen. Laws, ch. 223, §1.

**FACTS COMMON TO ALL COUNTS**

4.     The plaintiff, Thomas Cashman, resides at 375 Westfield Street, Dedham, Massachusetts, Norfolk County, where he also maintains a home office.

5.     Mr. Cashman was an employee of IBM continuously since February 3, 1997 and until he left IBM on November 30, 2004, at which time he held the position of a WWW Business Unit Executive, E-business on Demand Automation, IBM Software Group. Other positions held by Mr. Cashman at IBM which are relevant to the claims brought herein include Director of EMEA Financial Sales with Tivoli Global Financial Services; Tivoli Sales Manager, Business Unit Executive; Director, Financial Vertical, Tivoli Systems, Inc.; Director, Performance, Availability, Configuration and Operations Solutions, Tivoli Systems – Americas.

6.     The defendant, IBM, is a New York corporation and maintains a principal place of business at 1133 Westchester Avenue, White Plains, New York ("IBM Headquarters"). IBM is a foreign corporation registered with the Secretary of State of the Commonwealth of Massachusetts and regularly conducts and solicits business in Massachusetts. Notably, it has a division in Cambridge, Massachusetts known as Lotus Development Corporation. IBM maintains or has maintained offices in the Commonwealth of Massachusetts, including offices in Boston, Cambridge and Waltham, Massachusetts.

2

7.    The defendant, Charles Ill, was a senior executive at IBM, on information and belief holding, the position of Vice President of Americas Software, at all times relevant to this action. Mr. Ill was the direct line supervisor for Mr. Cashman's direct supervisor, Gregory Enriquez. On or about February 5, 2002, Mr. Cashman filed an Open Door grievance with Mr. Ill respecting IBM's failure to pay his 2001 commissions earned and due and payable pursuant to the 2001 50/50 SWG Sales Plan. Mr. Cashman initiated and received many communications involving Mr. Ill from Mr. Cashman's home office in Massachusetts directly related to the claims central to this action. On information and belief, Mr. Ill is now a sales executive with BEA Systems, Inc., located in San Jose, California. Mr. Ill is an employer of plaintiff as defined by Mass. Gen. Laws, ch. 149 § 148.

8.    The defendant, Steven A. Mills, is Senior Vice President & Group Executive, a position he has held since July of 2000. According to IBM, Mr. Mills is responsible for shaping IBM's overall software strategy and directing its software business. Mr. Mills is responsible for approving the structure of yearly sales plans, and approved the structure of the 2001 50/50 SWG Sales Plan. Mr. Mills maintains an office at IBM headquarters in New York. Upon information and belief, Mr. Mills travels regularly to IBM's offices in Massachusetts, to carryout his duties regarding IBM software. Mr. Mills was in the direct chain of command managing and controlling software sales and commission decisions for IBM, including those complained of by Mr. Cashman in this action. Mr. Mills is an employer of plaintiff as defined by Mass. Gen. Laws, ch. 149 § 148.

3

9.    The defendant, John R. Joyce, at all times relevant to this complaint was a Senior Vice President and Chief Financial Officer of IBM, a position he had held since 1999. Mr. Joyce was responsible for all financial and business development activities of IBM, including those taking place in Massachusetts and including compensation of its employees. Upon information and belief, IBM's Finance and Planning sector, headed by Mr. Joyce, was complicitous in the decision to cut Mr. Cashman's commissions. Mr. Joyce was an employer of plaintiff as defined by Mass. Gen. Laws, ch. 149 § 148.

10.    The defendant, Gregory Enriquez, was the Americas Sales Vice President of Tivoli IBM Software group at all times relevant to this action and was the direct-line supervisor for Mr. Cashman. Mr. Enriquez maintained an office at IBM Americas Software Group Headquarters during his tenure of Vice President. Mr. Enriquez regularly contacted Mr. Cashman by telephone and email at Mr. Cashman's Dedham, Massachusetts home office regarding IBM's business in Massachusetts, and, more precisely the claims raised in this lawsuit. In or about January 2002, Mr. Enriquez telephoned Mr. Cashman at Mr. Cashman's home office in Dedham, Massachusetts and notified him that his 2001 earned and due and payable commissions would be reduced. At all times relevant to this action, Mr. Enriquez was an employer of plaintiff as defined by Mass. Gen. Laws, ch. 149, §148. On information and belief, Mr. Enriquez is currently employed as the Senior Vice President-Worldwide Sales for Stratus Technologies, 111 Powdermill Road, Maynard, Massachusetts 01754.

4

## FACTS COMMON TO ALL COUNTS

### Tivoli IBM Software Group – EMEA

11.     After achieving over 400% of his sales quota at IBM for 1997, Mr.

Cashman was asked to take a three-year international assignment with EMEA (a division

of IBM, which is an acronym for Europe, Middle East and Africa) that involved being

relocated to the Netherlands. IBM directed a dedicated team to sell to substantial

institutional targets, largely located in Europe, where IBM determined significant growth

opportunities existed for its Tivoli products. Mr. Cashman was appointed to this position

because of his demonstrated skill in managing sales involving large, institutional

customers of IBM and his ability to close these deals.

12.     Mr. Cashman accepted this position and the substantial burden of

relocating to the Netherlands in large part due to the professional and financial

opportunities represented to him by IBM.

13.     Mr. Cashman's title was Director of EMEA Financial Sales with Tivoli

Global Financial Services. His management team initially included five veteran sales

managers. Mr. Cashman's direct line of supervision was up through the IBM Tivoli

EMEA organization.

14.     IBM expressly directed Mr. Cashman to develop large, profitable

transactions for the company. The team focused on sales to large institutions, principally

comprising European banks and insurance companies. The sales structure and revenue

targets for this team, as represented by the 1999 Sales Compensation Plan, were

aggressive – more so than most similarly situated Tivoli sales teams responsible for other

IBM geographical territories.

5

15.    Mr. Cashman's EMEA team each received an individual 1999 Sales Compensation plan modeled on that previously employed by Tivoli, which became very highly leveraged when a salesperson exceeded his or her sales goals by large amounts. A true and accurate copy of Mr. Cashman's plan for 1999 is attached as Exhibit A.

16.    Mr. Cashman worked with Bruno Teuber, IBM Tivoli's Vice President of Sales for EMEA, to design fair sales account responsibilities for each member of Mr. Cashman's team, as well as bonus incentives for the team, to provide true challenges and avoid "windfall" profits to any individual member of the team. The resulting distribution of accounts was particularly challenging to the team because the success of each salesperson, as well as the team, depended on sales a relatively small number of targeted customers.

17.    Over the course of his tenure in this position, Mr. Cashman personally recruited to the team three of the five IBM sales managers and an additional five business consultants with significant ties to the targeted business communities and demonstrated sales ability. In order to recruit this sales talent, Mr. Cashman touted the substantial financial incentives represented by the IBM compensation scheme if the team could produce outstanding sales performance.

18.    By fall of 1999, despite the aggressive goals set by IBM, Mr. Cashman's EMEA sales team performed exceptionally, just as IBM had asked, and was well on its way to exceeding individual and team quotas for the year. As a result of the team's success, IBM was realizing significant revenue.

19.    At this time, Mr. Teuber contacted Mr. Cashman informing him that IBM intended to elevate individual and team quotas so that year-end commissions and other

6

quota-based compensation would be reduced significantly. Mr. Cashman refused to change his team's compensation plans as he believed it would undermine his effectiveness as a manager and leader. He requested Mr. Teuber to reconsider.

20.    Mr. Teuber's next conversation with Mr. Cashman consisted of his informing Mr. Cashman that his compensation plan would be changed to eliminate commissions that Mr. Cashman had earned and that were due and payable. When Mr. Cashman asked whether he had any recourse to appeal the decision, Mr. Teuber told him that he could "go back to America" if he did not accept the reduction.

21.    As Mr. Cashman had rearranged his entire life so that he could be stationed in the Netherlands for three years, he had little option but to stay until he could make other arrangements. Mr. Cashman did begin immediate discussions with his "dotted line" manager back in New York to return to a position with IBM in the United States.

22.    Mr. Teuber initiated a two-fold reduction in the commissions compensation that IBM was obligated to pay Mr. Cashman's team. Rather than reduce quotas, IBM/EMEA resolved to pay the individuals on the team 50% of the commissions compensation they earned on large transactions, rather than the 100% due per their sales compensation plans. To reduce Mr. Cashman's commission compensation, which was based on team sales, rather than the leveraged overachievement commissions compensation articulated by his compensation plan, IBM paid him a lesser percentage for every dollar that his team sold above 186% of its quota for the year.

23.    Based on his sales quota of $28 million contained in his 1999 Sales Compensation Plan, and his actual sales for the year of $103.4 million, Mr. Cashman

would have earned approximately $1,582,200 in base salary and commissions for the year. Instead, with IBM/EMEA's end-of-the-year changes to his sales plan, his earnings were cut to $845,100, which cost Mr. Cashman at least $737,100 in earned commissions.

### Tivoli IBM Software Group Sales – Massachusetts

24.    In February of 2000, Mr. Cashman returned to the United States to rebuild the Tivoli Finance Vertical Team, which sold mostly to banking, insurance and brokerage institutions. Mr. Cashman faced significant challenges in this new position.

25.    The first hurdle faced by Mr. Cashman in making his team successful was significant turnover in the software industry that was occurring at the time he took the reigns. The opportunities available in the computer software industry at the zenith of the dot com expansion to make significant sums of money attracted many good salespeople away from IBM in the 1999-2000 period.

26.    The Tivoli product line had also suffered recent setbacks that led to customer dissatisfaction, including, significantly, IBM's sale of Tivoli's customer help desk, which had been portrayed as the core of Tivoli's management strategy for sales to large institutional customers. As a result, when Mr. Cashman returned to lead this team, many customers who had made significant Tivoli purchases in the preceding few years, had yet to deploy the systems (a problem known in the industry as "shelfware"). These frustrated customers required substantial attention from Mr. Cashman and his team merely to digest their prior purchases and integrate Tivoli products into their businesses.

27.    Despite the constant turnover and existing customer unrest, Mr. Cashman's team was one of the only two sales teams on a regional level to achieve its sales quota.

8

28.    In 2001, IBM took action to bring the Tivoli sector of its business (which was wholly owned by IBM since approximately 1996), including the sales operation, in line with the other IBM software divisions. For sales, this meant that Tivoli's field sales personnel was compensated for the first time pursuant to the IBM SWG [software group] Sales Plans. The one that applied to Mr. Cashman and his team, which were "direct, field sales personnel" was entitled the "50/50 SWG Sales Plan." A true and accurate copy of the 50/50 SWG Sales Plan for 2001 ("Sales Plan") is attached hereto as Exhibit B.

·29.    Essentially, the Sales Plan provided three sources of compensation for sales personnel to which it applied. Fifty per cent of a salesperson's compensation was considered base pay, or fixed portion of compensation that was to be paid semi-monthly. The other 50% of the "On Target Earnings" ("OTE") (total compensation available if salesperson achieved 100% of his or her quota) was divided between commissions and bonus-type opportunities. A final component of Total Cash Compensation (as defined by IBM) under the Sales Plan included any monies earned for "overachievement", sales in excess of 100% of an individual's or team's quota, which were generally paid out at a higher percentage of sales as the overachievement sales grew.

30.    IBM's software group ("SWG") made an express and concerted effort in 2001 to embrace and excite the Tivoli Americas Sales force of which Mr. Cashman's team was a prominent part. As is evident in the SWG management guidelines and communications from upper-tier SWG executives, IBM understood that it was suffering from attrition of its sales force and needed to stop this loss by providing aggressive

9

commission opportunities for its salespeople to compete with financial incentives offered by competitors the marketplace.

31.    On the cover of the IBM document that was provided to all sales staff by IBM to set out the benefits of the 50/50 SWG plan, "industry consultants" are quoted as saying, "your plan 'has some of the most aggressive rewards for overachievement in the industry.'"

32.    On the inside cover of the Sales Plan, in a message from Dan Lautenbach, Vice President, Worldwide Software Sales for IBM, he encourages, "[t]he software sales incentive plan recognizes the unique opportunities our sales force can identify and close this year. It is characterized by extremely high payout rates for business you close in excess of your assigned full year quota. And, because your sales plan is based on a self-funding model, *there are no caps to your earnings: the more you sell, the more revenue and incremental profit for IBM: and the more earnings for you.*" Emphasis supplied.

33.    The Sales Plan also included a listing of principles that guide the "Software Sales Incentive Plan," including, that "[t]he plan should be competitive with the software industry marketplace,' and "[t]he plan should be consistent with industry practice in key areas of uncapped earnings, earnings at first sale, and attractive upside opportunity."

34.    With respect to managers, IBM recognized in the Sales Plan that "[t]he plan should motivate Technical Support and Sales Management in a manner consistent with the team they support."

35.    The Sales Plan is replete with statements from IBM further emphasizing the "sky's-the-limit" approach to an individual salesperson's earnings for 2001. For

10

example Mr. Cashman and his team were promised, "[w]e have great expectations for a fantastic sales year with unlimited possibilities for you. There's no limit to your 2001 sales incentive opportunity;" "Your earnings for performance above quota continue to be uncapped in 2001;" "As soon as you start overachieving your full-year quota, the plan provides significant leverage to reward your performance. And, your earnings for attainment above 100% are uncapped." "You want to earn as much money as you can. We want that too, because when you win, IBM wins." Exhibit B.

36.    IBM also expressly recognized that its own gain was directly related to the overachievement of its salespeople. The Sales Plan states, "Revenue drives value for IBM. That's why the revenue measure is the largest portion of the incentive plan for most job roles. Double-digit revenue growth is one of our core business objectives, and we're making sure the Sales Incentive Plan pays you for helping achieve this goal." *Id.*

37.    For second-line sales managers like Mr. Cashman, his performance over 100% of his quota was even more highly rewarded in that the Sales Plan provided, "sales managers have accelerators that are greater than those for sales employees." In other words, the more sales revenue generated by a second line manager's team, the greater the percentage he or she would earn in commissions.

