## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THOMAS CASHMAN,<br>　　　Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 05 10306 RWZ |
| INTERNATIONAL BUSINESS MACHINES<br>CORPORATION, STEVEN A. MILLS,<br>CHARLES ILL, JOHN R. JOYCE, and<br>GREGORY ENRIQUEZ,<br>　　　Defendants. | ) ) ) ) ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## THEIR MOTION FOR PROTECTIVE ORDER
## AND
## RESPONSE OF DEFENDANTS STEVEN A. MILLS, JOHN R. JOYCE AND CHARLES ILL TO PLAINTIFF THOMAS CASHMAN'S EMERGENCY MOTION FOR EXPEDITED DISCOVERY RESPECTING PERSONAL JURISDICTION

Defendants Steven A. Mills, John R. Joyce, and Charles Ill (hereinafter, the "Defendants") oppose the Motion For Expedited Discovery filed by the plaintiff, Thomas Cashman, for the reasons that follow. In addition, these defendants request the Court to enter an order pursuant to Federal Rule of Civil Procedure 26(c) barring plaintiff from taking jurisdictional discovery. In the alternative, these defendants request the Court to enter an order limiting the jurisdictional discovery sought by plaintiff to information that relates solely to Defendants' contacts with Massachusetts in connection with plaintiff's 2001 commissions at issue in the case.

### I. Background and Summary of Argument

Plaintiff is a former IBM employee who filed a complaint on December 8, 2004 in Massachusetts Superior Court against International Business Machines Corporation ("IBM"), and two current and two former employees of IBM.

Defendants Steven Mills and John Joyce are among the senior-most executives of IBM. During the times relevant to the Complaint, John Joyce was the Chief Financial Officer of IBM and Steven Mills was head of IBM's Software Group worldwide, a $15 billion business. In addition, Charles Ill was the Vice President of Americas Software for IBM. Mr. Ill is no longer with IBM.

Defendants removed plaintiff's action to this court on February 17, 2005 on the basis of diversity jurisdiction. Plaintiff alleges in his First Amended Complaint that IBM breached a purported contract to pay plaintiff commissions. Plaintiff sued these Defendants under the Massachusetts Wage Act, asserting that the failure to pay commissions violated the Act, and that these Defendants were "employers" under the Act. With regard to Messrs. Mills and Joyce, plaintiff does not even allege that they knew who plaintiff was, let alone that they had direct involvement in the decisions regarding his pay. Moreover, there is no assertion that they did anything in Massachusetts relating to the claims against them asserted in the Complaint.

On March 9, 2005, these Defendants filed a motion to dismiss the complaint for lack of personal jurisdiction. On March 15, 2005, plaintiff filed a motion to extend the deadline for filing an opposition to that motion by an additional 30 days. (*See* Assented To Motion To Extend Time To File Opposition To Motion To Dismiss Filed By Defendants Steven A. Mills, John R. Joyce And Charles Ill (Ex. 1).) Plaintiff asserted that "additional time [was] necessary to review and oppose the Motion to Dismiss of three defendants on personal jurisdiction grounds, for which the plaintiff intends to request jurisdictional discovery." (*Id.* at 1). As indicated in plaintiff's motion, these Defendants agreed to the request for an extension of time to file, but *did not agree "to the appropriateness or extent of any jurisdictional discovery."* (*Id.* at 2 (emphasis added)).

Plaintiff then did nothing about obtaining jurisdictional discovery until Friday afternoon, April 1, even though his response to the motion to dismiss was due on April 22. Plaintiff then filed this motion seeking to impose on Defendants the burden of having to do discovery on an expedited basis. According to plaintiff, the Defendants should be required to respond to his jurisdictional discovery requests within 14 days. (Plaintiff's Emergency Motion For Expedited Discovery (hereinafter "Pl. Motion"), at 5-6.)

Defendants object. Plaintiff has known that personal jurisdiction was an issue since at least March 9, 2005, when the motion to dismiss was filed. He waited almost one month later, however, to seek jurisdictional discovery. What is more, he has given no reason for his delay. Despite all this, he asks the Court to order defendants to respond to discovery on an "expedited basis," without even acknowledging that these defendants are senior executives, and making light of the consequent burden that this discovery would impose on them.

Plaintiff has not provided even the slightest basis for believing that the Defendants are in possession of facts of which he is not privy that would establish jurisdiction in this case. Instead, he resorts to false innuendo concerning the Defendants' declarations filed in support of their motion to dismiss. The law is clear that discovery should not be permitted if it amounts to nothing more than a fishing expedition by the plaintiff. That is exactly what plaintiff is attempting here. That this is true is demonstrated both by the fact that plaintiff did not seek the discovery sooner, as well as by the fact that the discovery he now seeks is not narrowly drawn to obtain information that would be relevant to the jurisdictional issues presented by Defendants' motion to dismiss. For these reasons, as explained more fully below, the Court should deny plaintiff's motion for expedited discovery and grant Defendants' motion for a protective order concerning such discovery

3

## II.  Argument and Citation Of Authorities

**A.**   **Plaintiff Should Not Be Allowed To Wait Until The Eleventh Hour To Request Jurisdictional Discovery.**

Plaintiff has fashioned his motion as an "emergency motion" in which he seeks "expedited discovery" on the issue of personal jurisdiction.  According to plaintiff, "the interests of justice require that limited discovery respecting personal jurisdiction be permitted before allowing the drastic consequences of dismissal." (Pl. Motion, ¶ 15, at 5.)  Moreover, plaintiff asserts, the effort required by defendants "to respond to this discovery will be neglible [sic]." (*Id.*)

To begin with, it is difficult to see how the "interests of justice" would be served by allowing plaintiff's motion when plaintiff has not explained why he did not seek jurisdictional discovery sooner.  He certainly could have.  If anything, the interests of justice would better be served by denying plaintiff's motion for expedited discovery.  First, plaintiff should not be rewarded for his dilatory tactics.  Second, defendants should not be penalized for plaintiff's delay by having to respond to broad and burdensome discovery on an expedited basis when the cause of the plaintiff's emergency is his own inexcusable neglect.

Denial of discovery is warranted if the plaintiff waits until "the eleventh-hour" to make the request.  *See Thomas v. IBM*, 48 F.3d 478, 483-84 (10th Cir. 1995) (district court did not abuse its discretion in denying discovery where plaintiff "waited until the eleventh hour to request the deposition"; "noticeably absent from [the plaintiff's] opposition to IBM's protective order motion is any explanation as to why she waited"); *Harry A. v. Duncan*, 223 F.R.D. 536, 539 (D. Mon. 2004) (if plaintiff needed the discovery, he should not have "wait[ed] until the last minute to do scores of depositions and then . . . place the blame on the other party for the lack of timeliness issues").

4

An example where jurisdictional discovery was denied in circumstances similar to those here is *Donatelli v. UnumProvident Corp.*, 324 F. Supp. 2d 153, 164 (D. Maine 2004). In that case, the plaintiff argued that it was "'imperative that [he] be permitted to explore defendant's contacts [with the forum state], as well as their relation to [his] claims in order to fully assess whether . . . jurisdiction exists.'" *Id.* at 163. The court rejected this claim, noting that plaintiff waited one month before requesting leave to conduct discovery, and, had plaintiff been proactive, he could have completed discovery on time. *Id.* at 164 & n. 10. *See also Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 788 & n. 15 (D.C. Cir. 1983) (the fact that the plaintiff served its discovery requests within a month of the motion to dismiss did not establish that plaintiff had no adequate opportunity for discovery where the plaintiff was put on notice earlier in the proceedings that personal jurisdiction would be challenged).

Here, plaintiff's "emergency" is of his own making. Moreover, he seeks to put the burden of his lack of diligence on Defendants, making short change of the burden his last minute discovery requests are likely to impose on defendants, who are busy corporate executives. *See Wertheim Schroder & Co., Inc. v. Avon Prod., Inc.*, 1995 WL 6259, at *2 (S.D.N.Y. Jan. 9, 1995) (Ex. 2) (a court must remain mindful that "permitting unfettered discovery of corporate executives would threaten disruption of their business and could serve as a potent tool for harassment in litigation"). These circumstances alone call for the denial of plaintiff's motion. *See* Fed. R. Civ. P. 26(2) (discovery may be limited if the court determines, among other things, that "the party seeking discovery has had ample opportunity . . . to obtain the information sought").

**B.    Jurisdictional Discovery Is Not Appropriate Where, As Here, The Plaintiff Is Merely On A Fishing Expedition.**

The general rule is that district courts have broad discretion to permit or deny jurisdictional discovery. *See, e.g., Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 402 (4th Cir. 2003) (affirming denial of discovery request where "plaintiff offer[ed] only speculation or conclusory assertions about contacts with a forum state"); *Donatelli,* 324 F. Supp. 2d at 164 (denying discovery); *Sportrust Assocs. Int'l, Inc. v. The Sports Corp.*, 304 F. Supp. 2d 789, 794 (E.D. Va. 2004) (denying discovery).  However, the case law overwhelmingly supports the exercise of that discretion to *deny* discovery where the plaintiff has not asserted even a colorable basis for jurisdiction.

For example, in *Caribbean Broadcasting System, Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1089-90 (D.C. Cir. 1998), the plaintiff argued that the district court abused its discretion in dismissing its case for lack of personal jurisdiction without giving plaintiff an opportunity to conduct jurisdictional discovery.  The court rejected that argument, stating that the plaintiff had alleged "absolutely nothing . . . to indicate that a court in the District of Columbia might constitutionally assert jurisdiction over [defendant] . . ." *Id.* at 1089.  The court concluded, "[i]n light of [defendant's] uncontested affidavit," the district court was justified in denying jurisdictional discovery. *Id.* at 1090.

There is no shortage of case law denying a request for jurisdictional discovery for reasons similar to those given in *Caribbean Broadcasting System. See, e.g., Carefirst of Md., Inc.*, 334 F.3d at 402-03 (district court was within its discretion in deciding that plaintiff had failed to establish that jurisdictional discovery was warranted when there was no concrete proffer by the plaintiff, no indication of fraud or intentional misconduct in the defendant's jurisdictional affidavits, and no reason to believe that the additional information the plaintiff

6

sought would alter the analysis of personal jurisdiction); *McLaughlin v. McPhail*, 707 F.2d 800,

806-07 (4th Cir. 1983) ( "Against the defendants' affidavits stating that they had not engaged in

any of the acts enumerated in [Maryland's long-arm statute] McLaughlin offered 'nothing

beyond his bare allegation' that the defendants had had significant contacts with the state of

Maryland."); *Lehigh Valley Indus., Inc. v. Birenbaum,* 527 F.2d 87, 94 (2d Cir. 1975) ("We

conclude that there is a threshold failure here to establish any basis for finding that Norman

committed any tortious activity in New York and that there was no abuse of discretion below in

denying discovery.").[1]

    Plaintiff has not demonstrated that jurisdictional discovery is warranted in this case.

*First*, plaintiff has failed to make a concrete proffer concerning facts likely to be uncovered in

discovery that might justify a finding of jurisdiction here. Instead, plaintiff merely repeats the

allegations of his complaint. (*See* Pl. Motion, ¶¶ 3-6.) These allegations, as previously

demonstrated in Defendants' memorandum in support of their motion to dismiss, are

insufficient to establish personal jurisdiction, even if true.

