UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THOMAS CASHMAN,<br>        Plaintiff, | )<br>)<br>) | |
| v. | )<br>) | Civil Action No. 05 10306 RWZ |
| INTERNATIONAL BUSINESS MACHINES<br>CORPORATION, STEVEN A. MILLS,<br>CHARLES ILL, JOHN R. JOYCE, and<br>GREGORY ENRIQUEZ,<br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) | |

## MOTION OF DEFENDANTS
## STEVEN A. MILLS, JOHN R. JOYCE, AND CHARLES ILL
## FOR LEAVE TO FILE REPLY BRIEF IN SUPPORT OF THEIR MOTION
## TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Defendants Steven A. Mills, John R. Joyce, and Charles Ill hereby move this Court for

leave to file a reply brief in support of their motion to dismiss for lack of personal jurisdiction.

The basis for this motion is as follows:

1.      On March 9, 2005, defendants filed a motion to dismiss and memorandum of law

in support of that motion to dismiss in which they argued that the court lacks personal

jurisdiction over them.

2.      Plaintiff filed his response on April 22, 2005. (*See* Plaintiff Thomas Cashman's

Memorandum In Opposition To Defendants Steven A. Mills, John R. Joyce and Charles Ill's

Motion To Dismiss For Lack Of Personal Jurisdiction.)

3.      As of the date of this filing, the Court has not yet ruled on the defendants' motion

to dismiss.

4.      "When a defendant contests personal jurisdiction, the plaintiff has the burden of

proof to show that jurisdiction over the defendant is permitted." *Jana Brands, Inc. v. NexiFM,*

*Inc.*, 2003 WL 164251, *1 (No. Civ. A. 01-12320RWZ) (D. Mass. Jan. 23, 2000) (Zobel, J.)

(attached as Ex. E to Memorandum Of Law In Support Of Motion To Dismiss By Steven A.

Mills, John R. Joyce and Charles Ill). "In doing so, the plaintiff 'must go beyond the pleadings

and make affirmative proof.'" *Id.* (quoting *Chlebda v. H.E. Fortna & Brother, Inc.*, 609 F.2d

1022, 1024 (1st Cir. 1979) (citations omitted)). Defendants' memorandum in support of their

motion to dismiss contested personal jurisdiction based on the factual allegations of plaintiff's

complaint. It was not until after defendants filed their opening memorandum that plaintiff

attempted for the first time to meet his burden of proving jurisdiction. Thus, defendants have not

had the opportunity to address plaintiff's attempt at proving jurisdiction and to show why he has

not met his burden of proof. Defendants, accordingly, ask the Court's permission to file this

reply brief to address plaintiff's arguments and proof on the jurisdictional question.

     5.    Moreover, plaintiff's April 22, 2005 response to defendants' motion to dismiss

cites to numerous cases that defendants had not had the occasion to address. A reply is necessary

to demonstrate that the case law on which plaintiff relies does not support his arguments.

     6.    In addition, plaintiff's response brief presents a new argument. Plaintiff argues

that personal jurisdiction over these defendants is conferred by the Massachusetts Wage Act.

While plaintiff alluded to this argument in his papers filed in support of his motion for

jurisdictional discovery, defendants did not respond at that time for two reasons: (a) The

plaintiff offered only an abbreviated version of his Wage Act argument, and specifically stated

that he did "not intend to make his full blown opposition to the motion to dismiss herein . . . ."

(Plaintiff Thomas Cashman's Memorandum Of Law In Support Of Emergency Motion For

Reconsideration of Motion For Expedited Discovery And Response To Motion For Protective

Order Filed By Defendants Mills, Ill And Joyce, at 8 n. 3.) Because plaintiff saved his Wage Act

argument for his response to the motion to dismiss, defendants did not have the opportunity to

respond to it in their earlier opposition to the plaintiff's motion for jurisdictional discovery; and (b) Plaintiff's Wage Act argument was not relevant to the question of whether jurisdictional discovery was appropriate in this case. Therefore, although plaintiff alluded to it at that time, it was unnecessary for defendants to respond in their earlier opposition to the plaintiff's motion for jurisdictional discovery. If they had responded, it would only have confused the issues relevant to that motion. (*See* Proposed Reply Brief Of Defendants Steven A. Mills, John R. Joyce, and Charles Ill In Support Of Their Motion For A Protective Order at 6-7.)[1]  Therefore, defendants need to file a reply brief to explain why plaintiff's arguments under the Wage Act in favor of personal jurisdiction are without merit.

7.      Further, plaintiff has filed an affidavit with ten supporting exhibits. Plaintiff's affidavit sets forth in detail for the first time the contacts he alleges these defendants had with Massachusetts and on which he bases his claim for personal jurisdiction. (*See* Affidavit of Thomas Cashman, filed on April 20, 2005.) Thus, defendants need to file a reply brief to address the additional facts that plaintiff now sets forth in his affidavit.

8.      Finally, plaintiff has responded to defendants' motion with a confusing montage of arguments. The result is to make the obvious obtuse, and defendants need to file a reply to clarify the relevant legal standards applicable to the jurisdictional analysis and to show why plaintiff's morass of arguments does not alter the simple statutory and constitutional bases for a finding of no jurisdiction presented by defendants in their opening memorandum.

9.      Defendants' proposed reply brief is attached hereto.

---

[1] Defendants have filed a motion for leave to file a reply brief in support of their motion for a protective order. As of the date of this filing, the Court has not yet ruled on that motion.

ATI-2166580v1

WHEREFORE, defendants Steven A. Mills, John R. Joyce, and Charles Ill respectfully request that the Court grant this motion to file a reply brief in support of their motion to dismiss.

## Local Rule 7.1(A)(2) Certification

Counsel for Defendants, Heather Stepler, certifies that she conferred with Plaintiff's counsel, Sharon Patton, on May 10, 2005, regarding the filing of defendants' Motion For Leave To File A Reply Brief In Support Of Their Motion To Dismiss For Lack Of Personal Jurisdiction. Plaintiff's counsel indicated that plaintiff would not assent to the granting of this Motion.

Respectfully submitted,

**STEVEN A. MILLS, JOHN R. JOYCE AND CHARLES ILL**

/s/ Joan Ackerstein
Joan Ackerstein, BBO # 348220
Heather Stepler, BBO # 654269
JACKSON LEWIS LLP
75 Park Plaza, 4th Floor
Boston, Massachusetts 02116
(617) 367-0025

Janine Cone Metcalf (admitted pro hac vice)
Jordana R. Sternberg (admitted pro hac vice)
JONES DAY
1420 Peachtree Street, N.E., Suite 800
Atlanta, Georgia 30309-3053
(404) 521-3939
(404) 581-8330

May 10, 2005

4

ATI-2166580v1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THOMAS CASHMAN,<br>    Plaintiff, | )<br>)<br>) | |
| v. | )<br>) | Civil Action No. 05 10306 RWZ |
| INTERNATIONAL BUSINESS MACHINES<br>CORPORATION, STEVEN A. MILLS,<br>CHARLES ILL, JOHN R. JOYCE, and<br>GREGORY ENRIQUEZ,<br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) | **PROPOSED REPLY BRIEF** |

**REPLY BRIEF OF DEFENDANTS
STEVEN A. MILLS, JOHN R. JOYCE, AND CHARLES ILL
IN SUPPORT OF THEIR MOTION TO DISMISS FOR LACK OF PERSONAL
JURISDICTION**

## I.  INTRODUCTION

Plaintiff has not offered even a hint that defendants John Joyce or Steven Mills -- who, in

2001, were respectively the *Chief Financial Officer* of IBM and the Senior Vice President and

Group Executive of IBM's Software Group *Worldwide* -- had any idea who plaintiff was, let

alone personally were involved in deciding the amount of plaintiff's 2001 commissions.

Plaintiff's only allegation as to defendant Charles Ill regarding his 2001 commissions is that he –

*plaintiff* – contacted Ill at the latter's New York office to file a grievance, and that Ill responded

by email or phone from New York to the plaintiff in Massachusetts.

Defendants demonstrated in their opening memorandum that, under these facts, plaintiff

cannot establish personal jurisdiction (1) over defendants Joyce and Mills pursuant to either the

Massachusetts long-arm statute or constitutional due process requirements, and (2) over

defendant Ill pursuant to constitutional due process requirements.  Plaintiff's response cites all

kinds of cases and all kinds of facts, but not any that are relevant.  His arguments are a misfire

for at least three reasons:

*First,* the Massachusetts long-arm statute does not reach defendants Joyce and Mills because their alleged general business contacts with Massachusetts do not satisfy the "but for" causation test established by the Massachusetts Supreme Judicial Court. It simply cannot be said that "but for" defendants' general business contacts, IBM would have paid plaintiff the commissions he claims are due.

*Second,* neither the alleged general business contacts of defendants Joyce, Mills, and Ill, nor the alleged post-commission decision contacts of defendant Ill, satisfy the three-part test for constitutional due process. To begin with, they do not satisfy the proximate causation requirement that the First Circuit has adopted for the relatedness inquiry under the constitutional analysis – a test more stringent than the "but for" causation test under the Massachusetts long-arm statute. Moreover, they are insufficient to establish that these defendants individually availed themselves purposefully of the privilege of doing business in Massachusetts such that they should have foreseen being haled into court there. Finally, subjecting these defendants to suit in Massachusetts would be unreasonable based on the contacts plaintiff alleges they have had with the Commonwealth.

*Third,* the Massachusetts Wage Act does not alter the constitutional analysis discussed above. The Court must examine these defendants' contacts – contacts that they personally had with Massachusetts -- to see if those contacts satisfy the constitutional requirements; *i.e.,* meet the three-prong test of relatedness, purposeful availment, and reasonableness. The Massachusetts Wage Act does not magically transform these requirements to permit jurisdiction over corporate officers based on general business contacts that are *unrelated* to the plaintiff's claim, *do not* demonstrate purposeful availment, and *are not* such that it would be reasonable for the Court to assert jurisdiction over the individual defendants.

## II.  ARGUMENT AND CITATION TO AUTHORITIES

- **THE GENERAL BUSINESS CONTACTS OF DEFENDANTS JOYCE AND MILLS WITH THE COMMONWEALTH DO NOT SATISFY THE MASSACHUSETTS LONG-ARM STATUTE.**

As this Court recognized in *Radionics, Inc. v. Elekta Instrument AB*, 1994 WL 175028

(D. Mass. Apr. 26, 1994) (Case No. CIV. A. 93-10014-Z),[1] the "Massachusetts long-arm statute

allows personal jurisdiction over an entity transacting business in the Commonwealth, *but only if*

*the cause of action arises out of the* transaction." *Id.* at *1 (emphasis added).  The Court held in

*Radionics* that the plaintiff failed to show a connection between a parent company's local

business dealings and the alleged patent infringement of its subsidiaries doing business in

Massachusetts.  The same is true here.  That is, the plaintiff has failed to show a connection

between the general business contacts of defendants Joyce and Mills and plaintiff's claim for

unpaid commissions.  Therefore, defendants Joyce and Mills are not subject to personal

jurisdiction under the Massachusetts long-arm statute.

Plaintiff expends much ink attempting to rebut arguments that defendants have not made,

such as the argument that the forum-state contacts need not involve physical presence for the

long-arm statute to be satisfied.[2]  Defendants Joyce and Mills have shown not *just* that they

never transacted business concerning plaintiff's 2001 commissions *while in* Massachusetts.

They also have shown that the record is devoid of any evidence that they personally were

involved in plaintiff's dispute over his 2001 commissions.  None of the contacts plaintiff asserts

these two defendants had with Massachusetts (*see* Pl. Response at 6-8), are to the contrary

---

[1] Attached as Exhibit D to the defendants' memorandum in support of their motion to dismiss.

[2] (*See* Plaintiff Thomas Cashman's Memorandum In Opposition To Defendants Steven A. Mills, John R. Joyce And Charles Ill's Motion To Dismiss For Lack Of Personal Jurisdiction (hereinafter "Pl. Response") at 3-4.)

Rather, they establish only that Mills, and, to an even more distant extent, Joyce, oversaw IBM's operations. (*See* Pl. Response at 7.) While plaintiff argues strenuously that these asserted contacts are more extensive than contacts held to be sufficient in other cases, he focuses on the wrong point. *The extent of the contacts is irrelevant if none of them relate to the plaintiff's claim in the case.*

To the extent that plaintiff does address the relevant issue here – which is the relatedness or "arising out of" question -- his discussion is long on words and short on analysis. Essentially, plaintiff argues that the Massachusetts Supreme Judicial Court in *Tatro v. Manor Care, Inc*, 416 Mass. 763, 769-71, 625 N.E.2d 549, 552-55 (1994), adopted a "but for" causation test for the "arising out of" requirement, which test, plaintiff asserts with little analysis, is satisfied here. (*See* Pl. Response at 10-12.)

The plaintiff in *Tatro* was injured in California while staying at the defendant hotel. The defendant had no contacts with Massachusetts except for its solicitation of the plaintiff to stay at its hotel. The court concluded that "[b]ut for the defendant's solicitation of business in Massachusetts, and its agreement to provide the plaintiff with hotel accommodations in Anaheim, California, the plaintiff would not have been injured in a room of the hotel." *Id.* at 771-72, 625 N.E.2d at 555. *Tatro* does not help plaintiff in this case because he cannot satisfy even "but for" causation. That is, plaintiff still would have been denied his claimed commissions, notwithstanding Mills' alleged Webcasts, "motivating" emails, and final authority to approve sales plans. *And*, he still would have been denied his claimed commissions, notwithstanding Joyce's or his department's alleged reliance on forecast reports prepared by individuals in the field such as plaintiff. In short, plaintiff's claim for unpaid wages does not "arise out of" these acts that plaintiff asserts establish a connection between defendants Joyce

and Mills and Massachusetts.

. **PERSONAL JURISDICTION OVER DEFENDANTS JOYCE, MILLS, OR ILL IN MASSACHUSETTS COURT WOULD VIOLATE CONSTITUTIONAL STANDARDS.**

A plaintiff seeking to establish jurisdiction over a foreign defendant must satisfy the demands not only of state law but also of the federal Constitution.[3] The First Circuit applies a three-part test for determining whether subjecting a defendant to personal jurisdiction comports with constitutional due process requirements: (1) the claim directly arises out of or relates to the defendant's forum related activities ("relatedness"); (2) the defendant has purposefully availed itself of the privilege of conducting business in the forum state such that the defendant can reasonably foresee being haled into court there ("purposeful availment/minimum contacts"); and (3) the exercise of jurisdiction is reasonable ("gestalt factors"). *See United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1089 (1st Cir. 1992). Plaintiff cannot meet any of the three prongs of this test.

0. **The Defendants' Alleged Contacts With Massachusetts Do Not Satisfy The "Relatedness" Inquiry Under The Constitutional Due Process Analysis.**

The relatedness requirement focuses on the nexus between the defendant's contact with the forum and the plaintiff's cause of action, and *"ensures that the element of causation remains in the forefront of the due process investigation."* *Nowak v. Tak How Investments, Ltd.*, 94 F.3d 708, 714 (1st Cir. 1996) (emphasis added). The constitutional relatedness issue is dispositive here. Simply put, plaintiff's claim for unpaid commissions did not directly arise out of or relate to the general business contacts of these defendants with Massachusetts in their capacity as

---

[3] For this reason, the Court may choose to bypass the Massachusetts long-arm statute inquiry if the Court determines to dismiss on constitutional grounds. *See Sawtelle v. Farrell*, 70 F.3d 1381, 1388 (1st Cir. 1995) (skipping statutory analysis); *Ticketmaster-New York, Inc. v Alioto*, 26 F.3d 201, 205 (1st Cir. 1994) (where state-law issues under long-arm statute "are extremely murky," it "makes sense to resolve the jurisdictional question on constitutional grounds").

employees of IBM.

**.    The relatedness test requires a "proximate cause" connection between the defendants' alleged contacts with the forum and the plaintiff's claims.**

As set forth in defendants' opening brief, constitutional due process requires *at a minimum* that the contacts be a "but for" cause of the harm. The First Circuit, however, requires plaintiff to meet an even higher standard. In *Nowak,* 94 F.3d at 713-15, the First Circuit held that, to satisfy the relatedness requirement for establishing the constitutional requirements for personal jurisdiction, there should be a proximate cause relationship between the defendant's conduct and the plaintiff's claim. Plaintiff wrongly asserts that *Nowak* allows for some lesser standard. (Pl. Response at 13-16.)

*Nowak* involved a wrongful death action brought by the spouse of a woman who drowned in a hotel swimming pool located outside of Massachusetts. The question presented was whether the defendant's solicitation of business in Massachusetts allowed for jurisdiction. The court first held that the Massachusetts long-arm statute's "transaction of business" requirement was satisfied pursuant to the Supreme Judicial Court's opinion in *Tatro,* which the *Nowak* court noted was factually analogous to "the present case . . . in all essential respects." *Nowak,* 94 F.3d at 712. Turning to the constitutional question, the court concluded that "the proximate cause standard . . . comports with the relatedness inquiry because it so easily correlates to foreseeability, a significant component of the jurisdictional inquiry." *Id.* at 715. "That being said," however, the court went on to observe that "strict adherence to a proximate cause standard in all circumstances is unnecessarily restrictive." *Id.* The court declined to comment on whether something less than a proximate cause standard could meet "the basic factor of foreseeability" in "other kinds of fact patterns." However, the court found that the particular factual scenario at issue there – which the court described as "a foreign corporation [that]

directly targets residents in an ongoing effort to further a business relationship" and "a resident [who] is harmed while engaged in activities integral to the relationship the corporation sought to establish" – justified "a small overlay of 'but for' on 'proximate cause.'" *Id.* at 715-16

The "narrow exception to the proximate cause test" (*id.* at 716) recognized by the *Nowak* court is inapplicable in this case, which does not involve the solicitation of business from Massachusetts residents by an out-of-state corporation and subsequent injury out-of-state, as in *Tatro* and *Nowak*. Therefore, plaintiff must establish that the defendants' alleged contacts were the proximate cause of IBM's failure to pay commissions, which he cannot do. In any event, even if the First Circuit would apply only the less strict "but for" test (and there is no reason to believe that it would), as previously noted (*supra* at 4), plaintiff cannot even establish "but for" causation here.[4]

> **.    The causal connection must be between the defendants' contacts and the plaintiff's asserted injury.**

Plaintiff has not – and cannot – point to any facts that would establish that these defendants participated in the allegedly wrongful conduct of IBM in withholding commissions to which plaintiff believes he is entitled. Because plaintiff cannot tie these defendants to his claim, he relies on their purported general business contacts with Massachusetts instead. However, the First Circuit has "steadfastly reject[ed] the exercise of personal jurisdiction whenever the connection between the cause of action and the defendant's forum-state contacts seems attenuated and indirect." *United Elec., Radio & Mach. Workers of Am.*, 960 F.2d at 1089.

---

[4]Plaintiff's repeated references to a "meaningful link" with the plaintiff's injury, or claims that lie "in the wake of" commercial activities in the forum, are misleading at best. The term "meaningful link" appears in one line of *Nowak* (94 F.3d at 716), and was most likely intended by the court as another way of saying "but for" causation. The language "lies in the wake of" is quoted by the *Nowak* court as the standard in the Seventh Circuit, which the *Nowak* court noted was broader and more general than the "but for" overlay on proximate cause that it was allowing in the case before it (*id.* at 714, 716).

"Thus, '[t]he relatedness requirement is not met merely because a plaintiff's cause of action

*arose out of the general relationship between the parties;* rather, the action must *directly arise*

*out of the specific contacts between the defendant and the forum state.'*" *Phillips Exeter*

*Academy v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 290 (1st Cir. 1999) (quoting *Sawtelle*, 70

F.3d at 1389) (emphasis added).