38.    In the example provided on page 6 of the Sales Plan, IBM specifically notes that when a manager generates revenue through his team that is above 120% of his full year quota, he or she earns commissions compensation at 12 times the rate for attainment compensation, which is "uncapped." (Sales Plan, p. 5).

39.    IBM's message of unbounded earnings potential for sales personnel who over achieve was echoed in all communications to Mr. Cashman concerning quotas, sales

11

plans and territories. Steven Mills, then the Senior Vice President and Group Executive

for IBM SWG, wrote to hundreds of his sales managers on January 4, 2001 by email

(including Mr. Cashman at his Massachusetts office) to preview the year's message. He

stated, "we have put in significant effort to insure that quota's are reasonable and that we

are delivering a sales plan that will provide a big payoff for those who can drive growth.

Paying for growth is the key idea. Giving people the opportunity for significant financial

reward is part of the excitement of winning."

40.    IBM repeatedly reinforced that IBM wanted to retain its sales force by

providing financial incentives. At E-business University in 2001, a sales rally held at the

beginning of every calendar year to excite the sales force, Steven Mills acknowledged,

"We lost some good people. We cannot afford to have that happen in the year 2001. So

we're going to focus our time, our effort, our energy into everything that goes into having

a high performance sales team that is excited about selling for this organization, that's

committed to this organization and who wants to be here a year from now."

41.    Mr. Mills also stated in his January 4, 2001 email, "[g]iven what happened

to us in 2000, we MUST instill confidence that IBM SWG will be the software company

to be a part of in 2001. The key to our success this year will be to retain our reps . . .

How we treat our sales force this year and their growing commitment to our common

goals will be key to driving the growth of IBM software."

42.    Mr. Mills recognized that financial success was at the heart of IBM's sales

and retention plan. He said in his E-University speech, "That's what this year's sales

plan is all about. It's about making money. It's about leverage . . . It's about a plan and a

quota when combine[d] that causes you to put every last bit of effort into making this the

most successful financial year in your lives . . . The sales plan and the quotas together are all about how you're going to want to be here a year from now . . . you're going to want to be here because this is the best place to sell, with the best sales plan, with a tremendous opportunity for leverage."

43.    Nowhere in any of the sales plan materials that Mr. Cashman received or had access to was there any mention of a subjective judgment regarding a manager's level of involvement in a sales transaction in order for the revenue generated to be counted as part of a sales manager's quota.

44.    In February of 2001, Mr. Cashman was provided his target account list by an IBM account analyst.  Mr. Cashman received his individual quota letter and compensation plan from John Dunderdale, the outgoing Vice President of Sales for Tivoli Americas in early March of 2001.  True and accurate copies of both are attached hereto as Exhibit C.  Mr. Cashman's quota was $35.5 million in sales.

45.    Despite Mr. Cashman taking on additional responsibilities as IBM's Director of Performance, Availability, Configuration and Operations products for the Americas in August of 2001, Mr. Cashman and his Financial Vertical team attained nearly $70 million in sales for 2001, which, in accordance with the Sales Plan should been used to figure Mr. Cashman's Total Cash Compensation for 2001.

46.    However, in January of 2002, Mr. Enriquez, the IBM executive to which Mr. Cashman reported directly, called Mr. Cashman at his home office in Dedham, Massachusetts and indicated that IBM did not intend to pay him the commission compensation that he had earned and that was due and payable.

13

47.    Directly thereafter, at the IBM 2002 E-Business University sales rally, Mr. Enriquez approached Mr. Cashman, again confirming that his compensation would be reduced for 2001, and warning Mr. Cashman that he could not speak about the impending reductions with anyone.

48.    Shortly thereafter, Mr. Cashman learned that IBM's financial commission specialist responsible for tracking Mr. Cashman's sales was told by Mr. Enriquez to reduce the sales attributable to Mr. Cashman so that his resulting commission compensation, already earned and due and payable, would be cut. On Mr. Enriquez' order, Mr. Cashman's attainment earnings were reduced to approximately $57 million, thereby resulting in a loss in commission compensation of approximately $375,000.00.

49.    Despite IBM's backdoor attempts to reduce compensation to Mr. Cashman and other sales staff retrospectively and in contravention of the Sales Plan, IBM, through Mr. Mills, promised its salespeople at the January 2002 E-Business rally that its commitments from the prior year would be honored and that the sales staff should keep on selling.

<u>Grievance Process</u>

50.    For many years, IBM had a published internal grievance procedure known as the "Open Door Policy," which claimed to have been available to IBM employees who did not believe that they had been treated appropriately.

51.    Mr. Cashman discussed initiating an Open-Door grievance with his Human Resources representative, Michael Schade, but expressed some reservation about possible negative ramifications to his IBM career long-term if he filed a complaint. Mr. Schade assured him that IBM would not tolerate any form of reprisal. Mr. Cashman

14

began the Open-Door process by filing a grievance on February 5, 2002 with Charles Ill,

the Vice President of Americas Software for IBM at the time and a superior to Mr.

Enriquez.

52.     Mr. Ill followed neither the processes nor the timeline outlined by the

published Open-Door materials. While he did restore a small portion of Mr. Cashman's

attained sales months after the grievance was filed, the lion's share of the sales that had

been de-credited were not restored.

53.     On June 12, 2002, Mr. Cashman filed an appeal of Mr. Ill's determination.

Despite Mr. Cashman's best efforts to track the appeal, it took until November of 2002

before Mr. Cashman was merely told verbally that his appeal was denied.

54.     After Mr. Cashman complained in 2002 about the reduction in his 2001

compensation, he was removed from IBM's Executive Resource list by Mr. Enriquez,

who also refused to give him the highest rating on his performance evaluation for 2001,

despite that another IBM Executive did give him the highest rating for the same period.

Mr. Enriquez had confirmed for Mr. Cashman that his name appeared on that list in

August of 2001. As a result, Mr. Cashman has not been considered for an Executive

Management position. Mr. Enriquez also made negative comments about Mr. Cashman

to his subsequent manager and others at IBM after Mr. Cashman refused to accept cuts to

his compensation and initiated the internal grievance procedure.

55.     Since filing the Open-Door grievance, IBM has also consistently passed

Mr. Cashman over for advancement, taken away his management responsibilities, and

assigned him to positions that were not commensurate with his experience.

## COUNT I
### (Breach of Contract -- IBM)

56.    The plaintiff repeats and realleges all averments in paragraphs 1 through 55 as if fully set forth herein.

57.    IBM had a contract with Mr. Cashman for 1999 that dictated how his compensation would be paid for services rendered as an employee of IBM.

58.    Mr. Cashman performed all of his obligations pursuant to that contract.

59.    IBM breached that contract by failing to pay Mr. Cashman as required by the terms of the contract.

60.    As a result, Mr. Cashman has been damaged.

## COUNT II
### (Unjust Enrichment/Quantum Meruit -- IBM)

61.    The plaintiff repeats and realleges all averments in paragraphs 1 through 60 as if fully set forth herein

62.    Mr. Cashman rendered valuable services to IBM in 1999;

63.    IBM accepted Mr. Cashman's services and used, enjoyed, and profited by them;

64.    IBM should reasonably have expected that it would have to pay Mr. Cashman his full compensation for the services he rendered;

65.    Mr. Cashman reasonably expected to be paid full compensation for the services he rendered.

66.    IBM was unjustly enriched by receiving the benefit of Mr. Cashman's services while refusing to pay his full compensation.

## COUNT III
### (Breach of Contract -- IBM)

67.    The plaintiff repeats and realleges all averments in paragraphs 1 through 66 as if fully set forth herein.

68.    IBM had a contract with Mr. Cashman for 2001 that dictated how his compensation would be paid for services rendered as an employee of IBM.

69.    Mr. Cashman performed all of his obligations pursuant to that contract.

70.    IBM breached that contract by failing to pay Mr. Cashman as required by the terms of the contract.

71.    As a result, Mr. Cashman has been damaged.

## COUNT IV
### (Unjust Enrichment/Quantum Meruit – IBM)

72.    The plaintiff repeats and realleges all averments in paragraphs 1 through 71 as if fully set forth herein.

73.    Mr. Cashman rendered valuable services to IBM in 2001.

74.    IBM accepted Mr. Cashman's services and used, enjoyed, and profited by them.

75.    IBM should reasonably have expected that it would have to pay Mr. Cashman his full compensation for the services he rendered.

76.    Mr. Cashman reasonably expected to be paid full compensation for the services he rendered.

77.    IBM was unjustly enriched by receiving the benefit of Mr. Cashman's services while refusing to pay his full compensation.

## COUNT V

### (Violations of Mass. Gen. Laws ch. 149, §§ 148, 148A, 150 – IBM, Ill, Mills, Joyce and Enriquez)

78. The plaintiff repeats and realleges all averments in paragraphs 1 through 77 as if fully set forth herein.

79. Mr. Cashman earned compensation pursuant to IBM's 2001 SWG 50/50 Sales Plan, which remains unpaid despite verbal and written demands.

80. The unpaid compensation is covered by G.L. c. 149, § 148.

81. IBM is an employer within the meaning of G.L. c. 149, § 148.

82. Mssrs. Ill, Mills, Joyce and Enriquez are or were for relevant times officers or agents of IBM within the meaning of G.L. c. 149, § 148.

83. Defendants failed to pay Mr. Cashman his compensation which had become due and payable at the close of 2001, even after he requested payment of the sums due both verbally and in writing and followed IBM's published "Open-Door" grievance procedure.

84. As more fully described above, in violation of Mass. Gen. Laws, ch. 149, §148A, Mr. Cashman suffered retaliation by the Defendants for taking action to recover his compensation including but not limited to being removed from IBM's Executive Resource List.

85. Mr. Cashman has suffered harm as a result of the Defendants' conduct, in violation of M.G.L. ch. 149, §§148, 148A and 150.

**COUNT VI**
**(Interference with Advantageous Business Relations -- Enriquez)**

86.    The plaintiff repeats and realleges all averments in paragraphs 1 through 85 as if fully set forth herein.

87.    Mr. Cashman's name had been added to the list from which IBM appointed executives internally("Executive Resource List") in 2001.  A prerequisite for such an appointment was that an employee's name appear on this list.

88.    Mr. Enriquez was aware that Mr. Cashman's name was on the Executive Resource List and that to remain on the list Mr. Cashman's performance rating needed to remain at the highest level.

89.    In 2001, Mr. Cashman exceeded his team sales quota by nearly 100% and was rated at the highest level by Thomas Wroblewski, an IBM sales executive to which Mr. Cashman answered.

90.    In 2002, after Mr. Cashman protested the refiguring of his sales such that his commissions would be improperly reduced, and his commencement of an Open-Door grievance, Mr. Enriquez willfully, intentionally and with malice refused to give Mr. Cashman the highest rating for his 2001 performance so that he could not remain on the Executive Resource List and proceeded to spread false rumors and degrading comments about Mr. Cashman to other executives at IBM to damage his ability to succeed at the company.

91.    Mr. Enriquez's decision with respect to Mr. Cashman's performance was unlawfully calculated to cause Mr. Cashman damage and loss.

92.    As a result of Mr. Enriquez's actions, Mr. Cashman has suffered damage and loss.

WHEREFORE, the plaintiff, Thomas Cashman requests this court to:

1.  Enter judgment for Thomas Cashman against defendants on all counts of the Complaint;

2.  Award damages to Thomas Cashman in an amount determined by the court;

3.  Award treble damages, interest, costs, and attorneys' fees to Thomas Cashman pursuant to Count V of the Complaint, and,

4.  Award such other relief as this Court deems just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL COUNTS SO TRIABLE.**

THOMAS CASHMAN
By his attorneys,

Charles R. Bennett, Jr., BBO #037380
Kathleen E. Cross, BBO #556934
Sharon H. Patton, BBO #634780

HANIFY & KING
Professional Corporation
One Beacon Street
Boston, MA 02108
(617) 423-0400

DATED: December 8, 2004

406935

Exhibit A





**PRIVATE & CONFIDENTIAL**

12 May 1999

Mr T Cashman
Keizersgracht 361 D
1016 EJ
Amsterdam

Dear Tom

**RE: COMPENSATION REVIEW**

I have recently spent some time reviewing your compensation and I have great pleasure in confirming that your base salary will increase to £60,000, also your on target commissions will increase to £80,000 with effect from 1 January 1999. All your other existing terms and conditions of employment remain unchanged.

May I take this opportunity to thank you personally for your continued support and contribution both to the function and the Tivoli organisation as a whole.

Kind regards

Yours sincerely

Steve Standring
**Director, Verticals**

Tivoli Systems (UK) Ltd.
Sefton Park
Bells Hill
Stoke Poges
Bucks
SL2 4HD

Tel: 01753 896896
Fax: 01753 896899

Registered in England. No. 3129044
Registered Office: Rolls House
16-30 Ely Place, London, EC1N 6SN

CC:   Personnel File
      Payroll

Exhibit B

*Exhibit B*

**IBM**

# Welcome to the fabulous world of your 2001 Software Sales Incentive Plan

*Information you must have if you have a software sales quota . . .*

This is the place to learn about the new improved incentive plan that recognizes your high value to the IBM Software Group.



*According to industry consultants . . .*

Your plan "has some of the most aggressive rewards for overachievement in the industry"

A few minutes of reading will help you understand how to calculate your earnings under the 2001 sales plan, and why IBM Software is the place to be in 2001.



**Letter from the desk of Dan Lautenbach...**
**VP, Worldwide Software Sales**

You should be very excited about the unique software sales incentive plan that covers our sales representatives and sales managers for 2001. It's better than both the 2000 and 1999 plans. Compensation consultants who specialize in the software industry tell us it is really pushing the edge when it comes to rewarding overachievement. And, I think you have a superb opportunity to perform at an above-quota level this year.

This booklet explains the basic principles that guided design of the new plan, and provides information to help you understand how the plan works ... for you and for IBM.

The most important thing to understand is your importance to IBM's software business. Your plan is custom-designed to reflect the reality of the software industry, our competitors, and customer requirements for IBM's outstanding offerings.