    The first inquiry in determining jurisdiction is whether Plaintiff can establish sufficient

contacts with Massachusetts to satisfy the Massachusetts long-arm statute. Plaintiff fails to

---

[1]  *See also Sportrust Assocs. Int'l, Inc.*, 304 F. Supp. 2d at 794 ("As defendants have presented affidavits which specifically deny jurisdictional acts or contacts, . . . [jurisdictional] discovery would only waste the parties' time and resources, constituting nothing more than a 'fishing expedition.'"); *Bancoult v. McNamara*, 214 F.R.D. 5, 10 (D.D.C. 2003) ("If the plaintiff has provided statements too bare to support an inference of jurisdiction, responded to a defendant's affidavit with speculative or a complete absence of jurisdictional facts, or fails to make counter-allegations in its own affidavit, denial of discovery is not an abuse of discretion."); *Ellis v. Fortune Seas, Ltd.*, 175 F.R.D. 308, 312 (S.D. Ind. 1997) (citing cases and holding "it is reasonable for a court . . . to expect the plaintiff to show a colorable basis for jurisdiction before subjecting defendant to intrusive and burdensome discovery"); *Poe v. Babcock, Int'l, plc*, 662 F. Supp. 4, 7 (M.D. Pa. 1985) (holding that because "plaintiff has met defendants' affidavit evidence with mere speculation, plaintiff's request for . . . [jurisdictional] discovery . . . must be denied. It would be inappropriate for this court to allow plaintiff to conduct a fishing expedition in order to construct a basis for jurisdiction."); *Rich v. KIS California, Inc.*, 121 F.R.D. 254, 259 (M.D.N.C. 1988) ("plaintiffs' request for discovery against the individual defendant . . . amounts to nothing more than a fishing expedition"); *Leema Enters., Inc. v. Willi*, 575 F. Supp. 1533, 1536 (S.D.N.Y. 1983) ("Mere speculation, however, in the face of affidavit evidence conclusively to the contrary, necessitates denying plaintiff's request."); *International Terminal Operating Co. v. Skibs A/S Hidlefjord*, 63 F.R.D. 85, 87 (S.D.N.Y. 1973) (holding jurisdictional discovery not appropriate when plaintiff merely hopes to find statements in defendant's affidavit not accurate but has not made

7

allege facts to satisfy the statute with regard to Messrs. Mills and Joyce. The "Massachusetts long-arm statute allows personal jurisdiction over an entity transacting business in the Commonwealth *but only if the cause of action arises out of the transaction. Radionics, Inc. v. Elekta Instrument AB*, Civ. A. No. 93-10014-Z, 1994 WL 175028, at *1 (D. Mass. April 26, 1994) (Zobel, J.) (Ex. 3) (emphasis added). Plaintiff alleges that Mr. Mills was in the "chain of command" on commission decisions, but does not state any action Mr. Mills had taken in connection with plaintiff relating to the claims here, not to mention that there is no allegation that he did any such action in Massachusetts. With regard to Mr. Joyce, plaintiff merely alleges that Mr. Joyce was responsible for all financial and business development activities of IBM, including those taking place in Massachusetts. He does assert any action taken by Mr. Joyce -- whether in Massachusetts or not -- that relates to plaintiff's 2001 commissions.

The next inquiry to determine whether jurisdiction is appropriate is whether the Massachusetts contacts satisfy constitutional requirements. Plaintiff has not alleged facts that would satisfy due process concerns for any of the Defendants. For example, with regard to Mr. Ill, plaintiff alleges that *he* "initiated and received many communications *involving* Mr. Ill from his home office in Massachusetts directly related to" his commission claims in this case (Pl. Motion, ¶ 6), but does not assert anything more than these communications from outside the state to plaintiff within the state. Even assuming these allegations are true, they do not satisfy the constitutional requirements of due process.[2]

---

(continued...)

counter-allegations in its own affidavit; court should not "encourage a fishing expedition" where "all there is to pursue is a plaintiff's fanciful hope")

[2] We note plaintiff's carefully worded statement that "*he*" initiated and received many communications "*involving*" Mr. Ill from his home office in Massachusetts that were "directly related to the claims central to this action." (Pl. Motion, ¶ 6 (emphasis added).) Taken at its face value, this statement does not allege that Mr. Ill himself initiated or received any such communications. However, assuming for purposes of Mr. Ill's motion to dismiss that Mr. Ill did in fact communicate, albeit from outside the state, directly with the plaintiff, either by e-mail or telephone, concerning plaintiff's 2001 commissions, there still is no jurisdiction over him.

ATI-2162236v1

*Second*, Defendants have signed declarations, which establish that jurisdiction is not proper. Plaintiff claims to want discovery regarding these declarations, but has not and cannot present any basis for contending that defendant's jurisdictional declarations[3] are fraudulent or otherwise misleading. In his motion, plaintiff refers to Mr. Mill's declaration as being "circumspect," Mr. Joyce's declaration as a "thinly veiled attempt to avoid personal jurisdiction in Massachusetts," and all three Defendants' declarations as "lack[ing] any detail" and having the appearance of being "carefully crafted to avoid having to state the contact that they *did* have with Massachusetts." (Pl. Motion, ¶¶ 10-13.) Plaintiff's criticisms of the Defendants' declarations, however, are inapposite. The declarations affirm that Messrs. Mills and Joyce did *not* have any contacts with Massachusetts *relating to* the plaintiff's claims in this case because that is the only question relevant to the jurisdictional issue under the long-arm statute. Mr. Ill's declaration confirmed that to the extent plaintiff and Mr. Ill communicated, Mr. Ill conducted any such communications in New York, and did not come to Massachusetts in connection with the events described in the Complaint. Other contacts with Massachusetts are, again, irrelevant. The Defendants did not address whether they may have had contacts with Massachusetts *not related to* plaintiff's 2001 commissions because those contacts are simply irrelevant here. *See Radionics*, 1994 WL 175028, at *1 (Ex. 3); *Jana Brands, Inc. v. NexiFM, Inc*, 2003 WL 164251, at *1 (D. Mass. Jan. 23, 2003) (Zobel, J.) (Ex. 4) (the central question for purposes of the minimum contacts requirement of the due process clause is "whether the plaintiff's claims arise from or relate to the defendant's contact with Massachusetts . . . .").[4]

---

[3] Unsworn declarations made under penalty of perjury, which these declarations were, have the same force and effect as affidavits, pursuant to 28 U.S.C. § 1746

[4] These cases are discussed in greater detail in defendants' memorandum in support of its motion to dismiss at pp. 4-6.

*Third*, plaintiff has given no reason to believe that additional jurisdictional facts are likely to be uncovered by discovery. For example, plaintiff has not offered an affidavit of his own in which he asserts facts that contradict any of the facts attested to in the defendants' declarations. And, while plaintiff suggests that there may be facts "peculiarly within [the defendants'] knowledge" that could be uncovered by discovery,[5] he does not give any basis for that contention. As one court noted in addressing a similar situation, the plaintiff's arguments in this regard have "considerably less force in the context of a personal jurisdiction issue arising from an alleged contract than they might have in other contexts." *Ellis*, 175 F.R.D. at 310-11. The reason is that, in contrast to a tort situation where the plaintiff "is a total stranger" to the corporation that allegedly caused his injury, in a contract situation, "the court can reasonably expect the plaintiff to be able to specify at the outset at least those contacts the defendant has had with the forum that would support specific . . . personal jurisdiction." *Id.* at 312 n. 3. Thus, the court concluded, "[i]n cases based on alleged contracts between the parties, it would be *an unusual case* where the plaintiff *should need* discovery to show specific jurisdiction linking the defendant and the controversy to the forum" *Id.* at 312 (emphasis added).

Plaintiff has alleged breach of contract and therefore should be aware of the defendants' contacts on which he bases his claim of jurisdiction. As a result, his accusation that facts concerning such contacts might be lurking behind the defendants' allegedly "circumspect" declarations and hidden from his reach absent discovery, is pure bluster.

In short, plaintiff should not be "permitted to conduct discovery in an attempt to find a basis for in personam jurisdiction where there is not the slightest factual indication that such a basis might exist." *International Terminal Operating Co.*, 63 F.R.D. at 87. The only case cited

---

[5] *See* Pl Motion, ¶ 15 ("These defendants should not be allowed selectively to tiptoe through the jurisdictional facts peculiarly within their knowledge, without an opportunity for Mr Cashman to establish

10

by plaintiff in support of his motion for expedited discovery is distinguishable in that the court

in that case ordered further discovery on a "pivotal factor" to the jurisdictional question on

which "both sides gave equivocal responses." *Cytotherapeutics, Inc. v. Neurospheres Ltd*,

1997 WL 33547301, at *2 (D.R.I. Mar. 13, 1997) (Ex. 5). Here, plaintiff offers no facts to

support jurisdiction. "Where a plaintiff wants to subject a distant defendant to discovery in

order to determine whether sufficient contacts support jurisdiction, it is reasonable for a court

exercising its power under Rule 26(b)(2) to expect the plaintiff to show a colorable basis for

jurisdiction before subjecting the defendant to intrusive and burdensome discovery in that

distant forum." *Ellis*, 175 F.R.D. at 312. Plaintiff's failure to show such a colorable basis here

demands that his request for discovery be denied.

**C.    Jurisdictional Discovery Is Not Appropriate Where, As Here, The Discovery Sought Would Not Be Sufficient To Establish Personal Jurisdiction.**

In addition to the above, the discovery sought by plaintiff would not establish this

Court's personal jurisdiction over these defendants in any event. Both the interrogatories and

document requests seek information from defendants regarding any connection or contact they

have had with Massachusetts, whether business or personal, for any reason. Defendants

already have said in their declarations that they have had no contacts regarding plaintiff's 2001

commissions (other than the possibility that Mr. Ill communicated with the plaintiff about his

commissions from outside of Massachusetts, which is not sufficient). Any additional contacts

these defendants may have with Massachusetts that plaintiff might learn about in the discovery

they seek would *not be related to plaintiff's 2001 commissions*. These unrelated contacts could

not be relied upon under either the long-arm statute or due process requirements to establish

---

(continued . .)

otherwise ")

ATI-2162236v1

jurisdiction. *See Radionics, Inc.*, 1994 WL 175028, at *1 (Ex. 3) (Massachusetts long-arm statute requires that the cause of action arise out of the transaction in question for a party to be subject to personal jurisdiction under the "transacting any business" test); *Jana Brands, Inc.*, 2003 WL 164251, at *1 (Ex. 4) (due process requires that "the plaintiff's claims arise from or relate to the defendant's contact with Massachusetts").[6]

If the discovery sought would not assist the plaintiff in establishing personal jurisdiction, then it should be denied. *See, e.g., Noonan v. The Winston Co.*, 135 F.3d 85, 94-95 (1st Cir. 1998) ("Therefore, while Noonan may have discovered additional contacts between [defendant] and Massachusetts had he been permitted to continue discovery throughout the litigation, such contacts have no bearing on the jurisdictional analysis."); *see also Donatelli*, 324 F. Supp. 2d at 164 ("discovery about the particulars of how White obtained information concerning Donatelli's employment at UnumProvident is not reasonably calculated to resolve any of the analytical problems that currently exist insofar as relatedness and purposeful availment are concerned") As one court explained, "[plaintiff] also sought to discover all of [defendant's] contacts with Texas since 1973. *These contacts are irrelevant to the litigation and thus, given [plaintiff's] reliance on specific rather than general jurisdiction, irrelevant to the jurisdictional issue in this case.*" *Patterson v. Dietze, Inc.*, 764 F.2d 1145, 1148 (5th Cir. 1985) (emphasis added). Plaintiff seeks discovery of defendants' contacts that are not relevant to the inquiry of specific jurisdiction. Therefore, the defendants are entitled to a protective

---

[6] Plaintiff's reference (Pl. Motion, ¶¶ 3-6) to the Massachusetts Wage Act is a red herring. This statute establishes a cause of action against an officer of a corporation for non-payment of wages, but it does not provide an independent basis for personal jurisdiction over that officer. *See Nahigian v. Leonard*, 233 F. Supp. 2d 151, 158 n. 1 (D. Mass. 2002) (Massachusetts "still adheres to the general rule that jurisdiction over an officer cannot be based solely on jurisdiction over the corporation"; court finds jurisdiction because of an ERISA claim asserted in that case, but in a footnote analyzes the long-arm statute's "transacting business" provision and constitutional concerns in connection with a Wage Act claim) Thus, the fact that plaintiff has asserted a claim under the Wage Act does not alter the jurisdictional analysis discussed above, pursuant to which the plaintiff has to establish that the defendants' contacts with the State of Massachusetts are related to his claim for unpaid commissions

12

order from this discovery. *See* Fed. R. Civ. P. 26(b)(2) (court may limit discovery, *inter alia*, where the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case and the importance of the proposed discovery in resolving the issues in the case).