      This means that the Court must consider the contacts between the defendants and

Massachusetts "*viewed through the prism of*" the plaintiff's claim for unpaid wages. *Interface*

*Group-Mass., LLC v. Rosen*, 256 F. Supp. 2d 103, 107 (D. Mass. 2003) (emphasis added); *see*

*also United Elec., Radio & Mach. Workers of Am.*, 960 F.2d at 1089 (in considering relatedness

requirement, "it is important to bear in mind the nature of plaintiffs' claim"). For example, in

*Interface Group-Massachusetts, LLC*, 256 F. Supp. 2d at 107-08, the court held that it could not

assert personal jurisdiction over a CEO of a company that allegedly breached a sub tenancy

agreement with the plaintiff, even though the CEO was alleged to have caused the breach, to

have made approximately half-a-dozen business trips to Massachusetts, and to have made a

number of telephone calls and messages to the plaintiff's in-house counsel in Massachusetts.

The court held that none of these Massachusetts contacts "can be said to have *caused* the

plaintiff's injuries" stemming from the breach of the sub tenancy agreement (*id.* at 108

(emphasis in original)):

> The main thrust of the plaintiff's cause of action is *not* Rosen's
> Massachusetts business trips or telephone contacts, but rather the
> very act (or acts) of '*interference*' that the plaintiff claims Rosen
> committed. . . . [I]t would be utterly illogical to say that Rosen's
> Massachusetts business trips and telephone contacts constituted
> such alleged interference. If Rosen did indeed 'interfere' with the
> subtenancy contract between Key3 and Interface, the evidence
> produced by the plaintiff is insufficient to show that he did so
> either by acting in Massachusetts or by means of any of his
> specific individual contacts with the Commonwealth. . . . [T]he

> harm suffered by Interface appears merely to be the in-forum *effect* of defendant's extra-forum activities. Such in-forum effects of extra-forum activities are not sufficient to satisfy the constitutional requirement of minimum contacts.

*Id.* at 108-09 (emphasis in original).

Similarly, in *Aylward v. Fleet Bank*, 122 F.3d 616, 618-19 (8th Cir. 1997), the plaintiff sued the defendant bank for communicating allegedly derogatory credit references to credit reporting agencies and for failing to correct those references. Those acts all occurred outside the forum. The plaintiff based jurisdiction over the foreign bank on the latter's telephone calls and a letter sent to the plaintiff, which were related to the acts the plaintiff complained of "in the sense that [they] all concerned the credit cards and the notice of a past-due balance or a 'charged off' delinquency on [the plaintiff's] credit record." *Id.* at 619. The court stated, however, that these contacts were "merely tangential, not causal, and [were] not otherwise of any particular significance." *Id.* Therefore, the court held, it could not "say that [the plaintiff's] injuries arose from those telephone calls and letter." *Id.*

*Interface Group-Massachusetts, LLC* and *Aylward* are just two examples of a large body of case law that rejects jurisdiction based on general business contacts with the forum that do not give rise to the plaintiff's alleged injury.[5] These cases establish that the defendants' alleged

---

[5] *See, e.g., Massachusetts School of Law at Andover, Inc., v. American Bar Ass'n*, 142 F.3d 26, 35 (1st Cir. 1998) (defendant's in-state activities did not satisfy "relatedness" test because they "were benign"); *Sawtelle*, 70 F.3d at 1389 ("Of the limited contacts between the defendants and New Hampshire during their legal representation, few are relevant to the Sawtelles' claim of legal malpractice and thus few assist them in satisfying the relatedness element of the jurisdictional inquiry."); *United Elec., Radio & Mach. Workers of Am.* 960 F.2d at 1089 ("The breach of contract cannot conceivably be said to have arisen directly from, or been caused proximately by, ITD's remaining Massachusetts contacts – all of which related to financial and business assistance delivered after initial execution of the collective bargaining agreement."); *LaVallee v. Parrot-Ice Drink Prods. of Am.*, 193 F. Supp. 2d 296, 303 (D. Mass. 2002) ("[corporate officer's] communications transmitted into Massachusetts were ancillary to the allegedly offending non-forum activities of [the corporation]"); *U.S. Commercial Funding Corp. v. Galaxy Communications, Inc.*, 1999 WL 1101520, **2-3 (N.D. Ill. Nov. 30, 1999)

contacts with the forum must give rise to the gravamen of the harm of which plaintiff complains – in this case, IBM's alleged failure to pay plaintiff commissions. The general business contacts on which plaintiff relies, even if tangentially connected with plaintiff's earning of those commissions, did not involve any conduct by defendants that plaintiff can say was wrongful or otherwise directly led to his claim. Therefore, those contacts do not satisfy the relatedness requirement under the federal Constitution.[6]

### 0.    The Defendants Did Not Purposefully Avail Themselves Of The Privilege Of Conducting Business In Massachusetts.

The purposeful availment prong of the constitutional test for personal jurisdiction was first set out by the Supreme Court in *Hanson v. Denckla*, 357 U.S. 235 (1957). The Court said that "[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." *Id.* at 253. Rather, "there [must] be some act by which the defendant *purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protection of its law.*" *Id.* (emphasis added). As explained by the First Circuit, the Supreme Court intended by this test to make foreseeability and voluntary action the cornerstones of the purposeful availment prong of the constitutional test. *Ticketmaster-New York, Inc.*, 26 F.3d at 207.

---

(continued...)

(Case No. 99C4794) (Ex. A, hereto) (although corporate officers "appear[ed] to have had some contact with Illinois (in [the president's] case physical contact) in connection with dealings with [the plaintiff]," such contacts were insufficient because they were not "related to the particular claim that [plaintiff] has made against [the corporate officers] here").

[6] Defendant Ill's emails and calls to plaintiff concerning plaintiff's internal grievance to recover the allegedly unpaid commissions, while connected to plaintiff's claim in this case, nevertheless also fail the constitutional relatedness test. These emails and phone calls occurred *after* the plaintiff was denied the commissions that he alleges he was owed. Therefore, they could not have been causally related to the plaintiff's claim. *See, e.g., United Elec., Radio & Mach. Workers of Am., supra,* n. 5.

The general business contacts of defendants Joyce, Mills, and Ill were not such that defendants would reasonably anticipate being haled into Massachusetts court to answer to a Wage Act claim. Those business contacts, as just shown, did not relate to the plaintiff's claim for unpaid wages and did not personally benefit these individuals. Therefore, these defendants could not have anticipated that their general business contacts with Massachusetts could lead to a Wage Act claim being brought against them in a Massachusetts court. *See, e.g., Phillips Exeter Academy*, 196 F.3d at 292 ("the mere fact that the defendant willingly entered into a tendered relationship does not carry the day"; the purposeful availment test "investigates whether the defendant benefited from those contacts in a way that made jurisdiction foreseeable"); *Bond Leather Co.*, 764 F.2d at 934 (even if defendant engaged in some purposeful act directed at the forum "absent any intent by [that defendant] to exploit the local economy, . . . we cannot say that [the defendant] availed itself of the benefits of transacting business in Massachusetts and should reasonably have anticipated being haled into court here"); *LaVallee,* 193 F. Supp. 2d at 304 (where corporate officer "was neither completely responsible for the offending actions at issue nor fully cognizant of the" [emerging dispute between the plaintiff and the defendant corporation], [his] role in the instant dispute did not afford him notice that he might individually be haled into court in Massachusetts to answer for the actions of his employer).

As to defendant Ill, plaintiff cites to both his general business contacts with Massachusetts, as well as communications he may have sent to or received from plaintiff in Massachusetts about the internal grievance made by plaintiff to recover allegedly unpaid 2001 commissions. Even if these contacts were sufficient to satisfy the constitutional relatedness inquiry (*but see supra* at n. 6), they do not satisfy the purposeful availment test. The emails and phone calls that plaintiff asserts Ill made were neither voluntary nor foreseeably likely to subject

Ill to this Court's jurisdiction. To the extent that plaintiff contacted Ill in New York, that was not

an affirmative or intentional act *on Ill's part.* To the extent that Ill replied, that does not mean

that he availed himself of the privilege of conducting activities in Massachusetts thereby

invoking the privileges and protection of Massachusetts law. As discussed in defendants'

opening memorandum, this Court's opinion in *Jana Brands, Inc. v. NexiFm, Inc.*, 2003 WL

164251 (D. Mass. Jan. 23, 2003) (Zobel, J.),[7] is directly on point and establishes that Ill's receipt

of communications in New York from the plaintiff in Massachusetts was not a "voluntary"

contact with Massachusetts, and that Ill's sending of communications to plaintiff in

Massachusetts in response was merely a fortuitous contact with that state.[8]

"The purposeful availment requirement ensures that jurisdiction is not premised on

'random, isolated, or fortuitous' contacts with the forum state . . . ." *Nowak*, 94 F.3d at 716. The

alleged contacts of defendants Joyce, Mills, and Ill are random, isolated, and fortuitous insofar as

plaintiff's demand for additional commissions is concerned. Therefore, the plaintiff cannot

satisfy the second prong of the constitutional due process test.

### 0.   Asserting Jurisdiction Over Defendants In This Case Would Not Be Reasonable.

The principal question to be addressed in determining the reasonableness of conferring

---

[7] Attached as Ex. E to defendant's opening memorandum.

[8] *See also Massachusetts School of Law at Andover, Inc.*, 142 F.3d at 36-37 (telephone call and mailing into Massachusetts "are insufficient to establish purposeful availment"); *Aylward*, 122 F.3d at 619 ("we see none of the kind of intentional reaching out to Missouri residents that seems to be contemplated by the case law"); *Way v. Barr*, 1995 WL 274481, *7 (D. Md. May 9, 1995) (Case No. CIV. A. HAR94-2519) (Ex. B, hereto) (where defendant's "only contact with the forum state are telephone calls between himself and some Perot volunteers in Maryland," court concludes that defendant "has taken no action 'purposefully directed' at the State of Maryland that provided fair warning of the instant suit"); *Cadman v. Bond*, 603 F. Supp. 1335, 1337 (D. Mass. 1985) (no jurisdiction where defendants "were forced to correspond" with Massachusetts-based  plaintiffs due to plaintiffs' "fortuitous move into" Massachusetts).

personal jurisdiction is whether, even where purposefully generated contacts exist, subjecting a nonresident to the authority of a foreign tribunal is fair in the circumstances of the case. *Ticketmaster-New York, Inc.*, 26 F.3d at 209. The Supreme Court has identified five so-called "gestalt factors" that give content to this notion of reasonableness. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). The five gestalt factors are: (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies. *United Elec., Radio & Mach. Workers of Am.*, 960 F.2d at 1088. "The gestalt factors are not ends in themselves but they are, collectively, a means of assisting courts in achieving substantial justice. In very close cases, they may tip the constitutional balance." *Ticketmaster-New York, Inc.*, 26 F.3d at 209.

This is not a close case, and the Court therefore need not even address the gestalt factors. *See Sawtelle*, 70 F.3d at 1394 (if a plaintiff has failed to establish the minimum contacts with the forum, the court can skip the gestalt factors); *Terzano*, 986 F. Supp. at 712 (declining to discuss gestalt factors). Plaintiff discusses all five. (*See* Pl. Response at 18-19.) Assuming the Court finds it needs to address these factors, they tip in defendants' favor.

On the first factor, more is at stake than merely inconvenience to the defendants by having to litigate in a foreign forum. "One reason that the factor of inconvenience to the defendant weighs heavily in the jurisdictional balance is that it provides a mechanism through which courts may guard against harassment." *Ticketmaster-New York, Inc.*, 26 F.3d at 211. If personal jurisdiction is permitted over these defendants based on nothing more than their general business contacts, then they are vulnerable to being haled into court in almost any location.

IBM, as plaintiff so often has reminded us, is a "global company." (Pl. Response at 17.) These defendants, as high-level executives, could possibly have business contacts in every place that IBM does business. Unless jurisdiction is limited to forums in which the defendants' contacts directly led to, or proximately caused, the plaintiff's claims, plaintiffs anywhere can conceivably haul corporate executives into court with no other purpose in mind than to harass them.

On the second factor, plaintiff relies on Massachusetts' purported interest in protecting its citizens from the nonpayment of wages. That interest, however, is not at risk, even if the Court does not assert jurisdiction over these defendants. Plaintiff ignores the fact that the corporate defendant (IBM) is solvent and still subject to this Court's jurisdiction. So, chances are virtually nil that plaintiff will be left remediless (should there be a finding of liability) if the Court does not assert personal jurisdiction over Joyce, Mills, and Ill. *See Ticketmaster-New York, Inc.*, 26 F.3d at 211 (the forum state's interest in exercising jurisdiction is "much diminished" where the plaintiff may not have a good reason to sue the defendant); *compare Nahigian v. Leonard*, 233 F. Supp. 2d 151, 154-58 (D. Mass. 2002) (plaintiff sued corporate officers under Massachusetts Wage Act where company filed for bankruptcy just before failing to make payroll and other payments owed to employees); *Transportation Comm. Int'l Union v. Sultran Ltd.*, 187 F. Supp. 2d 880, 886-87 (E.D. Mich. 2002) (state had interest protecting its workers by exercising jurisdiction over parent of defunct corporation). Accordingly, plaintiff's concern that the defendants' jurisdictional arguments, if they prevail, will "gut the Wage Act" (Pl. Response To Motion For A Protective Order at 2) is without merit.[9]

_____

[9] The third and fourth factors – the plaintiff's interest in obtaining convenient and effective relief and the judicial system's interest in obtaining the most effective resolution of the controversy – are inconsequential here. With respect to the third factor, the First Circuit said in a case holding that the constitutional requirements were not met, "[w]hile we recognize that our ruling may sacrifice judicial economy, as well as the convenience of plaintiff, . . . we believe that

.    THE WAGE ACT DOES NOT ALTER THE JURISDICTIONAL ANALYSIS.

Finally, the plaintiff's assertion that the Wage Act itself "conclusively answers the

jurisdictional question" (Pl. Response at 9) must be rejected out-of-hand.[10]

*First*, it is well established that the issue of liability and the issue of personal jurisdiction

are separate and distinct inquiries. *See West Coast Video Enter., Inc. v. Ponce de Leon*, 1991 WL

18427, *11 (N.D. Ill. Feb. 5, 1991) (Case No. CIV. A. 90C1236) (Ex. C, hereto). Therefore, the

fact that a statute imposes personal liability on the defendant does not answer the question of

whether the court has jurisdiction over him to adjudicate his personal liability.[11]

---

(continued...)

it would violate traditional notions of fair play and substantial justice to compel [defendant] to
defend this action in Massachusetts . . . ." *Bond Leather Co.*, 764 F.2d at 935; *see also
Ticketmaster-New York, Inc.* 26 F.3d at 211 (while court "must accord plaintiff's choice of forum
a degree of deference in respect to the issue of its own convenience, the plaintiff's *actual*
convenience seems to be at best a makeweight") (citations omitted and emphasis in original).
With respect to the fourth factor, plaintiff's questionable motive in suing these individual
corporate executives when IBM has more than sufficient resources to pay any claim on which
plaintiff might prevail raises doubts as to whether the assertion of personal jurisdiction over these
defendants would be in the best interests of the judicial system. *See Ticketmaster-New York,
Inc.*, 26 F.3d at 211 ("*Apart from the possibility that the plaintiff's action might be thought
vexatious*, the interest of the judicial system in the effective administration of justice does not
appear to cut in either direction.") (emphasis added). The final factor -- the common interests of
all sovereigns in promoting substantive social policies – would seem to militate against
jurisdiction here as well, since subjecting these defendants to litigation in a foreign state based
only on their general business contacts with the forum, even though they had virtually nothing to
do with the plaintiff's claim, would make corporate executives answerable solely because of
their positions in the company, a result that contravenes the policies of the well-established rule
to the contrary. *See infra* at 16-17.

[10] We note that, despite the plaintiff's suggestions to the contrary, these defendants'
liability under the Wage Act is by no means certain. Were defendants to be required to defend
themselves in this lawsuit, they would show that plaintiff's Wage Act claim does not state a valid
cause of action against them under pertinent case law interpreting that statute.

[11] *See, e.g., In re Royal Ahold N.V. Securities & ERISA Lit.*, 351 F. Supp. 2d 334, 351 (D.
Md. 2004) (establishing "control person" liability under the securities laws was not sufficient to
establish personal jurisdiction); *In re Baan Co. Sec. Litig.*, 245 F. Supp. 2d 117, 129 (D.D.C.
2003) (equating "control person liability" with personal jurisdiction "impermissibly conflates
statutory liability with the Constitution's command that the exercise of personal jurisdiction must
be fundamentally fair"); *Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 86, 99 (D. Del.

*Second*, the cases plaintiff cites do not support his argument that defendants' "contacts in Massachusetts attributable to their corporate positions" satisfy constitutional due process requirements simply because the Wage Act makes defendants liable "by virtue of their corporate positions." (Pl. Response at 1 (emphasis omitted).) Indeed, one of plaintiff's cases – *Lautman v. Loewen Group, Inc.*, 2000 WL 772818 (E.D. Pa. June 15, 2000) (Case No. CIV. A. 99-75) (Ex. D, hereto) – actually establishes the opposite. The court in that case considered whether it had personal jurisdiction over several individual defendants whom the plaintiff alleged had violated the Pennsylvania Wage Payment and Collection Law. The court held that it could not assert personal jurisdiction over three of the five individual defendants because the alleged corporate contacts of these defendants did not demonstrate that they personally participated in the alleged wrongful conduct. *Id.* at **6-7. The court found that its assertion of personal jurisdiction over two other individual defendants was constitutionally permissible because they had "played an integral role in the decision to deny Lautman compensation under the stock option plan," and thus were "directly and personally involved in the commission of the allegedly wrongful conduct." *Id.* at 8-9.

Here plaintiff cannot show that defendants Joyce, Mills, or Ill personally participated in the alleged wrongful conduct of IBM in calculating plaintiff's 2001 commissions. Instead, plaintiff is asserting jurisdiction based solely on these defendants' corporate contacts that do not demonstrate any wrongdoing. This violates the principle that, for jurisdictional purposes, employees are "not to be judged according to their employer's activities [but by whether they were] primary participants in an alleged wrongdoing intentionally directed" at the forum. *Calder*

---

(continued...)

2002) ("[p]ersonal jurisdiction is an independent threshold consideration to the question of liability").

*v. Jones*, 465 U.S. 783, 790 (1984).[12]  Again, even if the Wage Act allowed a finding of *liability* without a finding of personal fault on the part of certain corporate officers, that would not alter the *jurisdictional* rule that the alleged contacts with the forum must involve the alleged wrongful conduct for which the plaintiff has sued.  (*See supra* at 7-10.)

*Third*, plaintiff cites to cases supposedly holding that "the individual's 'contacts with the forum stemming from corporate actions *should be considered* when evaluating whether the officer, as an individual, has minimum contacts with the forum which would support the assertion of personal jurisdiction.'"[13]  This does not advance plaintiff's argument here.  Rather, plaintiff cites to case law that affirms consideration of corporate contacts of individual employees in the context of *rejecting* the fiduciary or corporate shield doctrine.  Under that doctrine, jurisdiction over a corporate officer can *never* be based on actions taken in his corporate capacity.  *See, e.g., LaVallee*, 193 F. Supp. 2d at 301.  While many courts apply the fiduciary shield doctrine, others have refused to do so, holding instead that the corporate contacts of the employee are not off-limits in considering whether that individual had the requisite minimum contacts with the forum.