The software sales incentive plan recognizes the unique opportunities our sales force can identify and close this year. It is characterized by extremely high payout rates for business you close in excess of your assigned full year quota.

And, because your sales plan is based on a self-funding model, there are no caps to your earnings: the more you sell, the more revenue and incremental profit for IBM; and the more earnings for you.

I encourage you to read this important booklet. I believe you will be convinced that you are in the right place, at the right time, in our company.

I know I can count on each of you for a fast start and focused sales efforts throughout the year. Our collective efforts can assure a great year for the company, and for each of us.

Thanks for your efforts so far, and best wishes for a healthy and happy 2001.

Dan

# The Software Group Sales Incentive Plan Principles:

A set of basic principles guide development of your Software Sales Incentive Plan. The design point for 2001: a plan that motivates you to overachieve assigned targets; a plan that compensates you for outstanding performance; and a plan that attracts and retains top sales talent by delivering competitive compensation.

I. *The plan should reinforce IBM's software business strategy*

II. *The plan should be simple to understand and communicate*

III. *The plan should be competitive with the software industry marketplace*

IV. *The plan should be consistent with industry practice in key areas of uncapped earnings, earnings at first sale, and attractive upside opportunity*

V. *The plan should motivate Technical Support and Sales Management in a manner consistent with the team they support*

VI. *The plan should be tested against the prior year's plan and the current year's expectations*

VII. *The plan should address unique country environments*

**Table of Contents**

Important Changes for 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4
Framework and Terminology . . . . . . . . . . . . . . . . . . . . . . . . . .5
Performance Measures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
How Payout Rates Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
Sales Plan Example . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8
Glossary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

Please visit your new Sales Incentives site on the intranet. We'll soon be adding lots of useful content that helps you focus on big payout opportunities, and easily calculate your earnings.

*w3.ibm.com/software/sales/saletool.nsf/salestools/sales+incentives*

**3**



# Your 2001 Software Sales Incentive Plan

**Easy to understand. Easy to love.**
You talked. We listened. The result: new and improved features for the 2001 Software Sales Incentive Plan. We have great expectations for a fantastic sales year with unlimited possibilities for you. There's no limit to your 2001 sales incentive opportunity.

This booklet will help you understand how your Sales Incentive Plan works, how your performance is measured, how to calculate earnings, and how much money you can make.

## Important Changes for 2001

Your performance is important, and the new plan emphasizes greater pay-for-higher levels of performance.

## You get paid more from the first sale

The 2001 payout table pays 1% of your target incentive for every 1% attainment when you are at or below 100% of quota for PCO1. In 2000, the payout rate was just 0.5% when you were below 80% of quota. Changing to 1% for attainment at or below 100% attainment of quota reduces the complexity of the plan and makes it easier for you to estimate your pay.

## You get paid for attainment against full-year quota

You will be paid based on attainment against your full-year quota instead of attainment against a year-to-date quota. This change eliminates the concept of "seasonal" or quarterly skews. The full-year pay methodology encourages driving business earlier in the year because the accelerators apply when you exceed 100% of your full-year quota. Because quarterly results are still very important to IBM, your manager will be able to use PCO3 challenges to focus on quarterly initiatives.

## You get paid at higher payout rates above 100% of full-year quota

As in 2000, you have an accelerator for attainment above your quota; however, this year, the accelerator will apply when you achieve your full-year quota, as opposed to when you've reached your year-to-date quota. Your earnings for performance above quota continue to be uncapped in 2001.

## Calculation of your incentive payments is easy under the 2001 Plan

The year-to-date method used in 2000 created complexities because of fluctuations in performance during the year, and was a major cause of debit balances — situations in which sales reps owed IBM money.

## Sales Matter – You Matter

No one needs to tell you that you are the front line at IBM. Our success depends on you and your ability to sell products and services to our customers. It's straightforward: no sales, no customers, no growth, no IBM. Your sales success creates value for our shareholders and for you. The 2001 Sales Incentive Plan encourages you to drive sales.

# The 2001 Software Sales Incentive Plan Framework and Terminology
(See Software Sales Incentive Plan Glossary on page 10 for definitions).



## Pay Mix for Software Sales Plans

Pay Mix is the ratio of your Base Salary to your Target Incentive. A higher proportion of your pay on Target Incentive means more pay is at risk, with greater upside earnings potential. Pay Mix varies by job role and geography.

|  | SAM | Pillar | Partner | Technical |
|---|---|---|---|---|
| Americas | 60/40 | 60/40 | 60/40 and 70/30 | 75/25 |
| Asia Pacific | 60/40 | 50/50 | 60/40 and 70/30 | 75/25 |
| Japan | 60/40 | 60/40 | 60/40 and 70/30 | 90/10 |
| EMEA | 60/40 | 50/50 | 60/40 and 70/30 | 75/25 |
| Europe North | 50/50 | 50/50 | 60/40 and 70/30 | 75/25 |

## PCO Weightings for Software Sales Plans

Your Target Incentive has two components or Personal Contribution Objectives (PCOs). The split between PCO1 (Revenue) and PCO3 (Challenges) is generally 80/20. You earn eighty percent of your Target Incentive amount when you reach 100% of your full-year revenue quota.

## Payout Tables for Software Sales Plans

Sales employees around the world say they don't always understand how to calculate sales incentive payments. There are three payout rates that apply to your PCO1 performance measurement.

The payout rate when you are at or below 100% attainment of your full-year quota. For every 1% attainment against your full-year quota, you earn 1% of your PCO1 Target Incentive. At 100% quota achievement, you receive 100% of your Target Incentive for PCO1.

Higher payout rates apply when you are above 100% attainment of your full-year quota: As soon as you start overachieving your full-year quota, the plan provides significant leverage to reward your performance. And, your earnings for attainment above 100% are uncapped.



## Payout Table for Software Sales Representatives:

| Quota Zone | 0% - 100% | 100% - 125% | Above 125% |
|---|---|---|---|
| Payout Rate | 1% | 4% | 6% |

## Payout Table for Software Sales Managers:

In recognition of their large quotas and added responsibilities, sales managers have accelerators that are greater than those for sales employees.

| Quota Zone | 0% - 100% | 100% - 120% | Above 120% |
|---|---|---|---|
| FLM Payout Rate | 1% | 5% | 7.5% |
| SLM Payout Rate | 1% | 8% | 12% |

FLM = First Line Manager; SLM = Second Line Manager

Note: Not all employees with "manager" titles are considered managers for purposes of this plan. See the Glossary for eligibility rules for manager accelerators.

## More About the Plan

You can learn more about how you get paid by viewing the Sales Plan Example on pages 8 and 9. It illustrates how to estimate the payout of an individual transaction, and how to estimate total earnings.

## Performance Measures Used to State Personal Contribution Objectives

You want to earn as much money as you can. We want that too, because when you win, IBM wins. Sounds simple enough, so how do we get there? One of our goals is to make sure you get paid for doing what matters most to our business. The 2001 Sales Incentive Plan consists of Personal Contribution Objectives (PCOs) for your specific job role. Personal Contribution Objectives are defined as follows:

### • PCO1: It's All About Revenue

Revenue drives value for IBM. That's why the revenue measure is the largest portion of the incentive plan for most job roles. Double-digit revenue growth is one of our core business objectives, and we're making sure the Sales Incentive Plan pays you for helping achieve this goal.

### • PCO3: Challenges Beyond the Numbers

Making financial goals is key to our success, but it doesn't end there. We want to reward you for focusing on specific sales-related activities: closing high-profit transactions, moving into "white space" or using alternative sales channels to name a few. A portion of your Target Incentive is tied to individual and global challenges.

• *Individual Challenges:* Your managers know your opportunities best. That's why your first and second line managers will set challenges specifically for you.

• *Global Challenges:* Part of your incentive will be based on your achievement against global challenges, set by the Worldwide Software Sales Leader.

## 2001 Sales Incentive Plan for the Software Technical Sales Support Role

Pay Mix, the ratio of your Base Salary to your Target Incentive, is 75/25. Your PCO weightings align with the sales force you support, and your payout table will be the same as that of the sales force. In cases where team quotas are assigned, your individual payments will be made based on management assessment of your contribution.

## Incentive Payments Based on Your Performance: How Payout Rates Work

There are two easy-to-understand techniques you can use to calculate your pay: Payout Rate per $1,000 of revenue attainment, and Payout Rate per 1% attainment of your full-year quota. The same incentive payment amount is calculated by these two methods.

*Illustration: Your full year quota is $5M, and your Target Incentive (PCO1) is $40,000*
*Pay Rate per 1% Attainment of Full Year Quota Method*

| | 0% 100% of Full Year Quota | 100% 125% of Full Year Quota | Above 125% of Full Year Quota |
|---|---|---|---|
| 1% of Full Year Quota Earns | $400 | $1,600 | $2,400 |
| 100% of Full Year Quota | $400 × 100% $40,000 | | |
| | | | 100% = $40K |
| | | | 25% = $40K |
| | | | 25% = $60K |
| | | | $140,000 |

*Calculation of the payout rate per 1% of Full Year Quota attainment*
- *Payout Rate for the 0% to 100% zone:* Divide the PCO1 Target Incentive by 100. In the above example $40,000 divided by 100 equals $400 for each 1% of attainment.
- *Payout Rate for the 100% to 125% zone:* Multiple the 0% to 100% payout rate by 4 to get $1,600.
- *Payout Rate for the Above 125% zone:* Multiple the 0% to 100% payout rate by 6 to get $2,400.

*Illustration: Your full year quota is $5M, and your Target Incentive (PCO1) is $40,000*
*Pay Rate per $1,000 of Revenue Attainment Method*



*Calculation of the payout rate per $1,000 of revenue attainment*
- *Payout Rate for the 0% to 100% zone:* Divide the PCO1 Target Incentive by Full Year Quota. In the above example $40,000 divided by $5,000,000 equals $8 for each $1,000 of revenue.
- *Payout Rate for the 100% to 125% zone:* Multiple the 0% to 100% payout rate by 4 to get $32 for each $1,000 of revenue.
- *Payout Rate for the Above 125% zone:* Multiple the 0% to 100% payout rate by 6 to get $48 for each $1,000 of revenue.

7

**Example: Base Pay: $65,600; On Target Earnings: $108,800; Full Year Quota = $8.5M**

|  | Mar | Jun | Sep | Dec |
|---|---|---|---|---|
| Revenue Attained | $1.9M | $4.25M | $9.8M | $13.3M |
| % of Full Year Quota | 22% | 50% | 115% | 156% |
| Base Pay | $16,400 | $32,800 | $49,200 | $65,600 |
| Incentive Pay - PCO1 | $7,782 | $17,408 | $56,115 | $135,373 |
| Incentive Pay - PCO3 | $3,200 | $3,200 | $3,200 | $9,400 |
| Compensation | $27,382 | $53,408 | $108,515 | $210,373 |
| Annual Incentive Pay "at target performance" | | | | $43,520 |
| Incentive Pay Split: PCO1/PCO3 | | | | 80/20 |
| PCO3 Split: Local/Worldwide | | | | 50/50 |
| Annual Quota Incentive at 100% of PCO1 | | | | $34,816 |
| Funding of PCO3 Annual Challenges (uncapped) | | | | $8,704 |

| PCO3 Territory Challenges Assigned (Make/Miss) | Challenge A: Install Linux pilot at XYZ Bank |
|---|---|
| Each $2200 value | Challenge B: Replace Oracle & Microsoft at ABC Factory |
| PCO3 Challenges Available as Contests | Fast Start, Winback, others as announced |

| Quota Zone | Revenue Performance Pay (PCO1): Pay per $1,000 revenue |
|---|---|
| $0 – $8.5M | $4.10 per $1,000 |
| $8.5M – $10.625M | $16.38 per $1,000 |
| $10.625M+ | $24.58 per $1,000 |

## Scenario #1: Year-to-Date Earnings After 3 months

$1.9M sales (22% FY Quota), Challenge A accomplished, $1000 Contest prize won

| Base Salary = $5,467 / month × 3 months = $16,400 |
|---|
| Incentive Pay = $1.9M / $1000 × $4.10 / $1,000 revenue = $7,782 |
| Challenge A Payment = $2,200, Contests = $1,000 |
| Total Year-to-Date Compensation = $27,382 |

## Scenario #2: Year-to-Date Earnings After 6 months

$4.25M sales (50% FY Quota), Challenge A accomplished, $1,000 Contest prize won

| Base Salary = $5,467 / month × 6 months = $32,800 |
|---|
| Incentive Pay = $4.25M / $1,000 × $4.10 / $1,000 revenue = $17,408 |
| Challenge A Payment = $2,200, Contests = $1,000 |
| Total Year-to-Date Compensation = $53,408 |

## Scenario #3: Year-to-Date Earnings After 9 months

$9.8M sales (115% FY Quota), Challenge A accomplished, $1000 Contest prize won

| Base Salary = $5,467 / month × 9 months = $49,200 |
|---|
| Incentive Pay = $56,115 |
| $8.5M / $1,000 × $4.10 / $1,000 revenue = $34,816 |
| $1.3M / $1,000 × $16.38 / $1,000 revenue = $21,299 |
| Challenge A Payment = $2,200, Contests = $1,000 |
| Total Year-to-Date Compensation = $108,515 |

## Scenario #4: Year-to-Date Earnings After 12 months

$13.3M sales (156% FY Quota), Challenges A & B accomplished, $1,000 & $4,000 Contest prizes won

| Base Salary = $5,467 / month × 12 months = $65,600 |
|---|
| Incentive Pay = $135,373 |
| $8.500M / $1,000 × $4.10 / $1,000 revenue = $34,816 |
| $2.125M / $1,000 × $16.38 / $1,000 revenue = $34,816 |
| $2.675M / $1,000 × $24.58 / $1,000 revenue = $65,741 |
| Challenge A Payment = $2,200, Challenge B Payment = $2,200, Contests = $1,000 and $4,000 |
| Total Year-to-Date Compensation = $210,373 |



# 2001 Software Sales Incentive Plan Glossary

As you review the definitions in this section, it's helpful to understand how the elements of your pay work together. Keep in mind that the On-Target Earnings diagram does not contain all elements of your total cash compensation, such as awards or other cash payments.