**D.    Plaintiff's Discovery Requests Are Overly Broad, Unduly Burdensome, And Seek Irrelevant Information.**

Finally, defendants are entitled to a protective order because plaintiff's discovery requests are overly broad, unduly burdensome, and seek irrelevant information.

Plaintiff attached to its motion the requested discovery from Messrs. Mills and Joyce.[7] Plaintiff seeks, for example, (1) all documents demonstrating *any* contact Defendants have had with Massachusetts since July 1, 2000; (2) all documents demonstrating *any* business or real estate interest Defendants or any principal on whose behalf they acted may have had in Massachusetts since July 1, 2000; (3) *all* e-mails or other electronic communications that Defendants sent or caused to be sent into Massachusetts since July 1, 2000; (4) all telephone records indicating *any* calls Defendants made or caused to be made to Massachusetts since July 1, 2000; (5) all diaries or calendars demonstrating *any* meeting or communication with any persons in Massachusetts since July 1, 2000; and (6) all reports or receipts of business trips or expenditures in Massachusetts since July, 2000. (Ex. A to Pl. Motion.). Plaintiffs' interrogatory requests are similar. They seek (1) a complete description of *all* contact that each Defendant has had personally or as an agent of IBM with Massachusetts since July 1, 2000; (2) a description of *all* occasions on which each Defendant was physically present in Massachusetts since July 1, 2000; (3) a description of *any* communication sent by of on behalf of each Defendant or by or on

---

[7] Plaintiff states that the discovery to Mr. Ill is identical to the discovery to Mr Mills. (Pl Motion at 1, n. 2)

13

behalf of any other person into Massachusetts since July 1, 2000, which bore each Defendant's signature[8]; and (4) a description of *all* duties and responsibilities of *any* position that Mr. Joyce had with IBM since July 1, 2000, and how they affected IBM's Massachusetts employees. (Ex. B to Pl. Motion.).

Pursuant to these discovery requests, defendants would have to produce pages and pages of documents that have nothing to do with any issue in this case, including, for example, personal e-mails with friends in Massachusetts, as well as potentially sensitive and proprietary information having no relevance to this action. The requests are hopelessly vague. They potentially could include web purchases from Filene's or another Massachusetts store. Their answers to the interrogatories would have to include wholly irrelevant information including information of a personal nature, such as a description of a trip taken to Massachusetts to visit a friend. In short, plaintiff's requests are overly broad and seek information that is not relevant to this case.

Moreover, it would be nearly impossible for defendants to comply with these requests. For example, given the high-level positions of these defendants, they are likely to have generated literally thousands of e-mails. There would be no way to narrow the search to only e-mails "demonstrating any contact" with Massachusetts (Pl. Motion, Ex. A at 4) without looking at each and every one. Indeed, even if each e-mail were to be examined, that would not help in identifying those that demonstrate a contact with Massachusetts because internet addresses generally do not reveal the location of either the sender or the receiver. The absurdity of plaintiff's request is obvious, and it is clearly overly burdensome.

---

[8] Mr. Joyce was the CFO of IBM. As such, this request potentially encompasses Securities and Exchange Commission filings that he signed. There is no telling if and when Massachusetts residents obtained, for example, an IBM 10-K. Yet, that is the sort of information plaintiff seeks.

Finally, the discovery, if permitted, is likely to encompass highly sensitive, confidential, and proprietary information, given the fact that it involves communications from high-level IBM corporate executives, with responsibility for major businesses within IBM. Defendants already have stated that they had no contacts with Massachusetts relating to the plaintiff's commissions (other than those of Mr. Ill previously discussed). Therefore, plaintiff cannot demonstrate a need for this discovery sufficient to override the defendants' legitimate interest in protecting IBM's corporate secrets, as well as their own personal privacy.

Rule 26(b) of the Federal Rules of Civil Procedure deals "with the problem of over-discovery," that is, discovery that "is unduly burdensome or expensive, taking into account the needs of the case." *Mack v. The Great Atlantic & Pacific Tea Co.*, 871 F.2d 179, 187 (1st Cir. 1989). As the First Circuit succinctly stated, a party "ought not to be permitted to use broad swords where scalpels will suffice, nor to undertake wholly exploratory operations in the vague hope that something will turn up." *Id.* Requiring defendants to produce documents and respond to interrogatories about all contact of any nature whatsoever with Massachusetts for a five-year period (July 1, 2000 to the present) is clearly overly broad and unduly burdensome taking into account the needs of the case. Accordingly, if the Court were to allow jurisdictional discovery at all (which it should not), it should issue a protective order limiting the plaintiff's discovery to information that concerns contacts with Massachusetts directly relating to decisions regarding the payment of plaintiff's 2001 commissions.

15

### III. Conclusion

For the foregoing reasons, defendants Steven A. Mills, John R. Joyce and Charles Ill

respectfully request that Plaintiff Thomas Cashman's Emergency Motion For Expedited

Discovery Respecting Personal Jurisdiction be denied, and that the Court issue a protective order

against jurisdictional discovery in this case.

Respectfully submitted,

STEVEN A. MILLS, JOHN R. JOYCE AND
CHARLES ILL

/s/ Joan Ackerstein
Joan Ackerstein, BBO # 348220
Heather Stepler, BBO # 654269
JACKSON LEWIS LLP
75 Park Plaza, 4th Floor
Boston, Massachusetts  02116
(617) 367-0025

Dated:   April 7, 2005

16

# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THOMAS CASHMAN,  )
Plaintiff  )
 )
 )
v.  )          Civil Action No. 05-10306-RWZ
 )
 )
INTERNATIONAL BUSINESS  )
MACHINES CORPORATION,  )
STEVEN A. MILLS, CHARLES ILL,  )
JOHN R. JOYCE and GREGORY  )
ENRIQUEZ  )

ASSENTED TO MOTION TO EXTEND TIME TO FILE OPPOSITION
TO MOTION TO DISMISS FILED BY DEFENDANTS
STEVEN A. MILLS, JOHN R. JOYCE AND CHARLES ILL

Plaintiff Thomas Cashman ("Cashman") hereby moves, with the assent of the

¹ants International Business Machines Corporation ("IBM"), Steven A. Mills

("Mills"), Charles Ill ("Ill"), John R. Joyce ("Joyce") and Gregory Enriquez ("Enriquez")

(collectively, the "Defendants") for an additional thirty days to serve their Opposition to

the Motion to Dismiss filed by defendants Mills, Joyce and Ill, to and including April 22,

2005.  As grounds for this Motion, Cashman submits that additional time is necessary to

review and oppose the Motion to Dismiss of three defendants on personal jurisdiction

grounds, for which the plaintiff intends to request jurisdictional discovery.

Defendants have assented to the allowance of this motion, but by assenting to this motion, Defendants are not agreeing to the appropriateness or extent of any jurisdictional discovery.

Respectfully submitted,

THOMAS CASHMAN

By his attorneys,

Charles R. Bennett, Jr. (BBO#037380)
Kathleen E. Cross (BBO#556934)
Sharon H. Patton (BBO#634780)
HANIFY & KING, P.C.
One Beacon Street, 21st floor
Boston, MA  02108
(617) 423-0400

DATED: March 15, 2005

### Certificate of Service

I, Kathleen E. Cross, hereby certify that I have this 15 day of March 2005 served a true copy of the foregoing by First Class Mail upon the following counsel of record for all defendants:

Joan Ackerstein, Esq.
Heather L. Stepler, Esq.
Jackson Lewis LLP
75 Park Plaza
Boston, MA  02116

Kathleen E. Cross

2

425194

# EXHIBIT 2

Not Reported in F.Supp.
1995 WL 6259 (S.D.N.Y.)
(Cite as: 1995 WL 6259 (S.D.N.Y.))
**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
**WERTHEIM SCHRODER & CO.
INCORPORATED, On behalf of Itself and all
others
Similarly Situated, Plaintiff,
v.
AVON PRODUCTS, INC., Defendant.**
**No. 91 Civ. 2287 (PKL).**

Jan. 9, 1995.
Marc S. Dreier, Donald J. Lough, Fulbright &
Jaworski, New York City.

Richard J. Urowsky, Samuel W. Seymour, Sullivan
& Bromwell, New York City.

Alexander Ewing, Debevoise & Plimpton, New
York City.

John D. Soriano, Simpson Thacher & Bartlett, New
York City.

*MEMORANDUM AND ORDER*

FRANCIS, United States Magistrate Judge.

**\*1** The defendant in this action, Avon Products,
Inc. ("Avon"), has moved for a protective order
vacating deposition notices served by the plaintiff,
Wertheim      Schroder      &      Co.      Incorporated
("Wertheim").      A nonparty, Morgan Stanley & Co.
Incorporated ("Morgan Stanley"), has likewise
moved to quash deposition subpoenas served by the
plaintiff.      Wertheim has cross-moved for an order
compelling Avon to produce documents and respond
to     interrogatories     and     compelling     nonparties
Debevoise & Plimpton and James D. Wolfensohn &
Co., Inc. to comply with document subpoenas.
Each of these issues will be addressed in turn.

*Background*

This case arises out of the issuance by Avon of a
new series of preferred stock entitled Preferred
Equity-Redemption Cumulative Stock ("PERCS") in
June 1988.      Plaintiff Wertheim, a PERCS holder,

alleges that Avon's declaration of two common
stock dividends on February 7, 1991, or the
subsequent payment of a quarterly dividend on
March   1,   1991,   triggered   the   Accelerated
Redemption of the PERCS pursuant to the terms
upon which the PERCS were issued.      Wertheim
contends that Avon's alleged failure to comply with
the Accelerated Redemption provision constitutes a
violation of federal securities laws and a breach of
contract.

Wertheim has served notices for the deposition of
nine Avon employees:   Jules Zimmerman, former
Chief   Financial   Officer   of   Avon;      Edward
Robinson, Chief Financial Officer;  Ann Scavullo,
Vice   President-Investor   Relations;      Nicholas
Camera, former Assistant General Counsel;  Siri S.
Marshal,   former   General   Counsel;      Hicks   B.
Waldron, former Chairman of the Board and Chief
Executive Officer;   and Hays Clark, Stanley Gault,
and Charles Locke, members of the Avon Board.
Avon has moved for a protective order precluding
the depositions of all of these witnesses.