Defendants do not rely on the fiduciary shield doctrine as a reason for disregarding their general business contacts with the forum.  Rather, defendants' position is that those general

---

[12] *See also Alvarado-Morales v. Digital Equip. Corp.*, 843 F.2d 613, 617 (1st Cir. 1988) ("Jurisdiction over the individual officers or directors of a corporation cannot be imputed from jurisdiction over the corporation."); *Pilates, Inc. v. Pilates Instit., Inc.*, 891 F. Supp. 175, 181 (S.D.N.Y. 1995) ("employees who are not primary actors in the relevant transactions, but rather are merely corporate employees who played no part in the questionable activities, cannot be haled into New York courts simply because the corporation for which they work is alleged to have engaged in corporate wrongdoing").

[13] (Pl. Response at 11 (emphasis added) (quoting *National Precast Crypt Co. v. Dy-Core of Pa., Inc.*, 785 F. Supp. 1186, 1191 (W.D. Pa. 1992)); *see also* Pl. Response to Motion for Protective Order at 8.)

business contacts are not "related" sufficiently under either the Massachusetts long-arm statute or the federal Constitution to warrant the court's assertion of *in personam* jurisdiction over them. Plaintiff's citations stand solely for the principle – not at issue here -- that a corporate official, *who otherwise has sufficient contacts with a state* for the court's assertion of personal jurisdiction over him,[14] is not shielded from jurisdiction on the ground that those contacts occurred while conducting corporate business.  Even though defendants' contacts are not "shielded" in this respect, those contacts nevertheless fail to establish the constitutionally required "minimum contacts" for assertion of personal jurisdiction in this case.

   *Finally,* plaintiff's reliance on *Barthel v. One Community, Inc.*, 233 F. Supp. 2d 125 (D. Mass. 2002) (*see* Pl. Response at 15), is misplaced.  In *Barthel*, Judge Lasker held that personal jurisdiction was properly asserted over both a CEO and CFO of an out-of-state corporation who the plaintiff alleged were liable under the Massachusetts Wage Act, but he did so with very little analysis.  Rather, the opinion states that "the defendants have enjoyed at least minimum contacts with Massachusetts through their visits and communications," which contacts, the court said, "satisf[ied] due process requirements."  *Id.* at 128.  No further explanation as to what standards the court was applying and why the contacts in question satisfied due process was given.

---

   [14] After rejecting the fiduciary shield doctrine, the cases cited by plaintiff go on to assert personal jurisdiction over the corporate official based *not* on their general business contacts but on their specific actions that caused the plaintiff's asserted injury.  *See, e.g., Davis v. Metro Prods., Inc.*, 885 F.2d 515, 520-24 & n. 10 (9th Cir. 1989) (defendants' contacts with the state involved "actual participation in the [fraudulent] scheme" alleged by the plaintiff); *In re Royal Ahold N.V. Securities & ERISA Lit.*, 351 F. Supp. 2d at 351-52 (defendants signed SEC filings that the plaintiffs claimed were false); *Retail Software Servs., Inc. v. Lashlee*, 854 F.2d 18, 20-22 (2d Cir. 1988) (plaintiff alleged that the corporate officers were responsible for misrepresentations and misleading financial statements on which the plaintiff's claims were based); *Huth v. Hillsboro Ins., Management, Inc.*, 72 F. Supp. 2d 506, 511 (E.D. Pa. 1999) (plaintiff submitted evidence that defendant personally and directly was involved in the alleged wrong).

In contrast, Chief Judge Young's opinion in *Nahigian*, 233 F. Supp. 2d at 158 n. 1 -- also addressing personal jurisdiction under the Massachusetts Wage Act -- offers a more extensive analysis of the question. First, the court observed that the fiduciary shield doctrine does not protect the corporate employees from the assertion of jurisdiction, but noted that it is still the law that jurisdiction over an officer cannot be based solely on jurisdiction over the corporation. *Id.* at 158 n. 1. Therefore, the court said, to determine jurisdiction over the corporate employees, regardless of the plaintiff's Wage Act claims, the court had to evaluate the contacts that the two individual defendants had with Massachusetts to decide whether those contacts satisfied the requirement of "relatedness." *Id.* For one of the individual defendants, the court observed that telephone, email, and fax contacts with Massachusetts, as well as several visits to the state, would satisfy *neither* the Massachusetts long-arm statute *nor* the federal Constitution because those contacts *did not relate to either the company payroll or its decision to withhold the plaintiff's pay. Id.* As a result, the court concluded, "there is no evidence that any of Tvrdik's contacts with Massachusetts had any sort of causal relationship to the harm Nahigian alleges." *Id.*[15]

In short, *Nahigian* extensively analyzes the "relatedness" requirement and concludes that there would not be jurisdiction under either the long-arm statute or the federal Constitution over

---

[15] The court found that there was some evidence of wrongdoing and a causal relationship between similar contacts and the other defendant. *That* defendant, however, was "controlling the company's operations" and "allegedly mismanaging it," which mismanagement involved his activities relating to Massachusetts. The mismanagement led to the poor financial health of the company, the company's subsequent filing of bankruptcy, and the nonpayment of the plaintiff's wages. *Nahigian*, 233 F. Supp. at 156-57, 158 n. 1. Even so, the court noted, these facts might only establish the "but for" causation required under the Massachusetts long-arm statute; whether the First Circuit's stricter "proximate cause" test could be satisfied, the court said, was "a tougher issue." *Id.* The court did not pursue the issue given that the case involved a federal question and personal jurisdiction could be asserted in any event based on nationwide service of process.

a corporate officer who was not alleged to be personally involved in any wrongdoing and whose general business contacts with the state had no direct relationship to the corporation's non-payment of wages. The *Nahigian* court's analysis establishes that the assertion of personal jurisdiction over these defendants would offend the constitutional requirements of due process, and probably the Massachusetts long-arm statute as well.

### III.  CONCLUSION

This Court's assertion of personal jurisdiction over defendants Joyce, Mills, and Ill would offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 315 (1945). Accordingly, the court should grant defendants' motion to dismiss for lack of personal jurisdiction, and dismiss defendants Joyce, Mills, and Ill from this case.

Respectfully submitted,

**STEVEN A. MILLS, JOHN R. JOYCE AND CHARLES ILL**

_____
Joan Ackerstein, BBO # 348220
Heather Stepler, BBO # 654269
JACKSON LEWIS LLP
75 Park Plaza, 4th Floor
Boston, Massachusetts 02116
(617) 367-0025

Janine Cone Metcalf (admitted pro hac vice)
Jordana R. Sternberg (admitted pro hac vice)
JONES DAY
1420 Peachtree Street, N.E., Suite 800
Atlanta, Georgia 30309-3053
(404) 521-3939
(404) 581-8330

**Dated:  May ___, 2005**

# EXHIBIT "A"

Not Reported in F.Supp.2d
1999 WL 1101520 (N.D.Ill.)
(Cite as: 1999 WL 1101520 (N.D.Ill.))
C

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.
U.S. COMMERCIAL FUNDING CORP., Plaintiff,
v.
GALAXY COMMUNICATIONS, INC.; Telephone
Billing Services, Inc.; Norman Seibert;
Matt Freeman; and Ken Ashworth, Defendants.
No. 99 C 4794

Nov. 30, 1999.

*MEMORANDUM OPINION AND ORDER*

KENNELLY, J.

**\*1** This case is before the Court on the motions of
defendants Norman Siebert, Matt Freeman, and Ken
Ashworth to dismiss the claims against them for lack of
personal jurisdiction. The plaintiff in this case, U.S.
Commercial Funding, is an Illinois corporation with its
principal place of business here. There are four
defendants remaining in the case. Galaxy
Communications, Inc. is a Georgia corporation with its
principal place of business in that same state. Siebert,
the president, chief operating officer, and a director of
Galaxy, is a citizen and resident of Georgia. Freeman, a
vice president and director of Galaxy, is likewise a
Georgia citizen and resident. Ashworth, an attorney, is
a citizen and resident of Nevada.

According to the allegations in the complaint, Galaxy
is in the business of selling prepaid long distance
telephone calling cards. Commercial advanced funds to
Galaxy based on the sale and assignment of Galaxy's
accounts receivable. The agreement between
Commercial and Galaxy provided that Commercial
would purchase Galaxy's accounts receivable and
advance funds, and that Galaxy would remit the
proceeds of those accounts to Commercial to repay the
advances.

Galaxy engaged Telephone Billing Services, Inc.
(TBS), which was a defendant until it was voluntarily
dismissed, to submit Galaxy's bills to the local
telephone companies, to collect payments, and to remit
the payments to Commercial to repay Commercial's
advances. Commercial was an express intended
beneficiary of the contract between Galaxy and TBS.

Galaxy and TBS agreed that TBS could hold back up
to 10% of payments as a reserve fund to cover
chargebacks, bad debts, and other items. They also
agreed that if the reserve fund needed adjusting,
Commercial, TBS, and Galaxy each would have equal
input into the decision whether to change the reserve
amount.

The agreement between TBS and Galaxy provided that
TBS and Ashworth, an attorney, would maintain a
"fiduciary checking account" for the receipt and
collection of Galaxy's receivables, to be held in trust
for Commercial. The agreement also provided that at
regular intervals, a check would be written to
Commercial from the fiduciary account pursuant to a
stated formula. From August 1997 through February
1999, Ashworth and a representative of TBS signed
over 60 checks payable to Commercial for a total of
over $2.3 million.

Commercial alleges that contrary to the agreement
providing that it would have equal input into any
decision to increase the reserves held by TBS, TBS
increased its reserves without the knowledge of
Commercial. Commercial alleges that TBS collected
over $750,000 of funds that it should have turned over
to Commercial but failed to do so.

Commercial also alleges that beginning in November
1997, Galaxy became insolvent. Commercial alleges
that Seibert and Freeman were aware of Galaxy's
insolvency and were also aware of Galaxy's agreement
with Commercial. It contends that after Galaxy's
insolvency, Seibert and Freeman owed a fiduciary duty
to Galaxy's creditors, including Commercial, to hold
Galaxy's assets in trust for the creditors. Instead,
Commercial claims, Seibert and Freeman authorized
Galaxy to pay its officers, including themselves,
excessive salaries and other compensation, to withdraw
capital contributions, and to otherwise impair Galaxy's
ability to repay its creditors, including Commercial.

**\*2** In this action, Commercial has sued Galaxy for
breach of contract (Count 1); it originally sued TBS for
breach of contract (Count 2) but has voluntarily
dismissed that claim; it sued Seibert and Freeman for
violating the alleged fiduciary duty just described
(Counts 3 and 4); and it also sued Ashworth (Count 5).
The claim against Ashworth alleges that he owed
Commercial a duty of care which he breached by
failing to review TBS's reserve account to make sure
that it held the correct amount of reserves and by

Not Reported in F.Supp.2d
**(Cite as: 1999 WL 1101520, \*2 (N.D.Ill.))**

Page 2

failing to hold the Galaxy accounts in trust for the benefit of Commercial. Commercial alleges that Ashworth knew or should have known that TBS was holding excessive reserves and should have advised Commercial of this.

As previously indicated, Seibert, Freeman, and Ashworth have moved to dismiss for lack of personal jurisdiction. They initially argue, citing decisions from the Illinois state courts, that the complaint fails to allege facts supporting personal jurisdiction. In federal court, a plaintiff is not required to allege facts; that is an aspect of Illinois civil procedure that the federal courts do not follow. Commercial does, however, bear the burden of establishing a basis for personal jurisdiction, either in its complaint or otherwise.

The motions to dismiss filed by Seibert and Freeman are essentially identical. Under Fed.R.Civ.P. 4(k)(1)(A), this Court has jurisdiction over a defendant if an Illinois court would have jurisdiction over that defendant. The parties have spent a great deal of time discussing whether jurisdiction exists under the portion of the Illinois long arm statute which provides that a court has jurisdiction over a person for a claim arising from the commission of a tortious act within Illinois 735 ILCS 5/2-209(a)(2). The parties have disputed whether a breach of fiduciary duty is a "tortious act." The Court need not decide who has the better of that argument, however, because the Illinois long arm statute also provides that a court in Illinois "may also exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 ILCS 2/209(c). In other words, this Court has jurisdiction over the defendants if the exercise of jurisdiction would be consistent with due process.

The issue, therefore, is whether the defendants have had sufficient contact with Illinois such that they should reasonably anticipate being haled into court here. *World Wide Volkswagen Corp. v. Woodson,* 444 U.S. 298, 297 (1980). If the defendants purposefully availed themselves of the privilege of conducting activities in Illinois, they can in fact reasonably anticipate being sued there. *Id.*

Both Seibert and Freeman appear to have had some contact with Illinois (in Seibert's case physical contact) in connection with dealings with Commercial. Both of them have submitted affidavits, which are uncontroverted, stating that all of these contacts were in their capacity as officers of Galaxy. They invoke the so-called "fiduciary shield" doctrine and argue that

none of these contacts count for purposes of the personal jurisdiction analysis. The fiduciary shield doctrine, which the Illinois courts have adopted, holds that contacts with the forum state made by an individual in a representative capacity, typically on behalf of a corporation, cannot be considered to establish jurisdiction over that individual for a claim against him personally. *See Rice v. Nova Biomedical Corp.,* 38 F.3d 909, 912 (7th Cir.1994).

**\*3** Commercial argues that the fiduciary shield doctrine does not apply here, because the complaint alleges claims against Seibert and Freeman that involve the service of their personal interests, not those of Galaxy. Specifically, the complaint alleges that Seibert and Freeman, in managing Galaxy's assets, favored themselves over Galaxy's creditors, to whom they owed a fiduciary duty once Galaxy became insolvent. *See Energy Products Engineering, Inc. v. Reuscher (In re Reuscher),* 169 B.R. 398 (S.D.Ill.1994).

Commercial is correct that the fiduciary shield does not prevent the Court from considering contacts that Seibert and Freeman had with Illinois in connection with any alleged conduct involving their favoring of their own interests in alleged breach of their fiduciary duty to creditors *See Rice,* 38 F.3d at 912; *Vandeveld v. Christoph,* 877 F.Supp. 1160, 1164 (N.D.Ill.1995). However, Commercial has not identified, either in its complaint or by affidavit or by documentary evidence, any contacts that Seibert or Freeman had with Illinois that in any way involved their alleged breach of their fiduciary duty to creditors to preserve Galaxy's assets. "Specific jurisdiction," which is the variety of personal jurisdiction Commercial advocates, requires that the claim "aris[e] out of or [be] related to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n. 8 (1984). Commercial has not identified any contacts with Illinois on the part of Seibert or Freeman that are related to the particular claim that Commercial has made against them here. In short, while the Court agrees in large part with Commercial's argument regarding the non-application of the fiduciary shield doctrine, in practical terms this does not help Commercial's case, due to its failure to identify any pertinent contacts between Seibert and Freeman and the State of Illinois that involve the claims in this case.

Commercial argues that because it was a significant creditor of Galaxy, when Seibert and Freeman allegedly applied Galaxy's assets for their own benefit to the detriment of Galaxy's creditors, they were knowingly affecting an Illinois interest and causing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
**(Cite as: 1999 WL 1101520, \*3 (N.D.Ill.))**

injury to Commercial in this state. This, Commercial argues, suffices to establish jurisdiction consistent with the principles of due process. The Court disagrees. One of the cases upon which Commercial relies, *World-Wide Volkswagen,* makes it clear that foreseeability of injury alone "has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." *World-Wide Volkswagen,* 444 U.S. at 295. And the two Seventh Circuit decisions upon which Commercial relies in this regard, *Daniel J. Hartwig Associates, Inc. v. Kanner,* 913 F.2d 1213, 1218 (7th Cir.1990), and *FMC Corp. v. Varonos,* 892 F.2d 1308, 1312-14 (7th Cir.1990), both say that foreseeability, or the fact of an economic loss in Illinois, are not enough to establish jurisdiction in this state. These factors may support jurisdiction in an appropriate case, but there must first be some purposeful contact between the defendant and the State from which the claim arises. That is what is missing here as to Seibert and Freeman.

\*4 For these reasons, claims against Norman Seibert and Matt Freeman (Counts 3 and 4) are dismissed for lack of personal jurisdiction.

As for defendant Ashworth, his only purported contacts with Illinois involve his signing of checks payable to and addressed to Commercial. Commercial's claim does not arise from those contacts. Rather, its claim is that Ashworth was required to monitor TBS's activities and should have realized and informed Commercial that the reserves were too high. Even if Ashworth had such a duty, Commercial still has not identified any contacts between Ashworth and Illinois that are related to Commercial's claim. Based on the record before the Court, Ashworth never had any direct contact with Commercial at all.

Commercial also argues that Ashworth assumed a duty of care vis-a-vis Commercial, apparently believing that this would be enough of a basis to give rise to

jurisdiction here. It has cited no authority in support of that argument, nor is the Court aware of any. Again, due process requires some sort of purposeful contact between the defendant and the forum state related to the plaintiff's claim, and Commercial has identified nothing of the kind. Furthermore, the Court is not persuaded by Commercial's argument that Ashworth assumed a duty of care vis-a-vis Commercial. The only case that Commercial cites in support of that argument is *Cincinnati Insurance Co. v. City of Taylorville,* 818 F.2d 1345 (7th Cir.1987). What the court said in *Cincinnati Insurance,* discussing Illinois law, is that those cases in which a person is found liable for negligently performing a voluntary undertaking--an assumed duty--involve situations in which the defendant somehow placed the plaintiff in a more vulnerable position than the plaintiff would have been in if the defendant had taken no action at all. *Id.* at 1349. Nothing in the complaint as it is presently alleged suggests that that is the case here.

For these reasons, the claim against Ken Ashworth (Count 5) is dismissed for lack of personal jurisdiction.

CONCLUSION

For the reasons stated above, the motions of defendants Norman Seibert, Matt Freeman, and Ken Ashworth to dismiss for lack of personal jurisdiction are granted. Counts 3, 4, and 5 of the complaint are dismissed. Count 2 is likewise dismissed based on the notice of voluntary dismissal filed by the plaintiff.

1999 WL 1101520 (N.D.Ill.)

Motions, Pleadings and Filings (Back to top)

· 1:99CV04794                    (Docket)
(Jul. 22, 1999)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT "B"

Not Reported in F Supp.
1995 WL 274481 (D.Md.)
**(Cite as: 1995 WL 274481 (D.Md.))**
**H**

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, D. Maryland.
Lawrence A. WAY ("Way") and Richard D. Stover, Plaintiffs,
v
Thomas D. BARR, et al., Defendants.
Civ. A. No. HAR 94-2519.

May 9, 1995.

MEMORANDUM OPINION

HARGROVE, Senior District Judge.

*1 In an ongoing protest of their removal as volunteers in H. Ross Perot's presidential campaign, plaintiffs Lawrence A. Way ("Way") and Richard Stover ("Stover") (at times collectively referred to as "plaintiffs") have filed a broadly worded, fifteen count Complaint against seven defendants. Presently before the Court are two motions to dismiss submitted by various defendants. The Court has thoroughly reviewed the parties' memoranda and attached exhibits, and will decide the motions without convening a hearing. Local Rule 105.6 (D.Md.1994). For the reasons set forth below, the Court will grant the pending motions.

FACTS

For approximately six weeks in the spring of 1992, plaintiffs volunteered for the "Maryland Draft Perot Committee" ("Maryland Draft Committee"), a grass roots effort in Frederick County, Maryland to place H. Ross Perot ("Perot") on the ballot as a presidential candidate. In late April, 1992, some other volunteers from the Maryland Draft Committee contacted defendant Mark Blahnik ("Blahnik"), Manager of Field Operations for the national Perot Petition Committee ("PPC") with concerns about their safety. Racist statements made by Way and his reputed membership in the Ku Klux Klan apparently left some volunteers feeling threatened.