**Attainment:** Measurement of your cumulative actual sales against your full-year quota.

**Base Salary:** This is the fixed portion of your pay for each pay period.

**Manager (eligibility for accelerators) Rules:** To be eligible for manager accelerators, a manager must have sales reps reporting to him/her (based on the organization chart), and/or sales responsibility and provide business direction to a sales team. The manager is the person who typically sets Personal Contribution Objectives for this sales team, determines Personal Business Commitments (PBCs) for the team, and is responsible for the team's personnel records. The sales manager's quota should equal the sum of the quotas of the sales force reporting to him/her.

**•First Line Manager:** To be considered a first line manager for purposes of qualifying for First Line Manager payout rates, the person must have functional responsibility for a minimum of three sales reps based on the definition above. The second line manager is responsible for ensuring the correct plan assignment at the time the manager is put on the plan. Once the manager is assigned to the First Line Manager payout rates, changes will not be made during the year due to fluctuations in onboard rep headcount or the existence of temporarily open territories.

**•Second Line Manager:** To be considered a second line manager for the purposes of qualifying for Second Line Manager payout rates, the person must have responsibility for a minimum of two sales managers based on the definition above. The VP is responsible for ensuring the correct plan assignment at the time the second line manager is put on the plan. Once the manager is assigned to the Second Line Manager payout rates, changes will not be made during the year due to fluctuations in onboard rep headcount or the existence of temporarily open territories.

**On-Target Earnings (OTE):** Your On-Target Earnings is the sum of your Base Salary plus your Target Incentive. Your Target Incentive is your pay for



OTE (On-Target Earnings) = Base Salary + Target Incentive

Variable Pay

PCOs (Personal Contribution Objectives): The criteria by which performance is measured

Pay Mix: The relative proportions of Base Salary and Target Incentive at 100% attainment of objective

Target Incentive: Sales incentive opportunity for achievement of 100% objectives

Base Salary: Fixed portion of pay

Base Salary

achieving 100% of your Personal Contribution Objectives (PCOs).

**Pay Accelerator:** An increased incentive rate that is earned for every dollar sold above quota.

**Pay Mix:** The ratio of your Base Salary to your Target Incentive at 100% of full-year attainment. For example, a 60/40 plan means that 60% of your On-Target Earnings is Base Salary and 40% is Target Incentive.

**PCO1:** This is the Personal Contribution Objective for revenue.

**PCO2:** This is the Personal Contribution Objective for profit. This element is included in your incentive plan only when profit can be measured.

**PCO3:** This is the Personal Contribution Objective for individual and global challenges.

**PCO Weighting:** The percentage of your full-year Target Incentive that is tied to each Personal Contribution Objective (PCO). Your PCO Weighting is determined by your job role.

**Reference Salary:** What your salary would be if you were taken off incentive.

**Salary Equivalent:** Term used by the U.S. and Canada for Reference Salary.

**Target Incentive:** Your sales incentive opportunity for achievement of 100% of your PCO elements.

**10**

# 2001 Sales Planning Calendar

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
|  | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | 1 |
| 2 | 10 | 11 | 12 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 |  |  |  |  |  |





© International Business Machines Corporation 2001

IBM Corporation
Route 100
Somers , NY 10589

Printed in the United States of America
January, 2001
All Rights Reserved

IBM and the IBM logo are trademarks of International
Business Machines Corporation in the US, other
countries, or both.



Printed on recycled paper containing 10% recovered
post-consumer fiber.

| |
|---|
| Retirement, Region Financial, Royal & Sun Alliance, Sallie Mae, Southern Farm Bureau, |
| SunTrust, Synovus (Vital Processing Service), T Rowe Price, Total Systems, Union Labor Life, Union Planters, United Guaranty, First Tennessee |
| Chase Manhattan (JP Morgan), Alliance Capitol Management, Brown Brothers |
| CIT Group, Credit Suisse First Boston (Pershing), HSBC, Lehman Brothers, MBNA, |
| Moody's, Paine Webber, Reuters, Scudder |
| Bank of Tokyo, Barclay's Bank, CIBC Worldmarkets, Deutsche Bank, |
| Donaldson Lufkin & Jen., Dow Jones, GE Capital, Instinet, Mass Financial Services , |
| National Discount Brokers, Putnam,  Risk Enterprise Mgmt, Sovereign Bancorp, |
| UBS AG, UJB Summit Bancorp, Vanguard, |
| Bank of America,  Compass Bank, First Union, Southtrust, Wachovia |
| American ExpressTSSTM,Bank of New York, Bear Stearns, Depository Trust,Dime Bancorp, Fidelity, |
| Fleet Boston, Goldman Sachs, Lend Lease, Merrill Lynch, Morgan Stanley Dean Witter, NASDAQ |
| State Street, TD Waterhouse, Citicorp (Citibank, Travellers, Solomon Smith Barney, Primerica, |
| Aid Assoc. for Lutherans, Allstate Insurance, American Family, AmerUs Group, American Century |
| Auto Club Insurance, Auto Owners Insurance, Blue Cross of Minn., Chicago Board of Options, |
| Chicago Board of Trade, Chicago Mercantile Exchange, CNAInsurance, Farm Bureau Insurance (MI) |
| Federated Mutual, Firstar, Jackson National Life, Michigan Mutual Insurance (Amerisure), Minnesota Mutual Insurance, Ohio Savings, Principal Life Insurance, Reliastar , St Paul Companies, |
| State Farm Mutual Auto, US Bank,  Wausua Insurance ,American Express, American General |
| Ameritrade, Banc One Corp, Charter One Bank, Conseco, Fifth Third Bancorp, Charles Schwab |
| Fortis Benefits Ins., Great American Ins.,Household International, Huntington Bancshares, Keycorp, |
| Mellon Bank, Mutual of Omaha Ins., National City Corp., Nationwide, Northern Trust Corp., |
| Ohio Casualty Ins., PMA Group, PNC Bank, Progressive Casualty Ins., Provident Mutual Life, |
| Western and Southern Life Ins., Westfield Ins. Co., CalFed (Golden State Bank), ETrade, USAA |
| Aegon, AG Edwards , AON, Beta Systems, Comerica, Cuna Mutual Ins., Farmers Group |
| Discover Card, Edward Jones, First Data, Kemper Companies, LaSalle National Corp., |
| Lincoln Financial Corp., M&I Data (Metavante), MasterCard, Mercantile Bancorp, Mortgage Guaranty |
| Northwestern Mutual Life, RW Baird , TransUnion LLC, Van Kampen Funds, Zurich Ins. |
| Firemans Fund, First Security Service, Franklin Templeton, Oppenheimer Funds, Union Bank of CA, |
| Providian Financial, Visa International, Washington Mutual, Wells Fargo . |
| |

Employee Signature                    Date

Manager Signature                    Date

## 2001 Tivoli Systems Individual Compensation Plan: Territory Definition
(To be used for new territories or changes to existing territories)

## 1. Territory Identification

| Name | Tom Cashman |
|---|---|
| Serial Number | 427563 |
| Region | Finance |
| Date Territory Definition Created | 02/21/01 |
| Territory Effective Period | 01/01/01-12/31/01 |

This Territory definition cancels and replaces any prior Territory definitions for the above mentioned effective period.

## 2. Territory Detail

Territory detail **must** contain specific territory information, including Product, Geography (region, city, state and/or zip) and/or Named Accounts (if applicable).  (Note: **Area Code is not an acceptable parameter**)

Example of Acceptable Territory Definition:  New York, zip codes 10509, 10512, and 10539

Example of Unacceptable Territory Definition:  Southern New York, Westchester County

Product:

Geography: United States

Named Accounts: AFLAC, Amsouth, Astoria Financial, Bank Austria, Cantor Fitzgerald,

Credit Lyonnas, Diawa Securities, Dresdner Bank, nEmigrant Savings, Fuji Bank & Trust,

Greenpoint Financial, Industrial Bank of Japan, Lazard Freres, Neuberger and Berman,

Nikko Securities, Nomura Securities, Rosenthal Group, SG Cowen Securities, SIAC,

Standard & Poors, Sumitomo Bank, Swiss Reinsurance, Warburg Pincus

Assurant (American Bankers) , Branch Bank & Trust, Capitola One Financial, Colonial Bank,

Crawford & Co, Fannie Mae, First Maryland Bancorp, Freddie Mac, Geico, IBM Credit Corp (NC),

ING, Jefferson Pilot, National Council on Comp., NC Farm Bureau Mutual, Northern Trust

Employee Signature                    Date

Manager Signature                     Date

# EMPLOYEE QUOTA LETTER:

## EMPLOYEE DETAILS:

| | |
|---|---|
| Employee Name: | Tom Cashman |
| Employee Serial: | 427563 |
| Employee Manager: | Dunderdale |
| Organization: | FINANCIAL |

## PLAN DETAILS:

| | |
|---|---|
| Plan Type: | SM |
| Job Role: | Tivoli Sales Manager - BUE |
| Plan Effective Date: | 1/1/2001 |
| Territory: | FINANCIAL |
| Date on Quota: | 1/1/2001 |
| Your Pay Mix as a % of On-Target Earnings: | 50/50 |
| Your On-Target Earnings are: | $269,999 |
| Your Target Incentive Pay at 100% Attainment Is:<br>PCO1: 80%<br>PCO3: 20% | $108,000<br>$ 27,000 |

| Component | Weight | Target | Start Date – End Date | Bonus Opp for 100% Attainment (USD) |
|---|---|---|---|---|
| PCO1: Revenue | 100% | $35,500,000 | 1/1/2001 - 12/31/2001 | $108,000 |
| Component* | Criteria | Challenge Opportunity | Start Date – End Date | |
| PCO3A: | SWG Bounty Challenge | http://w3.software.ibm.com/americas/ awards/1QBounty.html | 1/1/01 - 3/31/01 | |
| PCO3B: | SWG Bounty Challenge | http://w3.software.ibm.com/americas/ awards/1QBounty.html | 1/1/01 - 3/31/01 | |

*PCO3 Criteria will be communicated to the field at the beginning of each quarter.

*Right to Modify or Cancel: While IBM's intent is to pay employees covered by this program according to its provisions, this program does not constitute a promise by IBM to make any distributions under it. IBM reserves the right to adjust the program terms or to cancel or otherwise modify the program at any time during the program period, or up until actual payment has been made under the program. Modification or cancellation may be applicable to all persons covered by the program, or to any subset as defined by management. Even though you may be given progress reports regarding plan achievement during the year, no one becomes entitled to any payment in advance of his or her receipt of the payment. Bonus opportunity which includes salary in the calculation reflects the salary in effect the date this letter is sent. However, actual bonus payments will be made based on the salary in effect the date the bonus is earned. The current payment amount appearing on an employee's assessment form will net against any debit balance in the employee's commission account.*

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                          TRIAL COURT OF THE COMMONWEALTH
                                      SUPERIOR COURT DEPARTMENT
                                      CIVIL ACTION NO. 2004-02106-A

—————————————————————————
                                            )
THOMAS CASHMAN,                             )
                                            )
                    Plaintiff,              )
                                            )
        vs.                                 )
                                            )
INTERNATIONAL BUSINESS                      )
MACHINES CORPORATION,                       )
STEVEN A. MILLS, CHARLES ILL,               )
JOHN R. JOYCE, and                          )
GREGORY ENRIQUEZ,                           )
                                            )
                    Defendants.             )
—————————————————————————

## FIRST AMENDED COMPLAINT AND JURY DEMAND

The plaintiff, Thomas Cashman ("Mr. Cashman"), asserts claims arising from his

employment by International Business Machines, Corp. ("IBM") and the actions and

omissions of various of its officers and senior managers based on IBM's failure to pay

Mr. Cashman compensation that he earned pursuant to the terms of his compensation

plan and subsequent retaliation for Mr. Cashman's pursuit of an internal grievance.

### JURISDICTION

1.    Jurisdiction is appropriate pursuant to the Massachusetts Long-Arm

Statute, Mass. Gen. Laws, ch. 223A, §3.

2.    The Massachusetts Wage Act, G.L. ch. 149, §§148, provides, in pertinent

part that, "[t]he president and treasurer of a corporation and any officers or agents having

the management of such corporation shall be deemed to be the employers of the employees of the corporation within the meaning of this section."

### VENUE

3.      Venue is appropriate pursuant to Mass. Gen. Laws, ch. 223, §1.

### FACTS COMMON TO ALL COUNTS

4.      The plaintiff, Thomas Cashman, resides at 375 Westfield Street, Dedham, Massachusetts, Norfolk County, where he also maintains a home office.

5.      Mr. Cashman was an employee of IBM continuously since February 3, 1997 and until he left IBM on November 30, 2004, at which time he held the position of a WWW Business Unit Executive, E-business on Demand Automation, IBM Software Group. Other positions held by Mr. Cashman at IBM which are relevant to the claims brought herein include Director of EMEA Financial Sales with Tivoli Global Financial Services; Tivoli Sales Manager, Business Unit Executive; Director, Financial Vertical, Tivoli Systems, Inc.; Director, Performance, Availability, Configuration and Operations Solutions, Tivoli Systems – Americas.

6.      The defendant, IBM, is a New York corporation and maintains a principal place of business at 1133 Westchester Avenue, White Plains, New York ("IBM Headquarters"). IBM is a foreign corporation registered with the Secretary of State of the Commonwealth of Massachusetts and regularly conducts and solicits business in Massachusetts. Notably, it has a division in Cambridge, Massachusetts known as Lotus Development Corporation. IBM maintains or has maintained offices in the Commonwealth of Massachusetts, including offices in Boston, Cambridge and Waltham, Massachusetts.