Wertheim has also served two deposition subpoenas
on Morgan Stanley, which was the investment
banking firm that advised Avon both on the offering
of the PERCS and subsequently on issuance of the
common stock dividends.   The witnesses sought to
be deposed are Joan Young and John Anda.
Morgan Stanley has moved to quash the subpoenas
on the ground that their testimony would be
duplicative.

Wertheim has cross-moved to compel Avon to
produce documents responsive to Wertheim's first
request for the production of documents and to
answer Wertheim's first set of interrogatories.
Wertheim has also moved to enforce document
subpoenas    served    on    nonparties    Debevoise    &
Plimpton, Avon's outside counsel who drafted the
terms of the PERCS, and James D. Wolfensohn,
Incorporated, another investment banking firm that
advised Avon as to the proposed dividend increase
and its impact on redemption of the PERCS.

*Discussion*

A. *General Considerations*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in F.Supp.
(Cite as: 1995 WL 6259, *1 (S.D.N.Y.))

The scope of discovery under the Federal Rules is quite broad.   A party may inquire about anything "relevant to the subject matter involved in the pending action."   Fed.R.Civ.P. 26(b)(1).   This "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 349, 351 (1978).

**\*2** Nevertheless, discovery is not boundless and a court may place limits on discovery demands.
The frequency or extent of use of the discovery method otherwise permitted under these rules and by any local rule shall be limited by the court if it determines that:
(i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive;  (ii) the party seeking discovery has had ample opportunity in the action to obtain the information sought;  or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.
Fed.R.Civ.P. 26(b)(2).

This case involves a multimillion dollar claim, both parties have substantial assets, and some of the proposed discovery is essential to resolving the issues at stake in the litigation.   Hence, all other things being equal, counsel should be given significant leeway in discovery.   On the other hand, a substantial amount of discovery has already taken place.   Moreover, "permitting unfettered discovery of corporate executives would threaten disruption of their business and could serve as a potent tool for harassment in litigation.   Accordingly, where other witnesses have the same knowledge, it may be appropriate to preclude a redundant deposition of a highly-placed executive." *Consolidated Rail Corp. v. Primary Ind. Corp.*, No. 92 Civ. 4927 (PNL), 1993 WL 364471, *1 (S.D.N.Y. Sept. 10, 1993) (citing *CBS v. Ahern*, 102 F.R.D. 820, 822 (S.D.N.Y.1984)).   It is against this background that specific requests for additional discovery must be measured.

B. *Avon Depositions*

*1. Financial Witnesses*
Wertheim seeks to depose Jules Zimmerman, who served as the Chief Financial Officer ("CFO") of Avon at the time the PERCS were issued.   Avon claims that although Mr. Zimmerman has knowledge relating to the PERCS, his testimony would be duplicative of that of witnesses who have already been deposed, particularly that of John Donaldson, who was the Vice-President and Treasurer of Avon throughout the entire life of the PERCS and who reported directly to Mr. Zimmerman.

Wertheim alleges that as CFO, Mr. Zimmerman was most directly responsible for Avon's capital structure including the issuance of the PERCS.   Wertheim also contends that he was responsible for educating the Chairman of the Board and Chief Executive Officer ("CEO") about the terms of the PERCS.   Affidavit of Marc S. Dreier dated Oct. 24, 1994, Exh. 17 at 91.   Mr. Zimmerman appears to have made the final decision on the form of the offering that would be presented to the Board of Directors for approval.   Dreier Aff., Exh. 18, 19. According to the testimony of Mr. Donaldson, it was Mr. Zimmerman who chose the PERCS proposal of the investment firm of Morgan Stanley & Co. ("Morgan Stanley") over other proposals; who had primary contact with Avon's senior management and the Board of Directors about the PERCS;  and who was the principal contact with Morgan Stanley.   Dreier Aff., Exh. 17 at 35, 91; Exh. 18, 20, 21.     Neither the CEO nor Mr. Donaldson can testify as to the communications between Morgan Stanley and Avon because they did not participate.   Additionally, since Mr. Donaldson did not endorse the PERCS offering, Mr. Zimmerman's testimony may well differ as to Avon's intentions regarding the offering.   Dreier Aff., Exh. 17 at 86-87.   Therefore, the deposition of Mr. Zimmerman may go forward.

**\*3** Wertheim next seeks the deposition of Edward Robinson, the current CFO of Avon, who replaced Mr. Zimmerman shortly after the PERCS were issued.   Avon claims that Mr. Robinson's testimony would duplicate that of witnesses who have already been deposed, particularly the testimony of Mr. Donaldson.

Mr. Zimmerman was the CFO involved in the issuance of the PERCS, but Mr. Robinson was the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1995 WL 6259, *3 (S.D.N.Y.))

CFO concerned with their redemption.    In its answers to Wertheim's interrogatories, Avon identified Mr. Robinson as someone who participated in communications in which the meaning and purpose of the PERCS offering setting forth the redemption terms was interpreted. Answer to Interrogatory No. 9.    Avon further stated that:

--Mr. Robinson was involved in decisions concerning the February 7, 1991, dividend declaration (which Wertheim asserts mandated redemption at a higher exchange rate than that which Avon exercised);

--He participated in communications concerning the possibility that the February 7, 1991, dividend declaration might obligate Avon to redeem the PERCS at the higher exchange rate;  and

--He was involved in Avon's choice of September 4, 1991, as the date for payment of the $3.00 per share special dividend which Avon claims avoided the need for Accelerated Redemption at the higher exchange rate.
Answers to Interrogatories No. 12, 14, 15.

Mr. Donaldson testified that Mr. Robinson was the person who reached the conclusion that the dividends declared on February 7, 1991, would not trigger Accelerated Redemption.  Dreier Aff., Exh. 17 at 134-35.    Since this is a key issue in the litigation, Wertheim has the right to know how Mr. Robinson reached this conclusion, and exactly what he told the Special Committee of Avon's Board. [FN1]  In light of the fact that the minutes of the meetings do not reflect the content of Mr. Robinson's comments in detail and that Mr. Donaldson was unable to testify as to the basis for Mr. Robinson's conclusion, Mr. Robinson's testimony is necessary.

Moreover, Mr. Robinson's testimony would not be duplicative of Mr. Donaldson's testimony because, according to Morgan Stanley, it was Mr. Robinson and not Mr. Donaldson who supervised Morgan Stanley's preparation of the Report of the Special Committee which concluded that the dividend increase did not trigger redemption of the PERCS. Dreier Aff., Exh. 17 at 60-62;  Exh. 57. Accordingly, Mr. Robinson can be deposed.

Wertheim also seeks to depose Ann Scavullo, the Director of Investor Relations when the PERCS were issued and when they were redeemed.    Avon

argues that since the Chief Executive Officer already testified about his public comments regarding Avon's financial condition and its restructuring program, Ms. Scavullo's testimony would be duplicative.

Ms. Scavullo's testimony is critical to the allegations that Avon fraudulently misled PERCS investors on February 7, 1991, when it declared an increased dividend without disclosing that it had no intention of honoring the Accelerated Redemption provision.  Wertheim purchased additional PERCS based on that declaration.    The documents show that Ms. Scavullo received inquiries from investors other than Wertheim on February 7, 1991, concerning the impact of the dividend announcement on the PERCS and whether it triggered Accelerated Redemption.  Dreier Aff., Exh. 30.    Wertheim contends that these inquiries indicate that there was confusion in the market concerning Avon's intentions, but while Avon responded to individual questions, it did not make a public announcement of its intention not be accelerate redemption of the PERCS until five days later.    Consequently, investors allegedly did not have equal access to information:  some knew that Avon would not redeem, while others (including Wertheim) did not. Ms. Scavullo conversations with investors on February 7, 1991, are therefore essential in evaluating the allegations of fraud.

*4 Avon argues that Ms. Scavullo spoke with a Wertheim employee on February 7, 1991, and told him that Avon did not believe that the dividend triggered Accelerated Redemption.  Nevertheless, Wertheim continued to purchase PERCS. Avon claims that on the basis of that testimony, Wertheim is estopped from claiming that it was misled with regard to its purchases of PERCS after it spoke to Avon.  Precisely because there exists some question concerning Ms. Scavullo's conversations with investors (including Wertheim) on February 7, 1991, her deposition is necessary.

### 2. Legal Witnesses

Wertheim seeks to depose Siri S. Marshall, who served as the Vice President of Legal Affairs when the PERCS were issued, and was appointed Secretary in 1990; and Nicholas Camera, Assistant General Counsel through December of 1990.  Ms. Marshall and Mr. Camera were both members of Avon's legal department and were involved in the



Not Reported in F.Supp.
(Cite as: 1995 WL 6259, *4 (S.D.N.Y.))

Page   4

issuance and redemption of the PERCS.    They reviewed drafts of the offering materials and have information concerning how the Accelerated Redemption provision came to be included. Wertheim argues that since they attended every relevant meeting of the Board of Directors, Avon's Finance Committee, and the Special Committee and often served as the secretary at those meetings, they can authenticate the minutes of those meetings. However, Avon has agreed to stipulate to the authenticity of those minutes, [FN2] and live testimony is not necessary for that purpose.

Ms. Marshall's and Mr. Camera's testimony would be duplicative of the testimony of Ralph Arditi, a partner at Debevoise & Plimpton, Avon's regular outside counsel, who advised Avon, and who was the principal draftsman of Article IIIB and the Offering Circular which set out the terms of the PERCS. It would also be duplicative of the testimony of James Lurie, of Davis, Polk & Wardwell, who advised Morgan Stanley in connection with the issuance of the PERCS, and who was also actively involved in the drafting of Article IIIB and the Offering Circular. Furthermore, it would be duplicative of the testimony of Thomas Knight, Avon's General Counsel for the entire period relevant to this lawsuit whose testimony Avon has offered and who had a more substantial role than his subordinates with regard to the decision to declare the special dividend and increase the quarterly dividend on the common stock.    Declaration of Julie B. Crockett dated Oct. 3, 1994, Exh. 9.    Mr. Knight participated in decisions relating to the PERCS and attended meetings of the Board, the Finance Committee, and the Special Committee.    Hence, any information concerning discussions at these meetings can be obtained from Mr. Knight.    Therefore, the deposition notices for Ms. Marshall and Mr. Camera are quashed.

### 3. Board Witnesses

Wertheim has next noticed the deposition of Hicks Waldron, Avon's CEO and Chairman of the Board of Directors when the PERCS were issued.    Mr. Waldron presided over the meetings of the Board of Directors and its Finance Committee at which the PERCS were discussed and approved.  Dreier Aff., Exh. 3, 4, 5, 6.  He was the principal contact between Avon and its special consultant on the issuance of the PERCS, Professor Robert Glauber of

Harvard Business School.    Avon relies on Dr. Glauber's review of the PERCS to support its interpretation.    Mr. Waldron set the agenda for Dr. Glauber's review of the proposed PERCS offering, he received Dr. Glauber's report, and he met with him to discuss the proposed offering.    Dreier Aff., Exh. 7, 8, 9.

*5 In addition, Mr. Waldron was the chief spokesman on the PERCS after issuance.    In the course of several presentations to the investment community he made public statements concerning the purpose of the PERCS and how redemption terms would operate.  Dreier Aff., Exh. 12, 13, 14. These statements bear on the main issues in this litigation:    the purpose and meaning of the redemption provision and the adequacy of Avon's disclosure of its intentions.