Defendant Thomas D. Barr ("Barr"), a partner in the law firm of Cravath, Swaine & Moore, introduced Blahnik and Richard Callahan, a principal in the defendant investigative firm, the Callahan & Gibbons Group ("Callahan & Gibbons"), on the telephone. Richard Callahan was meeting with Barr in New York on matters unrelated to the Perot campaign, and Blahnik was in Texas. After Blahnik described his concerns, Richard Callahan instructed him to call his son, John Callahan, in their San Francisco office, to discuss the situation. Blahnik then telephoned John Callahan, informed him about the volunteers' concerns, and asked that he do whatever he felt was appropriate

Callahan & Gibbons conducted a "background check" on both plaintiffs, requesting and receiving a "102 search," or "address update" on them from U.S. Datalink. The search yielded plaintiffs' current and past addresses, and social security numbers. Callahan & Gibbons also hired O'Connell Associates, Inc. ("O'Connell Associates"), an investigative firm based in New York to gather information about plaintiffs. Accessing information compiled by Equifax Corporation, O'Connell obtained a "DTEC report" on each plaintiff, which contained his name, address, birthdate, social security number, and place of employment. O'Connell also engaged Montgomery Investigative Services ("MIS"), a Maryland investigations agency, to search public state and federal court records in Maryland for any reference to plaintiffs.

Compiling the information it received, Callahan & Gibbons prepared reports on each plaintiff for the PPC. The April 30, 1992 report on Way contained his name, birth date, social security number, current residential address, prior residential address, business address, and other information regarding his business. Less detailed, the Stover report included only his name, approximate age, social security number, current address, established addresses, and previous address. The second report on Way, dated May 14, 1992, contained information from various court records and other public information, including Way's lack of criminal record, his involvement in local politics, and his role as a party in two civil law suits. The second report also disclosed that "Confidential and reliable sources, familiar with the investigation of Klan and white supremacy groups in Maryland, were unaware of Mr. Way." Attachment # 2 to Affidavit of Richard Callahan, Exhibit B to Defendants' Motion to Dismiss

*2 On April 30, 1992, Hal Kass, State Coordinator of County Coordinators of the State of Maryland, telephoned Way at the Frederick County office of the Maryland Draft Committee to fire him According to Way, Kass informed Way at a meeting on May 1, 1992 that Blahnik had instructed Kass to fire him [FN1] Affidavit of Lawrence A. Way, Exhibit B to Plaintiffs' Opposition, ¶ 18 [FN2] Stover voluntarily left the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1995 WL 274481, *2 (D.Md.))

Maryland Draft Committee after Way's discharge. Only after their termination did plaintiffs learn that various firms had conducted background investigations of them.

The circumstances surrounding their removal from the Maryland Draft Committee prompted plaintiffs to file several lawsuits. In June, 1992, Way filed suit in the Circuit Court for Anne Arundel County, Maryland for slander and slander per se against several defendants, including H. Ross Perot, the Perot Petition Committee, and the Maryland Draft Perot Committee. Way subsequently amended the Complaint to add counts for invasion of privacy and violations of the state and federal Fair Credit Reporting Acts ("FCRA"). In September, 1994, Stover filed a virtually identical Complaint in the Circuit Court for Garrett County, Maryland. On February 16, 1995, the Circuit Court for Anne Arundel County granted summary judgment in favor of defendants on the FCRA and invasion of privacy claims.

On July 2, 1993, Stover filed suit in this Court against O'Connell Associates, contending that by requesting a "consumer credit report" on him from Equifax Corporation and providing parts of that report to its client, the PPC, O'Connell Associates violated the federal and state FCRA and Stover's right to privacy. On January 26, 1994, this Court dismissed the Complaint, finding that it could not constitutionally exercise general or specific jurisdiction over O'Connell Associates. *Stover v. O'Connell Associates, Inc*, Civil Action No. HAR 93-1936 (D.Md. January 26, 1994). [FN3]

In their most expansive complaint yet, plaintiffs, proceeding *pro se*, now sue seven defendants on a litany of claims. At issue in the pending motions are plaintiffs' allegations of violations of the federal FCRA, 15 U.S.C. §§ 1681a-1681t, against Barr, Blahnik and Callahan & Gibbons (Count I); the state analogue, Md.Com.Law Code Ann. § 14-1201-1218, against Barr, Blahnik and Callahan & Gibbons (Count X); the First, Fifth and Ninth Amendments to the U.S. Constitution against Barr, Blahnik and Callahan & Gibbons (Count II); and invasion of privacy against Barr, Blahnik and Callahan & Gibbons (Count II). In addition, Way is suing O'Connell and Associates for violation of the federal and state FCRA (Counts IV and XI) and invasion of privacy (Count V).

Barr, Callahan & Gibbons, and O'Connell Associates request dismissal of the Complaint for lack of personal jurisdiction, or, in the alternative, for failure to state a claim. Barr, Callahan & Gibbons, and O'Connell Associates also argue that collateral estoppel bars Way's claims against them. Blahnik moves for dismissal of the claims against him based on lack of personal jurisdiction over him. Alternatively, Blahnik contends that dismissal is warranted because plaintiffs failed to timely serve him, and/or fail to state a claim upon which relief can be granted.

## DISCUSSION

**\*3** Under Fed.R.Civ.P. 12(b)(6), the Court may dismiss an action for failure to state a claim upon which relief can be granted. When reviewing a claim pursuant to a Motion to Dismiss, the Court must presume all factual allegations of the complaint to be true. *Miree v. De Kalb County*. 433 U.S. 25 (1977). However, legal conclusions or deductions, framed as factual allegations, do not benefit from a presumption of truthfulness. *United States v. Tulare Lake Canal Co.*, 535 F.2d 1093, 1097 (9th Cir.1976), *cert. den.*, 429 U.S. 1121 (1977). Dismissal is not warranted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957) (citations omitted).

### I. Personal Jurisdiction

The exercise of personal jurisdiction over nonresident defendants requires a two-step inquiry. First, the Court must determine whether the applicable state long-arm statute confers jurisdiction, and second, whether the assertion of that jurisdiction comports with the constitutional requirements of due process. *Blue Ridge Bank v. Veribanc, Inc*, 755 F.2d 371, 373 (4th Cir.1985). Although Maryland law determines whether the state long-arm statute authorizes jurisdiction, federal law controls whether the exercise of personal jurisdiction satisfies federal due process. *Ratliff v. Cooper Laboratories. Inc*, 444 F.2d 745, 747 n. 3 (4th Cir.1971), *cert. den.*, 404 U.S. 948 (1971).

Once defendants challenge the Court's exercise of personal jurisdiction over them, the burden shifts to plaintiffs to establish a factual basis supporting the exercise of *in personam* jurisdiction. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936). In response, plaintiffs allege that personal jurisdiction over defendants is proper under sections (b)(1), (b)(3) and (b)(4) of the Maryland long arm statute, which provide that "[a] court may exercise personal jurisdiction over a person, who directly or by an agent: (1) Transacts any business or performs any character of work or service in the State; (3) Causes

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1995 WL 274481, *3 (D.Md.))

Page 6

tortious injury in the State by an act or omission in the State; [or] (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, service, or manufactured products used or consumed in the State." Md.Cts. & Jud.Proc Code Ann. § 6- 103(b)(1), (b)(3) and (b)(4).

The Due Process Clause of the Fourteenth Amendment protects a defendant's "liberty interest in not being bound *in personam* by judgments of a forum with which [it] lacks meaningful contacts, ties or relations." *First American First, Inc. v. National Association of Bank Women*, 802 F.2d 1511, 1515 (4th Cir.1986). Before a court may exercise *in personam* jurisdiction, a defendant must have certain "minimum contacts" with the forum state. *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Minimum contacts exist where the defendant " 'purposefully directs' its activities toward the residents of the forum. If the defendant has created a substantial connection to the forum, then he has purposefully 'availed himself of the privilege of conducting business there.' " *Ellicott Machine Corp. v. John Holland Party Ltd.*, 995 F.2d 474, 477 (4th Cir 1993) (internal quotations and citations omitted). Once minimum contacts are present, the Court must determine whether the connection between a defendant's conduct and the forum state are such that "the defendant should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*. 444 U.S. 286, 297 (1980). In other words, the court must determine that "the assertion of personal jurisdiction would comport with 'fair play and substantial justice.' " *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (quoting International Shoe, 326 U.S. at 320).

**\*4** No single facet of the relationship between two parties is dispositive of the issue of whether the exercise of *in personam* jurisdiction is consistent with due process. Rather, whether the assertion of personal jurisdiction comports with due process must be decided on a case by case basis. *Burger King*, 471 U.S. at 479.

Although the Court has stayed discovery in this case pending a decision on the motions to dismiss, plaintiffs have conducted extensive discovery in at least three prior suits stemming from the same event, their discharge from the Maryland Draft Committee. These suits have involved virtually identical allegations and parties in both state and federal courts. In fact, the discovery materials obtained in these prior suits

constitute the primary support for plaintiffs' contention that the exercise of personal jurisdiction over defendants is proper. [FN4] Plaintiffs have already inquired into defendants' contacts with the forum state. Aside from unsubstantiated attacks that these discovery materials are incomplete, defective, false, and/or prejudicial, plaintiffs fail to specify what relevant information any additional discovery would yield. Given their silence and the protracted history of their dispute with defendants, no additional discovery is necessary to aid the Court in resolving the pending motions.

A. Barr, Callahan & Gibbons and O'Connell Associates

Plaintiffs offer an incoherent theory to support the exercise of personal jurisdiction over defendants Barr, Callahan & Gibbons and O'Connell Associates. After wrestling with plaintiffs' voluminous *pro se* submissions, the Court has distilled their arguments to two distinct theories: general and specific jurisdiction. General jurisdiction applies where no relationship exists between the defendant's contacts with the forum and the facts underlying the cause of action. In such cases, courts may exercise jurisdiction over the defendant if its contacts are "extensive, continuous and systematic." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984). Specific jurisdiction applies when a cause of action arises out of the defendant's particular contacts with the forum. Thus, "even a single transaction in the forum may be sufficient for the exercise of jurisdiction, in a suit based on that transaction, where the transaction 'had substantial connection with that State.' " *Geelhoed v. Jensen*, 277 Md. 220, 228, 352 A.2d 818, 823 (1976) (quoting McGee, 355 U.S. at 223). The defendant need only have "fair warning that a particular activity may subject [it] to the jurisdiction of a foreign sovereign. 'Fair warning' exists when a defendant has purposefully directed his activities at residents of the forum, and the litigation results from injuries arising out of those activities." *Chung v. NANA Development Corp.*, 783 F.2d 1124, 1130 (4th Cir.1986) (internal quotations and citations omitted) (Ervin, J., dissenting), *cert. den.*, 479 U.S. 948 (1986).

**\*5** The only link between Barr and the investigations which form the subject of the instant complaint is buried in the midst of plaintiffs' complaint and memorandum--that is, Barr's role in introducing Blahnik to Richard Callahan on the telephone. Other than this informal introduction, no allegation exists that Barr played any role in the resultant relationship

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 7
**(Cite as: 1995 WL 274481, \*5 (D.Md.))**

between Blahnik and Callahan & Gibbons, or any of the investigations performed by the other defendants. Therefore, in the absence of any contacts between Barr and the State of Maryland, or between Barr and the causes of actions asserted herein, Barr cannot be said to have "extensive, continuous and systematic" contacts with, or "purposefully directed" his activities at, the forum state. Neither the exercise of specific or general jurisdiction over him comports with the requirements of the state long-arm statute or federal guarantees of due process. Accordingly, the Court will dismiss Barr from this suit.

General jurisdiction over either Callahan & Gibbons or O'Connell Associates is likewise not constitutionally permissible based on the latter's occasional retention of the services of the Maryland investigative firm MIS. Even if this limited employment constituted an agency relationship, in the absence of more substantial and regular contacts with this forum, O'Connell's intermittent historical contacts with the State of Maryland are not so "extensive, continuous and systematic" as to sustain this Court's exercise of general jurisdiction over it. By extension then, general jurisdiction over Callahan & Gibbons may not rest on its engagement of O'Connell Associates.

Although Callahan & Gibbons hired security guards to protect the volunteers at the Maryland Draft Committee, their presence in Maryland bear no relationship to the causes of action plaintiffs have raised in this case. Accordingly, the employment of these security guards fails to provide a basis for either general or specific jurisdiction over the California firm.

Plaintiffs rest their entire theory of specific jurisdiction over Callahan & Gibbons and O'Connell Associates on the in-state activities of MIS. According to plaintiffs, in investigating plaintiffs' background, MIS acted as the agent of O'Connell Associates, who in turn acted as the agent of Callahan & Gibbons. As this Court previously held in a parallel suit against O'Connell Associates filed by plaintiff Stover, personal jurisdiction over O'Connell Associates does not exist based on the conduct of MIS in the forum state because those actions do not form the subject of the instant complaint. O'Connell initially instructed MIS to conduct criminal background checks on both plaintiffs and to determine whether plaintiffs had "any ties to [the] KKK or any known white supremist [sic] group." MIS Assignment Sheets on Way and Stover, Exhibits 31 and 32 to Plaintiffs' Opposition. Although the scope of the investigation later expanded to include inquiries into public court records maintained by the

Maryland Bankruptcy Court, local District and Circuit Courts, and Federal Court, the undisputed record indicates that MIS did not inquire into plaintiffs' credit history, *id.*, nor did O'Connell Associates request that MIS obtain any credit information on plaintiffs. Affidavit of John O'Connell, Exhibit C to Defendants' Motion to Dismiss, ¶ 17. *See also* Affidavit of Daniel C. Frishkorn, Exhibit D to Defendants' Motion to Dismiss, ¶ 4.

**\*6** Given the above facts, plaintiffs' claims do not arise out of MIS's conduct in Maryland; instead, all of their claims, which concern information about their credit histories, stem from database searches performed by Callahan & Gibbons in California, and O'Connell Associates in New York. Although the subjects of these searches had ties to the State of Maryland, such an attenuated connection to this forum fails to support the exercise of either general or specific jurisdiction over either defendant.

B. Blahnik

Continuing in their haphazard manner, plaintiffs simply recite a convoluted and disjointed string of "facts" taken from Blahnik's deposition to argue that the Court's exercise of personal jurisdiction over him is proper. The only arguable support for the exercise of general jurisdiction over Blahnik in this case stems from his position as Manager of Field Operations for the national PPC, under whom various regional coordinators served. [FN5]

Plaintiffs, however, are unable to offer any specific evidence of Blahnik's alleged contacts with this forum. At all relevant times, the uncontroverted evidence is that Blahnik has resided in Texas. Affidavit of Mark A. Blahnik, Exhibit A to Motion to Dismiss, ¶ 5. He does not own or maintain any interest in any real estate, warehouses, bank accounts or other assets in the State of Maryland. *Id.* at ¶ 6. Blahnik reports that he does not advertise in the State, does not maintain any agents or employees in the State, and has never entered into any contract in the State of Maryland. *Id.* at ¶¶ 7-8. After ample opportunity, the lack of any description of the nature and extent of Blahnik's contacts with the Maryland state organization leads the Court to conclude that Blahnik's contacts are not so "extensive, continuous and systematic" as to confer general jurisdiction over him in this case. *See Helicopteros,* 466 U.S. at 414. *Goodyear Tire & Rubber Co. v. Ruby,* 312 Md. 413, 422-423, 540 A.2d 482, 486-87 (1988).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 8
(Cite as: 1995 WL 274481, *6 (D.Md.))

To avoid dismissal, plaintiffs must establish that the Court may exercise specific jurisdiction over Blahnik. Plaintiffs theorize that by instructing Callahan & Gibbons to "do whatever he felt was appropriate" to handle the concerns of volunteers in the Frederick, Maryland office, Blahnik "witting or not, gave the Callahan & Gibbons Groups 'ApparentAuthority' [sic] to do whatever he felt was appropriate." Plaintiffs' Memorandum in Opposition, p. 4. According to this theory, Callahan & Gibbons acted as Blahnik's agent in investigating plaintiffs, thereby attributing their acts to Blahnik as the principal. [FN6]

The determination of whether an agency relationship exists is ordinarily a question of fact. *Medical Mutual Liability Insurance Society v. Mutual Fire, Marine and Inland Insurance Co.,* 37 Md.App. 706, 712, 379 A.2d 739, 742 (Md.Ct.Spec.App.1977). Where an agency relationship rests on the conduct of the parties, the party alleging the agency bears the burden of proving not only its existence, but also its nature and extent. *Id.* at 713, 379 A.2d at 743; *Schear v. Motel Management Corp.,* 61 Md.App. 670, 687, 487 A.2d 1240, 1248 (Md.Ct.Spec.App.1985).

*7 The Restatement defines "apparent authority" as "the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons." *Restatement (Second) of Agency* § 8 (1958). To recover under this theory, plaintiffs must establish that Blahnik, by his actions and/or conduct, presented Callahan & Gibbons to a third party as being authorized to act on his behalf, and that the third party relied in good faith upon this representation. *Restatement (Second) of Agency* § 8 cmts. a and c. *See also Mercedes-Benz of N. Am. v. Garten,* 94 Md.App. 547, 567, 618 A.2d 233, 238 (Md.Ct.Spec.App.1993); *Hofherr v. Dart Industries, Inc.,* 853 F.2d 259, 262 (4th Cir.1988).

Plaintiffs have failed to allege, however, in this case that Blahnik took any action that led a third person to reasonably believe that Callahan & Gibbons had authority to act on his behalf. In fact, no statements exists regarding the perceptions or reactions of any person with whom Callahan & Gibbons came in contact during their investigation. Therefore, plaintiffs have failed to set forth a claim that Callahan & Gibbons acted with apparent authority in inquiring into their backgrounds. [FN7] Because no basis for apparent authority exists, the contacts of Callahan & Gibbons with the State of Maryland, if any, may not be

attributed to Blahnik in an effort to exercise personal jurisdiction over him. [FN8]

Blahnik's only contact with the forum state are telephone calls between himself and some Perot volunteers in Maryland. It is unclear from the pleadings, however, whether Blahnik initiated these calls to Maryland or merely received them. Nevertheless, "without more, communications made from outside the State to a Maryland resident are not enough to justify the exercise of personal jurisdiction over an out-of-state defendant." *Leather Masters v. Giampier Ltd.,* 836 F.Supp. 328, 331 (D.Md.1993).

After wading through the voluminous exhibits that plaintiffs submitted in opposition to Blahnik's dismissal, the Court reaches only one conclusion--that Blahnik has taken no action "purposefully directed" at the State of Maryland that provided fair warning of the instant suit. Despite plaintiffs' protestations to the contrary, the exercise of personal jurisdiction over him would thus contravene both the state long-arm statute and the protections of federal due process. Therefore, the Court will dismiss Blahnik from this suit.

CONCLUSION

Plaintiffs attempt to obscure the infirmities of their case by inundating the Court with a cascade of paperwork and continually casting aspersions on defendants' motives and legal arguments. Their inflammatory words, however, serve only to highlight the inadequacies of their own arguments. Stripped of their self-serving rhetoric, plaintiffs offer no basis for the exercise of personal jurisdiction over defendants Barr, Callahan & Gibbons, O'Connell Associates, or Blahnik. Therefore, the Court will grant defendants' motions to dismiss. It will be so ordered.