7.    The defendant, Charles Ill, was a senior executive at IBM, on information and belief holding, the position of Vice President of Americas Software, at all times relevant to this action. Mr. Ill was the direct line supervisor for Mr. Cashman's direct supervisor, Gregory Enriquez. On or about February 5, 2002, Mr. Cashman filed an Open Door grievance with Mr. Ill respecting IBM's failure to pay his 2001 commissions earned and due and payable pursuant to the 2001 50/50 SWG Sales Plan. Mr. Cashman initiated and received many communications involving Mr. Ill from Mr. Cashman's home office in Massachusetts directly related to the claims central to this action. On information and belief, Mr. Ill is now a sales executive with BEA Systems, Inc., located in San Jose, California. Mr. Ill is an employer of plaintiff as defined by Mass. Gen. Laws, ch. 149 § 148.

8.    The defendant, Steven A. Mills, is Senior Vice President & Group Executive, a position he has held since July of 2000. According to IBM, Mr. Mills is responsible for shaping IBM's overall software strategy and directing its software business. Mr. Mills is responsible for approving the structure of yearly sales plans, and approved the structure of the 2001 50/50 SWG Sales Plan. Mr. Mills maintains an office at IBM headquarters in New York. Upon information and belief, Mr. Mills travels regularly to IBM's offices in Massachusetts, to carryout his duties regarding IBM software. Mr. Mills was in the direct chain of command managing and controlling software sales and commission decisions for IBM, including those complained of by Mr. Cashman in this action. Mr. Mills is an employer of plaintiff as defined by Mass. Gen. Laws, ch. 149 § 148.

3

9.      The defendant, John R. Joyce, at all times relevant to this complaint was a Senior Vice President and Chief Financial Officer of IBM, a position he had held since 1999. Mr. Joyce was responsible for all financial and business development activities of IBM, including those taking place in Massachusetts and including compensation of its employees. Upon information and belief, IBM's Finance and Planning sector, headed by Mr. Joyce, was complicitous in the decision to cut Mr. Cashman's commissions. Mr. Joyce was an employer of plaintiff as defined by Mass. Gen. Laws, ch. 149 § 148.

10.     The defendant, Gregory Enriquez, was the Americas Sales Vice President of Tivoli IBM Software group at all times relevant to this action and was the direct-line supervisor for Mr. Cashman. Mr. Enriquez maintained an office at IBM Americas Software Group Headquarters during his tenure of Vice President. Mr. Enriquez regularly contacted Mr. Cashman by telephone and email at Mr. Cashman's Dedham, Massachusetts home office regarding IBM's business in Massachusetts, and, more precisely the claims raised in this lawsuit. In or about January 2002, Mr. Enriquez telephoned Mr. Cashman at Mr. Cashman's home office in Dedham, Massachusetts and notified him that his 2001 earned and due and payable commissions would be reduced. At all times relevant to this action, Mr. Enriquez was an employer of plaintiff as defined by Mass. Gen. Laws, ch. 149, §148. On information and belief, Mr. Enriquez is currently employed as the Senior Vice President-Worldwide Sales for Stratus Technologies, 111 Powdermill Road, Maynard, Massachusetts 01754.

4

## FACTS COMMON TO ALL COUNTS

### Tivoli IBM Software Group – EMEA

11.    After achieving over 400% of his sales quota at IBM for 1997, Mr. Cashman was asked to take a three-year international assignment with EMEA (a division of IBM, which is an acronym for Europe, Middle East and Africa) that involved being relocated to the Netherlands. IBM directed a dedicated team to sell to substantial institutional targets, largely located in Europe, where IBM determined significant growth opportunities existed for its Tivoli products. Mr. Cashman was appointed to this position because of his demonstrated skill in managing sales involving large, institutional customers of IBM and his ability to close these deals.

12.    Mr. Cashman accepted this position and the substantial burden of relocating to the Netherlands in large part due to the professional and financial opportunities represented to him by IBM.

13.    Mr. Cashman's title was Director of EMEA Financial Sales with Tivoli Global Financial Services. His management team initially included five veteran sales managers. Mr. Cashman's direct line of supervision was up through the IBM Tivoli EMEA organization.

14.    IBM expressly directed Mr. Cashman to develop large, profitable transactions for the company. The team focused on sales to large institutions, principally comprising European banks and insurance companies. The sales structure and revenue targets for this team, as represented by the 1999 Sales Compensation Plan, were aggressive – more so than most similarly situated Tivoli sales teams responsible for other IBM geographical territories.

5

15.     Mr. Cashman's EMEA team each received an individual 1999 Sales Compensation plan modeled on that previously employed by Tivoli, which became very highly leveraged when a salesperson exceeded his or her sales goals by large amounts. A true and accurate copy of Mr. Cashman's plan for 1999 is attached as Exhibit A.

16.     Mr. Cashman worked with Bruno Teuber, IBM Tivoli's Vice President of Sales for EMEA, to design fair sales account responsibilities for each member of Mr. Cashman's team, as well as bonus incentives for the team, to provide true challenges and avoid "windfall" profits to any individual member of the team. The resulting distribution of accounts was particularly challenging to the team because the success of each salesperson, as well as the team, depended on sales a relatively small number of targeted customers.

17.     Over the course of his tenure in this position, Mr. Cashman personally recruited to the team three of the five IBM sales managers and an additional five business consultants with significant ties to the targeted business communities and demonstrated sales ability. In order to recruit this sales talent, Mr. Cashman touted the substantial financial incentives represented by the IBM compensation scheme if the team could produce outstanding sales performance.

18.     By fall of 1999, despite the aggressive goals set by IBM, Mr. Cashman's EMEA sales team performed exceptionally, just as IBM had asked, and was well on its way to exceeding individual and team quotas for the year. As a result of the team's success, IBM was realizing significant revenue.

19.     At this time, Mr. Teuber contacted Mr. Cashman informing him that IBM intended to elevate individual and team quotas so that year-end commissions and other

6

quota-based compensation would be reduced significantly. Mr. Cashman refused to change his team's compensation plans as he believed it would undermine his effectiveness as a manager and leader. He requested Mr. Teuber to reconsider.

20.     Mr. Teuber's next conversation with Mr. Cashman consisted of his informing Mr. Cashman that his compensation plan would be changed to eliminate commissions that Mr. Cashman had earned and that were due and payable. When Mr. Cashman asked whether he had any recourse to appeal the decision, Mr. Teuber told him that he could "go back to America" if he did not accept the reduction.

21.     As Mr. Cashman had rearranged his entire life so that he could be stationed in the Netherlands for three years, he had little option but to stay until he could make other arrangements. Mr. Cashman did begin immediate discussions with his "dotted line" manager back in New York to return to a position with IBM in the United States.

22.     Mr. Teuber initiated a two-fold reduction in the commissions compensation that IBM was obligated to pay Mr. Cashman's team. Rather than reduce quotas, IBM/EMEA resolved to pay the individuals on the team 50% of the commissions compensation they earned on large transactions, rather than the 100% due per their sales compensation plans. To reduce Mr. Cashman's commission compensation, which was based on team sales, rather than the leveraged overachievement commissions compensation articulated by his compensation plan, IBM paid him a lesser percentage for every dollar that his team sold above 186% of its quota for the year.

23.     Based on his sales quota of $28 million contained in his 1999 Sales Compensation Plan, and his actual sales for the year of $103.4 million, Mr. Cashman

would have earned approximately $1,582,200 in base salary and commissions for the year. Instead, with IBM/EMEA's end-of-the-year changes to his sales plan, his earnings were cut to $845,100, which cost Mr. Cashman at least $737,100 in earned commissions.

### Tivoli IBM Software Group Sales – Massachusetts

24. In February of 2000, Mr. Cashman returned to the United States to rebuild the Tivoli Finance Vertical Team, which sold mostly to banking, insurance and brokerage institutions. Mr. Cashman faced significant challenges in this new position.

25. The first hurdle faced by Mr. Cashman in making his team successful was significant turnover in the software industry that was occurring at the time he took the reigns. The opportunities available in the computer software industry at the zenith of the dot com expansion to make significant sums of money attracted many good salespeople away from IBM in the 1999-2000 period.

26. The Tivoli product line had also suffered recent setbacks that led to customer dissatisfaction, including, significantly, IBM's sale of Tivoli's customer help desk, which had been portrayed as the core of Tivoli's management strategy for sales to large institutional customers. As a result, when Mr. Cashman returned to lead this team, many customers who had made significant Tivoli purchases in the preceding few years, had yet to deploy the systems (a problem known in the industry as "shelfware"). These frustrated customers required substantial attention from Mr. Cashman and his team merely to digest their prior purchases and integrate Tivoli products into their businesses.

27. Despite the constant turnover and existing customer unrest, Mr. Cashman's team was one of the only two sales teams on a regional level to achieve its sales quota.

28.     In 2001, IBM took action to bring the Tivoli sector of its business (which was wholly owned by IBM since approximately 1996), including the sales operation, in line with the other IBM software divisions. For sales, this meant that Tivoli's field sales personnel was compensated for the first time pursuant to the IBM SWG [software group] Sales Plans. The one that applied to Mr. Cashman and his team, which were "direct, field sales personnel" was entitled the "50/50 SWG Sales Plan." A true and accurate copy of the 50/50 SWG Sales Plan for 2001 ("Sales Plan") is attached hereto as <u>Exhibit B</u>.

29.     Essentially, the Sales Plan provided three sources of compensation for sales personnel to which it applied. Fifty per cent of a salesperson's compensation was considered base pay, or fixed portion of compensation that was to be paid semi-monthly. The other 50% of the "On Target Earnings" ("OTE") (total compensation available if salesperson achieved 100% of his or her quota) was divided between commissions and bonus-type opportunities. A final component of Total Cash Compensation (as defined by IBM) under the Sales Plan included any monies earned for "overachievement", sales in excess of 100% of an individual's or team's quota, which were generally paid out at a higher percentage of sales as the overachievement sales grew.

30.     IBM's software group ("SWG") made an express and concerted effort in 2001 to embrace and excite the Tivoli Americas Sales force of which Mr. Cashman's team was a prominent part. As is evident in the SWG management guidelines and communications from upper-tier SWG executives, IBM understood that it was suffering from attrition of its sales force and needed to stop this loss by providing aggressive

commission opportunities for its salespeople to compete with financial incentives offered by competitors the marketplace.

31.  On the cover of the IBM document that was provided to all sales staff by IBM to set out the benefits of the 50/50 SWG plan, "industry consultants" are quoted as saying, "your plan 'has some of the most aggressive rewards for overachievement in the industry.'"

32.  On the inside cover of the Sales Plan, in a message from Dan Lautenbach, Vice President, Worldwide Software Sales for IBM, he encourages, "[t]he software sales incentive plan recognizes the unique opportunities our sales force can identify and close this year. It is characterized by extremely high payout rates for business you close in excess of your assigned full year quota. And, because your sales plan is based on a self-funding model, *there are no caps to your earnings: the more you sell, the more revenue and incremental profit for IBM: and the more earnings for you.*" Emphasis supplied.

33.  The Sales Plan also included a listing of principles that guide the "Software Sales Incentive Plan," including, that "[t]he plan should be competitive with the software industry marketplace,' and "[t]he plan should be consistent with industry practice in key areas of uncapped earnings, earnings at first sale, and attractive upside opportunity."

34.  With respect to managers, IBM recognized in the Sales Plan that "[t]he plan should motivate Technical Support and Sales Management in a manner consistent with the team they support."

35.  The Sales Plan is replete with statements from IBM further emphasizing the "sky's-the-limit" approach to an individual salesperson's earnings for 2001. For

example Mr. Cashman and his team were promised, "[w]e have great expectations for a fantastic sales year with unlimited possibilities for you. There's no limit to your 2001 sales incentive opportunity;" "Your earnings for performance above quota continue to be uncapped in 2001;" "As soon as you start overachieving your full-year quota, the plan provides significant leverage to reward your performance. And, your earnings for attainment above 100% are uncapped." "You want to earn as much money as you can. We want that too, because when you win, IBM wins." Exhibit B.

36.    IBM also expressly recognized that its own gain was directly related to the overachievement of its salespeople. The Sales Plan states, "Revenue drives value for IBM. That's why the revenue measure is the largest portion of the incentive plan for most job roles. Double-digit revenue growth is one of our core business objectives, and we're making sure the Sales Incentive Plan pays you for helping achieve this goal." *Id.*

37.    For second-line sales managers like Mr. Cashman, his performance over 100% of his quota was even more highly rewarded in that the Sales Plan provided, "sales managers have accelerators that are greater than those for sales employees." In other words, the more sales revenue generated by a second line manager's team, the greater the percentage he or she would earn in commissions.

38.    In the example provided on page 6 of the Sales Plan, IBM specifically notes that when a manager generates revenue through his team that is above 120% of his full year quota, he or she earns commissions compensation at 12 times the rate for attainment compensation, which is "uncapped." (Sales Plan, p. 5).

39.    IBM's message of unbounded earnings potential for sales personnel who over achieve was echoed in all communications to Mr. Cashman concerning quotas, sales

plans and territories. Steven Mills, then the Senior Vice President and Group Executive for IBM SWG, wrote to hundreds of his sales managers on January 4, 2001 by email (including Mr. Cashman at his Massachusetts office) to preview the year's message. He stated, "we have put in significant effort to insure that quota's are reasonable and that we are delivering a sales plan that will provide a big payoff for those who can drive growth. Paying for growth is the key idea. Giving people the opportunity for significant financial reward is part of the excitement of winning."

40.    IBM repeatedly reinforced that IBM wanted to retain its sales force by providing financial incentives. At E-business University in 2001, a sales rally held at the beginning of every calendar year to excite the sales force, Steven Mills acknowledged, "We lost some good people. We cannot afford to have that happen in the year 2001. So we're going to focus our time, our effort, our energy into everything that goes into having a high performance sales team that is excited about selling for this organization, that's committed to this organization and who wants to be here a year from now."

41.    Mr. Mills also stated in his January 4, 2001 email, "[g]iven what happened to us in 2000, we MUST instill confidence that IBM SWG will be the software company to be a part of in 2001. The key to our success this year will be to retain our reps . . . How we treat our sales force this year and their growing commitment to our common goals will be key to driving the growth of IBM software."