Avon argues that his testimony will completely overlap the testimony of James Preston, the present Chairman and CEO of Avon.    However, Mr. Preston testified that he only became President and Chief Operating Officer in May 1988, just prior to the issuance of the PERCS and that before that time he had no real involvement in the management discussions leading up to their issuance.  Dreier Aff., Exh. 16 at 11, 17-19.  In light of these facts, Mr. Waldron's testimony is important to determining Avon's initial understanding of how the redemption provisions were to work and to establish the context in which Avon determined that the PERCS were necessary.    Wertheim asserts that the redemption provisions were either designed to mislead investors as to the appeal of the PERCS or were framed so hastily and recklessly that Avon disregarded the reliance investors would place on the interpretation later rejected by Avon.    These assertions underlie Wertheim's fraud claims and it is likely that Mr. Waldron can best address them.

Wertheim's interest in obtaining this information has to be weighed against the burden to Mr. Waldron, who has since retired.    Since the issues which Mr. Waldron will address underlie one of the material issues in this litigation, the burden of the proposed discovery does not outweigh its likely benefit. Additionally, Mr. Waldron's testimony is not obtainable from a more convenient source. Therefore, Mr. Waldron may be deposed.

Wertheim has also requested the depositions of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1995 WL 6259, *5 (S.D.N.Y.))

Hays Clark, Stanley Gault, and Charles Locke, members of the Special Committee of Avon's Board of Directors that advised the Board in February 1991 that it could increase the dividends on Avon's common stock without triggering Accelerated Redemption by declaring an increase in the quarterly dividend as well as a special dividend, but deferring payment until after September 1, 1991. Wertheim seeks to discover exactly what information was presented to the Special Committee which led it to that conclusion and how each Committee member reacted to that information. However, Wertheim has already taken the testimony of the other three members of the Special Committee, and a party has no absolute right to depose every person who has discussed a subject, even if that subject is central to the litigation. Additionally, Wertheim will discover exactly what information was presented to the Special Committee when it deposes Edward Robinson, who made the presentation.

Wertheim nevertheless demands these three further depositions to disprove Avon's argument that the terms of the PERCS were clear. [FN3] However, the court has already found that the language of the Accelerated Redemption provision is ambiguous as to whether the declaration of February 7, 1991 or the subsequent dividend payment on March 1, 1991 triggered the Accelerated Redemption provision. *Wertheim Schroder & Co. Inc. v. Avon Products, Inc.*, No. 91 Civ. 2287 (PKL), 1993 WL 126427, at *6 (S.D.N.Y. April 1, 1993) (denying summary judgment). In addition, the discovery already taken shows that the Special Committee members did not have a single understanding of the terms of the PERCS. Marc E. Leland, a member of the Special Committee testified that the declaration of an increased dividend would trigger the Accelerated Redemption provision. Dreier Aff., Exh. 27 at 149-50. On the other hand, Joseph A. Rice, the Chairman of the Special Committee, testified that only payment of an increased dividend would do so. Dreier Aff., Exh. 23 at 21-22.

*6 Finally, the burden to each of the potential deponents is substantial. Mr. Clark is 75 years old, retired, and resides for part of the year in Florida. Mr. Locke is 65 years old, retired, and resides in Illinois. Mr. Gault is the Chairman and CEO of Goodyear Tire and Rubber Company and resides in Ohio. His executive responsibilities are significant and time consuming. Any marginal value that

Wertheim might obtain from their testimony is overborne by the burden to these individuals. Additionally, the travel time and costs associated with taking testimony from out of state witnesses weighs against Wertheim. Therefore, none of these witnesses need be produced. [FN4]

C. *Morgan Stanley Witnesses*

Morgan Stanley, the investment bank that advised Avon in the issuance of the PERCS, now moves to quash subpoenas served on two of its employees, Joan Young and John Anda. Morgan Stanley contends that these depositions would be duplicative of others already taken, and it argues that because it is a nonparty, the Court should be especially sensitive to any burden that would be imposed upon it.

The courts have not spoken with a single voice on the question of whether discovery requests directed to nonparties should be treated differently from those addressed to parties and, if so, in what respects. On one hand, courts often state that the obligations of a nonparty under Rule 45 of the Federal Rules of Civil Procedure are equivalent to the duties of parties responding to discovery under other rules. *See Schwartz v. New York City Off-Track Betting Corp.*, No. 92 Civ. 1166 (KMW), 1993 WL 42760, at *3 (S.D.N.Y. Feb. 11, 1993); *Castle v. Jallah*, 142 F.R.D. 618, 620 (E.D.Va.1992). On the other hand, many courts suggest that weight should be given to nonparty status in assessing the burden of compliance. *See Katz v. Batavia Marine & Sporting Supplies, Inc.*, 984 F.2d 422, 424 (Fed.Cir.1993); *Jack Frost Laboratories, Inc. v. Physicians & Nurses Manufacturing Corp.*, No. 92 Civ. 9264 (MGC), 1994 WL 9690, at *2 (S.D.N.Y. Jan. 13, 1994).

Certainly, discovery should not simply be denied on the ground that the person or entity from whom it is sought is not a party to the action. The outcome of litigation should not hinge on the fortuity that relevant information is possessed by a nonlitigant rather than by a party. A better approach is for the court to take steps to relieve a nonparty of the burden of compliance even when such accommodations might not be provided to a party. For example, while a party is generally expected to bear its own costs of responding to discovery requests, Rule 45(c)(3)(B)(iii) specifically

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1995 WL 6259, *6 (S.D.N.Y.))

contemplates compensating a nonparty who would otherwise incur substantial expense.

Morgan Stanley's motion can now be measured against these principles. Morgan Stanley argues that Joan Young should not be required to testify because her testimony would be duplicative of that of David Topper, who has already been deposed. Each was a member of the team that advised Avon's Special Committee on the PERCS. However, Ms. Young attended and provided advice at the first meeting of the Special Committee on July 31, 1990, a meeting which Mr. Topper did not attend. Dreier Aff., Exh. 32. Likewise, she made a presentation at the Special Committee's July 3, 1990 meeting, when Mr. Topper was again not in attendance. Dreier Aff., Exh. 24 at 16-18; Exh. 35. Morgan Stanley's assertion that Ms. Young's responsibilities were identical to Mr. Topper's is belied by these facts. Thus, while Mr. Topper may have generally been in the best position to testify about Morgan Stanley's advice on the PERCS, there are gaps in his knowledge that can best be filled by the deposition of Ms. Young. *See Polycast Technology Corp. v. Uniroval Inc.,* No. 87 Civ. 3297 (CSH), 1990 WL 138968, at *3 (S.D.N.Y. Sept. 20, 1990).

**\*7** The question remains whether Wertheim should be required to compensate Morgan Stanley. The burden of preparing for a single additional deposition is not substantial, and Morgan Stanley has ample resources. Moreover, Morgan Stanley was not a mere bystander to the transactions at issue: it provided advice about them for which it received compensation. Under these circumstances, Morgan Stanley could reasonably anticipate continuing involvement, whether as a litigant or as a nonparty. For these reasons, no shifting of costs is warranted, and Morgan Stanley's motion to quash the subpoena for Joan Young is denied.

Morgan Stanley also argues that any deposition of John Anda would duplicate testimony of John H. Erdman, Jr. Mr. Erdman was the senior member of the Morgan Stanley team that advised Avon at the issuance of the PERCS. He has already testified for two days. The only function exclusively performed by Mr. Anda that Wertheim Schroder has identified was the review of a draft of the offering memorandum. Dreier Aff., Exh. 50. However, the drafts were prepared by Avon or its outside counsel, who have already been deposed. Dreier

Aff., Exh. 31 at 41-44; Exh. 47 at 15, 63. Apart from this, the only basis asserted for taking Mr. Anda's deposition is that "Morgan Stanley's insistence that he not be deposed at all reasonably leads Wertheim Schroder to conclude that Mr. Anda may have something important to say." Plaintiff's Memorandum at 24. Based on the record, a more reasonable conclusion is that Mr. Anda has nothing new to say. Accordingly, Morgan Stanley's motion to quash the subpoena served on Mr. Anda is granted.

D. *Document Requests and Interrogatories*

In its cross-motion, Wertheim seeks to compel production of a variety of documents and answers to interrogatories that it believes are relevant to Avon's motive for allegedly defrauding the PERCS holders.

In Document Request No. 2, Wertheim seeks documents concerning a possible link between a dividend reduction and a tender offer or takeover bid for Avon or a possible link between a dividend reduction and a proxy fight for control of Avon. Avon claims that those requests are not relevant to this lawsuit but has agreed to produce documents responsive to this request. Therefore, this issue need not be addressed here.

In Documents Requests No. 15, 16, and 17, Wertheim demands all documents concerning the interest of Amway, Mary Kay and Jacobs in acquiring Avon. Wertheim asserts that these takeover documents are relevant to its fraud claim against Avon because they would reveal Avon's motive in the issuance of the PERCS and the February 7, 1991, declaration. However, these takeover threats occurred in 1989, after the PERCS were already issued, and well before the dividend declaration in February 1991. Wertheim has not demonstrated any connection between these takeover attempts and the PERCS. In light of the burden on Avon to search for and review these documents which might be of marginal relevance, I shall not require Avon to produce them. *See Chemical Bank v. Affiliated FM Insurance Co.,* No. 87 Civ. 0150 (VLB), 1994 WL 89273, at *2 (S.D.N.Y. March 16, 1994) (where evidence sought would be of only marginal probative value, motion to compel should be denied).

**\*8** In Document Request No. 18, Wertheim seeks

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1995 WL 6259, *8 (S.D.N.Y.))

documents relating to a threatened takeover by Chartwell Associates.    Wertheim argues that it needs these documents to prove that Avon's fear of a takeover motivated it to increase its dividend even though this would violate the terms of the PERCS. James Preston, the CEO of Avon, testified that Avon did not engage in a share repurchase partly because it would increase Chartwell's percentage in Avon and thus enhance the risk of a takeover. Dreier Aff., Exh. 16 at 189-90. The Special Committee Report also acknowledges Avon's concern with increasing shareholder value without enhancing Chartwell's ability to take control of Avon.    Second Amended Class Action Complaint, Exh. B.    These documents are relevant to Wertheim's allegations of fraud and they therefore must be produced.

Finally, in Interrogatory No. 6, Wertheim requests that Avon identify all persons who witnessed or participated in any discussions concerning a possible takeover bid or proxy fight for Avon involving Amway, Mary Kay, Jacobs, or Chartwell.    For the same reasons that Avon must produce the documents concerning Chartwell, it must also identify all the persons involved in that threatened proxy fight. However, as discussed above, the relevance of the Amway, Mary Kay, and Jacobs takeover threats is dubious, and Avon therefore need not identify the persons who were involved in those potential takeovers.

Discovery requests similar to those addressed above were served by subpoenas *duces tecum* upon nonparties Debevoise & Plimpton and James D. Wolfensohn Incorporated.    They shall respond to the same extent required of Avon.

*Conclusion*

For the reasons set forth above, Avon's notice for a protective order is granted to the extent that the notices of deposition served upon Siri S. Marshall, Nicholas Camera, Hays Clark, Stanley Gault, and Charles Locke are quashed upon the condition that none of these persons shall appear at trial as a witness for Avon.    In all other respects, Avon's motion is denied.    Morgan Stanley's motion to quash the subpoena for the deposition of Joan Young is denied, but its motion to quash the subpoena for the deposition of John Anda is granted.    Wertheim's cross-motion to compel is

granted to the extent · that Avon shall provide documents responsive to Document Request No. 18 and shall respond to Interrogatory No. 6 with respect to Chartwell only.    Nonparties Debevoise & Plimpton and James D. Wolfensohn Incorporated shall be subject to the same obligations.    The cross-motion is otherwise denied.

SO ORDERED.