ORDER

*8 For the reasons set forth in the attached Memorandum Opinion, IT IS this 9th day of May, 1995, by the United States District Court for the District of Maryland, hereby ORDERED:

1. That the motion to dismiss submitted by defendants Thomas D. Barr, the Callahan & Gibbons Group, and O'Connell Associates, Inc. BE, and the same hereby IS, GRANTED.

2. That the motion to dismiss submitted by defendant Mark A. Blahnik BE, and the same hereby IS, GRANTED.

FN1. In his deposition, Blahnik maintains

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 9
(Cite as: 1995 WL 274481, *8 (D.Md.))

that he did not participate in the decision to remove Way in Maryland. *See* Deposition of Mark A. Blahnik, Exhibit 1 to Plaintiffs' Opposition, p. 64, lines 12-15. As the Court is considering a motion to dismiss, however, it will construe all disputed facts in the light most favorable to plaintiffs

FN2. Pursuant to Local Rule 105.2(a), plaintiffs' Reply Memorandum should have been entitled an "Opposition." Therefore, to avoid confusion with Blahnik's "Reply," the Court will refer to plaintiffs' memorandum as an "Opposition."

FN3. Stover's appeal of the dismissal is pending in the Fourth Circuit Court of Appeals.

FN4. In addition to document discovery, interrogatories and requests for admissions, 27 depositions were taken, including those of H. Ross Perot, Richard Callahan, John T. O'Connell, and Mark Blahnik. *See* defendants Barr, Callahan & Gibbons and O'Connell's Memorandum in Support of Motion to Dismiss, p. 2 n. 3.

FN5. At the outset, the Court notes that Blahnik's contact with the forum state on behalf of the national PPC may be insufficient to establish personal jurisdiction over him as an individual. *See Umans v. PWP Services, Inc.*, 50 Md.App. 414, 419-421, 439 A.2d 21, 24-25 (Md.Ct.Spec.App.1982); *Quinn v. Bowmar Publishing Company*, 445 F.Supp. 780, 786 (D.Md.1978). Because disagreement exists over the continued viability of the "fiduciary shield doctrine" under Maryland law, *compare Western Contracting Corp. v. Bechtel Corp.*, 885 F.2d 1196, 1200 (4th Cir.1989) *with Birrane v. Master Collectors, Inc.*, 738 F.Supp. 167, 169 (D.Md.1990), the

Court will nevertheless continue its analysis of the nature and extent of Blahnik's contacts with the forum state in determining whether the exercise of personal jurisdiction over him is proper

FN6. Although distinguishing between the jurisdiction of the forum state over the nonresident defendant and the merits of the case is important when considering the scope of the long-arm statute, *see Groom v. Margulies*, 257 Md. 691, 703, 265 A.2d 249, 254 (1970), the boundaries of these two inquiries are not always clearly defined. Where, as here, defendant challenges both the Court's jurisdiction over him and the adequacy of the claims asserted against him, an inquiry into both areas is appropriate.

FN7. Plaintiffs are likewise unable to establish that Blahnik conferred express authority on Callahan & Gibbons to act on his behalf. Under Maryland law, an express agency requires that the agent be subject to the principal's right of control, have a duty to act primarily for the benefit of the principal, and have the power to alter the legal relationship of the principal. *Schear*, 61 Md.App. at 687, 487 A.2d at 1248. No allegation exists, however, that Blahnik maintained any control over the scope and direction of Callahan & Gibbon's actions.

FN8. *See* Memorandum Opinion, *supra*, at pp. 9-13.

1995 WL 274481 (D.Md.)

Motions, Pleadings and Filings (Back to top)

1:94CV02519                    (Docket)
(Sep. 12, 1994)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT "C"

Not Reported in F.Supp.
1991 WL 18427 (N.D.Ill.)
(Cite as: 1991 WL 18427 (N.D.Ill.))
▷

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.
WEST COAST VIDEO ENTERPRISES, INC.,
Plaintiff,
v.
Edmund PONCE DE LEON, et al., Defendants.
No. 90 C 1236.

Feb. 5, 1991.

*MEMORANDUM OPINION AND ORDER*

CONLON, District Judge.

**\*1** In this breach of contract case, West Coast Video
Enterprises, Inc. ("West Coast Video") sues Edmund
Ponce de Leon and six other members of his family
(collectively "the Ponce de Leons") for money
allegedly due and owing under three contracts. The
Ponce de Leons assert counterclaims against West
Coast Video, Elliot W. Stone and Richard J. Abt
(collectively "counter-defendants"), for unfair
competition, breach of contract, various state law
violations involving fraud, and for civil violations of
the Racketeer Influenced and Corrupt Organizations
Act ("RICO"), 18 U.S.C. §§ 1961-68. Counter-
defendants now move for summary judgment on the
second amended counterclaim. For the reasons set
forth below, the court only addresses West Coast
Video's motion for summary judgment as to the RICO
counterclaims (second amended counts III and IV).
The court will, however, consider Stone and Abt's
motion for summary judgment in its entirety.

*BACKGROUND*

I. Procedural History

On October 4, 1989, West Coast Video filed suit
against the Ponce de Leons in the Eastern District of
Pennsylvania, seeking to recover money due under
three contracts. In March 1990, the Ponce de Leons
successfully moved to transfer venue to this district.
On April 25, 1990, the court ordered discovery closed
on July 25, 1990. All dispositive motions were to be
filed by July 25, 1990. On May 25, 1990, the Ponce de
Leons filed a counterclaim against plaintiff West Coast
Video, and joined counter-defendants Stone and Abt to
the charges. Counter-defendants answered the

counterclaim on June 13, 1990. Two weeks later, the
parties requested and were granted an extension of time
to conduct discovery. The court set November 20,
1990 as the date on which the parties were to submit
the joint pretrial order and placed the case on its
December trial calendar. On October 3, 1990, the
Ponce de Leons filed an amended counterclaim.

On November 20, 1990, one month after the close of
discovery, the parties appeared before the court and
failed to present their joint pretrial order. Instead, West
Coast Video, Stone and Abt sought leave to file a
motion for summary judgment on the Ponce de Leon's
amended counterclaim, and a thirty-three page
supporting memorandum. The court stated that the
motion for summary judgment, filed one month after
the close of discovery and nearly four months after the
deadline for all dispositive motions, was too late. The
court gave the parties until November 27, 1990 to
present their pretrial order.

Between November 20 and November 27, the court
reviewed West Coast Video's motion for summary
judgment. The motion pointed out, among other
things, basic pleading defects in the RICO counts. In
addition, Stone and Abt's motion for summary
judgment claimed that the court lacked personal
jurisdiction over them. None of the counter-
defendants had ever moved to dismiss the counterclaim
based on these alleged pleading defects; they chose
instead to engage in extensive discovery for several
months and wait for the eve of trial to move for
summary judgment.

**\*2** On November 27, the parties again failed to present
their pretrial order. When the court asked counsel for
West Coast Video why the pleading defects had not
been addressed earlier, counsel stated that his law firm
"did not want to ... burden the courts twice . when we
thought that one dispositive motion [for summary
judgment] would get rid of this entire counterclaim."
Counsel for the Ponce de Leons then explained the
prejudice resulting from West Coast Video's failure to
file a timely motion to dismiss the counterclaim. Had
West Coast Video successfully moved to dismiss the
counterclaim earlier, the Ponce de Leons would have
had an opportunity to amend their counterclaim to state
valid claims for relief. By waiting until the eve of trial
to file a motion for summary judgment directed in part
at the sufficiency of the pleadings, West Coast Video
eliminated the Ponce de Leon's chance to amend. In
fairness, the court granted the Ponce de Leons leave to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1991 WL 18427, *2 (N.D.Ill.))

Page 2

file a second amended counterclaim by December 4, 1990.

The Ponce de Leons' second amended counterclaim was identical to the previous counterclaim, but added specific allegations of predicate RICO acts for counts III and IV. West Coast Video was given to December 18, 1990 to answer or otherwise plead. On December 18, West Coast Video filed a pleading captioned "amended motion for summary judgment" with a fifteen-page supporting memorandum. Stone and Abt also filed their own motion for summary judgment and fifteen-page supporting memorandum. The motions became fully briefed on January 23, 1991.

West Coast Video's memorandum in support of its "amended" motion for summary judgment addresses only the RICO counts of the second amended counterclaim. Apparently, West Coast Video presumes the court will consider its "amended" motion for summary judgment in conjunction with the November motion for summary judgment and thirty-three page supporting memorandum. Indeed, West Coast Video devotes only half a page in its "amended" memorandum to counts I, II, V, VI and VII. West Coast Video states that these counts should be dismissed for the reasons set forth in the memorandum in support of the November motion for summary judgment. The court shall not consider the arguments set forth in the November memorandum. The court never granted West Coast Video's motion for leave to file this oversized brief. In addition, the Ponce de Leons never responded to the November motion. It would be unfair to require the Ponce de Leons to respond (in a fifteen page brief) to all of the arguments in West Coast Videos' two supporting memoranda, which total 48 pages. Accordingly, the court considers West Coast Video's motion for summary judgment only as it relates to Counts III and IV. Regarding Abt and Stone's motion, the court shall consider it in full except insofar as the motion references the unauthorized November memorandum.

II. Facts Relevant to Counts III and IV of the Second Amended Counterclaim

*3 Counter-defendant Elliot Stone is the president and chief executive officer of West Coast Video. Elliot Stone's and Richard Abt's Statement of Undisputed Material Facts ("Stone and Abt's Facts") ¶ 1. Richard Abt serves as vice president and general counsel for West Coast Video. Id. ¶ 2. Both Abt and Stone reside in Pennsylvania. Id. ¶¶ 1-2.

At all relevant times, the Ponce de Leons have lived in Chicago, Illinois. West Coast Video's Statement of Uncontested Facts [FN1] ("West Coast Video's Facts") ¶¶ 7-9. Edmund Ponce de Leon is an attorney licensed to practice law in Illinois. Id. ¶ 6. Prior to September 30, 1987, the Ponce de Leons contemplated opening a West Coast Video franchise store. Before entering into a franchise agreement with West Coast Video, Edmund Ponce de Leon received, through the mail, a form letter signed by Stone. Ponce de Leon Ex. 3. In essence, the letter welcomed the "Potential Franchise Investor" to West Coast Video and informed the reader in general terms that West Coast Video led the video industry in franchise expertise, service and support. Id. Included with Stone's letter was a promotional brochure that boasted a variety of benefits for franchisees. Id. The benefits listed in the brochure included: (1) an ongoing support program to assist the franchisee with everything from choosing a store location to the store's grand opening; (2) exclusive territorial rights in the franchisee's specified area; and (3) national and regional advertising support from West Coast Video. Id.

In addition, West Coast Video provided the Ponce de Leons with a copy of West Coast Video's Uniform Franchise Offering Circular ("offering circular"). West Coast Video's Facts ¶ 2. The offering circular contained estimates as to the amount of a franchisee's initial investment. West Coast Video Ex. 2 at 21-26. The offering circular also included a section designated:

ITEM 19: ACTUAL, AVERAGE, PROJECTED OR FORECASTED FRANCHISE SALES, PROFITS OR EARNINGS

Franchisor does not make representations as to actual, average, estimated, projected or potential Franchisee sales, profits or earnings.

Id. at 43.

Before executing the franchise agreement with West Coast Video, Edmund Ponce de Leon reviewed the offering circular and the franchise agreement, and advised the Ponce de Leons of the legal consequences of both documents. West Coast Video's Facts ¶ 6. The franchise agreement contained a clause granting the franchisee an exclusive territory:

The franchisor may not establish or operate a company-owned outlet, or grant to any person or entity the right to establish or operate, a business within

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1991 WL 18427, *3 (N.D.Ill.))

Page 3

Franchisee's Territory....

West Coast Video's Ex. 1 at 2.    The franchise agreement also stated:

This Agreement contains all of the terms and conditions agreed upon by the parties. No promises or representations have been made by Franchisor other than herein set forth. No modifications of the terms of this Agreement shall be valid unless made in writing and executed by both the Franchisor and the Franchisee ...

*4 ... the amount of profit or loss resulting from the operation of the business will be directly attributable to the performance of Franchisee ... [Franchisee] represents that no profit potentials were given by Franchisor, and further represents that the Franchisor offers no guarantee as to the viability of a business in the territory and/or site location selected by Franchisee.

*Id.* at 24-25.

On September 30, 1987, the Ponce de Leons executed the franchise agreement with West Coast Video. West Coast Video Facts ¶ 1. On November 30, 1987, in anticipation of opening their West Coast Video retail store, the Ponce de Leons leased a storefront in a newly-constructed strip mall known as the Lane Plaza Shopping Center ("Lane Plaza"), located at 2550 West Addison Street in Chicago. *Id.* ¶¶ 10-11. The terms of the lease required the Ponce de Leons to pay rent of approximately $4,800 per month for seven years, beginning in March 1988. *Id.* ¶ 11. The Ponce de Leons have been in arrears on their rent obligations since their first payment was due in March 1988. *Id.* ¶ 16. [FN2]

On April 6, 1988, the Ponce de Leons opened their West Coast Video retail store in Lane Plaza. *Id.* ¶ 5. During the summer of 1988, West Coast Video informed the Ponce de Leons that it intended to open a West Coast Video regional headquarters and corporate retail store at 2101 West Irving Park Road, approximately five blocks from the Ponce de Leons' store. *Id.* ¶ 17. Because the new corporate store might adversely affect the Ponce de Leon's Lane Plaza store, West Coast Video offered the Ponce de Leons certain additional benefits, including the option to purchase up to three additional franchises at reduced prices. *See* West Coast Video's Ex. 7. In September 1988, the Ponce de Leons executed and returned a letter evidencing this arrangement between the Ponce de Leons and West Coast Video. West Coast Video's

Facts ¶ 19. Around this time, the Ponce de Leons complained to West Coast Video's Midwest Director, Judi Fishman, that they never received the designated exclusive territory they were promised in the franchise agreement. West Coast Video personnel sent several letters assuring the Ponce de Leons that they would soon receive a map indicating their exclusive territory. West Coast Video's Exs. 8, 9, 25. The Ponce de Leons never received this information. Ponce de Leons' Additional Facts ¶ 2.

West Coast Video opened its corporate store in April 1989. Amended Counterclaim ¶¶ 19-20; Answer to Amended Counterclaim ¶¶ 19-20. Shortly thereafter, the Ponce de Leons complained to Judi Fishman that the new corporate store drew customers away from the Ponce de Leon's Lane Plaza store. Ms. Fishman denied that the corporate store was the cause of the Ponce de Leons' financial difficulties. West Coast Video Ex. 12. Ms. Fishman also stated that the Ponce de Leons owed West Coast Video substantial amounts of money under three contracts. *Id.* The Ponce de Leons refused to pay these amounts, claiming West Coast video wrongfully opened the corporate store within the Ponce de Leon's exclusive territory.

*5 The Ponce de Leons closed their Lane Plaza store in October 1989. West Coast Video's Facts ¶ 14. From the time the Ponce de Leons opened their store in April 1988 until the time the store closed, the Ponce de Leons never achieved an operating profit for any month. *Id.*

## DISCUSSION

Summary judgment must be granted when the record shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Marcial v. Coronet Ins. Co.,* 880 F.2d 954, 959 (7th Cir.1989). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986); *Schroeder v. Lufthansa German Airlines,* 875 F.2d 613, 620 (7th Cir.1989). All reasonable factual inferences must be viewed in favor of the nonmoving party. *Holland v. Jefferson Nat'l Life Ins. Co.,* 883 F.2d 1307, 1312 (7th Cir.1989).

I. West Coast Video's Motion for Summary Judgment on the RICO Claims

Count III of the second amended counterclaim charges

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1991 WL 18427, *5 (N.D.Ill.))

Page 4

West Coast Video with violating RICO, 18 U.S.C. §
1962(a). [FN3]  Count III asserts that West Coast
Video used income derived from a pattern of mail and
wire fraud to operate and maintain the enterprise of
West Coast Video. [FN4]  In Count IV, the Ponce de
Leons charge Stone and Abt with violating § 1962(c)
of RICO.  Section 1962(c) prohibits employees of an
enterprise from operating the enterprise through a
pattern of racketeering activity.  18 U.S.C. § 1962(c).
West Coast Video contends that the Ponce de Leons
have failed to present evidence that would entitle them
to recover under RICO.

A. *Predicate Racketeering Acts*

Paragraph twelve of the second amended counterclaim
encapsulates the theoretical basis of the Ponce de
Leons' RICO claims:

In 1985, West Coast Video set up enterprises and
traveled about the United States, including the State of
Illinois, soliciting participation in its franchise
arrangements by offering assurances of profitability in
exchange for an individual's investment.    Counter-
defendants accomplished this scheme by sending
fraudulent representations, guarantees and inducements
through the mail and by telephone and in person
through its agents and sales representatives. Counter-
defendants further accomplished this scheme by failing
to provide potential franchisees, including Counter-
plaintiffs herein, with such profit potential information
properly disclosed within the disclosure documents
required under applicable federal and state statutes.
Counter-defendants further provided false and
misleading information to potential franchisees,
including the Counter-plaintiffs herein.

Although paragraph twelve purports to allege a broad
scheme by West Coast Video to defraud vast numbers
of franchisees throughout the United States, the rest of
the allegations in the counterclaim focus solely on
West Coast Video's alleged misconduct toward the
Ponce de Leons. [FN5]    The second amended
counterclaim contains five specific allegations
describing West Coast Video's alleged predicate acts of
mail and wire fraud perpetrated on the Ponce de Leons.
In the first allegation of mail fraud, the Ponce de Leons
assert that Stone's form letter to prospective
franchisees, and the accompanying promotional
brochure and offering circular, contained materially
false information.    Second Amended Counterclaim ¶
51(a).  Second, the Ponce de Leons claim that officers
of West Coast Video sent three letters to the Ponce de
Leons falsely promising exclusive territory rights.  *Id.* ¶

51(b).    These three letters were dated October 10,
1988, December 9, 1988 and April 17, 1989--all were
sent more than one year after the Ponce de Leons
entered into the franchise agreement on September 30,
1987.

**6** Third, the Ponce de Leons allege three 1989
telephone conversations in which Richard Abt
attempted to induce Edmund Ponce de Leon to waive
the Ponce de Leons' right to an exclusive territory.  *Id.*
¶ 51(c).  The fourth and fifth allegations of mail fraud
state that on May 29, 1990, and again on September
21, 1990, Abt and Stone attempted to conceal West
Coast Video's pattern of racketeering activity by
sending materially false letters to the Deputy Chief of
the Franchise Division of the Illinois Attorney General.
*Id.* ¶¶ 51(d)-(e); Ponce de Leons' Exs. 11, 12.

In a ten-page discussion, West Coast Video argues that
none of the alleged letters or telephone conversations
were fraudulent.  However, the court need not address
whether   these   communications   were   false   or
misleading, because as a matter of law, the allegations
fail to demonstrate a pattern of racketeering activity, an
essential element in a RICO claim. [FN6]

B. *The Pattern Element*

A "pattern of racketeering activity," as defined in 18
U.S.C. § 1961(5), requires at least two predicate acts of
racketeering activity.    In addition, the racketeering
predicate acts must be related, and must amount to or
threaten continued criminal activity.    *H.J. Inc. v.
Northwestern Bell Telephone Co.*, 492 U.S. 229, 109
S.Ct. 2893, 2900 (1989); *United States Textiles, Inc. v.
Anheuser-Busch Companies, Inc.*, 911 F.2d 1261,
1266 (7th Cir.1990).  The relationship-plus-continuity
test is a case-by-case inquiry involving many factors.
*H.J. Inc.*, 109 S.Ct. at 2902; *U.S. Textiles*, 911 F.2d at
1266.   Predicate acts are related if they have similar
purposes, results, participants, victims or methods of
commission.   *H.J. Inc.*, 109 S.Ct. at 2901.   The Ponce
de Leons allege that West Coast Video perpetrated
various acts of mail and wire fraud in furtherance of a
single scheme: first to persuade the Ponce de Leons to
purchase a franchise based on false promises, and then
to cover up any trace of wrongdoing by mailing
fraudulent letters to the office of the Illinois Attorney
General.    Because the predicate acts have similar
victims, participants, purposes and results, the Ponce
de Leons have alleged related predicate acts of mail
and wire fraud.