42.    Mr. Mills recognized that financial success was at the heart of IBM's sales and retention plan. He said in his E-University speech, "That's what this year's sales plan is all about. It's about making money. It's about leverage . . . It's about a plan and a quota when combine[d] that causes you to put every last bit of effort into making this the

12

most successful financial year in your lives . . . The sales plan and the quotas together are all about how you're going to want to be here a year from now . . . you're going to want to be here because this is the best place to sell, with the best sales plan, with a tremendous opportunity for leverage."

43.    Nowhere in any of the sales plan materials that Mr. Cashman received or had access to was there any mention of a subjective judgment regarding a manager's level of involvement in a sales transaction in order for the revenue generated to be counted as part of a sales manager's quota.

44.    In February of 2001, Mr. Cashman was provided his target account list by an IBM account analyst. Mr. Cashman received his individual quota letter and compensation plan from John Dunderdale, the outgoing Vice President of Sales for Tivoli Americas in early March of 2001. True and accurate copies of both are attached hereto as Exhibit C. Mr. Cashman's quota was $35.5 million in sales.

45.    Despite Mr. Cashman taking on additional responsibilities as IBM's Director of Performance, Availability, Configuration and Operations products for the Americas in August of 2001, Mr. Cashman and his Financial Vertical team attained nearly $70 million in sales for 2001, which, in accordance with the Sales Plan should been used to figure Mr. Cashman's Total Cash Compensation for 2001.

46.    However, in January of 2002, Mr. Enriquez, the IBM executive to which Mr. Cashman reported directly, called Mr. Cashman at his home office in Dedham, Massachusetts and indicated that IBM did not intend to pay him the commission compensation that he had earned and that was due and payable.

47.     Directly thereafter, at the IBM 2002 E-Business University sales rally, Mr. Enriquez approached Mr. Cashman, again confirming that his compensation would be reduced for 2001, and warning Mr. Cashman that he could not speak about the impending reductions with anyone.

48.     Shortly thereafter, Mr. Cashman learned that IBM's financial commission specialist responsible for tracking Mr. Cashman's sales was told by Mr. Enriquez to reduce the sales attributable to Mr. Cashman so that his resulting commission compensation, already earned and due and payable, would be cut. On Mr. Enriquez' order, Mr. Cashman's attainment earnings were reduced to approximately $57 million, thereby resulting in a loss in commission compensation of approximately $375,000.00.

49.     Despite IBM's backdoor attempts to reduce compensation to Mr. Cashman and other sales staff retrospectively and in contravention of the Sales Plan, IBM, through Mr. Mills, promised its salespeople at the January 2002 E-Business rally that its commitments from the prior year would be honored and that the sales staff should keep on selling.

<u>Grievance Process</u>

50.     For many years, IBM had a published internal grievance procedure known as the "Open Door Policy," which claimed to have been available to IBM employees who did not believe that they had been treated appropriately.

51.     Mr. Cashman discussed initiating an Open-Door grievance with his Human Resources representative, Michael Schade, but expressed some reservation about possible negative ramifications to his IBM career long-term if he filed a complaint. Mr. Schade assured him that IBM would not tolerate any form of reprisal. Mr. Cashman

14

began the Open-Door process by filing a grievance on February 5, 2002 with Charles Ill,

the Vice President of Americas Software for IBM at the time and a superior to Mr.

Enriquez.

52.    Mr. Ill followed neither the processes nor the timeline outlined by the

published Open-Door materials. While he did restore a small portion of Mr. Cashman's

attained sales months after the grievance was filed, the lion's share of the sales that had

been de-credited were not restored.

53.    On June 12, 2002, Mr. Cashman filed an appeal of Mr. Ill's determination.

Despite Mr. Cashman's best efforts to track the appeal, it took until November of 2002

before Mr. Cashman was merely told verbally that his appeal was denied.

54.    After Mr. Cashman complained in 2002 about the reduction in his 2001

compensation, he was removed from IBM's Executive Resource list by Mr. Enriquez,

who also refused to give him the highest rating on his performance evaluation for 2001,

despite that another IBM Executive did give him the highest rating for the same period.

Mr. Enriquez had confirmed for Mr. Cashman that his name appeared on that list in

August of 2001. As a result, Mr. Cashman has not been considered for an Executive

Management position. Mr. Enriquez also made negative comments about Mr. Cashman

to his subsequent manager and others at IBM after Mr. Cashman refused to accept cuts to

his compensation and initiated the internal grievance procedure.

55.    Since filing the Open-Door grievance, IBM has also consistently passed

Mr. Cashman over for advancement, taken away his management responsibilities, and

assigned him to positions that were not commensurate with his experience.

## COUNT I
### (Breach of Contract -- IBM)

56.     The plaintiff repeats and realleges all averments in paragraphs 1 through 55 as if fully set forth herein.

57.     IBM had a contract with Mr. Cashman for 1999 that dictated how his compensation would be paid for services rendered as an employee of IBM.

58.     Mr. Cashman performed all of his obligations pursuant to that contract.

59.     IBM breached that contract by failing to pay Mr. Cashman as required by the terms of the contract.

60.     As a result, Mr. Cashman has been damaged.

## COUNT II
### (Unjust Enrichment/Quantum Meruit -- IBM)

61.     The plaintiff repeats and realleges all averments in paragraphs 1 through 60 as if fully set forth herein

62.     Mr. Cashman rendered valuable services to IBM in 1999;

63.     IBM accepted Mr. Cashman's services and used, enjoyed, and profited by them;

64.     IBM should reasonably have expected that it would have to pay Mr. Cashman his full compensation for the services he rendered;

65.     Mr. Cashman reasonably expected to be paid full compensation for the services he rendered.

66.     IBM was unjustly enriched by receiving the benefit of Mr. Cashman's services while refusing to pay his full compensation.

**COUNT III**
**(Breach of Contract -- IBM)**

67.    The plaintiff repeats and realleges all averments in paragraphs 1 through 66 as if fully set forth herein.

68.    IBM had a contract with Mr. Cashman for 2001 that dictated how his compensation would be paid for services rendered as an employee of IBM.

69.    Mr. Cashman performed all of his obligations pursuant to that contract.

70.    IBM breached that contract by failing to pay Mr. Cashman as required by the terms of the contract.

71.    As a result, Mr. Cashman has been damaged.

**COUNT IV**
**(Unjust Enrichment/Quantum Meruit – IBM)**

72.    The plaintiff repeats and realleges all averments in paragraphs 1 through 71 as if fully set forth herein.

73.    Mr. Cashman rendered valuable services to IBM in 2001.

74.    IBM accepted Mr. Cashman's services and used, enjoyed, and profited by them.

75.    IBM should reasonably have expected that it would have to pay Mr. Cashman his full compensation for the services he rendered.

76.    Mr. Cashman reasonably expected to be paid full compensation for the services he rendered.

77.    IBM was unjustly enriched by receiving the benefit of Mr. Cashman's services while refusing to pay his full compensation.

17

## COUNT V

### (Violations of Mass. Gen. Laws ch. 149, §§ 148, 148A, 150 – IBM, Ill, Mills, Joyce and Enriquez)

78.    The plaintiff repeats and realleges all averments in paragraphs 1 through 77 as if fully set forth herein.

79.    Mr. Cashman earned compensation pursuant to IBM's 2001 SWG 50/50 Sales Plan, which remains unpaid despite verbal and written demands.

80.    The unpaid compensation is covered by G.L. c. 149, § 148.

81.    IBM is an employer within the meaning of G.L. c. 149, § 148.

82.    Mssrs. Ill, Mills, Joyce and Enriquez are or were for relevant times officers or agents of IBM within the meaning of G.L. c. 149, § 148.

83.    Defendants failed to pay Mr. Cashman his compensation which had become due and payable at the close of 2001, even after he requested payment of the sums due both verbally and in writing and followed IBM's published "Open-Door" grievance procedure.

84.    As more fully described above, in violation of Mass. Gen. Laws, ch. 149, §148A, Mr. Cashman suffered retaliation by the Defendants for taking action to recover his compensation including but not limited to being removed from IBM's Executive Resource List.

85.    Mr. Cashman has suffered harm as a result of the Defendants' conduct, in violation of M.G.L. ch. 149, §§148, 148A and 150.  Mr. Cashman has applied to and received authorization from the Office of the Attorney General, Commonwealth of Massachusetts, Fair Labor and Business Practices Division, to prosecute this claim.

**COUNT VI**
**(Interference with Advantageous Business Relations – Enriquez)**

86.    The plaintiff repeats and realleges all averments in paragraphs 1 through 85 as if fully set forth herein.

87.    Mr. Cashman's name had been added to the list from which IBM appointed executives internally("Executive Resource List") in 2001. A prerequisite for such an appointment was that an employee's name appear on this list.

88.    Mr. Enriquez was aware that Mr. Cashman's name was on the Executive Resource List and that to remain on the list Mr. Cashman's performance rating needed to remain at the highest level.

89.    In 2001, Mr. Cashman exceeded his team sales quota by nearly 100% and was rated at the highest level by Thomas Wroblewski, an IBM sales executive to which Mr. Cashman answered.

90.    In 2002, after Mr. Cashman protested the refiguring of his sales such that his commissions would be improperly reduced, and his commencement of an Open-Door grievance, Mr. Enriquez willfully, intentionally and with malice refused to give Mr. Cashman the highest rating for his 2001 performance so that he could not remain on the Executive Resource List and proceeded to spread false rumors and degrading comments about Mr. Cashman to other executives at IBM to damage his ability to succeed at the company.

91.    Mr. Enriquez's decision with respect to Mr. Cashman's performance was unlawfully calculated to cause Mr. Cashman damage and loss.

92.    As a result of Mr. Enriquez's actions, Mr. Cashman has suffered damage and loss.

WHEREFORE, the plaintiff, Thomas Cashman requests this court to:

1.    Enter judgment for Thomas Cashman against defendants on all counts of the Complaint;

2.    Award damages to Thomas Cashman in an amount determined by the court;

3.    Award treble damages, interest, costs, and attorneys' fees to Thomas Cashman pursuant to Count V of the Complaint, and,

4.    Award such other relief as this Court deems just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL COUNTS SO TRIABLE.**

THOMAS CASHMAN
By his attorneys,

Charles R. Bennett, Jr., BBO #037380
Kathleen E. Cross, BBO #556934
Sharon H. Patton, BBO #634780

HANIFY & KING
Professional Corporation
One Beacon Street
Boston, MA  02108
(617) 423-0400

DATED: January 7, 2005

406935

Exhibit A

 

**PRIVATE & CONFIDENTIAL**

12 May 1999

Mr T Cashman
Keizersgracht 361 D
1016 EJ
Amsterdam

Dear Tom

### RE: COMPENSATION REVIEW

I have recently spent some time reviewing your compensation and I have great pleasure in confirming that your base salary will increase to £60,000, also your on target commissions will increase to £80,000 with effect from 1 January 1999.   All your other existing terms and conditions of employment remain unchanged.

May I take this opportunity to thank you personally for your continued support and contribution both to the function and the Tivoli organisation as a whole.

Kind regards

Yours sincerely

Steve Standring
**Director, Verticals**

CC:    Personnel File
       Payroll

Tivoli Systems (UK) Ltd.
Sefton Park
Bells Hill
Stoke Poges
Bucks
SL2 4HD

Tel: 01753 896896
Fax: 01753 896899

Registered in England. No. 3128044
16-20 Ely Place, London, EC1N 6SN

Exhibit B

*Exhibit B*



# *Welcome to the fabulous world of your 2001 Software Sales Incentive Plan*

*Information you must have if you have a software sales quota . . .*
This is the place to learn about the new improved incentive plan that recognizes your high value to the IBM Software Group.



*According to industry consultants ...*
Your plan "has some of the most aggressive rewards for overachievement in the industry"

A few minutes of reading will help you understand how to calculate your earnings under the 2001 sales plan, and why IBM Software is the place to be in 2001.



**Letter from the desk of Dan Lautenbach...**
**VP, Worldwide Software Sales**

You should be very excited about the unique software sales incentive plan that covers our sales representatives and sales managers for 2001. It's better than both the 2000 and 1999 plans. Compensation consultants who specialize in the software industry tell us it is really pushing the edge when it comes to rewarding overachievement. And, I think you have a superb opportunity to perform at an above-quota level this year.

This booklet explains the basic principles that guided design of the new plan, and provides information to help you understand how the plan works ... for you and for IBM.

The most important thing to understand is your importance to IBM's software business. Your plan is custom-designed to reflect the reality of the software industry, our competitors, and customer requirements for IBM's outstanding offerings.

The software sales incentive plan recognizes the unique opportunities our sales force can identify and close this year. It is characterized by extremely high payout rates for business you close in excess of your assigned full year quota.

And, because your sales plan is based on a self-funding model, there are no caps to your earnings: the more you sell, the more revenue and incremental profit for IBM; and the more earnings for you.

I encourage you to read this important booklet. I believe you will be convinced that you are in the right place, at the right time, in our company.

I know I can count on each of you for a fast start and focused sales efforts throughout the year. Our collective efforts can assure a great year for the company, and for each of us.

Thanks for your efforts so far, and best wishes for a healthy and happy 2001.


Dan

# The Software Group Sales Incentive Plan Principles:

A set of basic principles guide development of your Software Sales Incentive Plan. The design point for 2001: a plan that motivates you to overachieve assigned targets; a plan that compensates you for outstanding performance; and a plan that attracts and retains top sales talent by delivering competitive compensation.