FN1. The Special Committee was created to advise the Board on alternatives to enhance shareholder value.

FN2. Wertheim offered to forego Ms. Marshall's deposition if (i) Mr. Camera is produced for deposition, (ii) Avon stipulates to the authenticity and admissibility of the minutes of all meetings that Ms. Marshall recorded as Secretary, and (iii) Avon stipulates not to call Ms. Marshall as a trial witness. Avon has agreed to stipulate to the authenticity of the minutes, but has not addressed the other conditions.

FN3. Wertheim did offer to limit itself to deposing only one of these Special Committee Members so long as Avon stipulates not to call as a trial witness any Special Committee member who has not been deposed.    Avon did not responded to this suggestion.

FN4. Avon, however, shall not be permitted to utilize these persons as witnesses at trial.

1995 WL 6259 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

.        1:91CV02287            (Docket)
(Apr. 03, 1991)

**END OF DOCUMENT**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# EXHIBIT 3

Not Reported in F.Supp.
1994 WL 175028 (D.Mass.), 33 U.S.P.Q.2d 1110
(Cite as: 1994 WL 175028 (D.Mass.))
**H**

Page    1

**Motions, Pleadings and Filings**

United States District Court, D. Massachusetts.
**RADIONICS, INC.**
v.
**ELEKTA INSTRUMENT AB and Elekta
Instruments, Inc.**
Civ. A. No. 93-10014-Z.

April 26, 1994.
Martin J O'Donnell, Cesari & McKenna, Boston,
MA, David J. Thibodeau, Jr., Cesari & McKenna,
Boston, MA, for Radionics, Inc.

Theresa M. Gillis, Thomas Heyman, Jones, Day,
Reavis & Pouge, New York City, Michael T.
Cetrone, Joseph F. Shea, Nutter, McClennen &
Fish, Boston, MA, for Elekta Instrument AB,
Elekta Instruments Inc.

*MEMORANDUM AND ORDER*

ZOBEL, District Judge.

**\*1**  Radionics, Inc.'s ("Radionics") patent
infringement case is based on Elekta Instruments,
Inc.'s ("Elekta Instruments") sale of a device that
enables physicians to target surgical sites.    This
memorandum addresses three sets of motions, Elekta
Instrument AB's ("Elekta AB") motion to dismiss
for lack of personal jurisdiction, Elekta Instruments'
motion to dismiss for lack of standing, and the
parties' cross motions to compel discovery.

I.  Elekta AB's Motion to Dismiss for Lack of
Personal Jurisdiction.

Elekta AB, a Swedish company, moves to dismiss
for lack of personal jurisdiction.    It maintains that it
does no business in Massachusetts such that the
Commonwealth's long-arm statute may reach it, and
does not have the minimum contacts with
Massachusetts necessary for this Court to assert
jurisdiction.  Radionics argues that because Elekta
AB is the parent entity of several companies doing
business in the United States and Massachusetts,
jurisdiction is proper.

A nonresident defendant must be amenable to
service of process before a court can assert

jurisdiction.    In addition, due process requires a
showing that the defendant "purposefully established
" 'minimum contacts' " in the forum State." *Asahi
Metal Indus. Co. v. Superior Court of California,*
480 U.S. 102, 108-09 (1987) (quoting *Burger King
Corp. v. Rudzewicz,* 471 U.S. 462, 474 (1985)).
The necessary connection between the defendant and
the forum state must arise from "an action of the
defendant purposefully directed toward the forum
State." *Asahi,* 480 U.S. at 112 (emphasis omitted).
Mere foreseeability that defendant's products might
enter the forum state's market is not enough.  *Id.*
Thus, whatever the specifics of a state's long-arm
statute, the exercise of jurisdiction is improper
absent the requisite contacts between the defendant
and the forum state.

*A. Elekta AB's Contacts with Massachusetts*

First, Radionics claims that Elekta AB is the sole
shareholder and exercises plenary control of Ruggles
Corporation ("Ruggles"), a surgical instrument
company in Quincy, Massachusetts.  According to
Radionics, Ruggles is undercapitalized and shares a
common board of directors with Elekta AB.  In its
view, this corporate structure justifies piercing the
corporate veil and subjecting Elekta AB to
jurisdiction through its Massachusetts subsidiary.

Radionics has failed to show a connection,
however, between Ruggles and the instant case.  It
has not even suggested that Ruggles manufactures,
markets, sells or distributes the Elekta Instruments
products it is accused of infringing.    The
Massachusetts long-arm statute allows personal
jurisdiction over an entity transacting business in the
Commonwealth, but only if the cause of action
arises out of the transaction.  Mass.Gen.L.Ann. ch.
223A, § 3 (West 1985).  Thus, even if Elekta AB
wielded full-scale control over the Ruggles
operation, it would not be subject to this Court's
jurisdiction.

**\*2** Second, Radionics asserts that Elekta AB itself
marketed and sold its products in Massachusetts.
Elekta AB allegedly distributed press releases for an
April, 1993 neurosurgeons' convention in Boston.
Radionics submits two newspaper articles to support
its claim.    The first article is an announcement by
Elekta Instruments (the United States company), not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1994 WL 175028, *2 (D.Mass.))

Page    2

Elekta AB (the Swedish company), regarding its products; it suggests no connection between Massachusetts and Elekta AB. The second article reported that a Canadian company had agreed with Elekta AB to distribute a "viewing wand," a device not accused of infringing. (Thibodeau Aff., Exs. F, G). Again, Radionics has failed to show a connection between Elekta AB's local business dealings and this infringement action.

Radionics relies on several cases (all decided before the Supreme Court gutted the foreseeability doctrine in *Asahi* ) for the proposition that a foreign company which induces a United States company (Elekta Instruments) to distribute infringing products is subject to federal jurisdiction at the situs of the patent holder. First, that situs is Utah, not Massachusetts. Second, each of these cases is distinguishable from the instant case because the foreign companies had additional contacts with the forum state which justified jurisdiction. *See Honeywell, Inc. v. Metz Apparatewerke,* 509 F.2d 1137 (7th Cir.1975) (distributor company located in forum state; foreign company furnished publicity material and warranties to forum state); *Crucible, Inc. v. Stora Kopparbergs Bergslags AB,* 403 F.Supp. 9 (W.D.Pa.1975) (foreign corporation negotiated contracts in forum state); *Engineered Sports Prods. v. Brunswick Corp.,* 362 F.Supp. 722 (D.Utah 1973) (foreign company directed trade names and advertising into forum state); *S.C.M. Corp. v. Brother Int'l Corp.,* 316 F.Supp. 1328 (S.D.N.Y.1970) (foreign corporation identified itself with domestic. forum state corporation in advertising); *Olin Mathieson Chem. Corp. v. Molins Org., Ltd.,* 261 F.Supp. 436 (E.D.Va.1966) (foreign company sent its employees to do business in forum state); *Huchel v. Sybron Corp.,* 212 U.S.P.Q. (BNA) 133 (S.D.Tex.1980) (foreign corporation advertised its products within forum state); *Antonious v. Kamata-Ri Co.,* 204 U.S.P.Q. (BNA) 110 (D.Md.1979) (foreign company negotiated patent and retained sales agent in forum state); *Kearns v. Wood Motors, Inc.,* 204 U.S.P.Q. (BNA) 485 (E.D.Mich.1978) (foreign corporation offered forum's customers option of receiving their products directly from Germany).

Finally, Radionics claims that due process is satisfied by aggregating the contacts of a foreign corporation. It is true that in federal question cases, a defendant may be subject to federal

jurisdiction if it has minimum contacts with the United States rather than with the forum state. Before a defendant can be hailed into court, however, it must be amenable to service of process, either through the state's long-arm statute, or a statute allowing nationwide service of process, because service of process constitutes the vehicle by which the court obtains jurisdiction. *United Elec. Workers v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1085 (1st Cir.1992); *In re Plastic Bag Production Patent and Antitrust Litigation,* No. MDL-705, 1987 WL 14500, at *2 (D.Mass. Apr. 24, 1987) (aggregate United States contacts satisfy due process in suit under the Clayton Act which allows nationwide service of process). The Massachusetts long-arm statute will not reach Elekta AB.

*3 Because Radionics has submitted no evidence of contacts sufficient to satisfy either the service of process statutes or the due process requirements of federal jurisdiction, Elekta AB's motion to dismiss (# 11) is granted.

II. Elekta Instruments' Motion to Dismiss for Lack of Standing or Failure to Join an Indispensable Party.

Elekta Instruments claims that Radionics is a mere licensee of the disputed U.S. Patent No. 4,608,977 (the "Brown patent") and therefore has no standing to sue for infringement. According to Elekta Instruments, when an exclusive licensee brings a patent infringement suit, the patent owner must be joined as a necessary party. Radionics maintains that it is legally an assignee of the Brown patent and thus may sue in its own name without joining the patent owner.

A. *Radionics' Standing to Sue for Infringement*

Standing to sue for infringement generally rests with the patent owner or the owner's assignees. *Waterman v. Mackenzie,* 138 U.S. 252, 255 (1891); *Arachnid, Inc. v. Merit Indus.,* 939 F.2d 1574, 1579 (Fed.Cir.1991). A non-exclusive licensee has no title to the patent and has no right to sue for infringement. *Waterman,* 138 U.S. at 255; *Amgen, Inc. v. Chugai Pharmaceutical Co.,* 808 F.Supp. 894, 899-900 (D.Mass.1992). Thus, the crucial question is whether, as a matter of law, Radionics was effectively the assignee of the Brown patent.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1994 WL 175028, *3 (D.Mass.))

Page 3

Whether a transfer is an assignment or a license does not depend upon the name by which it calls itself, but upon the legal effect of its provisions. *Vaupel Textilmaschinen v. Meccanica Euro Italia,* 944 F.2d 870, 875 (Fed.Cir.1991) (quoting *Waterman,* 138 U.S. at 256). The legal effect is determined by the substance of rights the patent owner granted and the rights it retained. *Vaupel,* 944 F.2d at 874-75. An agreement transferring all substantial rights and retaining only incidental ones is an assignment and provides the assignee standing to sue for infringement. *Id.*

A patent owner holds "the right to exclude others from making, using, and selling" the claimed invention. 35 U.S.C.A. § 154 (West 1984). Courts considering whether a grant of rights also confers upon the transferee standing to sue have examined whether the transferor granted "essential" rights to the patent. These are the " 'right of exclusivity, the right to transfer and *most importantly* the right to sue infringers.' " *Ciba-Geigy Corp. v. Alza Corp.,* 804 F.Supp. 614, 630 (D.N.J.1992) (quoting *Calgon Corp. v. Nalco Chemical Co.,* 726 F.Supp. 983, 986 (D.Del.1989) ).

The agreement ("Agreement") between Brown and Radionics grants Radionics the following rights: (1) the exclusive right to make, have made, use, lease and sell the invention (Agreement, ¶¶ II(A), (B)); (2) the right to transfer the license (Agreement, ¶ II(C)); and (3) the right to bring suit for infringement (Agreement, ¶ V(B)). Brown retained the following rights: (1) the right to convert the license to a non-exclusive license if annual minimum royalties were not paid (Agreement, ¶ III(H)); (2) the right to consent to the transfer or assignment of the license, with the proviso that consent will not be unreasonably withheld (Agreement, ¶¶ II(C), (D)); and (3) the right to bring suit if Radionics does not exercise its right to sue within six months of notice from Brown (Agreement, ¶ V(B)). As discussed further below, none of these reserved rights is so substantial as to reduce the transfer to a mere license, therefore, Radionics has standing to sue for infringement.