As to continuity, the Seventh Circuit considers four

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

factors in determining whether a pattern sufficient to support a RICO claim has been alleged: (1) the number and variety of predicate acts and the duration of their commission; (2) the number of victims; (3) the presence of separate schemes; and (4) the occurrence of distinct injuries. *U.S. Textiles,* 911 F.2d at 1266; *Olive Can Co., Inc. v. Martin,* 906 F.2d 1147, 1151 (7th Cir.1990); *Morgan v. Bank of Waukegan,* 804 F.2d 970, 975 (7th Cir.1986). As a result of the Supreme Court's decision in *H.J. Inc.,* the Seventh Circuit "now analyze[s] these various factors with an eye towards achieving a 'natural and common sense' result." *U.S. Textiles,* 911 F.2d at 1267, quoting *H.J. Inc.,* 109 S.Ct. at 2907.

**\*7** The first factor looks to the number and variety of predicate acts and the length of time over which they were committed. However, when RICO claims are premised on mail or wire fraud, the number of predicate acts often bears little relevance to whether a pattern of racketeering activity has been alleged. As the Seventh Circuit recently reiterated:

Mail and wire fraud are perhaps unique among the various sorts of "racketeering activity" possible under RICO in that the existence of a multiplicity of predicate acts may be no indication of the requisite continuity of the underlying fraudulent activity. Thus, a multiplicity of mailings does not necessarily translate into a "pattern" of racketeering activity.

*U.S. Textiles,* 911 F.2d at 1268, quoting *Sutherland v. O'Malley,* 882 F.2d 1196, 1205 n. 8 (7th Cir.1989). *See also Ashland Oil, Inc. v. Arnett,* 875 F.2d 1271, 1278 (7th Cir.1989) ("number of [mail and wire fraud] offenses is only tangentially related to the underlying fraud, and can be a matter of happenstance").

A number of cases demonstrate the Seventh Circuit's position regarding RICO claims based on mail and wire fraud. In *U.S. Textiles,* a T-shirt manufacturer alleged that its customer committed extortion by forcing the manufacturer to enter into a contract. The terms of the contract required the manufacturer to make up a \$2.55 million inventory deficit through a series of transactions. The manufacturer claimed that each separate transaction pursuant to the contract represented a separate predicate act of mail and/or wire fraud, and that the sum of these transactions amounted to a pattern of racketeering activity. The Seventh Circuit disagreed. Noting that each allegation of mail and wire fraud related back to the extortion allegedly achieved by the original contract, the court concluded that "the raw number of transactions and the length of

time over which those transactions occurred was pure happenstance in light of the underlying concern which is the 'continuity' of the criminal activity." *U.S. Textiles,* 911 F.2d at 1268. The court further observed that:

Virtually every garden-variety fraud is accomplished through a series of wire or mail fraud acts that are "related" by purpose and spread over a period of at least several months. Where such a fraudulent scheme inflicts or threatens only a single injury, we continue to doubt that Congress intended to make the availability of treble damages and augmented criminal sanctions dependent solely on whether the fraudulent scheme is well enough conceived to enjoy prompt success or requires pursuit for an extended period of time.

*Id.*

Similar results were reached in *Lipin Enterprises, Inc. v. Lee,* 803 F.2d 322 (7th Cir.1986), and *SK Hand Tool Corp. v. Dresser Indus., Inc.,* 852 F.2d 936 (7th Cir.1988), *cert. denied,* 109 S.Ct. 3241 (1989). The *Lipin* court held that twelve acts of mail fraud, in which a seller of a company overstated the company's value, did not constitute a pattern of racketeering activity. The court noted that the multiple mailings essentially defrauded the purchaser on only one occasion--the date the company was purchased. *Lipin,* 803 F.2d at 324. Likewise, in *SK Hand Tool,* the defendant corporation committed several predicate acts of mail and wire fraud for the sole purpose of inducing the plaintiff to purchase a corporate division at an inflated price. The Seventh Circuit concluded that despite the number of fraudulent mailings, the plaintiff had not demonstrated the threat of continuing activity necessary in order to meet the pattern requirement. *Id.* at 940.

**\*8** The facts of the present case fall into the same category as *U.S. Textiles, Lipin* and *SK Hand Tool.* The Ponce de Leons' counterclaim alleges several instances of mail and wire fraud occurring over the course of approximately two years. However, these letters and telephone conversations all relate back to West Coast Video's alleged act of fraudulently inducing the Ponce de Leons to purchase a franchise for more than it was worth--an act that was accomplished on September 30, 1987. Thus, West Coast Video's letters reassuring the Ponce de Leons that they would receive their exclusive territory, and Richard Abt's telephone conversation with Edmund regarding the exclusive territory, were all part of a single fraudulent scheme. As in *U.S. Textiles,* the number of mailings and telephone calls are not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1991 WL 18427, *8 (N.D.Ill.))

instructive in determining the existence of a pattern of racketeering activity

The second factor pertinent to the continuity inquiry is the number of victims. In this case, the Ponce de Leons are the only victims, despite their broad claim that scores of franchisees suffered from West Coast Video's deceptive practices. [FN7] Although the absence of multiple victims does not automatically doom a RICO claim, it may be significant in light of the other factors. U.S. Textiles, 911 F.2d at 1268. In the present case, the third factor--the existence of multiple schemes--also cuts against finding a pattern. The foregoing discussion demonstrates that the Ponce de Leons have alleged a single scheme on the part of West Coast Video to induce (through false promises) the Ponce de Leons into executing the franchise agreement, and then to cover up any wrongdoing. Contrary to the Ponce de Leons' assertion, the alleged "cover-up" letters to the Office of the Illinois Attorney General do not amount to a separate fraudulent scheme. See Jones v. Lampe, 845 F.2d 755, 759 (7th Cir.1988) ("If we were to treat every alleged 'cover-up' as a separate scheme, every transaction could turn into a 'multiple scheme' if the defendant denies wrongdoing").

The final factor to consider is whether the alleged predicate acts caused distinct injuries. Clearly, the Ponce de Leons suffered a single economic injury from West Coast Video's alleged acts of mail and wire fraud. The alleged harm to the Ponce de Leons consists of the money they lost as a result of their investment in the video franchise, including any money they may be required to pay under the three contracts with West Coast Video. Moreover, although one could argue that the Ponce de Leons suffered a distinct injury each time they incurred a debt or made a payment pursuant to the terms of their franchise agreement,

a natural and common sense approach to the pattern element of RICO would instruct that identical economic injuries suffered over the course of two years stemming from a single contract were not the type of injuries which Congress intended to compensate via the civil provisions of RICO.

**\*9** U.S. Textiles, 911 F.2d at 1269.

In sum, without regard to whether the mailings or telephone calls were in fact fraudulent, the Ponce de Leons have failed to allege a pattern of racketeering activity sufficient to support a RICO claim. Accordingly, summary judgment is granted in favor of

West Coast Video, Stone, and Abt as to Counts III and IV of the second amended counterclaim.

II. Stone and Abt's Motion for Summary Judgment

Stone and Abt advance two reasons in support of their motion for summary judgment. First, Stone and Abt argue that Count IV's RICO claim against them is insufficient as a matter of law. The foregoing discussion confirms Stone and Abt's position. Stone and Abt also contend that this court lacks personal jurisdiction over them as to the remaining counts in the second amended counterclaim.

A. The Jurisdictional Standard

Now that the court has determined that the RICO claims must be eliminated from the counterclaim, federal subject matter jurisdiction over the counterclaim is based solely on diversity of citizenship. A federal district court sitting in diversity has personal jurisdiction over a non-consenting, nonresident defendant if a court of the forum state would have personal jurisdiction. Daniel J. Hartwig Assocs., Inc. v. Kanner, 913 F.2d 1213, 1216 (7th Cir.1990). The party asserting personal jurisdiction bears the burden of establishing that jurisdiction is proper. Saylor v. Dyniewski, 836 F.2d 341, 342 (7th Cir.1988); Olinski v. Duce, 155 Ill.App.3d 441, 508 N.E.2d 398, 400 (1st Dist.1987).

Under the Illinois long-arm statute, an Illinois court has personal jurisdiction over a party that commits one of fourteen enumerated acts, including transacting business or committing a tortious act in Illinois. Ill.Ann.Stat. ch. 10, para. 2-209(a) (Smith-Hurd Supp.1990). Prior to September 7, 1989, personal jurisdiction based on the long-arm statute was permissible only if the cause of action arose out of the defendant's commission of an enumerated act. FMC Corp. v. Varonos, 892 F.2d 1308, 1311 n. 5 (7th Cir.1990). However, a recent amendment to the long-arm statute provides that "a court may also exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution or by the Constitution of the United States." Ill.Ann.Stat ch. 10, ¶ 2-209(c) (Smith-Hurd Supp.1990). The Seventh Circuit has construed this amendment to render the jurisdictional reach of the Illinois long-arm statute co-extensive with minimum due process requirements. FMC Corp., 892 F.2d at 1311 n. 5. See also Kinney v. Anchorlock Corp., 736 F.Supp. 818, 825 n. 5 (N.D.Ill.1990). Thus, under the amended long-arm statute, a defendant need not commit one of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 7
(Cite as: 1991 WL 18427, *9 (N.D.Ill.))

enumerated acts in ¶ 2-209(a); personal jurisdiction is
proper if the requirements of due process are met.
Because the Ponce de Leons filed their counterclaim on
May 25, 1990, the question of personal jurisdiction
over Stone and Abt is governed by the new provision
of the Illinois long-arm statute, which became effective
September 7, 1989. Thus, the sole inquiry is whether
the exercise of personal jurisdiction over Stone and
Abt in Illinois comports with due process.

### B. Constitutional Due Process Requirement

**\*10** The due process analysis for personal jurisdiction
focuses on whether the defendants "purposefully
established minimum contacts in the forum state."
*Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474
(1985). The defendants need not have physically
entered the forum state; the minimum contact
requirement is met if the defendants purposefully
availed themselves of the privilege of conducting an
activity within the forum state, thus invoking the
benefits and the protections of its laws. *Hanson v.
Denckla,* 357 U.S. 235, 253 (1958). In this respect,
the court must consider "whether the defendant[s']
conduct and connection with the forum state are such
that [they] should reasonably anticipate being haled
into court there." *World-Wide Volkswagen Corp. v.
Woodson,* 444 U.S. 286, 297 (1980). "Contacts with
the forum state that are merely 'random,' 'fortuitous,' or
'attenuated' are not sufficient to establish that
jurisdiction was foreseeable to the defendant [s]."
*Daniel J. Hartwig,* 913 F.2d at 1218, quoting *Burger
King,* 471 U.S. at 475.

Applying these principles to the present case, the court
concludes that the Ponce de Leons have not met their
burden in establishing Stone's and Abt's minimum
contacts with Illinois. True, Stone and Abt are officers
and shareholders of West Coast Video. But this fact,
without more, does not show that Stone and Abt
reasonably anticipated that they would be subject to an
Illinois lawsuit against them in their *personal*
capacities. The Ponce de Leons must demonstrate that
Stone and Abt--not West Coast Video or its agents--
conducted themselves so as to personally invoke the
benefits and protections of Illinois laws. The
minimum contacts standard, coupled with application
of the Illinois fiduciary shield doctrine, preclude this
court's exercise of personal jurisdiction over Stone and
Abt.

Under the fiduciary shield doctrine, "if an individual
has contact with a [s]tate only by virtue of his acts as a
fiduciary of a corporation, such acts may not form the

predicate for the exercise of jurisdiction over him as an
individual." *Washburn v. Becker,* 186 Ill.App.3d 629,
542 N.E.2d 764, 766 (1st Dist.1989); *Olinski v. Duce,*
155 Ill.App.3d 441, 508 N.E.2d 398, 400 (1st
Dist.1987). The doctrine is based on the perceived
unfairness of forcing "an individual to defend a suit
brought against him personally in a forum with which
his only relevant contacts are acts performed not for his
own benefit but for the benefit of his employer."
*Washburn,* 542 N.E.2d at 766 (citations omitted). The
fiduciary shield doctrine is an equitable doctrine; it is
to be applied in the court's discretion based upon the
particular facts of each case. *Washburn,* 542 N.E.2d at
767. *See also Torco Oil Co. v. Innovative Thermal
Corp.,* 730 F.Supp. 126, 135 (N.D.Ill.1989).

In the present case, Stone and Abt were at all times
clearly acting in their representative capacities as
officers of West Coast Video. Any contacts Stone and
Abt had with Illinois were achieved in their roles as
West Coast Video corporate officers. Indeed, the
Ponce de Leons appear to have already acknowledged
this fact by alleging:

**\*11** That at all times relevant hereto and in performing
the acts as set out hereinafter, Counter-Defendants,
Elliot W. Stone, Chief Executive Officer and President
of West Coast Video, and Richard J. Apt [sic], Vice-
President and General Counsel of West Coast Video,
were acting within the scope of their authority as
officers and duly authorized agents of the Counter-
Defendant, West Coast Video.

Second Amended Counterclaim ¶ 50. Application of
the fiduciary shield doctrine seems particularly
appropriate here.

The Ponce de Leons argue that the fiduciary shield
doctrine should not preclude the exercise of
jurisdiction over Abt and Stone. In so arguing, the
Ponce de Leons point out that Stone and Abt may both
be held personally liable under the Illinois Franchise
Disclosure Act. This observation, however, overlooks
the distinction between personal liability and personal
jurisdiction. As the *Olinski* court explained,
"[p]ersonal jurisdiction refers to the power of a court to
bind parties to its judgments; while personal liability
involves the responsibility, and the exposure of a
party's personal, not corporate, assets to judgment."
*Olinski,* 508 N.E.2d at 400. Thus, while a non-resident
corporate agent's conduct might subject him to
personal liability, that same conduct does not
necessarily provide the requisite minimum contacts for
the exercise of personal jurisdiction. *Id.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 8
(Cite as: 1991 WL 18427, *11 (N.D.Ill.))

The Ponce de Leons also claim that the fiduciary
shield doctrine is inapplicable in this case because
Stone and Abt are the "sole owners of the company."
See Ponce de Leons' response at 4.    According to the
Ponce de Leons, Stone and Abt "clearly have a
substantial personal interest and cannot be said to be
acting purely for the benefit of the corporation." Id.
Apparently, the Ponce de Leons seek to invoke the
"alter ego" or "sham" exception to the fiduciary shield
doctrine. See Washburn, 542 N.E.2d at 767 (personal
jurisdiction not precluded where "corporation which an
individual defendant represents is a 'sham,' in that it
lacks sufficient assets to respond in damages to a suit
or is the defendant's alter ego"); Torco, 730 F.Supp. at
135-36.    However, to survive summary judgment, the
Ponce de Leons cannot rely on the bare allegation that
Stone and Abt are the sole owners of West Coast
Video.    There must be some evidence that West Coast
Video is a mere shell corporation.    The Ponce de
Leons have not presented any evidence of commingled
funds, under-capitalization, or inadequate corporate
records. Turco, 730 F.Supp. at 136-37.    Thus, the
Ponce de Leons fail to present any reason why the
fiduciary shield doctrine should not apply.

Based on the evidence presented and the applicable
Illinois law, the court concludes that an Illinois court
would not exercise personal jurisdiction over Stone and
Abt.    Accordingly, summary judgment is granted as to
counter-defendants Stone and Abt.

### CONCLUSION

Stone and Abt's motion for summary judgment is
granted.    Stone and Abt are dismissed from this action
with prejudice.    West Coast Video's motion for
summary judgment is granted in part and denied in
part.    Summary judgment is granted in favor of West
Coast Video on Counts III and IV of the second
amended counterclaim.    Summary judgment is denied
in all other respects.

FN1.    Local Rule 12(1) requires a party
moving for summary judgment to file
a statement of material facts as to which the
moving party contends there is no genuine
issue and that entitle the moving party to a
judgment as a matter of law....    That
statement shall consist of short numbered
paragraphs, including within each paragraph
specific references to the affidavits, parts of
the record, and other supporting materials
relied upon to support the facts set forth in
that paragraph.
West Coast Video submitted a "Statement of
Undisputed  Material  Facts"  containing

paragraphs numbered 1-35, and an "Amended
Statement of Undisputed Material Facts with
paragraphs  designated  "a-k."        While
paragraphs 1-19 comply with Rule 12(1),
paragraphs 20-35 and a-k fail to satisfy the
requirements of Rule 12(1), because they do
not assert any facts.        Instead, these
paragraphs merely notify the court that
certain documents are attached as exhibits
("Attached hereto as Exhibit ___ is a true and
correct copy of ___.")    Because West Coast
Video has not asserted any factual statements
in connection with paragraphs 20-35 and a-k,
they do not amount to "statements of material
facts" under Rule 12(1).

FN2. The Ponce de Leons deny that they were
always behind on their rent obligations, but
offer no supporting evidence.    The affidavit
of Edmund Ponce de Leon states "we were in
arrears with the store rent from the start, but
... there existed certain disputes as to rent
credits due to us from the landlord." Ponce
de Leon Ex. 3 ¶ 31.

FN3. 18 U.S.C. § 1962(a) provides, in
relevant part:
It shall be unlawful for any person who has
received any income derived, directly or
indirectly, from a pattern of racketeering
activity ... to use or invest, directly or
indirectly, any part of such income, or the
proceeds of such income, in acquisition of
any interest in, or the establishment or
operation of, any enterprise which is engaged
in, or the activities of which affect, interstate
or foreign commerce.
The term "person" includes any individual or
entity capable of holding a legal or beneficial
interest in property. 18 U.S.C. § 1961(3).

FN4. Under 18 U.S.C. § 1961(4), a
corporation qualifies as an "enterprise."

FN5. As to West Coast Video's alleged
misconduct towards other franchisees, the
Ponce de Leons attempt to bolster the
inadequate allegations in the counterclaim
with affidavits of five non-party franchisees
who have experienced financial difficulties
with their West Coast Video franchises.
Ponce de Leons' Exs. 4-9. The affiants state
that West Coast Video and its agents gave
them false earnings projections and generally
failed to fulfill the obligations under the
franchise agreements. Id. The affidavits fail
to state whether the alleged misstatements
were made through use of the mail or
telephone. Thus, the Ponce de Leons have

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    **Page 9**
**(Cite as: 1991 WL 18427, \*11 (N.D.Ill.))**

not presented evidence demonstrating mail or wire fraud as to the non-party franchisees.

FN6. For this reason, it is particularly unfortunate that West Coast Video failed to file a timely motion attacking the sufficiency of the counterclaim on its face. West Coast Video's delay in challenging the obvious deficiencies in the RICO claims resulted in unnecessary discovery for both sides and costly protraction of this litigation.

FN7. As discussed above, except for the

sweeping and conclusory allegations in paragraph twelve, the counterclaim concerns West Coast Video's alleged wrongdoing towards only the Ponce de Leons.

1991 WL 18427 (N.D.Ill.)

Motions, Pleadings and Filings (Back to top)

· 1:90CV01236                (Docket) (Mar. 05, 1990)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT "D"

Not Reported in F.Supp.2d
2000 WL 772818 (E.D.Pa.)
(Cite as: 2000 WL 772818 (E.D.Pa.))