I.   *The plan should reinforce IBM's software business strategy*

II.  *The plan should be simple to understand and communicate*

III. *The plan should be competitive with the software industry marketplace*

IV.  *The plan should be consistent with industry practice in key areas of uncapped earnings, earnings at first sale, and attractive upside opportunity*

V.   *The plan should motivate Technical Support and Sales Management in a manner consistent with the team they support*

VI.  *The plan should be tested against the prior year's plan and the current year's expectations*

VII. *The plan should address unique country environments*

---

**Table of Contents**

Important Changes for 2001 ............................4
Framework and Terminology .........................5
Performance Measures ...............................6
How Payout Rates Work .............................7
Sales Plan Example ................................8
Glossary .........................................10

---

**Please visit your new Sales Incentives site on the intranet. We'll soon be adding lots of useful content that helps you focus on big payout opportunities, and easily calculate your earnings.**

*w3.ibm.com/software/sales/saletool.nsf/salestools/sales+incentives*



# Your 2001 Software Sales Incentive Plan

**Easy to understand. Easy to love.**

You talked. We listened. The result: new and improved features for the 2001 Software Sales Incentive Plan. We have great expectations for a fantastic sales year with unlimited possibilities for you. There's no limit to your 2001 sales incentive opportunity.

This booklet will help you understand how your Sales Incentive Plan works, how your performance is measured, how to calculate earnings, and how much money you can make.

## Important Changes for 2001

Your performance is important, and the new plan emphasizes greater pay for higher levels of performance.

## You get paid more from the first sale

The 2001 payout table pays 1% of your target incentive for every 1% attainment when you are at or below 100% of quota for PCO1. In 2000, the payout rate was just 0.5% when you were below 80% of quota. Changing to 1% for attainment at or below 100% attainment of quota reduces the complexity of the plan and makes it easier for you to estimate your pay.

## You get paid for attainment against full-year quota

You will be paid based on attainment against your full-year quota instead of attainment against a year-to-date quota. This change eliminates the concept of "seasonal" or quarterly skews. The full-year pay methodology encourages driving business earlier in the year because the accelerators apply when you exceed 100% of your full-year quota. Because quarterly results are still very important to IBM, your manager will be able to use PCO3 challenges to focus on quarterly initiatives.

## You get paid at higher payout rates above 100% of full-year quota

As in 2000, you have an accelerator for attainment above your quota; however, this year, the accelerator will apply when you achieve your full-year quota, as opposed to when you've reached your year-to-date quota. Your earnings for performance above quota continue to be uncapped in 2001.

## Calculation of your incentive payments is easy under the 2001 Plan

The year-to-date method used in 2000 created complexities because of fluctuations in performance during the year, and was a major cause of debit balances — situations in which sales reps owed IBM money.

## Sales Matter – You Matter

No one needs to tell you that you are the front line at IBM. Our success depends on you and your ability to sell products and services to our customers. It's straightforward: no sales, no customers, no growth, no IBM. Your sales success creates value for our shareholders and for you. The 2001 Sales Incentive Plan encourages you to drive sales.

**4**

## The 2001 Software Sales Incentive Plan Framework and Terminology
(See Software Sales Incentive Plan Glossary on page 10 for definitions).



## Pay Mix for Software Sales Plans

Pay Mix is the ratio of your Base Salary to your Target Incentive. A higher proportion of your pay on Target Incentive means more pay is at risk, with greater upside earnings potential. Pay Mix varies by job role and geography.

|              | SAM   | Pillar | Partner           | Technical |
|--------------|-------|--------|-------------------|-----------|
| Americas     | 60/40 | 60/40  | 60/40 and 70/30   | 75/25     |
| Asia Pacific | 60/40 | 50/50  | 60/40 and 70/30   | 75/25     |
| Japan        | 60/40 | 60/40  | 60/40 and 70/30   | 90/10     |
| EMEA         | 60/40 | 50/50  | 60/40 and 70/30   | 75/25     |
| Europe North | 50/50 | 50/50  | 60/40 and 70/30   | 75/25     |

## PCO Weightings for Software Sales Plans

Your Target Incentive has two components or Personal Contribution Objectives (PCOs). The split between PCO1 (Revenue) and PCO3 (Challenges) is generally 80/20. You earn eighty percent of your Target Incentive amount when you reach 100% of your full-year revenue quota.

## Payout Tables for Software Sales Plans

Sales employees around the world say they don't always understand how to calculate sales incentive payments. There are three payout rates that apply to your PCO1 performance measurement.

The payout rate when you are at or below 100% attainment of your full-year quota: For every 1% attainment against your full-year quota, you earn 1% of your PCO1 Target Incentive. At 100% quota achievement, you receive 100% of your Target Incentive for PCO1.

Higher payout rates apply when you are above 100% attainment of your full-year quota: As soon as you start overachieving your full-year quota, the plan provides significant leverage to reward your performance. And, your earnings for attainment above 100% are uncapped.



**Payout Table for Software Sales Representatives:**

| Quota Zone | 0% - 100% | 100% - 125% | Above 125% |
|---|---|---|---|
| Payout Rate | 1% | 4% | 6% |

**Payout Table for Software Sales Managers:**

In recognition of their large quotas and added responsibilities, sales managers have accelerators that are greater than those for sales employees.

| Quota Zone | 0% - 100% | 100% - 120% | Above 120% |
|---|---|---|---|
| FLM Payout Rate | 1% | 5% | 7.5% |
| SLM Payout Rate | 1% | 8% | 12% |

FLM = First Line Manager; SLM = Second Line Manager

Note: Not all employees with "manager" titles are considered managers for purposes of this plan. See the Glossary for eligibility rules for manager accelerators.

## More About the Plan

You can learn more about how you get paid by viewing the Sales Plan Example on pages 8 and 9. It illustrates how to estimate the payout of an individual transaction, and how to estimate total earnings.

## Performance Measures Used to State Personal Contribution Objectives

You want to earn as much money as you can. We want that too, because when you win, IBM wins. Sounds simple enough, so how do we get there? One of our goals is to make sure you get paid for doing what matters most to our business. The 2001 Sales Incentive Plan consists of Personal Contribution Objectives (PCOs) for your specific job role. Personal Contribution Objectives are defined as follows:

## • PCO1: It's All About Revenue

Revenue drives value for IBM. That's why the revenue measure is the largest portion of the incentive plan for most job roles. Double-digit revenue growth is one of our core business objectives, and we're making sure the Sales Incentive Plan pays you for helping achieve this goal.

## • PCO3: Challenges Beyond the Numbers

Making financial goals is key to our success, but it doesn't end there. We want to reward you for focusing on specific sales-related activities: closing high-profit transactions, moving into "white space" or using alternative sales channels to name a few. A portion of your Target Incentive is tied to individual and global challenges.

- *Individual Challenges:* Your managers know your opportunities best. That's why your first and second line managers will set challenges specifically for you.
- *Global Challenges:* Part of your incentive will be based on your achievement against global challenges, set by the Worldwide Software Sales Leader.

## 2001 Sales Incentive Plan for the Software Technical Sales Support Role

Pay Mix, the ratio of your Base Salary to your Target Incentive, is 75/25. Your PCO weightings align with the sales force you support, and your payout table will be the same as that of the sales force. In cases where team quotas are assigned, your individual payments will be made based on management assessment of your contribution.

## Incentive Payments Based on Your Performance: How Payout Rates Work

There are two easy-to-understand techniques you can use to calculate your pay: Payout Rate per $1,000 of revenue attainment, and Payout Rate per 1% attainment of your full-year quota. The same incentive payment amount is calculated by these two methods.

*Illustration: Your full year quota is $5M, and your Target Incentive (PCO1) is $40,000*
*Pay Rate per 1% Attainment of Full Year Quota Method*

| | 0% - 100% of Full Year Quota | 100% - 125% of Full Year Quota | Above 125% of Full Year Quota |
|---|---|---|---|
| 1% of Full Year Quota Earns | $400 | $1,600 | $2,400 |
| 100% of Full Year Quota | $400 x 100% = $40,000 | | |
| | | $1,600 | |
| | | | 100% = $40K |
| | | | 125% = $40K |
| | | | 25% = $60K |
| | | | $140,000 |

*Calculation of the payout rate per 1% of Full Year Quota attainment*
- *Payout Rate for the 0% to 100% zone:* Divide the PCO1 Target Incentive by 100. In the above example $40,000 divided by 100 equals $400 for each 1% of attainment.
- *Payout Rate for the 100% to 125% zone:* Multiple the 0% to 100% payout rate by 4 to get $1,600.
- *Payout Rate for the Above 125% zone:* Multiple the 0% to 100% payout rate by 6 to get $2,400.

*Illustration: Your full year quota is $5M, and your Target Incentive (PCO1) is $40,000*
*Pay Rate per $1,000 of Revenue Attainment Method*



*Calculation of the payout rate per $1,000 of revenue attainment*
- *Payout Rate for the 0% to 100% zone:* Divide the PCO1 Target Incentive by Full Year Quota. In the above example $40,000 divided by $5,000,000 equals $8 for each $1,000 of revenue.
- *Payout Rate for the 100% to 125% zone:* Multiple the 0% to 100% payout rate by 4 to get $32 for each $1,000 of revenue.
- *Payout Rate for the Above 125% zone:* Multiple the 0% to 100% payout rate by 6 to get $48 for each $1,000 of revenue.



## Example for a Software Account Manager

Your 2001 Compensation Plan is designed to help you achieve financial success, as you contribute to the growth of IBM's software revenues. You're wondering, "How much will I make for closing a deal?" The following example illustrates how the value of many deals adds up in your full-year, quarterly or monthly sales incentive earnings. The key ingredients for the example are: How much did you sell? What is your full-year revenue quota (PCO1)? What is your full-year PCO1 Target Incentive pay?

*Disclaimer: This example is provided for illustration purposes only. Actual sales incentive payments will be different than the numbers displayed here. In cases of conflict between what is shown in this booklet and local documentation, local plan documentation prevails.*

## Quota and Territory Management

Successful growth is the result of focusing resources and attention in a disciplined manner over an extended period of time. Sales enablement programs, solution selling training, marketing activities, and sales collateral help you identify opportunities and take actions that can maximize your effectiveness. You are well positioned for 2001. As an active participant in the software industry, and as a Software Account Manager in IBM's Software Group, you can really make a positive contribution to customers. You can sell leadership products and solutions — and with the 2001 sales plan, you have the opportunity for outstanding professional and financial success.

## Comparison of Your Plan to the Industry

Consultant studies indicate the design of your plan is consistent with the plans used by sales professionals throughout the software industry. What's more important ... Your opportunity to earn really big money due to above quota performance is greater, because your overachievement payout rates are significantly higher than industry practice.

| In this zone -> | 0% - 100% of Full Year Quota | 100% - 125% of Full Year Quota | Above 125% of Full Year Quota |
|---|---|---|---|
| For each $1000 of revenue, You earn: | 1X | 4X | 6X no earnings cap |

*Note: 1X is calculated based on your Full Year Quota and PCO1 Target Incentive Pay.*
*Note: Accelerators may also be expressed in terms of percentages: 1% of PCO1 Target Incentive is paid for each 1% of Full Year Quota attainment between 0% and 100% of Full Year Quota; 4% is paid for attainment between 100% and 125%; 6% is paid for attainment above 125% of Full Year Quota.*

## Software Account Manager Illustration

(Note: your quota, territory management, and earnings details will differ from this illustration)
You are assigned an $8,500,000 full-year revenue quota, and two territory challenges; and you are eligible for local and worldwide sales contests. Your sales plan has the following characteristics: a "60/40" Base/Incentive Pay Mix; an "80/20" PCO1/PCO3 Incentive Split; a "50/50" Worldwide/Local Manager PCO3 Split; and you have the opportunity to earn very substantial additional pay for quota overachievement.
Compensation is based on your Base Pay, an On-Target Earnings level that reflects IBM's practice of paying sales professionals at a higher rate than other employees who are not on a sales plan, and your sales performance as a percentage of your full-year revenue quota. Attainment of assigned territory objectives, and achievement against available contest targets add to your earnings. Your earnings are easily calculated, and increase dramatically as soon as you start to overachieve your full-year revenue target.

**Example: Base Pay: $65,600; On Target Earnings: $108,800; Full Year Quota = $8.5M**

| | Mar | Jun | Sep | Dec |
|---|---|---|---|---|
| Revenue Attained | $1.9M | $4.25M | $9.8M | $13.3M |
| % of Full Year Quota | 22% | 50% | 115% | 156% |
| Base Pay | $16,400 | $32,800 | $49,200 | $65,600 |
| Incentive Pay - PCO1 | $7,782 | $17,408 | $56,115 | $135,373 |
| Incentive Pay - PCO3 | $3,200 | $3,200 | $3,200 | $9,400 |
| Compensation | $27,382 | $53,408 | $108,515 | $210,373 |

| | |
|---|---|
| Annual Incentive Pay "at target performance" | $43,520 |
| Incentive Pay Split: PCO1/PCO3 | 80/20 |
| PCO3 Split: Local/Worldwide | 50/50 |
| Annual Quota Incentive at 100% of PCO1 | $34,816 |
| Funding of PCO3 Annual Challenges (uncapped) | $8,704 |
| PCO3 Territory Challenges Assigned (Make/Miss) | Challenge A: Install Linux pilot at XYZ Bank |
| Each $2200 value | Challenge B: Replace Oracle & Microsoft at ABC Factory |
| PCO3 Challenges Available as Contests | Fast Start, Winback, others as announced |
| Quota Zone | Revenue Performance Pay (PCO1): Pay per $1,000 revenue |
| $0 - $8.5M | $4.10 per $1,000 |
| $8.5M - $10.625M | $16.38 per $1,000 |
| $10.625M+ | $24.58 per $1,000 |

**Scenario #1: Year-to-Date Earnings After 3 months**

$1.9M sales (22% FY Quota), Challenge A accomplished, $1000 Contest prize won

| |
|---|
| Base Salary = $5,467 / month × 3 months = $16,400 |
| Incentive Pay = $1.9M / $1000 × $4.10 / $1,000 revenue = $7,782 |
| Challenge A Payment = $2,200, Contests = $1,000 |
| Total Year-to-Date Compensation = $27,382 |

**Scenario #2: Year-to-Date Earnings After 6 months**

$4.25M sales (50% FY Quota), Challenge A accomplished, $1,000 Contest prize won

| |
|---|
| Base Salary = $5,467 / month × 6 months = $32,800 |
| Incentive Pay = $4.25M / $1,000 × $4.10 / $1,000 revenue = $17,408 |
| Challenge A Payment = $2,200, Contests = $1,000 |
| Total Year-to-Date Compensation = $53,408 |

**Scenario #3: Year-to-Date Earnings After 9 months**

$9.8M sales (115% FY Quota), Challenge A accomplished, $1000 Contest prize won

| |
|---|
| Base Salary = $5,467 / month × 9 months = $49,200 |
| Incentive Pay = $56,115 |
| $8.5M / $1,000 × $4.10 / $1,000 revenue = $34,816 |
| $1.3M / $1,000 × $16.38 / $1,000 revenue = $21,299 |
| Challenge A Payment = $2,200, Contests = $1,000 |
| Total Year-to-Date Compensation = $108,515 |

**Scenario #4: Year-to-Date Earnings After 12 months**

$13.3M sales (156% FY Quota), Challenges A & B accomplished, $1,000 & $4,000 Contest prizes won

| |
|---|
| Base Salary = $5,467 / month × 12 months = $65,600 |
| Incentive Pay = $135,373 |
| $8.500M / $1,000 × $4.10 / $1,000 revenue = $34,816 |
| $2.125M / $1,000 × $16.38 / $1,000 revenue = $34,816 |
| $2.675M / $1,000 × $24.58 / $1,000 revenue = $65,741 |
| Challenge A Payment = $2,200, Challenge B Payment = $2,200, Contests = $1,000 and $4,000 |
| Total Year-to-Date Compensation = $210,373 |



# 2001 Software Sales Incentive Plan Glossary

As you review the definitions in this section, it's helpful to understand how the elements of your pay work together. Keep in mind that the On-Target Earnings diagram does not contain all elements of your total cash compensation, such as awards or other cash payments.