1. *Exclusivity*

*4 The right to convert the license to a non-exclusive arrangement if minimum royalties are not paid does not affect the exclusivity of the grant. An assignment of a patent " 'may be either absolute, or by way of mortgage and liable to be defeated by non-performance of a condition subsequent.' " *Vaupel,* 944 F.2d at 875 (quoting *Waterman,* 138 U.S. at 256); *Ciba-Geigy,* 804 F.Supp. at 629-33 (exclusive licensee who has sufficient rights to maintain an infringement action does not lose that ability because a condition subsequent would destroy its exclusive license). *Cf. Pfizer Inc. v. Elan Pharmaceutical Research Corp.,* 812 F.Supp. 1352, 1371-73 (D.Del.1993) (where patent owner retained right to manufacture invention, licensee had no standing to sue). Until lost by the nonpayment of royalties, Radionics' rights to the patent are exclusive and thus support its suit.

2. *Transferability*

Similarly, the fact that Brown retained the right to consent to the granting of sublicenses, but agreed that consent will not be unreasonably withheld, does not destroy the assignment. At most, such a consent provision is "a minor derogation from the grant of rights" which does not "substantially interfere with the full use ... of the exclusive rights under the patent." *Vaupel,* 944 F.2d at 875; *Ciba-Geigy,* 804 F.Supp. at 633-34.

3. *Right to Sue for Infringement*

Finally, the agreement did transfer the right to sue for infringement, subject to defeasance only if not exercised. Such a provision does not destroy the assignment. *Vaupel,* 944 F.2d at 875; *Ciba-Geigy,* 804 F.Supp. at 635. Notably, Brown does not retain a concurrent right to bring a lawsuit; he may only sue if Radionics does not.

The *Vaupel* court saw the grant of the right to sue for infringement as particularly dispositive, because in that case, as here, the ultimate question was whether the licensee could sue alone or only in conjunction with the patent owner. *Vaupel,* 944 F.2d at 875. The court noted that the policy underlying the requirement that an exclusive licensee join the owner is to prevent the possibility of two suits on the same patent against a single infringer. *Id.* That policy is not undercut here because the right to sue rests solely with Radionics unless Radionics forgoes its right, which it has not done. *See Vaupel,* 944 at 875-76.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
**(Cite as: 1994 WL 175028, \*4 (D.Mass.))**

B. *Joinder under Rule 19*

Under the Federal Rules of Civil Procedure, a person must be joined if "complete relief cannot be accorded among those already parties," or if a decision in the case may make "persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations." Fed.R.Civ.P. 19(a).    Following the reasoning above, it is clear that Radionics can secure complete relief for itself without the joinder of Brown. Further, the defendants will not be subject to multiple or inconsistent obligations because this suit bars a later action on the same patent by Brown. Defendant Elekta Instruments' motion to dismiss for lack of standing or failure to join an indispensable party (# 23) is denied.

III. Discovery Disputes.

**\*5** The foregoing renders most of the litigants' discovery quarrels moot.   The parties shall attempt to resolve the remaining disputes, and only if unable to do so shall detail the issues to which a decision is required.

#### Conclusion
Elekta AB's motion to dismiss (# 11) is allowed. Elekta Instruments' motion to dismiss for lack of standing and failure to join an indispensable party (# 23) is denied.

**Motions, Pleadings and Filings (Back to top)**

.            **1:93CV10014**            **(Docket)**
**(Jan. 07, 1993)**

**END OF DOCUMENT**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# EXHIBIT 4

Not Reported in F.Supp.2d
2003 WL 164251 (D.Mass.)
**(Cite as: 2003 WL 164251 (D.Mass.))**
c

Page   1

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Massachusetts.
**JANA BRANDS, INC.**
v.
**NEXIFM, INC. d/b/a IFM International Foods
and Gustavo Vela
No. Civ.A. 01-12320RWZ.**

Jan. 23, 2003.

*MEMORANDUM OF DECISION*

ZOBEL, J.

**\*1** Plaintiff Jana Brands, Inc., a Delaware corporation with its principle place of business in Natick, Massachusetts, produces frozen fish products. Defendant NexiFM, Inc., a Texas corporation with its principle place of business in Texas, distributes frozen foods. In 2000, defendant sought to purchase frozen seafood and contacted a food broker in California [FN1] who called Kevin McCarthy, Jana Brand's president, at the plaintiff's Seattle, Washington office. Negotiations for the sale continued via telephone while Mr. McCarthy was at the company's Massachusetts headquarters. During these discussions, the plaintiff requested that the broker send additional credit information for the defendant to its Washington office to be forwarded to the Massachusetts headquarters. After approval, the plaintiff's Massachusetts office faxed to defendant sales confirmations, import/export related documents and invoices.

> FN1. A factual discrepancy exists between the plaintiff and the defendants as to the particular broker who contacted the plaintiff's Washington office. Where such discrepancy exists, the plaintiff's allegations will be presumed true. Here, the plaintiff has not specified the location of the broker, while the defendants have alleged that they contacted a broker in California.

In December 2000, defendant purchased three 35,200 pound containers of frozen seafood for $90,288 from the plaintiff. The seafood was shipped

from Los Angeles, California. In January 2001, plaintiff's Massachusetts office received a payment of $30,976. Thereafter, defendant Gustavo Vela, NexiFM's president and sole owner, sent three payments to the plaintiff totaling $15,000. Two of the payments were sent directly to plaintiff's bank at an unidentified location. Mr. McCarthy collected the third payment at defendants' Texas office. Because defendant Vela orally agreed to pay the remaining balance by the end of 2001, the plaintiff agreed not to sue. Defendant Vela called plaintiff's Massachusetts office several times to discuss the matter but did not make additional payments.

The plaintiff filed suit on December 26, 2001, alleging breach of contract, unjust enrichment, quantum meruit, and unfair and deceptive trade acts and practices under Massachusetts law. Defendants have filed a Motion to Dismiss for lack of personal jurisdiction.

When a defendant contests personal jurisdiction, the plaintiff has the burden of proof to show that jurisdiction over the defendant is permitted. *Landmark Bank v. Machera,* 736 F.Supp. 375, 380 (D.Mass.1990). In doing so, the plaintiff "must go beyond the pleadings and make affirmative proof." *Chlebda v. H.E. Fortna & Brother, Inc.,* 609 F.2d 1022, 1024 (1st Cir.1979) (citations omitted.).

In a diversity case, personal jurisdiction over a nonresident defendant is restricted by: (1) the forum state's long-arm statute and (2) the Due Process Clause of the Fourteenth Amendment. *Lyle Richards International, Ltd. v. Ashworth,* 132 F.3d 111, 112 (1st Cir.1997). The Massachusetts' long-arm statute states that "[a] court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's (a) transacting any business in this commonwealth...." Mass. Gen. Laws ch. 223A, § 3. Because jurisdiction under the statute is authorized to the limits permitted by the Constitution, the sole issue is whether Section 3(a) confers jurisdiction within its literal and constitutional boundaries. *Good Hope Industries, Inc. v. Ryder Scott Co.,* 389 N.E.2d 76, 79-80 (Mass.1979).

**\*2** The literal requirement of the statute is easily

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



met: a single  " 'isolated' transaction, or one with 'little impact on the commerce" of the commonwealth" suffices. *Bond Leather Co., Inc. v.. Q.T. Shoe Mfg. Co.,* 764 F.2d 928, 932 (1st Cir.1985). Therefore, in the ordinary case, the inquiry focuses on the constitutional issue. *Cambridge Literary Properties, Ltd. v. W. Goebel Porzellanfabrik,* 295 F.3d 59, 63 (1st Cir.2002). Then the question is whether the plaintiff's claims arise from or relate to the defendants' contacts with Massachusetts, *Sigros v. Walt Disney World Co.,* 129 F.Supp.2d 56, 66 (D.Mass.2001), "which resulted from an affirmative, intentional act of the defendant, such that it is fair and reasonable to require the defendant to come into the State to defend the action." *Good Hope Industries, Inc.,* 389 N.E.2d at 79. *See also Cambridge Literary Properties, Ltd.,* 295 F.3d at 63. "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240 (1958).

In the present case, the plaintiff has not carried its burden to establish the existence of personal jurisdiction over the defendants. By engaging in the instant transaction, defendants did not purposefully avail themselves of the privilege of "conducting activities within the forum State, thus invoking the benefits and protections of its laws." *See Bond Leather Co., Inc.,* 764 F .2d at 933 (stating that "the fact that a nonresident enters into a single commercial contract with a resident of the forum state is not necessarily sufficient to meet the constitutional minimum for jurisdiction."). Defendants' contacts with Massachusetts were fortuitous. The telephone conversations defendants' agent had with plaintiff's president while the latter was in Massachusetts and defendant Vela's subsequent calls concerning payment cannot be construed as affirmative acts whereby defendants availed themselves of the privilege of conducting activities in Massachusetts. *See Aub v. Technicolor Entertainment Services,* 2002 WL 31269003 (stating that the "fact that there were long-distance communications between the parties by mail and telephone is not enough to justify the conclusion that [business was transacted] *in* Massachusetts."). Furthermore, although defendants' payments were ultimately received by the plaintiff, the facts indicate

that only one was sent to Massachusetts, which is insufficient to confer jurisdiction. *See 'Automatic' Sprinkler Corp. of America v. Seneca Foods Corp.,* 280 N.E.2d 423, 445 (Mass.1972) (stating that "making payments through the mail" is not a significant contact.). The only other contacts defendants had with Massachusetts did not involve an affirmative or intentional act by them; they merely received faxes from the plaintiff.

*3 All other relevant facts occurred outside of Massachusetts. Significantly, the defendants' broker or agent initially contacted the plaintiff's Washington office and began negotiations there. Plaintiff notably had defendants' broker send the credit information to the plaintiff's Washington office. Finally, the seafood sold under the contract was shipped from California. Given the minimal contacts defendants had with the state, they could not have reasonably anticipated being haled into a Massachusetts court.

Accordingly, the defendants' Motion to Dismiss is allowed. Judgment may be entered dismissing the Complaint without prejudice.

2003 WL 164251 (D.Mass.)

**Motions, Pleadings and Filings (Back to top)**

.            **1:01CV12320**            (Docket) (Dec. 26, 2001)

**END OF DOCUMENT**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# EXHIBIT 5

Not Reported in F.Supp.
1997 WL 33547301 (D.R.I.)
(Cite as: 1997 WL 33547301 (D.R.I.))

Only the Westlaw citation is currently available.

United States District Court,
D. Rhode Island.
**CYTOTHERAPEUTICS, INC., Plaintiff,**
v.
**NEUROSPHERES LTD., Defendant.**
**No. Civ.A. 97-019L.**

March 13, 1997.

Joseph V. Cavanagh, Jr., Blish & Cavanagh, Providence, RI, William C. Brashares, H. Joseph Hameline, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, for plaintiff.

Don M. Kennedy, Keefe B. Clemons, Goodwin, Procter & Hoar, Boston, MA, Peter F. Mathieu, Baluch, Gianfrancesco,Mathieu & Szerlag, Providence, RI, for defendant.

*MEMORANDUM AND ORDER*

LAGUEUX, Chief J.