Page 8

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
Martin R. LAUTMAN, Plaintiff,
v.
The LOEWEN GROUP, INC., et al., Defendants.
No. CIV. A. 99-75.

June 15, 2000.

*MEMORANDUM AND ORDER*

YOHN.

**\*1** The plaintiff, Martin R. Lautman, brought this diversity action against the Loewen Group Inc. (the "Loewen Group"), Raymond L. Loewen, Robert L. Lundgren, Timothy R. Hogenkamp, Michael G. Weedon, and Paul Wagler alleging breach of contract and violation of the Pennsylvania Wage Payment and Collection Law ("WPCL"). Currently pending before the court is the motion to dismiss the plaintiff's complaint pursuant to Federal Rules of Civil Procedure 12(b)(2), (b)(5) and (b)(6), which was filed by Raymond L. Loewen, Robert L. Lundgren, Timothy R. Hogenkamp, Michael G. Weedon, and Paul Wagler (collectively the "individual defendants"). In their motion to dismiss, the individual defendants argue that: (1) the summons and complaint were never properly served upon Loewen, Weedon, or Wagler; (2) the court does not have personal jurisdiction over the individual defendants; and (3) the plaintiff's complaint fails to state a claim against the individual defendants for a violation of the WPCL. I will address each of these arguments in turn.

#### FACTUAL BACKGROUND

The plaintiff, Lautman, is the sole owner of Marketing Channels, Inc. ("M.C.I."), a marketing consulting company. *See* Compl. ¶ 13. On December 23, 1996, M.C.I. entered into a two-year marketing consulting agreement with the Loewen Group. *See id.* at ¶ 14. Pursuant to this agreement, the Loewen Group hired M.C.I. to conduct market research and to develop business opportunities for the Loewen Group. *See id.* The consulting agreement provided that the Loewen Group would compensate M.C.I. in the amount of $400,000 per year, plus travel and expenses. *See id.* at ¶ 15. The agreement also provided that M.C.I. would receive 100,000 ten-year stock options at an exercise price to be determined by the Loewen Group according to its stock option plan. *See id.* at ¶ 15. Specifically, the

consulting agreement provided that:

> If on October 31, 1998 M.C.I. has not exercised vested options awarded hereunder, and the average closing price per share of The Loewen Group, Inc. stock for the five consecutive trading days immediately preceding October 31, 1998 is below the Exercise Price of the options, then Loewen agrees to pay M.C.I. an additional amount of cash, so that the value of the unexercised vested options, together with the additional amount of cash, is equal to the value of the unexercised vested options at the Exercise Price.

*Id.* at ¶ 16. On September 14, 1997, Loewen Group International, a subsidiary of the Loewen Group, entered into an oral agreement to employ Lautman as a Marketing Assistant to the Executive Vice President of Operations. *See id.* at ¶ 17. In executing the agreement, Lautman and Loewen Group International agreed that part of Lautman's compensation would be derived from a stock option agreement to be entered into between the plaintiff and the Loewen Group. *See id.* at ¶ 18.

On May 15, 1997, Lautman entered into a stock option agreement with the Loewen Group. *See id.* at ¶ 19. The stock option agreement provided that 50,000 shares of capital stock of the Loewen Group, at an exercise price of $30.375 per share, would become exercisable by Lautman in installments over an 18 month period. *See id.* at ¶ 21. Section 19(a) of the stock option agreement provided as follows:

> **\*2** If on October 31, 1998, [Lautman] has not exercised vested options awarded hereunder, and the average closing price per share of the Shares on the New York Stock Exchange for the five consecutive trading days immediately preceding October 31, 1998 is below the exercise price of the options, then the Company agrees to pay [Lautman] an additional amount of cash, so that the value of the unexercised vested options, together with the additional amount of cash, is equal to the value of the unexercised vested options at the exercise price.

*Id.* at ¶ 21. According to Lautman, section 19(a) of the stock option agreement provided the basis for the calculation of the "net catch-up payment" pursuant to which Lautman was "entitled to a cash payment equal to the number of unexercised vested options multiplied by the difference between the exercise price of his unexercised vested options and the average closing price per share of Loewen Group on the New York Stock Exchange for the five consecutive days immediately preceding October 31, 1998." *Id.* at ¶ 22.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: 2000 WL 772818, *2 (E.D.Pa.))

Page 9

The consulting agreement expired on October 31, 1998, and was not renewed by the Loewen Group. *See id.* at ¶ 23. On November 3, 1998, Lautman informed the Loewen Group that he was entitled to a "net catch-up payment of $1,073,750" pursuant to the stock option agreement. *See id.* at ¶ 24. Lautman then sent the Loewen Group an invoice for $1,073,750. *See id.* at ¶ 25. The defendants have not honored Lautman's request for payment and have maintained that he is not entitled to such a cash payment. *See id.*

Lautman filed a two-count complaint against the Loewen Group, Raymond L. Loewen, Robert L. Lundgren, Timothy R. Hogenkamp, Michael G. Weedon, and Paul Wagler. The first count of the complaint, which alleges breach of contract for stock options, is brought only against the Loewen Group. *See* Compl. ¶¶ 29- 32. The second count of the complaint alleges that all of the defendants violated Pennsylvania's Wage Payment and Collection Law.

The individual defendants have brought the pending motion to dismiss to challenge the plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b). Specifically, the individual defendants argue that the court should dismiss the plaintiff's complaint because: (1) the court lacks personal jurisdiction over all of the individual defendants; (2) three of the individual defendants were not properly served with the complaint and summons; and (3) count two (for a violation of the WPCL) fails to state a claim upon which relief can be granted.

### STANDARD OF REVIEW

Once a defendant has raised a jurisdictional defense, the burden shifts to the plaintiff to prove that the relevant jurisdictional requirements are met. *See Mellon Bank (East) PSFS v. Farino,* 960 F.2d 1217, 1223 (3d Cir.1992); *Gehling v. St. George's Sch. of Medicine, Ltd.,* 773 F.2d 539, 542 (3d Cir.1985). The plaintiff must support this burden through "sworn affidavits or other competent evidence." *North Penn Gas Co. v. Corning Natural Gas Corp.,* 897 F.2d 687, 689 (3d Cir.), *cert. denied,* 498 U.S. 847 (1990) (citations omitted); *Royal Gist-Brocades N.V. v. Sierra Prods. Ltd.,* No. 97-1147, 1997 WL 792905, at *1 (E.D.Pa. Dec. 22, 1997). Where the complaint and affidavits are relied upon to satisfy its burden, the plaintiff succeeds by making a prima facie showing that jurisdiction exists. *See Friedman v. Israel Labour Party,* 957 F.Supp. 701, 706 (E.D.Pa.1997). "Factual discrepancies created by affidavits are generally resolved in favor of the non-moving party." *Id.; see also Carteret Savings Bank v. Shushan,* 954 F.2d 141,

142 n. 1 (3d Cir.), *cert. denied,* 506 U.S. 817 (1992).

**\*3** As for the defendant's motion to dismiss pursuant to Rule 12(b)(6), the purpose of such a motion is to test the legal sufficiency of the complaint. *See Sturm v. Clark,* 835 F.2d 1009, 1011 (3d Cir.1987). In deciding a motion to dismiss for failure to state a claim, the court must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the non-movant." *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994) (citing *Rocks v. Philadelphia,* 868 F.2d 644, 645 (3d Cir.1989)). At this stage of the litigation, "[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984) In deciding a motion to dismiss, a district court also may consider exhibits attached to the complaint and matters of public record. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993), *cert. denied,* 510 U.S. 1042 (1994). Moreover, "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Id.* (citations omitted).

### DISCUSSION

In their motion to dismiss, the individual defendants argue that the court lacks personal jurisdiction, service was improper, and the complaint fails to state a claim upon which relief can be granted. Because I conclude that the court does not have personal jurisdiction over some of the individual defendants, I will address that issue first and then discuss the other arguments made by the individual defendants.

#### a. *Lack of Personal Jurisdiction*

Whether personal jurisdiction over an out-of-state defendant is proper requires a two-part inquiry. First, a district court sitting in diversity must determine whether the long-arm statute of the forum state would permit the courts of the forum state to exercise jurisdiction over the defendant. *See* Fed.R.Civ.P. 4(e)(1); *Imo Indus. v. Kiekert AG,* 155 F.3d 254, 259 (3d Cir.1998). Second, a district court must ask whether asserting personal jurisdiction would be consistent with the dictates of the due process clause. *See Imo Indus.,* 155 F.3d at 259. In Pennsylvania, the state long-arm statute is coextensive with the limit of due process. *See* 42 Pa.C.S.A. § 5322(B) (Purdon's 1981 & 1999 Supp.) (extending state court jurisdiction

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: 2000 WL 772818, *3 (E.D.Pa.))

Page 10

over non-residents to the "fullest extent allowed under the Constitution of the United States"); *Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Prods. Co.,* 75 F.3d 147, 150 (3d Cir.1995). Consequently, the essential question is whether asserting personal jurisdiction over the defendant would comport with the requirements of due process.

The due process inquiry focuses on the relationship between the defendant's conduct, the forum state, and the litigation. *See Shaffer v. Heitner,* 433 U.S. 186, 204 (1977); *Imo Indus.,* 155 F.3d at 259. To satisfy the dictates of the due process clause, the defendant must have purposefully directed conduct toward the forum state or must have purposefully availed himself of the protection of the laws of the forum state. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985); *Imo Indus.,* 155 F.3d at 259.

**\*4** Case law development over time has delineated two independent bases of personal jurisdiction. A defendant is subject to the general jurisdiction of the court regardless of where the events occurred giving rise to the action when the defendant's contacts with the forum state are continuous and systematic. *See Helicopteros Nacionales de Columbia v. Hall,* 466 U.S. 408, 414 n. 9 & 416 (1984); *Imo Indus.,* 155 F.3d at 259 n. 2. In contrast, a defendant is subject to the specific jurisdiction of the court when the events giving rise to the action are related to the forum state and the defendant has the necessary minimum contacts with the forum state. *See Helicopteros Nacionales de Columbia,* 466 U.S. at 414 n. 8; *Imo Indus.,* 155 F.3d at 259.

In this case, the plaintiff argues that the court has specific jurisdiction over the individual defendants. [FN1] *See* Memorandum of Plaintiff, Martin R. Lautman, in Opposition to the Motion to Dismiss of Defendants Raymond L. Loewen, Robert L. Lundgren, Timothy R. Hogenkamp, Michael G. Weedon and Paul Wagler ("Pl.'s Opp.") at 14 (stating that "[i]n this case, the allegations against the Individual Defendants arise out of their forum-related activities and, therefore, specific jurisdictional principles apply to this analysis"). The plaintiff claims that the court may exercise specific jurisdiction over the individual defendants on the following three grounds: (1) pursuant to 42 Pa.C.S.A. § 5322(a)(3) [FN2] because the individual defendants' actions harmed the plaintiff in Pennsylvania; (2) pursuant to 42 Pa.C.S.A. § 5322(a)(4) [FN3] because the individual defendants committed an act or omission outside of Pennsylvania that caused harm or tortious injury inside Pennsylvania; and (3) pursuant to 42 Pa.C.S.A. § 5322(a)(10) [FN4]

because the individual defendants violated a Pennsylvania statute, the WPCL, within Pennsylvania. *See* Pl.'s Opp. at 14.

> FN1. The plaintiff does not contend that the court has general jurisdiction over the individual defendants *See* Pl.'s Opp at 14.

> FN2. 42 Pa.C.S.A. § 5322(a)(3) provides that a "tribunal of this Commonwealth may exercise personal jurisdiction over a person ... who acts directly or by an agent, as to a cause of action or other matter arising from such person ... [c]ausing harm or tortious injury by an act or omission in this Commonwealth."

> FN3. 42 Pa.C.S.A. § 5322(a)(4) provides that a "tribunal of this Commonwealth may exercise personal jurisdiction over a person ... who acts directly or by an agent, as to a cause of action or other matter arising from such person ... [c]ausing harm or tortious injury by an act or omission outside this Commonwealth."

> FN4. 42 Pa.C.S.A. § 5322(a)(10) provides that a "tribunal of this Commonwealth may exercise personal jurisdiction over a person ... who acts directly or by an agent, as to a cause of action or other matter arising from such person ... [c]ommitting any violation within the jurisdiction of this Commonwealth of any statute, home rule charter, local ordinance or resolution, or rule or regulation promulgated thereunder by any government unit or of any order of court or other government unit."

Specific jurisdiction is proper under constitutional due process standards where two showings are made. First, the plaintiff must demonstrate that the defendant has the requisite minimum contacts with the forum state. *See Burger King Corp.,* 471 U.S. at 474; *Imo Indus.,* 155 F.3d at 259. These contacts must be such that the defendant's conduct in the forum state demonstrates the purposeful direction or availment which underlies the personal jurisdiction inquiry. *See Burger King Corp.,* 471 U.S. at 472; *Imo Indus.* 155 F.3d at 259. Where the conduct of a defendant is such that he reasonably should have foreseen being haled into court in the forum state, the necessary minimum contacts have been shown. *See World Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980). If the necessary minimum contacts do exist, then courts inquire whether the exercise of personal jurisdiction would comport with traditional notions of "fair play and substantial justice." *See International Shoe Co. v. Washington,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d
(Cite as: 2000 WL 772818, *4 (E.D.Pa.))

Page 11

326 U.S. 310, 316 (1945); *Burger King Corp.*, 471 U.S. at 485-86; *Imo Indus.*, 155 F.3d at 259.

*5 Whether a defendant has sufficient minimum contacts with a forum state is a fact-based inquiry which will vary from case to case. *See Burger King Corp*, 471 U.S. at 485. Courts need not determine the best or most logical place for personal jurisdiction. *See Strick Corp. v. A.J.F. Whse. Distribs., Inc.*, 532 F.Supp. 951, 960 (E.D.Pa.1982). Rather, courts are to ensure that consistent with the requirements of due process, a defendant is subjected to personal jurisdiction only where the defendant " 'purposefully directed' his activities at the residents of the forum ." *See Burger King Corp.*, 471 U.S. at 472; *Imo Indus.*, 155 F.3d at 259; *Vetrotex Certainteed Corp.*, 75 F.3d at 150.

The individual defendants argue that the plaintiff has failed to allege that "any of the individual defendants had any specific contacts with Pennsylvania in their corporate or individual capacities." *See* Memorandum of Law in Support of Motion to Dismiss of Defendants Raymond L. Loewen, Robert L. Lundgren, Timothy R. Hogenkamp, Michael G. Weedon and Paul Wagler ("Def.'s Memo.") at 12. Furthermore, the individual defendants contend that their corporate activities are not a sufficient basis for the court to exercise personal jurisdiction over them in their individual capacity. *See id.* The individual defendants argue that, pursuant to the "corporate shield" doctrine, the "contacts of the defendant as an agent of a corporation are not attributable to him to establish personal jurisdiction." *See id.* (citing *J.C. Snavely & Sons, Inc. v. Springland Assoc., Inc.*, 600 A.2d 972 (Pa.Super.Ct.1991); *Babish v. Karsnak*, 528 A.2d 649 (Pa.Super.Ct .1987)).

Thus, it is necessary to examine the extent of protection afforded by the "corporate shield" doctrine under Pennsylvania law. The corporate shield doctrine protects officers and directors by limiting the extent to which their actions performed in the corporate capacity may be used to exercise jurisdiction over them individually. *See Maleski v. DP Realty Trust*, 653 A.2d 54, 62-63 (Pa.Commw.Ct.1995); *Sneberger v. BTI Americas, Inc.*, No. 98- 932, 1998 WL 826992, at *3 (E.D.Pa. Nov. 30, 1998); *PSC Professional Servs. Group, Inc. v. American Digital Sys., Inc.*, 555 F.Supp. 788, 793 (E.D.Pa.1983). The rationale for this doctrine is the concern over forcing officers and directors to choose either to "disassociate themselves from the corporation or defend the propriety of their conduct in a distant forum." *PSC Professional Servs. Group*, 555 F.Supp. at 793.

Courts in this district, however, have held that the protections of the corporate shield doctrine are not absolute. *See Fyk v. Roth*, No. 94-3826, 1995 WL 57487, at *2 (E.D.Pa. Feb. 10, 1995) (Rendell, J.) [FN5] Accordingly, courts have refused to permit a corporate officer to invoke the shield when the officer was involved in tortious conduct for which he or she could be held personally liable. *See Elbeco Inc. v. Estrella de Plato, Corp.*, 989 F.Supp. 669, 676 (E.D.Pa.1997); *Rittenhouse & Lee v. Dollars & Sense. Inc.*, No. 8305996, 1987 WL 9665, at *4 n. 6 (E.D. Pa. April 15, 1987) (Scirica, J.) (holding that one of the factors a court should consider in the jurisdictional inquiry is the "extent and nature of [the] corporate officer's personal participation in the tortious conduct"). Courts have also invoked a second exception to the doctrine when a corporate officer has been charged with violating a statutory scheme that provides for personal, as well as corporate, liability. *See Huth v. Hillsboro Ins. Mgmt.* 72 F.Supp.2d 506, 511 (E.D.Pa.1999) (holding that the corporate contacts of a corporate officer could be considered for jurisdictional purposes because the statute the plaintiff was suing under allowed the corporate officer to be held personally liable for statutory violations) (citing *National Precast Crypt Co. v. Dy-Core of Pa.*, 785 F.Supp. 1186, 1191 (W.D.Pa.1992)); *see also Rototherm Corp. v. Penn Linen & Uniform Serv., Inc.*, No. 96-6544, 1997 WL 419627, at *8 n. 10 (E.D.Pa. July 3, 1997) (noting that the only exceptions to the corporate shield doctrine are "(1) where the agent commits a tort in the forum state in his corporate capacity [;] or (2) where the agent is charged with violating a statutory scheme that provides for personal as well as corporate liability"). In cases involving these exceptions, the courts look to the following three factors to determine whether it is proper to consider the defendant's corporate contacts in the jurisdictional inquiry: (1) the defendant's "role in the corporate structure"; (2) "the nature and quality of the [defendant's] forum contacts"; and (3) "the extent and nature of the defendant's personal participation in the [allegedly wrongful] conduct." *See Rittenhouse & Lee.* 1987 WL 9665, at * 4 n. 6 (setting forth the three factors to consider in determining whether corporate contacts are relevant to the jurisdictional inquiry); *see also Elbeco Inc. v. Estrella de Plato, Corp.*, 989 F.Supp. 669, 676 (E.D.Pa.1997) (applying the three factors from *Rittenhouse & Lee* in determining whether to consider the defendant's corporate contacts with the forum); *Royal Gist-Brocades N.V. v. Sierra Prods. Ltd.*, No. 97-1147, 1997 WL 792905, at *6 (E.D.Pa. Dec. 22, 1997) (same); *Beistle Co. v. Party U.S.A.*, 914

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: 2000 WL 772818, *5 (E.D.Pa.))

F.Supp. 92, 96 (M.D.Pa.1996) (same); *Fyk*, 1995 WL 57487, at *2 (same).

> FN5. For a discussion of the evolution of the corporate shield doctrine in this District, see *Neyer, Tiseo & Hindo, Ltd. v. Russell*, No. 92-2983, 1993 WL 52552, at *4 (E.D.Pa. Feb. 25, 1993).

**\*6** In this case, the plaintiff alleges that the individual defendants violated a statutory scheme (the WPCL) for which they could be held personally liable. [FN6] Thus, this case falls within the second exception to the corporate shield doctrine. [FN7] I will therefore examine the factors set forth in *Rittenhouse & Lee* with regard to each individual defendant. In doing so, I must consider: (1) the individual defendant's role in the corporate structure; (2) the nature and quality of the defendant's contacts with Pennsylvania; and (3) the extent and nature of the defendant's personal participation in the wrongful conduct.