**Attainment:** Measurement of your cumulative actual sales against your full-year quota.

**Base Salary:** This is the fixed portion of your pay for each pay period.

**Manager (eligibility for accelerators) Rules:** To be eligible for manager accelerators, a manager must have sales reps reporting to him/her (based on the organization chart), and/or sales responsibility and provide business direction to a sales team. The manager is the person who typically sets Personal Contribution Objectives for this sales team, determines Personal Business Commitments (PBCs) for the team, and is responsible for the team's personnel records. The sales manager's quota should equal the sum of the quotas of the sales force reporting to him/her.

**•First Line Manager:** To be considered a first line manager for purposes of qualifying for First Line Manager payout rates, the person must have functional responsibility for a minimum of three sales reps based on the definition above. The second line manager is responsible for ensuring the correct plan assignment at the time the manager is put on the plan. Once the manager is assigned to the First Line Manager payout rates, changes will not be made during the year due to fluctuations in onboard rep headcount or the existence of temporarily open territories.

**•Second Line Manager:** To be considered a second line manager for the purposes of qualifying for Second Line Manager payout rates, the person must have responsibility for a minimum of two sales managers based on the definition above. The VP is responsible for ensuring the correct plan assignment at the time the second line manager is put on the plan. Once the manager is assigned to the Second Line Manager payout rates, changes will not be made during the year due to fluctuations in onboard rep headcount or the existence of temporarily open territories.

**On-Target Earnings (OTE):** Your On-Target Earnings is the sum of your Base Salary plus your Target Incentive. Your Target Incentive is your pay for



achieving 100% of your Personal Contribution Objectives (PCOs).

**Pay Accelerator:** An increased incentive rate that is earned for every dollar sold above quota.

**Pay Mix:** The ratio of your Base Salary to your Target Incentive at 100% of full-year attainment. For example, a 60/40 plan means that 60% of your On-Target Earnings is Base Salary and 40% is Target Incentive.

**PCO1:** This is the Personal Contribution Objective for revenue.

**PCO2:** This is the Personal Contribution Objective for profit. This element is included in your incentive plan only when profit can be measured.

**PCO3:** This is the Personal Contribution Objective for individual and global challenges.

**PCO Weighting:** The percentage of your full-year Target Incentive that is tied to each Personal Contribution Objective (PCO). Your PCO Weighting is determined by your job role.

**Reference Salary:** What your salary would be if you were taken off incentive.

**Salary Equivalent:** Term used by the U.S. and Canada for Reference Salary.

**Target Incentive:** Your sales incentive opportunity for achievement of 100% of your PCO elements.

# 2001 Sales Planning Calendar

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | | | | | |

SUNDAY    MONDAY    TUESDAY    WEDNESDAY    THURSDAY    FRIDAY    SATURDAY





© International Business Machines Corporation 2001

IBM Corporation
Route 100
Somers , NY 10589

Printed in the United States of America
January, 2001
All Rights Reserved

IBM and the IBM logo are trademarks of International
Business Machines Corporation in the US, other
countries, or both.


Printed on recycled paper containing 10% recovered
post-consumer fiber.

Exhibit C

*Exhibit C*

# EMPLOYEE QUOTA LETTER:

## EMPLOYEE DETAILS:

| | |
|---|---|
| Employee Name: | Tom Cashman |
| Employee Serial: | 427563 |
| Employee Manager: | Dunderdale |
| Organization: | FINANCIAL |

## PLAN DETAILS:

| | |
|---|---|
| Plan Type: | SM |
| Job Role: | Tivoli Sales Manager - BUE |
| Plan Effective Date: | 1/1/2001 |
| Territory: | FINANCIAL |
| Date on Quota: | 1/1/2001 |
| Your Pay Mix as a % of On-Target Earnings: | 50/50 |
| Your On-Target Earnings are: | $269,999 |
| Your Target Incentive Pay at 100% Attainment is:<br>  PCO1: 80%<br>  PCO3: 20% | → $408,000<br>→ $ 27,000 |

| Component | Weight | Target | Start Date – End Date | Bonus Opp for 100% Attainment (USD) |
|---|---|---|---|---|
| PCO1: Revenue | 100% | $35,500,000 | 1/1/2001 - 12/31/2001 | $108,000 |
| Component* | Criteria | Challenge Opportunity | Start Date – End Date | |
| PCO3A: | SWG Bounty Challenge | http://w3.software.ibm.com/americas/ awards/1QBounty.html | 1/1/01 - 3/31/01 | |
| PCO3B: | SWG Bounty Challenge | http://w3.software.ibm.com/americas/ awards/1QBounty.html | 1/1/01 - 3/31/01 | |

*PCO3 Criteria will be communicated to the field at the beginning of each quarter.

*Right to Modify or Cancel:  While IBM's intent is to pay employees covered by this program according to its provisions, this program does not constitute a promise by IBM to make any distributions under it.  IBM reserves the right to adjust the program terms or to cancel or otherwise modify the program at any time during the program period, or up until actual payment has been made under the program.  Modification or cancellation may be applicable to all persons covered by the program, or to any subset as defined by management.  Even though you may be given progress reports regarding plan achievement during the year, no one becomes entitled to any payment in advance of his or her receipt of the payment.  Bonus opportunity which includes salary in the calculation reflects the salary in effect the date this letter is sent.  However, actual bonus payments will be made based on the salary in effect the date the bonus is earned.  The current payment amount appearing on an employee's assessment form will net against any debit balance in the employee's commission account.*

## 2001 Tivoli Systems Individual Compensation Plan: Territory Definition
(To be used for new territories or changes to existing territories)

### 1. Territory Identification

| Name | Tom Cashman |
|---|---|
| Serial Number | 427563 |
| Region | Finance |
| Date Territory Definition Created | 02/21/01 |
| Territory Effective Period | 01/01/01-12/31/01 |

This Territory definition cancels and replaces any prior Territory definitions for the above mentioned effective period.

### 2. Territory Detail

Territory detail **must** contain specific territory information, including Product, Geography (region, city, state and/or zip) and/or Named Accounts (if applicable). **(Note: Area Code is not an acceptable parameter)**
Example of Acceptable Territory Definition: New York, zip codes 10509, 10512, and 10539
Example of Unacceptable Territory Definition: Southern New York, Westchester County

Product:

Geography: United States

Named Accounts: AFLAC, Amsouth, Astoria Financial, Bank Austria, Cantor Fitzgerald, Credit Lyonnas, Diawa Securities, Dresdner Bank, nEmigrant Savings, Fuji Bank & Trust, Greenpoint Financial, Industrial Bank of Japan, Lazard Freres, Neuberger and Berman, Nikko Securities, Nomura Securities, Rosenthal Group, SG Cowen Securities, SIAC, Standard & Poors, Sumitomo Bank, Swiss Reinsurance, Warburg Pincus Assurant (American Bankers), Branch Bank & Trust, Capitola One Financial, Colonial Bank, Crawford & Co, Fannie Mae, First Maryland Bancorp, Freddie Mac, Geico, IBM Credit Corp (NC), ING, Jefferson Pilot, National Council on Comp., NC Farm Bureau Mutual, Northern Trust

Employee Signature _____    Date _____

Manager Signature _____    Date _____

| |
|---|
| Retirement, Region Financial, Royal & Sun Alliance, Sallie Mae, Southern Farm Bureau, |
| SunTrust, Synovus (Vital Processing Service), T Rowe Price, Total Systeris, Union Labor Life, Union |
| Planters, United Guaranty, First Tennessee |
| Chase Manhattan (JP Morgan), Alliance Capitol Management, Brown Brothers |
| CIT Group, Credit Suisse First Boston (Pershing), HSBC, Lehman Brothers, MBNA, |
| Moody's, Paine Webber, Reuters, Scudder |
| Bank of Tokyo, Barclay's Bank, CIBC Worldmarkets, Deutsche Bank, |
| Donaldson Lufkin & Jen., Dow Jones, GE Capital, Instinet, Mass Financial Services , |
| National Discount Brokers, Putnam,  Risk Enterprise Mgmt, Sovereign Bancorp, |
| UBS AG, UJB Summit Bancorp, Vanguard, |
| Bank of America,  Compass Bank, First Union, Southtrust, Wachovia |
| American ExpressTSSTM,Bank of New York, Bear Stearns, Depository Trust,Dime Bancorp, Fidelity, |
| Fleet Boston, Goldman Sachs, Lend Lease, Merrill Lynch, Morgan Stanley Dean Witter, NASDAQ |
| State Street, TD Waterhouse, Citicorp (Citibank, Travellers, Solomon Smith Barney, Primerica), |
| Aid Assoc. for Lutherans, Allstate Insurance, American Family, AmerUs Group, American Century |
| Auto Club Insurance, Auto Owners Insurance, Blue Cross of Minn., Chicago Board of Options, |
| Chicago Board of Trade, Chicago Mercantile Exchange, CNAInsurance, Farm Bureau Insurance (MI) |
| Federated Mutual, Firstar, Jackson National Life, Michigan Mutual Insurance (Amerisure), Minnesota |
| Mutual Insurance, Ohio Savings, Principal Life Insurance, Reliastar , St Paul Companies, |
| State Farm Mutual Auto, US Bank,  Wausua Insurance ,American Express, American General |
| Ameritrade, Banc One Corp, Charter One Bank, Conseco, Fifth Third Bancorp, Charles Schwab |
| Fortis Benefits Ins., Great American Ins.,Household International, Huntington Bancshares, Keycorp, |
| Mellon Bank, Mutual of Omaha Ins., National City Corp., Nationwide, Northern Trust Corp., |
| Ohio Casualty Ins., PMA Group, PNC Bank, Progressive Casualty Ins., Provident Mutual Life, |
| Western and Southern Life Ins., Westfield Ins. Co., CalFed (Golden State Bank), ETrade, USAA |
| Aegon, AG Edwards , AON, Beta Systems, Comerica, Cuna Mutual Ins., Farmers Group |
| Discover Card, Edward Jones, First Data, Kemper Companies, LaSalle National Corp., |
| Lincoln Financial Corp., M&I Data (Metavante), MasterCard, Mercantile Bancorp, Mortgage Guaranty |
| Northwestern Mutual Life, RW Baird , TransUnion LLC, Van Kampen Funds, Zurich Ins. |
| Firemans Fund, First Security Service, Franklin Templeton, Oppenheimer Funds, Union Bank of CA, |
| Providian Financial, Visa International, Washington Mutual, Wells Fargo |

Tivoli Systems Confidential
Last Revision: February 13, 2001
Prepared by: Carrie Black

Employee Signature                     Date

Manager Signature                     Date

# EXHIBIT B

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS.                                    SUPERIOR COURT DEPARTMENT

THOMAS CASHMAN,
          Plaintiff,

v.

INTERNATIONAL BUSINESS MACHINES                Civil Action No. NOCV 2004-02106-A
CORPORATION, STEVEN A. MILLS,
CHARLES ILL, JOHN R. JOYCE, and
GREGORY ENRIQUEZ,
          Defendants.

## NOTICE OF FILING OF NOTICE OF REMOVAL

To:    Civil Clerk's Office
       Norfolk County Superior Court
       650 High Street
       Dedham, MA  02026

       PLEASE TAKE NOTICE that a Notice of Removal in the above action from the Superior

Court, Norfolk County, has been duly filed in the U.S. District Court for the District of

Massachusetts.  Attached hereto as Exhibit A is a certified copy of that Notice of Removal.

       This Court is requested to proceed no further unless and until such time as the action may

be remanded by order of said United States District Court.

Respectfully submitted,

INTERNATIONAL BUSINESS MACHINES
CORPORATION, STEVEN A. MILLS, CHARLES
ILL, JOHN R. JOYCE, and GREGORY
ENRIQUEZ

By their attorneys,

_____
Joan Ackerstein, BBO # 348220
Heather Stepler, BBO #654269
JACKSON LEWIS LLP
75 Park Plaza, 4th Floor
Boston, Massachusetts 02116
(617) 367-0025

Dated: February ___, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on this _____ day of February, 2005, a copy of the foregoing document was served upon Plaintiff's Attorney, Kathleen E. Cross, Hanify & King, One Beacon Street, Boston, MA 02108, by first-class mail, postage prepaid.

_____
Jackson Lewis LLP