**\*1** This dispute arises from an agreement entered into by plaintiff Cytotherapeutics, Inc. (based in Rhode Island) and defendant Neurospheres Ltd. (based in Calgary, Alberta, Canada). Pursuant to that agreement, plaintiff received a license from defendant for the commercial development, sale and use of "in vitro generated, EGF-responsive neuronal stem cells." Plaintiff now claims that defendant has violated that agreement by altering its interpretation of the term "epidermal growth factor" or "EGF" and that said breach causes injury to plaintiff in Rhode Island. Therefore, plaintiff has brought suit in Rhode Island seeking expedited discovery and a preliminary injunction to hold the status quo until arbitration can be conducted in Toronto, Ontario, Canada.

This case is presently before the Court on defendant's motion to dismiss for lack of personal jurisdiction or, in the alternative, on the basis of forum non conveniens. For the reasons that follow, decision on defendant's motion is deferred. Additional discovery by the parties will be allowed over the next thirty (30) days on the issues of personal jurisdiction and forum non conveniens, and then the Court will conduct a full evidentiary hearing on those issues.

I. Facts

The facts essential to the resolution of this motion are as follows. Plaintiff is a bio-pharmaceutical company based in Rhode Island and incorporated in Delaware. Defendant is incorporated under the laws of Alberta, Canada, and its place of business is in Calgary.

In March of 1994, the parties entered into an agreement under which plaintiff received a license for the commercial development, sale and use of "in vitro generated, EGF-responsive neuronal stem cells" for use in transplantation to treat human disease, in exchange for supplying large sums of money for continued research and development by defendant. The licensing agreement states that it shall be interpreted in accordance with the laws of Alberta. The contract also provides for alternate dispute resolution "with respect to any matter relating to" the agreement. Pursuant to the contract, such matters will be dealt with first by mediation and then binding arbitration to be conducted by the International Chamber of Commerce of Toronto, Canada.

The licensing agreement between the parties is currently a source of controversy, as plaintiff claims that defendant has broken the contract and is now negotiating with plaintiff's competitors for licensing agreements. Plaintiff has moved for, and intends to pursue, arbitration on the merits of the dispute in Canada, as provided by the licensing agreement. However, on January 13, 1997, plaintiff brought suit in this Court seeking expedited discovery and immediate injunctive relief pending arbitration.

On January 16, 1997, defendant commenced an action in Alberta, Canada. The Provincial Court there temporarily restrained plaintiff Cytotherapeutics, Inc. from pursuing its claims in this Court, but subsequently lifted that temporary restraining order.

**\*2** After the restraining order was vacated, this Court conducted a hearing on defendant's motion to dismiss for lack of personal jurisdiction or for forum non conveniens. At that time, this Court determined that facts essential to the resolution of the motion were unknown and ordered the parties to submit supplemental affidavits and/or memoranda

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1997 WL 33547301, *2 (D.R.I.))

Page    2

concerning the formation of the contract.

Both parties have filed supplemental affidavits and memoranda. Defendant argues that the final act which caused the contract to become binding occurred in Calgary, thereby rendering the exercise of specific jurisdiction in Rhode Island inappropriate. In contrast, plaintiff asserts that the final act of contract formation occurred in Rhode Island, and, therefore, this Court has specific personal jurisdiction in this case.

In the alternative, defendant contends that the present case should be dismissed by this Court on the basis of forum non conveniens. Defendant argues that Alberta provides a suitable alternate forum for this dispute, and all the "relevant and essential sources of proof" are located in Alberta. Defendant's arguments are premised on its view that this controversy is essentially based in Canada. In contrast, plaintiff disputes that the relevant witnesses and documents are exclusively in Canada. Rather, it is plaintiff's contention that the present dispute is global in nature, with serious effects in Rhode Island.

II. Discussion

A. *Personal Jurisdiction*

A court may exercise "specific jurisdiction" when "plaintiff's claims 'arise out of' or are 'directly related' to defendant's contacts with the forum state." *DuPont Tire Serv. Ctr., Inc. v. N. Stonington Auto-Truck Plaza, Inc.,* 659 F.Supp. 861, 863 (D.R.I.1987) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). [FN1] In *DuPont Tire,* this Court held that it could exercise specific jurisdiction over a defendant when the defendant's sole contact with Rhode Island was a trip to the state to negotiate a contract. Since the dispute arose from that contract, and the contract was completed in Rhode Island, the Court found that the defendant had "purposefully directed" its behavior toward Rhode Island, rendering itself subject to suit in this state. *See DuPont Tire,* 659 F.Supp. at 863-864 (quoting *Asahi Metal Ind. Co. v. Superior Court of California,* 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)).

FN1. In contrast, a court may exercise "general

jurisdiction" when "plaintiff's claims do not arise out of or are not directly related to defendant's contacts with the forum state . . ." if those contacts are continuous and substantial. *Id.* (citing *Helicopteros Nacionales,* 466 U.S. at 414 n. 9). At the hearing, plaintiff conceded that defendant's contacts with Rhode Island are not sufficient to sustain a finding of general jurisdiction.

Relying on *DuPont Tire,* at the hearing on this matter this Court inquired as to where the final act in the formation of the contract occurred. Both sides gave equivocal responses, so the Court asked for additional information. The supplemental affidavits and memoranda submitted make contrary claims as to where the contract was formed. Plaintiff states Rhode Island, and defendant says Alberta. Since a pivotal factor in the requisite analysis is disputed, this Court finds itself unable to decide the issue of personal jurisdiction at this time.

*3 In other cases where facts relevant to the issue of personal jurisdiction were disputed, this Court viewed the facts favorably to the plaintiff and proceeded to trial, even though plaintiff bears the burden of proving that the exercise of personal jurisdiction is proper. For example, in *Thompson Trading Ltd. v. Allied Lyons PLC,* 123 F.R.D. 417 (D.R.I.1989); 124 F.R.D. 534 (D.R.I.1989) (denying motion for reconsideration), this Court held that plaintiff's allegations, if true, would subject the defendants to the Court's specific in personam jurisdiction. Therefore, the Court allowed the case to proceed to trial for further inquiry. *See also McAleer v. Smith,* 728 F.Supp. 857 (D.R.I.1990) (holding that plaintiffs had alleged a prima facie case for the exercise of personal jurisdiction, but noting that plaintiffs still had the burden of proving proper exercise of such jurisdiction at trial).

However, the present matter differs from other cases in this context. For example, in *Thompson,* 124 F.R.D. at 535, this Court expressly stated that the issues concerning personal jurisdiction were "intertwined" with the merits of the dispute. In contrast, the facts concerning personal jurisdiction in the case at bar may be decided without reaching the substantive aspects of the controversy. Moreover, notions of comity are particularly salient in the present case, as it involves arbitration on the merits of the dispute in Canada. For these reasons, it

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



is important that this Court ascertain the facts relevant to the issue of personal jurisdiction before deciding whether to grant plaintiff injunctive relief.

As plaintiff has suggested, resolution of these issues would be facilitated by additional discovery. *See El-Fadl v. Central Bank of Jordan,* 75 F.3d 668 (D.C.Cir.1996) (remanding case for additional discovery concerning whether contacts were sufficient to support the exercise of general personal jurisdiction). Therefore, this Court orders that there be a thirty day period for additional discovery, to be followed by a full evidentiary hearing on the issue of personal jurisdiction.

B. *Forum Non Conveniens*

If this Court determines that it has specific personal jurisdiction over defendant, it may still dismiss this suit on the basis of forum non conveniens. This doctrine "permits discretionary dismissals on a 'case by case' basis where an alternative forum is available in another nation which is fair to the parties and substantially more convenient for them or the courts." *Mercier v. Sheraton Int'l, Inc.,* 981 F.2d 1345, 1349 (1st Cir.1992), *cert. denied,* 508 U.S. 912, 113 S.Ct. 2346, 124 L.Ed.2d 255 (1993) (citations omitted) (hereinafter *"Mercier II"* ).

In the First Circuit, courts have conducted a two-part inquiry when determining whether to dismiss a suit on this basis. *See, e.g., Id.* First, the court will determine whether there is an adequate alternate forum. A forum is deemed adequate if it is both "available" and "adequate." *Id.* at 1349- 1350. A forum is "available" if "the defendant who asserts forum non conveniens is amenable to process in the alternative forum." *Id.* at 1349. A forum is "adequate" unless "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all." *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 254, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). *See also Mercier II,* 981 F.2d at 1350. It is the defendant's burden to prove the adequacy of the alternative forum, for "[t]he plaintiff's forum choice 'should rarely be disturbed.' ' *Mercier v. Sheraton Int'l, Inc.,* 935 F.2d 419, 424 (1st Cir.1991) (quoting *Gulf Oil v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)) (hereinafter *"Mercier I"* ).

*4 Second, the court will evaluate the convenience

of the forum by weighing the public and private factors articulated by the Supreme Court in *Gulf Oil Corp. v. Gilbert.* In *Gilbert,* the Court stated that when considering the "private interest of the litigant,"

[i]mportant considerations are the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Gilbert,* 330 U.S. at 508. *See also Thomson Info. Svcs., Inc. v. British Telecommunications, PLC,* 940 F.Supp. 20, 23 (D.Mass.1996). When examining the "[f]actors of public interest," the Court noted that congestion in the forum, the forum's relationship to the litigation, and the forum's familiarity with the law governing the case are significant. *Gilbert,* 330 U.S. at 508-509. *See also Mercier II,* 981 F.2d at 1354; *Howe v. Goldcorp Investments, Ltd.,* 946 F.2d 944, 951 (1st Cir.1991) , *cert. denied,* 502 U.S. 1095, 112 S.Ct. 1172, 117 L.Ed.2d 418 (1992).

Plaintiff asserts, and this writer agrees, that defendant has merely made "conclusory allegations" concerning the adequacy of Alberta as a forum for the present dispute. Defendant has responded to several arguments made by plaintiff concerning the adequacy of Alberta; however, defendant has not affirmatively shown why Alberta is an adequate forum. More specifically, defendant has not discussed Alberta's procedural rules or substantive law concerning the issues at hand--the granting of expedited discovery and maintaining the status quo pending arbitration.

In addition, the parties to this controversy depict very different scenarios when weighing the *Gilbert* factors. For example, defendant asserts that the ease of access to both witnesses and documents militates in favor of the Alberta forum, whereas plaintiff argues that important witnesses and other sources of proof are located in several places at great distance from Alberta.

As a threshold matter, this Court may not dismiss this case because of forum non conveniens without determining that Alberta is an adequate alternative forum. For example, in *Mercier I,* 935 F.2d at 430,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1997 WL 33547301, *4 (D.R.I.))

the First Circuit reversed the district court's dismissal of a case on the basis of forum non conveniens and remanded the case for additional factual inquiry. In so holding, the First Circuit noted that the defendant had failed to affirmatively show the adequacy of the proposed alternative forum, and the plaintiff had not proven that the forum could not be deemed adequate. *Id.* at 427. *Cf. Tramp Oil and Marine, Ltd. v. M/V Mermaid I,* 743 F.2d 48 (1st Cir.1984) (reversing dismissal by district court under the doctrine of forum non conveniens because district court acted without first identifying an adequate alternative forum). Moreover, the factual predicate for evaluation under the factors articulated in *Gilbert* is substantially disputed in this case. Therefore, during the additional thirty day period granted by this Court, the parties should also conduct discovery on the issue of forum non conveniens.

III. Conclusion

**\*5** For the foregoing reasons, defendant's motion to dismiss for lack of personal jurisdiction, or, in the alternative, for forum non conveniens, is held in abeyance. The parties are granted a thirty day period from the date hereof for additional discovery on the issues of personal jurisdiction and forum non conveniens. A full evidentiary hearing before this Court will be scheduled thereafter.

It is so ordered.

1997 WL 33547301 (D.R.I.)

END OF DOCUMENT

® 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.