> FN6. The plaintiff asserts only one claim against the individual defendants, for an alleged violation of the Pennsylvania WPCL. *See* Pl.'s Compl. ¶¶ 33-39 (alleging only one count, for a violation of the WPCL, against the individual defendants). Moreover, the individual defendants may be held personally liable for violations of the WPCL. *See* 43 P.S. §§ 260.2a-260.3.

> FN7. In their motion to dismiss, the individual defendants argue that violations of the WPCL "do not amount to tortious conduct and do not justify the assertion of personal jurisdiction over non-resident corporate officers where the officer had no personal contacts with the forum." *See* Def.'s Memo. at 13-14 (citing *Bowers v. NETI Tech., Inc.*, 690 F.Supp. 349 (E.D.Pa.1988) and *Central Pennsylvania Teamsters Pension Fund v. Burten*, 634 F.Supp. 128, 132 (E.D.Pa.1986) ). The individual defendants are correct that some courts in this district have concluded that a violation of the WPCL does not amount to tortious conduct and thus, does not trigger the tortious conduct exception to the corporate shield doctrine. *See, e.g., Schommer v. Eldridge*, No. 92-3272, 1992 WL 357557, at *2 (E.D.Pa. Nov. 30, 1992) (holding that personal jurisdiction over an individual defendant who allegedly violated WPCL was not proper because a WPCL violation does not amount to tortious conduct, but failing to consider whether such a violation may be a statutory violation for which an officer may be held personally

liable). I need not decide whether a violation of the WPCL amounts to tortious conduct, however, because the plaintiff has alleged that the individual defendants violated a statutory scheme (the WPCL) for which the officers could be held personally liable. *See Huth*, 72 F.Supp.2d at 511 (recognizing an exception to the corporate shield doctrine when the corporate officer may be held personally liable under a statutory scheme). Therefore, because this case fits within the second exception to the corporate shield doctrine, I need not decide whether it also fits within the first exception (the tortious conduct exception).

Pursuant to the first prong of the *Rittenhouse & Lee* test, I must examine the officer's role in the corporate structure. In this case, all of the individual defendants were high-ranking corporate officials with a significant level of authority in the corporation. [FN8] Therefore, the first prong of the *Rittenhouse & Lee* test is satisfied as to all of the individual defendants. Thus, it is necessary to analyze the second and third prongs of the *Rittenhouse & Lee* test--that is, the nature and quality of the officer's contacts with Pennsylvania and the personal participation of each individual officer with the allegedly wrongful conduct. I will examine the allegations set forth by the plaintiff as to the forum contacts of each individual defendant.

> FN8. The plaintiff alleges that: (1) Loewen founded the Loewen Group, acted as the corporation's President and Chairman of the Board, and was the corporation's largest shareholder from 1995 through most of 1998; (2) Hogenkamp was a member of the Executive Committee of the Loewen Group; (3) Wagler was the Chief Financial Officer of the Loewen Group; (4) Lundgren was the President of the Loewen Group; and (5) Weedon was the Executive Vice President and Chief Administrative Officer of the Loewen Group. *See* Pl.'s Opp. at 19-26.

*(1) Raymond Loewen*

The plaintiff alleges that Loewen, who is a Canadian citizen and resident: (1) attended a board meeting held in the Loewen Group's Philadelphia office in 1996; (2) was present at a company Christmas party held in Philadelphia; (3) assisted in the opening of the Philadelphia office of the Loewen Group; (4) conversed via telephone on a monthly basis with Lawrence Miller, who was the employee in charge of the Philadelphia office; (5) negotiated the acquisition of a Pennsylvania-based company; (6) authorized the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

execution of a contract between the Loewen Group and Provident America (a Pennsylvania-based company); (7) participated in the decision to close the Philadelphia office in 1998 and to terminate the employment of the Philadelphia employees; (8) contacted Lautman, via telephone and in person, concerning the marketing activities of the Loewen Group; (9) took part in the decision to establish a stock option plan for employees of the Loewen Group; and (10) hired attorneys in Philadelphia for various matters including the Provident America contract. [FN9] *See* Pl.'s Opp. at 19-21 & 21 n. 6.

> FN9. The plaintiff also alleges in his brief that Loewen was "personally ... involved in the decision to terminate Lautman's employment and ... personally concluded that Lautman was not entitled to compensation under the Stock Option Agreement...." *See* Pl.'s Opp. at 21. The plaintiff, however, fails to cite any factual support for this conclusory statement and it is not included in his complaint or a supporting affidavit. Therefore, because it is not supported by any factual basis, I will not consider this statement as evidence that Loewen personally participated in any wrongful conduct.

Even assuming all of the plaintiff's allegations to be true, however, none of the contacts alleged relates to the commission of wrongful conduct. They only relate to the second factor, his contacts within Pennsylvania. Thus, the plaintiff has submitted no evidence at all concerning Loewen's participation in the wrongful conduct, the third and most important factor, and only limited evidence of sporadic contact with Pennsylvania, most of it from Canada.

**\*7** Therefore, the plaintiff has failed to meet his burden of demonstrating competent evidence that would warrant the court's piercing of the corporate shield. *See Fyk,* 1995 WL 57847, at \*3 (refusing to disregard the corporate shield when the plaintiff had not shown that the individual corporate defendants had committed any wrongful acts). Accordingly, I will not disregard the corporate shield as to Loewen. As a result, I conclude that Loewen did not have sufficient minimum contacts to support personal jurisdiction. Accordingly, I will dismiss with prejudice the claim against him pursuant to Federal Rule of Civil Procedure 12(b)(2).

### (2) *Timothy Hogenkamp*

The plaintiff alleges that Hogenkamp, a Canadian

resident and citizen: (1) assisted in the formation of the Philadelphia office; and (2) was present in Philadelphia at various times to help with the office formation. *See* Pl.'s Opp. at 25-26.

Again, the plaintiff has only submitted evidence of sporadic contacts with Pennsylvania and has failed to allege that Hogenkamp personally participated in any wrongful conduct. Consequently, I will also permit Hogenkamp to invoke the protections of the corporate shield. The exercise of personal jurisdiction over Hogenkamp in this court is therefore improper and I will dismiss the complaint against him with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(2).

### (3) *Paul Wagler*

The plaintiff alleges that Wagler, who resides in Canada and is a Canadian citizen: (1) attended meetings in Philadelphia in 1996 and 1998; (2) was partially responsible for activities of the Philadelphia office of the Loewen Group; and (3) communicated on a regular basis with members of the Philadelphia office. *See* Pl.'s Opp. at 25.

As with Loewen and Hogenkamp, the plaintiff has not alleged that Wagler was involved personally in the commission of any wrongful acts. Accordingly, I will not disturb the corporate shield as it applies to Wagler. Because the plaintiff has not satisfied his burden of proving that Wagler had sufficient contacts with Pennsylvania, the court may not exercise personal jurisdiction over Wagler. Therefore, I will dismiss the complaint against Wagler with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(2).

### (4) *Robert Lundgren*

The plaintiff alleges that Lundgren, a Canadian citizen and resident: (1) communicated with members of the Philadelphia office of the Loewen Group; (2) attended a board meeting of the Loewen Group in Philadelphia in 1996; (3) was present in Philadelphia to discuss a possible sale of assets to Lawrence Miller and to discuss potential investments for the company; (4) had regular telephone conversations with Miller in Philadelphia; (5) referred Lautman's demand for compensation under section 19(a) of the stock option agreement to counsel; and (6) determined that Lautman's claim under section 19(a) was not appropriate. *See* Pl.'s Opp. at 23-24; Pl.'s Ex. V (Dep. of Robert Lundgren) at 20 ("I determined with respect to the advice from [counsel] and my own reading of the clause that Mr. Lautman's claim was not appropriate.").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: 2000 WL 772818, *7 (E.D.Pa.))

**\*8** All of these allegations, considered together, support the plaintiff's contention that Lundgren played an integral role in the decision to deny Lautman compensation under the stock option plan. Accordingly, because of Lundgren's significant role in the corporate structure of the Loewen Group, because it appears that he was directly and personally involved in the commission of the allegedly wrongful conduct (i.e., the denial of compensation under the stock option plan), and because he had some contacts with Pennsylvania, I conclude that Lundgren is not entitled to the benefit of the corporate shield. Furthermore, considering Lundgren's contacts with Pennsylvania, I conclude that his contacts with the forum state are sufficient to satisfy the minimum contacts analysis.

Because I have concluded that the plaintiff has established that Lundgren has sufficient minimum contacts with Pennsylvania, I must also consider the second prong of the jurisdictional analysis, which is a determination of whether the exercise of personal jurisdiction comports with the traditional notions of fair play and substantial justice. In making this determination, I must determine whether jurisdiction would be reasonable in light of factors articulated by the Supreme Court. *See Burger King Corp.*, 471 U.S. at 477; *World-Wide Volkswagon Corp.*, 444 U.S. at 292. "These factors include: 'the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies.' " *Mellon Bank (East), PSFS v. Farino,* 960 F.2d 1217, 1222 (3d Cir.1992) (quoting *World-Wide Volkswagon Corp.,* 444 U.S. at 292). "Generally, once the plaintiff makes out a prima facie case in favor of personal jurisdiction, the defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Elbeco Inc.,* 989 F.Supp. at 677. The individual defendants do not argue that the exercise of personal jurisdiction in Pennsylvania would be unfair or unjust. Thus, Lundgren has not met his burden of demonstrating that this forum offends traditional notions of fair play and substantial justice. Accordingly, I conclude that the court has jurisdiction to consider the plaintiff's claims against Lundgren and I will therefore deny Lundgren's motion to dismiss for lack of jurisdiction.

*(5) Michael Weedon*

The plaintiff alleges that Weedon, who is a citizen and resident of Canada: (1) was responsible for the activities of the Philadelphia office of the Loewen Group; (2) participated in the decision to close the Philadelphia office; (3) visited Philadelphia on several occasions, including in 1998 to assist with the closing of the Philadelphia office; (4) visited Pittsburgh in 1998 to address the issue of sales performance; (5) communicated on a regular basis with various employees of the Philadelphia office of the Loewen Group; (6) participated in the decision to terminate Lautman's employment; (7) investigated whether the Loewen Group would owe compensation to Lautman pursuant to section 19(a) upon the termination of his employment; (8) discussed the meaning of section 19(a) of the stock option agreement with counsel; (9) reviewed the agreements between Lautman and the Loewen Group prior to deciding to terminate Lautman's employment; and (10) wrote to Lautman on October 1, 1998 and terminated his employment. *See* Pl.'s Opp. at 21-23.

**\*9** From these contacts, it appears that Weedon was substantially involved in the decision to deny Lautman compensation under the stock option agreement. Therefore, because Lautman had a significant corporate position, because he was personally involved in the decision to deny payments to Lautman, and because he had some contacts with Pennsylvania, I will deny him the benefit of the corporate shield. Thus, I conclude that he had sufficient contacts with the forum state to satisfy due process. Furthermore, for the same reasons that I concluded that the exercise of personal jurisdiction over Lundgren did not offend traditional notions of fair play and substantial justice, I also conclude that the exercise of personal jurisdiction over Weedon is not unfair or unjust. Thus, I conclude that the court has jurisdiction to consider the plaintiff's claims against Weedon and I will deny his motion to dismiss for lack of jurisdiction.

b. *Improper Service of Process*

In their motion to dismiss, the individual defendants also argue that the claims against Loewen, Wagler, and Weedon should be dismissed because those defendants were never properly served with a summons and complaint in this case. Because I have already determined that the court does not have personal jurisdiction over Loewen and Wagler, I need only consider whether the plaintiff properly served Weedon with a summons and complaint.

Weedon contends that the service of process upon him

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

was faulty for two reasons. First, Weedon argues that the affidavit of service, which was made by Daryl Riva, a private process server employed by Pacific Process Servers, is faulty because it "states only that a copy of the Summons--not the Complaint-- was left with a person admitting to be [Weedon]." *See* Def.'s Mot. at 7. Because Federal Rule of Civil Procedure 4(c) [FN10] requires that the summons and complaint be served together, Weedon contends that service upon him was improper. *See* Def.'s Mot. at 6 & 6 n. 3. Second, Weedon denies that he was ever personally served with the summons and complaint. *See id.* at 7 & Ex. D (Affidavit of Michael Weedon).

> FN10. Federal Rule of Civil Procedure 4(c) mandates that a "summons shall be served together with a copy of the complaint." *See* Fed.R.Civ.P. 4(c).

According to Rule 4, service may be "effected by any person who is not a party and who is at least 18 years of age." *See* Fed.R .Civ.P. 4(c)(2). Rule 4 further provides that if service is made "by a person other than a United States marshal or deputy United States marshal," the person shall provide proof of service to the court in the form of an affidavit. *See* Fed.R.Civ.P. 4(l). The rule makes clear, however, that "[f]ailure to make proof of service does not affect the validity of the service," and the "court may allow proof of service to be amended." *See id.*

In this case, Daryl Riva, the private process server hired by the plaintiff to effect service on Weedon, filed two affidavits of service with the court. On May 7, 1999, Riva filed an affidavit of service in which he stated that he served Weedon personally with a summons on March 14, 1999. *See* Pl.'s Opp. Ex. H ("Declaration of Server" and Affidavit of Service for Michael Weedon). On May 20, 1999, Riva filed an amended affidavit of service in which he stated that, on March 14, 1999, he served Weedon with a summons and complaint in this civil action. *See* Pl.'s Opp. Ex. K (Amended "Declaration of Server" and Affidavit of Service for Michael Weedon). Weedon now objects to the first affidavit of service because it does not state that Riva served the complaint along with the summons. *See* Def.'s Mot. at 7. Because Rule 4(l) is liberal about allowing proof of service to be amended, *see* Fed.R .Civ.P. 4(l), and because Weedon does not claim to have been prejudiced by the form of the original proof of service, *see United States v. Islip,* 18 F.Supp.2d 1047, 1059 (Ct. In'tl Trade 1998), I will consider Riva's amended affidavit of service to be valid. Because the amended proof of service states that

Weedon was served with both a summons and a complaint, I will not dismiss the complaint on this ground.

**\*10** Weedon also argues that service of the complaint and summons upon him was improper because he denies that he was ever served with process on March 14, 1999. In his own affidavit, Weedon claims that he "was never personally served with a copy of the Summons and Complaint in this case." *See* Def.'s Mot Ex. D (Affidavit of Michael Weedon). Weedon also states in his affidavit that he was not served at his home residence on March 14, 1999, because he was not at his home residence on that date. *See id.* In his deposition, Weedon states that he was at Whistler on that date with his wife and two sons. *See* Pl 's Opp. Ex. O (Deposition of Michael Weedon) at 64-65. In his motion to dismiss, however, Weedon does not provide any corroborating evidence to support his contention that he was not at his home on March 14, 1999.

Courts in this district have concluded that a return of service by a private process server creates a rebuttable presumption that proper service was effectuated. *See Lin v. Pennsylvania Machine Works,* No. 97-5407, 1998 WL 111788, at *2 (E.D.Pa. March 3, 1998); *Constitution Bank v. Painewebber Inc.,* No. 91-5175, 1992 WL 50103, at *2 (E.D.Pa. Feb. 28, 1992); *FROF, Inc. v. Harris,* 695 F.Supp. 827, 829 (E.D.Pa.1988). "[A] bare allegation by a defendant that he was improperly served cannot be allowed to bely the private processor's return." *FROF,* 695 F.Supp. at 829. In this case, Weedon offers only an unsubstantiated denial of service. As noted above, although he stated in his deposition that he was at Whistler on March 14, 1999, he does not corroborate that statement with any supporting evidence. Weedon's unsupported assertion, therefore, is insufficient to defeat the rebuttable presumption that the private process server effectuated proper service upon Weedon. Thus, I conclude that Weedon was properly served with process and I will not dismiss the claims against Weedon on this ground.

c. *Failure to State A Claim Upon Which Relief Can Be Granted*

Finally, the individual defendants argue that the plaintiff's complaint fails to state a claim upon which relief can be granted under the WPCL. *See* Def.'s Mot. at 15-16. The individual defendants argue that the WPCL provides a right of action to an employee only against his or her employer. They contend that Lautman was employed by the Loewen Group International Inc., and was not employed by the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 16
(Cite as: 2000 WL 772818, *10 (E.D.Pa.))

Loewen Group. Therefore, the individual defendants argue that Lautman may not state a claim under the WPCL against them because they were officers and directors of the Loewen Group, not of the Loewen Group International Inc.

As explained above, I must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the non-movant," in deciding a motion to dismiss. *See Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir.1994) (citing *Rocks v. Philadelphia*, 868 F.2d 644, 645 (3d Cir.1989)). Furthermore, in response to a Rule 12(b)(6) motion, "[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

**\*11** In this case, the plaintiff's complaint alleges that the Loewen Group hired the plaintiff's company, M.C.I., to conduct marketing research for the Loewen Group. *See* Compl. ¶ 14. The complaint also alleges that the plaintiff entered into a stock option agreement with the Loewen Group on May 15, 1997, the alleged violation of which forms the basis of the plaintiff's claim. *See id.* at ¶ 19. Furthermore, the plaintiff alleges that the Loewen Group terminated the plaintiff's employment. *See id.* at ¶ 23. Considering all of the allegations in the light most favorable to the plaintiff, I conclude that the plaintiff has alleged sufficient facts to establish that the Loewen Group was the plaintiff's employer. Clearly this is a substantial issue, but it will have to be resolved on a more fully developed record. At this time, therefore, I will not dismiss the plaintiff's complaint for failure to state a claim upon which relief can be granted under the WPCL.

### CONCLUSION
Based on the foregoing reasons, I conclude that the court may not properly exercise personal jurisdiction over Raymond Loewen, Timothy Hogenkamp, or Paul Wagler, but may exercise personal jurisdiction over

Robert Lundgren and Michael Weedon. Accordingly, I will grant in part and deny in part the individual defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction and will dismiss the plaintiff's complaint with prejudice as to Loewen, Hogenkamp, and Wagler.

As to the claims brought against Weedon and Lundgren, I find that service was properly effectuated on Weedon and the plaintiff has stated a claim upon which relief can be granted against both Lundgren under the WPCL. Therefore, I will deny the individual defendants' motion to dismiss for improper service and failure to state a claim upon which relief can be granted.

An appropriate order follows.

### ORDER
AND NOW, this ___ day of June, 2000, upon consideration of the motion to dismiss of defendants Raymond Loewen, Robert Lundgren, Timothy Hogenkamp, Michael Weedon, and Paul Wagler, the plaintiff's response, and the individual defendants' reply thereto, IT IS HEREBY ORDERED that the plaintiff's motion to dismiss is GRANTED IN PART AND DENIED IN PART as follows:

   (1) the motion to dismiss of Raymond Loewen, Timothy R. Hogenkamp, and Paul Wagler for lack of personal jurisdiction is GRANTED, and the claims against Raymond Loewen, Timothy R. Hogenkamp, and Paul Wagler are DISMISSED WITH PREJUDICE;
   (2) Michael Weedon's motion to dismiss for lack of personal jurisdiction, improper service, and failure to state a claim upon which relief can be granted is DENIED WITH PREJUDICE; and
   (3) Robert Lundgren's motion to dismiss for lack of personal jurisdiction and failure to state a claim upon which relief can be granted is DENIED WITH PREJUDICE.

2000 WL 772818 (E.D.Pa.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.